# EXHIBIT 1

CORTE PERMANENTE DE ARBITRAJE  PERMANENT COURT OF ARBITRATION

---

## CERTIFICATION OF COPY OF
## FINAL AWARD DATED 7 OCTOBER 2020

**RE:** **PCA CASE N° 2019-43 – IC POWER ASIA DEVELOPMENT LTD. V. THE REPUBLIC OF GUATEMALA**

I, José Luis Aragón Cardiel, Legal Counsel of the Permanent Court of Arbitration ("PCA"), the institution under the auspices of which the above-referenced matter was conducted, hereby CERTIFY that the document annexed hereto (Final Award, dated 7 October 2020) is a true and authentic copy of the original document of which it purports to be a copy. I have carefully compared the said copy with the said original and found the same to agree therewith.

Signed, this ……3ʳᵈ………. day of …December……….. 2021, at …The Hague…………….

José Luis Aragón Cardiel
Legal Counsel
Permanent Court of Arbitration
Peace Palace
Carnegieplein 2
2517 KJ The Hague
The Netherlands



PCA CASE No. 2019-43

IN THE MATTER OF
AN ARBITRATION PURSUANT TO THE AGREEMENT BETWEEN THE GOVERNMENT
OF THE STATE OF ISRAEL AND THE GOVERNMENT OF THE REPUBLIC OF
GUATEMALA FOR THE RECIPROCAL PROMOTION AND PROTECTION OF
INVESTMENTS OF 7 NOVEMBER 2006

- between -

IC POWER ASIA DEVELOPMENT LTD.

(the "Claimant")

- and -

THE REPUBLIC OF GUATEMALA

(the "Respondent", and together with Claimant, the "Parties")

_____

FINAL AWARD

_____

**Arbitral Tribunal**

Professor Albert Jan van den Berg (President)
Professor Guido S. Tawil
Professor Raúl Emilio Vinuesa

**Registry**

The Permanent Court of Arbitration

7 October 2020



**TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................................9
A.      The Parties ...........................................................................................................9
B.      The Background of the Dispute ...........................................................................9
C.      The Arbitration Agreement................................................................................10
D.      The Applicable Law...........................................................................................11
E.      The Constitution of the Tribunal.......................................................................12
F.      The Applicable Arbitration Rules .....................................................................12
G.      The Seat of the Arbitration................................................................................12
H.      The Language of the Arbitration........................................................................12

II.     PROCEDURAL HISTORY ...............................................................................13
A.      Initiation of the Arbitration and the Parties' Procedural Agreement ...............13
B.      First Written Submissions and Document Production .......................................13
C.      Tribunal Constitution and Initial Procedural Steps ..........................................13
D.      Further Written Submissions and Further Issues of Document Production ......16
E.      The Coronavirus Pandemic and the Timing of the Hearing..............................19
F.      The Hearing and Post-Hearing Submissions.....................................................21

III.    FACTUAL RECORD ..........................................................................................23
A.      Main Actors .......................................................................................................24
        1.      The Claimant and Related Entities .........................................................24
        2.      Governmental Bodies .............................................................................25
B.      The 2011 Transaction.........................................................................................26
C.      Tax Implications of the 2011 Transaction ........................................................28
        1.      Tax Regulations in Guatemala................................................................28
                (a)     Reverse Triangular Merger .........................................................28
                (b)     Allowable Deductions in Guatemala............................................31
        2.      Tax Audit of the Distributors by SAT ....................................................35
        3.      Binding Tax Opinions.............................................................................42
        4.      Rectification Payments ...........................................................................47
D.      Acquisition of the Distributors by IC Power.....................................................49
        1.      Due Diligence .........................................................................................50
        2.      Closing.....................................................................................................58
E.      Change of Leadership in SAT............................................................................59
        1.      Corruption Cases within SAT .................................................................59
        2.      Change of Leadership in SAT .................................................................60
        3.      Revision of the Distributors' Tax Declarations .....................................61
F.      Criminal Proceeding and Further Tax Audit Against the Distributors ..............65
        1.      SAT's Criminal Complaint.....................................................................65
        2.      Criminal Proceedings and Second Tax Audit.........................................68
                (a)     Provisional Measures: Preventive Seizure of Bank Accounts....68
                (b)     Tax Audit by SAT for Years 2014-2015 ......................................72

|  | (c) | *Hearing regarding Lifting of Preventive Seizures and Payments under Protest* ....72 |
|  | (d) | *Provisional Measures: Designation of Receivers* ................................................. 77 |
|  | (e) | *Preliminary Motions* .............................................................................................. 79 |
|  |  | (i) *Motion of Prejudiciality* ................................................................... 79 |
|  |  | (ii) *Motion to Dismiss for Failure to State a Claim* ............................... 79 |
|  |  | (iii) *Objection for Lack of Causal Relation and Elements of the Crime* .............. 81 |
|  | (f) | *Audit in relation to Rectification Payments and Calculation of Amounts Allegedly Due* ................................................................................................................. 82 |
|  | (g) | *Current Status of the Criminal Proceeding* ........................................................... 84 |
| G. | Distributors' Request for Binding Tax Opinions regarding Debt Refinancing .......................... 85 |  |
| H. | Consultations between the Parties .......................................................................................... 86 |  |
| I. | Sale of the Distributors ........................................................................................................ 88 |  |
| J. | The Claim Agreement and Supplemental Agreement ............................................................. 90 |  |
| **IV.** | **RELIEF REQUESTED** ................................................................................................. 91 |  |
| **V.** | **THE TRIBUNAL'S JURISDICTION AND THE ADMISSIBILITY OF CLAIMS** ........... 92 |  |
| A. | The Tribunal's Jurisdiction .................................................................................................. 94 |  |
|  | 1. | The Date on which the Investment Must be Held .................................................... 94 |
|  |  | (a) *The Parties' Arguments* ...................................................................... 94 |
|  |  | (b) *The Tribunal's Considerations* ........................................................... 99 |
|  | 2. | The Claimant's Standing ...................................................................................... 105 |
|  |  | (a) *The Parties' Arguments* .................................................................... 105 |
|  |  | (b) *The Tribunal's Considerations* ......................................................... 106 |
|  | 3. | Due Diligence and Abuse of Investment Arbitration .......................................... 107 |
|  |  | (a) *The Parties' Arguments* .................................................................... 107 |
|  |  | (b) *The Tribunal's Considerations* ......................................................... 111 |
|  | 4. | Domestic or International Law ............................................................................ 112 |
|  |  | (a) *The Parties' Arguments* .................................................................... 112 |
|  |  | (b) *The Tribunal's Considerations* ......................................................... 117 |
|  | 5. | Claimant's Prima Facie Case for a Violation of the Treaty ................................ 119 |
|  |  | (a) *The Parties' Arguments* .................................................................... 119 |
|  |  | (b) *The Tribunal's Considerations* ......................................................... 120 |
|  | 6. | Denial of Justice or Procedural Error .................................................................. 121 |
|  |  | (a) *Requirement for Denial of Justice* ................................................... 121 |
|  |  | (b) *Existence of Denial of Justice* .......................................................... 126 |
|  |  | (c) *The Tribunal's Considerations* ......................................................... 128 |
| B. | Admissibility of Claims ...................................................................................................... 129 |  |
|  | 1. | The Parties' Arguments ....................................................................................... 129 |
|  | 2. | The Tribunal's Considerations ............................................................................ 132 |
| C. | The Tribunal's Conclusion in respect of Jurisdiction and Admissibility ............................... 132 |  |
| **VI.** | **THE MERITS OF THE CLAIMANT'S CASE** ................................................................ **132** |  |
| A. | Article 2 of the Treaty and Fair and Equitable Treatment .................................................... 133 |  |
|  | 1. | The Parties' Arguments on FET ........................................................................... 133 |
|  |  | (a) *Breach of the Claimant's Legitimate Expectations* ............................. 133 |

|       | (b)   | Arbitrary Treatment................................................................................................139 |
|       |       | (i)    Standard for Arbitrary Treatment..........................................................139 |
|       |       | (ii)   Arbitrary Behaviour by the SAT............................................................142 |
|       |       | (iii)  Arbitrary Behaviour by the Criminal Courts ........................................144 |
|       | (c)   | Denial of Due Process and Procedural Fairness..........................................146 |
|       | (d)   | Failure to Act Transparently.......................................................................149 |
| 2.    | The Tribunal's Considerations on FET.....................................................................152 |
|       | (a)   | The Binding Tax Opinions............................................................................152 |
|       | (b)   | Requirement to Exhaust Administrative Proceedings ...................................155 |
|       | (c)   | The Criminal Court ......................................................................................159 |
|       | (d)   | Did the Respondent Breach the FET Standard in the Treaty? .....................165 |
|       |       | (i)    Arbitrary Conduct ............................................................................166 |
|       |       | (ii)   Legitimate Expectations ...................................................................174 |
|       |       | (iii)  Due Process ....................................................................................176 |
|       |       | (iv)   Lack of Transparency.......................................................................178 |
| 3.    | The Tribunal's Determination on FET ......................................................................179 |

**B.** Article 2 of the Treaty and Obligation Not to Impair by Unreasonable Measures ....................179
|       | (a)   | The Claimant's Position ...............................................................................179 |
|       | (b)   | The Respondent's Position ...........................................................................180 |
|       | (c)   | The Tribunal's Analysis and Determination on Non-Impairment......................180 |

**C.** Article 3 and the MFN Clause and Umbrella Clause Protections................................................181
|       | (a)   | Applicability of Umbrella Clause Protections...............................................182 |
|       | (b)   | Whether the Respondent Breached the Umbrella Clause Protections ..................184 |
|       | (c)   | The Tribunal's Analysis and Determination on Article 3 and the MFN Clause and Umbrella Clause Protections ..........................................................................187 |

**D.** The Tribunal's Conclusion on the Merits ....................................................................187

**VII. COSTS**...........................................................................................................................**187**

**A.** The Parties' Costs ...........................................................................................................187
| 1.    | The Claimant's Costs...............................................................................................188 |
| 2.    | The Respondent's Costs...........................................................................................188 |

**B.** The Tribunal's Analysis...................................................................................................189
| 1.    | Relevant Legal Provisions ......................................................................................189 |
| 2.    | Allocation of the Costs of Arbitration ...................................................................192 |
| 3.    | Reasonableness of Costs ........................................................................................192 |
| 4.    | Quantification of Costs ...........................................................................................193 |
|       | (a)   | Arbitration Costs .........................................................................................193 |
|       | (b)   | Legal Costs ..................................................................................................193 |

**VIII. THE TRIBUNAL'S DECISION**..................................................................................**194**

## LIST OF DEFINED TERMS

| | |
|---|---|
| **2011 Transaction** | Acquisition of Energuate by Actis from Fenosa in 2011 through a specific form of LBO referred to as a "reverse triangular merger" |
| **Acquisition of Energuate** | IC Power's acquisition of Energuate from Actis, which closed on 28 January 2016 |
| **Actis** | Actis LLP |
| **AIG** | AIG Asia Pacific Insurance Ltd. |
| **Annulment Resolutions** | Resolutions issued on 13 November 2014 by the SAT nullifying the SAT Hearings Notifications |
| **Arbitration Costs** | The costs of the arbitration referred in Article 40(2)(a)-(c) and (f) of the UNCITRAL Rules |
| **ASCOED** | Ascoed, S.A. |
| **ASROED** | Asroed, S.A. |
| **Audit Reports** | Reports issued on 12 December 2013 and on 17 February 2014 by the Auditing Teams |
| **Auditing Teams** | Two teams of auditors appointed by the Head of Taxation Division of Special Taxpayers (*Jefe de División de Fiscalización, Gerencia de Contribuyentes Especiales Grandes*) through several official notices issued in October and November 2012 to verify whether the Distributors had fulfilled their tax obligations |
| **Binding Tax Opinions** | Binding tax opinions issued by the SAT on 9 February 2015 |
| **CICIG** | International Commission Against Impunity in Guatemala |
| **Citi** | Citigroup Global Markets, Inc. |
| **Claim Agreement / Letter Agreement** | Agreement entered into by Nautilus Inkia Holdings LLC, DEOCSA, DEORSA, IC Power Distribution Holdings, Pte. Ltd. and IC Power on 28 December 2017, whereby IC Power would "continue to retain the right to pursue the Investment Treaty Claims against Guatemala and to retain any proceeds thereof" |
| **Claimant / IC Power** | IC Power Asia Development Ltd. |
| **Claimant's Application on Withheld Documents** | Claimant's request to the Tribunal to instruct the Respondent to produce documents withheld from document production, submitted on 10 December 2019 |

| **Claimant's Application to Share Documents** | Claimant's application pursuant to Order No. 2 to share the withheld documents with specific persons for the purpose of seeking instruction or testimony, submitted on 27 December 2019 |
|---|---|
| **Consultation Requests** | Request submitted by the Distributors to the SAT on 17 October 2016 to obtain a binding opinion pursuant to Article 102 of the Tax Code regarding the entitlement to deduct interest arising from the refinanced debt |
| **Costs of Arbitration** | The Legal Costs and the Arbitration Costs, collectively |
| **Criminal Complaint** | Criminal complaint filed on 13 July 2016 by the SAT against the Distributors for alleged tax fraud |
| **Criminal Court** | Fifth Criminal, Narcotics, and Environmental Crimes Trial Court of the Department of Guatemala. Court which admitted the Criminal Complaint on 22 July 2016 |
| **Criminal Proceeding** | Criminal proceeding against the Distributors currently underway before the criminal courts in Guatemala as a result of the Criminal Complaint filed against them by the SAT |
| **DD Team** | Due diligence team set up by IC Power and composed of 12 internal members, assisted by a team of 4 external executives, including the former CEO of Chilectra and Ampla, and Mr. Horacio Albín, former CFO of Energuate |
| **DEOCSA** | Distribuidora de Electricidad de Occidente, S.A. |
| **DEORSA** | Distribuidora de Electricidad de Oriente, S.A. |
| **Distributors** | DEOCSA and DEORSA, together |
| **Dutch SPVS** | Five companies incorporated in the Netherlands and indirectly controlled by Actis. This term refers, collectively, to the following companies: DEOCSA, B.V., DEORSA, B.V., RECSA, B.V., GUATEMEL, B.V. and GENERACION LIMPIA, B.V |
| **Energuate** | Group of companies formed by the Distributors, Guatemel and Recsa known collectively as Energuate |
| **EY** | Ernst and Young |
| **FCPA** | Foreign Corrupt Practices Act |
| **Fenosa** | Unión Fenosa Internacional, S.A. |
| **FET** | Fair and equitable treatment |

| | |
|---|---|
| **Final version of DD Report** | Final version of García & Bodán's due diligence report dated 22 October 2015 |
| **First version of DD Report** | First version of García & Bodán's due diligence report dated 26 June 2015 |
| **Globeleq** | Globeleq Americas Limited |
| **Government / Respondent** | The Republic of Guatemala |
| **Guatemalan SPVs** | Together, ASCOED and ASROED |
| **Guatemala-Netherlands BIT** | Agreement between the Republic of Guatemala and the Kingdom of the Netherlands on the Promotion and Reciprocal Protection of Investments |
| **Guatemel** | Comercializadora Guatemalteca Mayorista de Electricidad, S.A. |
| **IC** | Israel Corporation IC Ltd. |
| **Inkia** | Inkia Energy Limited |
| **ISQ** | I Squared Capital |
| **Kenon** | Kenon Holdings Ltd. |
| **LBO** | Reverse merger leveraged buyout |
| **Legal Costs** | The legal and other costs referred to in Article 40(2)(d)-(e) of the UNCITRAL Rules |
| **MFN** | Most-favoured nation |
| **Modified Consultation Requests** | Modification submission submitted by the Distributors on 21 November 2016 with regard to their Consultation Requests |
| **Non-Binding Tax Opinions** | Opinions issued by the SAT on 6 December 2016 in response to the Distributors' Modified Consultation Requests |
| **Payments under Protest** | Payments made under protest by the Distributors to the SAT for the alleged tax deficiencies for tax years 2011 to 2015 and which, according to the Claimant, amounted to a total of US$ 75 million |
| **PwC** | PricewaterhouseCoopers |
| **Recsa** | Redes Eléctricas de Centro América, S.A. |

| | |
|---|---|
| **Rectification Payments** | Series of rectification payments submitted by the Distributors on 19 February 2015 in relation to their tax declarations for the years 2011 to 2013 |
| **Respondent's Application to Strike** | Respondent's request to the Tribunal to exclude from the record specific sections of the Claimant's Rejoinder on Jurisdiction, the second witness statement of Mr. Urbina, the third report of Deloitte, and an exhibit, submitted on 3 April 2020 |
| **Sale** | Sale by IC Power Distribution Holdings Pte. Ltd. and Inkia of IC Power's assets in Latin America to Nautilus Inkia Holdings LLC, Nautilus Distribution Holdings LLC, and Nautilus Isthmus Holdings LLC (subsidiaries of ISQ). The sale was effected by a Stock Purchase Agreement dated 24 November 2017 and closed on 31 December 2017 |
| **SAT** | The Guatemalan Superintendence of Tax Administration (*Superintendencia de Administración Tributaria*) |
| **SAT Hearings Notifications** | Notifications issued on 27 March 2014 by the Taxation Division of SAT (*División de Fiscalización, Gerencia de Contribuyentes Especiales Grandes*) to the Distributors notifying that, as a result of the Tax Audit, the SAT had formulated certain adjustments that could be challenged within thirty working days from such notification |
| **SAT Internal Reports** | SAT internal reports to the SAT's Chief of the Audit Division for Special Large Taxpayers dated 21 September 2015 which recommended an audit of the Distributors' Rectification Payments in relation to the fiscal years 2011 to 2013 |
| **SAT Law** | Law of the Superintendence of Tax Administration |
| **SAT Rectification Payments Minutes** | SAT's Minutes of meetings held on 27 February 2015 by a representative from the Distributors with SAT officials of the Taxation and Collection Departments to discuss the Rectification Payments. Such minutes reflect certain statements made by the Distributors' representative to the effect that the Rectification Payments were made taking into account the Binding Tax Opinions |
| **SPAs** | Two share purchase agreements signed on 19 May 2011 in New York: pursuant to the first SPA, Fenosa sold its shares in the Target to the Dutch SPVs. Following the conclusion of the first SPA, DEOCSA, B.V. and DEORSA, B.V. sold their shares in the Distributors to the Guatemalan SPVs under the second SPA |

| | |
|---|---|
| **Supplemental Agreement** | Supplemental agreement entered into by IC Power and ISQ on 19 December 2019 whereby they clarified their original intention in entering the Claim Agreement |
| **Syndicated Loans** | Series of syndicated loans managed by Banco Agromercantil and signed by the Guatemalan SPVs on 19 May 2011, pursuant to which they received a joint sum of US$ 220 million |
| **Target** | DEORSA, DEOCSA, Generación Limpia Guatemala, S.A., Guatemel and Recsa |
| **Tax Audit** | Inclusion of the Distributors within the audit schedule of SAT in 2012 to determine whether they had properly performed their tax obligations |
| **Tax Code** | Decree Law 6-91 of the Guatemalan Congress, Tax Code |
| **Tax Deductions** | Two tax deductions which, according to the Claimant, were generated during the 2011 Transaction, namely: (i) the amortization of the goodwill obtained by the Distributors as a result of the Transaction; and (ii) a deduction for interest expenses on the loans used to acquire the Distributors |
| **Tax Opinion Requests** | Requests submitted on 5 February 2015 by the Distributors to the Consulting Department of the SAT seeking binding tax opinions regarding the deductibility of interest payments and goodwill amortization arising from the 2011 Transaction |
| **Treaty** | Agreement Between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments of 7 November 2006 |
| **UNCITRAL Rules** | UNCITRAL Arbitration Rules, as revised in 2013 |
| **VCLT** | Vienna Convention on the Law of Treaties |

## I.   INTRODUCTION

### A.   THE PARTIES

1.   The Claimant in this arbitration is IC Power Asia Development Ltd. ("**IC Power**" or the "**Claimant**"), a private company with limited liability, incorporated under the laws of the Israel, with its address at 45 Rothschild Boulevard, Tel-Aviv, 6578403, Israel.  The Claimant is represented in these proceedings by Jonathan C. Hamilton, Rafael Llano, Jaime M. Crowe, and Michelle Grando of White & Case LLP, 701 Thirteenth Street N.W., Washington, D.C. 20005, United States, and Torre del Bosque – PH, Blvd. Manuel Avila Camacho, 24, 11000 CDMX, Mexico.

2.   The Respondent in this arbitration is the Republic of Guatemala, a sovereign State (the "**Government**" or the "**Respondent**").  The Respondent is represented in these proceedings by Lic. Jorge Luis Donado Vivar, Lcda. Ana Luisa Gatica Palacios, and Lcda. Lilian Elizabeth Nájera Reyes of the Procuraduría General de la Nación of the Republic of Guatemala; by Ministro Robert Antonio Malouf Morales, Viceministra Alba Edith Flores Ponce de Molina, Alexander Salvador Cutz Calderón, Jorge Luis Godínez Aguirre, and Karla Estefanía Liquez Aldana of the Ministerio de Economía of the Republic of Guatemala; by Eduardo Silva Romero, José Manuel García Represa and Catalina Echeverri Gallego of Dechert (Paris) LLP, 32 Rue de Monceau, Paris, 75008, France; and by Juan Felipe Merizalde, Dechert LLP, 1900 K St. NW, Washington DC, 20006, United States.

### B.   THE BACKGROUND OF THE DISPUTE

3.   A dispute has arisen between IC Power and the Government in respect of which the Claimant commenced these arbitration proceedings.  The subject matter of the dispute concerns the Claimant's investment in the energy distribution market of Guatemala through the purchase of two Guatemalan companies, Distribuidora de Electricidad de Oriente, S.A. ("**DEORSA**") and Distribuidora de Electricidad de Occidente, S.A. ("**DEOCSA**" and, together with DEORSA, the "**Distributors**") and the measures taken by the Government with respect to back taxes allegedly owed by the Distributors.  The subject matter of the dispute further concerns Binding Tax Opinions issued by the Government, prior to the Claimant's acquisition of the Distributors, in respect of the amortization of goodwill generated from a prior acquisition of the Distributors, carried out by way of a reverse merger.

## C.   THE ARBITRATION AGREEMENT

4.   These proceedings were commenced pursuant to the *Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments* of 7 November 2006 (the "**Treaty**"). Article 8 of the Treaty provides as follows:

### ARTICLE 8

### SETTLEMENT OF INVESTMENT DISPUTES
### BETWEEN A CONTRACTING PARTY AND AN INVESTOR

1.   Any investment dispute between a Contracting Party and an investor of the other Contracting Party shall be settled by negotiations.

2.   If a dispute under paragraph 1 of this Article cannot be settled within six (6) months of a written notification of this dispute, it shall be on the request of the investor settled as follows:

   (a)   by a competent court of the Host Contracting Party; or

   (b)   by conciliation; or

   (c)   by arbitration by the International Center for the Settlement of Investment Disputes (ICSID), established by the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, opened for signature at Washington, D.C. on [M]arch 18, 1965, provided that both Contracting Parties are Parties to the Convention; or

   (d)   by arbitration under the Additional Facility Rules of ICSID, provided that only one of the Contracting Parties is a Party to the ICSID Convention; or

   (e)   by an ad hoc arbitration tribunal, which is to be established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL). Unless otherwise agreed, all submissions shall be made and all hearings shall be completed within six (6) months of the date of selection of the Chairman, and the arbitral panel shall render its written and reasoned decisions within two (2) months of the date of the final submissions or the date of the closing of the hearings, whichever is later.

3.   Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article. This consent and the submission by a disputing investor of a claim to arbitration shall satisfy the requirements of:

   (a)   Chapter II of the ICSID Convention or the Additional Facility Rules of ICSID for written consent of the parties;

   (b)   Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958 ("The New York Convention"), for an agreement in writing.

4.   The choice of one dispute settlement mechanism will exclude any other. Notwithstanding the above, an investor who has submitted the dispute to national jurisdiction may have recourse to the arbitral tribunals mentioned in paragraph 2 of this Article so long as a judgment has not been delivered on the subject matter of the dispute by a national court.

5.   The award shall be final and binding. Each Contracting Party shall carry out without delay the provisions of any such award and provide in its territory for the enforcement of such award.

## D.   THE APPLICABLE LAW

5.   The applicable law for the interpretation of this Treaty is public international law. The Tribunal considers the relevant rule on the interpretation of treaties to be embodied in Article 31 of the Vienna Convention on the Law of Treaties (the "**VCLT**"). The supplementary means of interpretation of treaties is set out in Article 32 of the VCLT.[1]  Articles 31 and 32 provide as follows:

### ARTICLE 31. GENERAL RULE OF INTERPRETATION

1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

   (a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

   (b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

   (a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

   (b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

   (c) Any relevant rules of international law applicable in the relations between the parties.

4. A special meaning shall be given to a term if it is established that the parties so intended.

### ARTICLE 32. SUPPLEMENTARY MEANS OF INTERPRETATION

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a) Leaves the meaning ambiguous or obscure; or

(b) Leads to a result which is manifestly absurd or unreasonable.

6.   As a result of the Tribunal's application of public international law, the results it reaches in the interpretation and application of the treaty may differ from the results that would be reached through the application of domestic law in the courts of Guatemala.

---

[1]   Vienna Convention on the Law of Treaties Vienna, 23 May 1969, 1155 U.N.T.S 331 (**Authority CL-105**).

**E.    THE CONSTITUTION OF THE TRIBUNAL**

7.    The Tribunal is composed of Professor Albert Jan van den Berg, Professor Guido S. Tawil, and Professor Raúl Emilio Vinuesa, with Professor van den Berg serving as the President of the Tribunal.

8.    The Claimant appointed Professor Tawil as a co-arbitrator on 15 June 2018.  The Respondent appointed Professor Vinuesa as a co-arbitrator on 13 July 2018.  In keeping with the Parties' Procedural Agreement of 26 April 2019, Professor van den Berg was appointed, and the Tribunal deemed constituted, on 14 November 2019.

**F.    THE APPLICABLE ARBITRATION RULES**

9.    Pursuant to the Parties' Procedural Agreement of 26 April 2019, the arbitration rules applicable to these proceedings are the UNCITRAL Arbitration Rules, as revised in 2013 (the **"UNCITRAL Rules"**).

**G.    THE SEAT OF THE ARBITRATION**

10.    Pursuant to the Parties' Procedural Agreement of 26 April 2019, the legal seat (or place) of the arbitration is London, England.

**H.    THE LANGUAGE OF THE ARBITRATION**

11.    Pursuant to the Parties' Procedural Agreement of 26 April 2019, the languages of the arbitration are English and Spanish.  The Parties further agreed with respect to language as follows:

> 5.1.    Submissions. Correspondence may be sent in either of the two procedural languages without the need for a translation. The main documents constituting written submissions (pleadings, witness statements, and expert reports ("Main Documents")) shall be submitted in one procedural language on the Filing Date (as defined below), with a translation into the other language on the Supplemental Filing Date (as defined below). Documentary evidence and legal authorities ("Supporting Documents") may be submitted in English or Spanish. Any Supporting Documents presented in a language other than English or Spanish shall be translated into English or Spanish as to the relevant part thereof. The Tribunal may require a complete translation.

> 5.2.    Governing Language and Translations. The governing language of documents shall be the original language of the document. Translations need not be certified unless there is a dispute as to the content of a translation. Any material disagreement in relation to translations will be decided by the Tribunal following comments by the Parties.

> 5.3.   Orders, Decisions, Award. The Tribunal shall render any order, decision, or award in one procedural language, with a translation into the other procedural language provided within a reasonable time period.[2] (emphasis omitted)

## II.   PROCEDURAL HISTORY

### A.   INITIATION OF THE ARBITRATION AND THE PARTIES' PROCEDURAL AGREEMENT

12.   On 20 February 2018, the Claimant served on the Respondent its Notice of Arbitration.

13.   On 22 March 2018, the Respondent provided its Response to the Notice of Arbitration.

14.   On 26 April 2019, the Parties reached a Procedural Agreement (the "Procedural Agreement") to structure the schedule for submissions and the timing of the constitution of the Tribunal, bearing in mind the restrictions provided for in the Treaty.

15.   On 15 June 2018, the Claimant appointed Professor Guido S. Tawil as co-arbitrator.

16.   On 13 July 2018, the Respondent appointed Professor Raúl Emilio Vinuesa as co-arbitrator.

### B.   FIRST WRITTEN SUBMISSIONS AND DOCUMENT PRODUCTION

17.   On 16 May 2019, the Claimant submitted its **Statement of Claim**.

18.   On 16 September 2019, the Respondent submitted its **Statement of Defence**.

19.   On 11 October 2019, the Parties submitted their respective document production requests.

20.   On 28 October 2019, the Parties submitted their respective responses to document production requests.

21.   On 7 November 2019, the Parties submitted their replies to responses to document production requests.

### C.   TRIBUNAL CONSTITUTION AND INITIAL PROCEDURAL STEPS

22.   On 14 November 2019, with the appointment of Professor van den Berg, the Tribunal was constituted.

---

[2]   Parties' Procedural Agreement of 26 April 2019.

23. On 15 November 2019, a procedural consultation between the Parties and the Tribunal was held via telephone conference.

24. On 19 November 2019, the Tribunal issued its decisions on the Parties' respective document production requests.

25. On 20 November 2019, the Parties were requested to provide at their earliest convenience hard copies of their submissions to certain members of the Tribunal as well as to provide the PCA with an electronic and a hard copy of the full record of the proceedings to date.

26. On 27 November 2019, the Claimant informed that it had shipped copies of the materials requested in the PCA's letter of 20 November 2019. By e-mail of the same date, the Respondent informed that it had mailed printed and electronic copies of documents pursuant to the PCA's letter of 20 November 2019.

27. On 5 December 2019, the Tribunal (i) circulated a draft version of the Terms of Appointment and a draft Order No. 1, inviting the Parties' comments thereon by 12 December 2019; (ii) provided a Spanish translation on the Tribunal's decisions on the Parties' respective requests for the production of documents; and (iii) advised the Parties of Professor Tawil's updated contact details.

28. On 9 December 2019, the Parties conveyed their agreement to extend certain deadlines for subsequent written submissions and advised the Tribunal of their agreement to a Confidentiality Supplement to the Procedural Agreement, dated 4 December 2019.

29. On 10 December 2019, the Claimant requested the Tribunal to instruct the Respondent to produce documents withheld from document production (the **"Claimant's Application on Withheld Documents"**).

30. On 11 December 2019, the Tribunal invited the Respondent's comments on the Claimant's Application on Withheld Documents.

31. On 13 December 2019, the Respondent provided its comments on the Claimant's Application on Withheld Documents.

32. On the same date, the Parties submitted their respective comments on the draft Terms of Appointment, draft Procedural Order No. 1, and draft procedural timetable provided by the Tribunal.

33.   On 19 December 2019, the Tribunal issued **Order No. 2**, containing its Decision on the Claimant's Application on Withheld Documents as follows:

> 1.   The Claimant's request that the Respondent produce the Withheld Documents is granted, subject to the directions below.
>
> 2.   The Parties shall treat as confidential the Withheld Documents, in accordance with paragraph 9.4 of the Procedural Agreement dated 26 April 2019, as amended by the Confidentiality Supplement to Procedural Agreement dated 4 December 2019.
>
> 3.   The Withheld Documents shall further be designated as "attorney's eyes only", meaning that:
>
> > (i)   the Withheld Documents are to be produced to Claimant's counsel of record for their review only, by Friday, 20 December 2019;
> >
> > (ii)   Claimant's counsel of record ("White & Case") may only provide the Withheld Documents to its attorneys, paralegals and other staff whose involvement in the conduct of these proceedings is reasonably considered to be necessary;
> >
> > (iii)   For the avoidance of doubt, Claimant's counsel of record may not share the Withheld Documents with anyone not directly employed by White & Case, which thus prohibits disclosure to representatives of the Claimant, or any expert or witness in these proceedings, subject to any future directions by the Tribunal;
> >
> > (iv)   Each copy of the Withheld Documents shall be marked clearly on each page: "CONFIDENTIAL – RESTRICTED ACCESS – FOR USE IN PCA CASE 2019-43 ONLY";
> >
> > (v)   Claimant's counsel of record shall take reasonable measures to ensure compliance with the restrictions set out in the present Order and Claimant's counsel of record can be held liable for any violation of those restrictions;
> >
> > (vi)   Should Claimant wish to introduce the Withheld Documents into the record, or share them with specific persons for the purpose of seeking instructions or witness/expert testimony, it may make an application to the Tribunal as necessary;
> >
> > (vii)   Either Party may apply for an amendment to, or a derogation from, this Order upon a showing of good cause; and
> >
> > (viii)   Any dispute arising from this Order during the pendency of the present proceedings shall be resolved by this Tribunal. (emphasis omitted)

34.   Also on 19 December 2019, the Tribunal circulated a finalized version of the Terms of Appointment for the Parties' signature and an updated draft of the Tribunal's Order No. 1 for the Parties' further comments.

35.   On 21 December 2019, the Claimant conveyed the Parties' agreement to adjust the procedural calendar for written submissions.

36.   On 23 December 2019, the Respondent confirmed its agreement with the above-mentioned communication and confirmed that it had provided a response pursuant to Order No. 2.

**D.  FURTHER WRITTEN SUBMISSIONS AND FURTHER ISSUES OF DOCUMENT PRODUCTION**

37.   On 27 December 2019, the Claimant submitted its **Statement of Reply and Response to Jurisdictional Objections**. Spanish translations were submitted on 3 January 2020.

38.   On 27 December 2019, the Claimant made an application pursuant to Order No. 2 to share the withheld documents with specific persons for the purpose of seeking instruction or testimony (the **"Claimant's Application to Share Documents"**).

39.   On 28 December 2019, the Tribunal invited the Respondent's comments on the Claimant's Application to Share Documents.

40.   On the same date, the Tribunal provided an updated draft Procedural Timetable for the Parties' comments and circulated a Spanish translation of Order No. 2.

41.   On 31 December 2019, the Respondent provided its comments on the Claimant's Application to Share Documents.

42.   On 2 January 2020, the Claimant provided signature pages of the Terms of Appointment and its comments on the procedural timetable and draft Order No. 1.

43.   On 6 January 2020, the Tribunal issued the finalized version of its **Order No. 1** (in English and Spanish).

44.   On the same date, the Tribunal issued **Order No. 3** containing a Decision on the Claimant's Application to Share Documents as follows:

> 1.   The Claimant shall provide, by Thursday, 9 January 2020 (i) its explanation of the substantive basis for its Application; (ii) its identification of the persons with whom the Withheld Documents would be shared; and (iii) a draft confidentiality agreement to be signed by those persons.
>
> 2.   The Respondent may provide any further comments on the Claimant's Application by Tuesday, 14 January 2020.
>
> 3.   The Tribunal will decide upon the Claimant's Application promptly thereafter.
>
> 4.   Any application to admit the Withheld Documents into the record should be made by Tuesday, 21 January 2020. The Respondent may comment on any such application by Friday, 24 January 2020. The Tribunal will rule on any such application shortly thereafter.
>
> 5.   Subject to the Tribunal's decision on the Claimant's Application and any application to admit the Withheld Documents, any comments by the Claimant on the Withheld Documents, and any witness or expert evidence with respect thereto, shall be filed by Thursday, 30 January 2020, on the understanding that such submissions and/or evidence shall be limited to comments on the Withheld Documents.

    6.     The Respondent may respond to any submissions and/or evidence in relation to the Withheld Documents together with its Rejoinder submission, due on 21 February 2020. (emphasis omitted)

45.    On 9 January 2020, the Tribunal circulated a Spanish translation of Order No. 3.

46.    By letter of the same date, pursuant to Order No. 3, the Claimant identified the persons with whom it planned to share the withheld documents, provided a draft confidentiality agreement to be signed by said persons and the substantive basis for its application to share such documents.

47.    On 10 January 2020, the Parties provided signed copies of the **Terms of Appointment**.

48.    On 14 January 2020, the Respondent indicated that it did not object to the exhibition of documents to the persons identified in the Claimant's communication and requested an amendment to the proposed confidentiality agreement.

49.    On 16 January 2020, the Tribunal issued **Order No. 4** containing a further Decision on the Claimant's Application to Share Documents, as follows:

    1.     The Claimant's application to share the Withheld Documents with Mr. Saúl Augusto Donado Rodríguez, Mr. Juan Rodolfo Pérez Trabanino, Mr. Walter Martínez, and Mr. Robert Rosen is granted.

    2.     Before receiving the Withheld Documents, the individuals identified above shall each give the following confidentiality undertaking:

        I, _____, confirm that I have reviewed this Confidentiality Undertaking and expressly undertake to be bound by the provisions hereof, and that I can be held liable for any violation of this undertaking.

        I agree to treat as confidential the Withheld Documents produced to me on the date hereof and to not disclose such documents, unless I am duly required by any court or governmental authority of competent jurisdiction to do so. In such case, I shall immediately give notice thereof to Counsel for IC Power Asia Development Ltd. in the referenced proceedings, and shall reasonably cooperate with any lawful effort to protect such Annex 1 Documents from further disclosure.

        The Withheld Documents that I will receive shall be used for the sole purpose of this Arbitration and will be destroyed at the termination of the referenced proceedings.

        The confidentiality obligations undertaken hereof shall remain in full force and effect notwithstanding the termination of the referenced proceedings.

    3.     The Claimant shall provide the Respondent with copies of the confidentiality undertaking signed by each of the aforementioned persons, as well as an indication of which of the Withheld documents were shared with each individual. (emphasis omitted)

50.    On 23 January 2020, the Claimant provided executed confidentiality undertakings and an indication of the withheld documents which were shared with the client representative and

experts, and "confirmed that it [would] make a concise supplemental submission and introduce therewith certain Withheld Documents".

51.  On 24 January 2020, the Tribunal noted that it had not yet granted leave to the Claimant to introduce the Withheld Documents, considered the Claimant's letter of 23 January 2020 to be an application to admit the Withheld Documents into the record under paragraph 4 of Order No. 3, and invited the Respondent's comments on said application.

52.  On 27 January 2020, the Respondent provided its comments on the Claimant's application.

53.  On 28 January 2020, the Claimant submitted comments in response to the Respondent's letter.

54.  On the same date, the Tribunal invited the Claimant to provide any comments on the Respondent's letter.

55.  On 28 January 2020, the Claimant provided its comments on the Respondent's letter dated 27 January 2020.

56.  On 29 January 2020, the Tribunal issued **Order No. 5** containing its Decision on the Introduction of Withheld Documents, as follows:

> 1.  The Claimant's application to introduce the Withheld Documents and to provide comments and expert evidence thereon is granted.
>
> 2.  The deadline for the introduction of the Withheld Documents and any accompanying comments or expert statements remains Thursday, 30 January 2020.
>
> 3.  As set out in Order No. 3, the Claimant's submissions and/or evidence shall be limited to comments on the Withheld Documents.
>
> 4.  The Withheld Documents, as well as the Parties' comments and any witness or expert evidence in respect thereof, shall remain designated as "attorney's eyes only" and shall not be shared by Claimant's Counsel with anyone except for:
>
>     (a)  persons directly employed by White & Case;
>
>     (b)  Mr. Saúl Augusto Donado Rodríguez, Mr. Juan Rodolfo Pérez Trabanino, Mr. Walter Martínez, and Mr. Robert Rosen;
>
>     (c)  Members of the Tribunal and assistants employed directly by them;
>
>     (d)  Officials of the Permanent Court of Arbitration;
>
> 5.  The Tribunal and PCA will ensure that the Withheld Documents will be used for the sole purpose of this arbitration and will be destroyed at the termination of the proceedings.
>
> 6.  To facilitate the maintenance of the confidentiality regime applicable to the Withheld Documents, the Respondent's response to the Claimant's submissions and evidence on the Withheld Documents, to be submitted in conjunction with its Rejoinder submissions on 21 February 2020, shall be set out in a separate document from the Rejoinder itself and marked as "attorney's eyes only" (emphasis omitted).

57.     On 30 January 2020, the Claimant submitted its Comments to the Withheld Documents and accompanying documents and expert statements.

58.     On 13 February 2020, the Respondent requested the Tribunal to order the Claimant to produce certain documents (the "Respondent's Application for Further Document Production").

59.     On 15 February 2020, the Tribunal invited the Claimant's comments on the Respondent's Application for Further Document Production.

60.     On 18 February 2020, the Claimant provided its comments on the Respondent's Application for Further Document Production.

61.     On 20 February 2020, the Tribunal issued **Order No. 6**, denying the Respondent's Application for Further Document Production.

62.     On 21 February 2020, the Respondent submitted its Rejoinder on the Merits and Reply to the Jurisdictional Objections (including an attorney's eyes only version).

63.     On 9 March 2020, the Tribunal issued Spanish translations of Orders Nos. 4, 5, and 6.

**E.     THE CORONAVIRUS PANDEMIC AND THE TIMING OF THE HEARING**

64.     On 11 March 2020, the Tribunal invited the Parties to confer in relation to the implications of the novel coronavirus pandemic for the hearing anticipated for April 2020.

65.     On 17 March 2020, through a joint communication, the Parties suggested to hold a conference call to discuss procedural steps.

66.     On 20 March 2020, the Parties conveyed their agreement to extend the submission date for the Claimant's Rejoinder on Jurisdiction.

67.     On 23 March 2020, a teleconference between the Parties and the Tribunal was held, during which all participants concurred that it was impossible as a practical matter to proceed with an in-person hearing in April 2020. The Parties indicated that they could agree to postponing the hearing to July 2020, with the understanding that the hearing would proceed by videoconference in the event that the public health situation continued to render an in-person hearing impossible.

68.     On 25 March 2020, the Claimant submitted its **Statement of Rejoinder on Jurisdiction**. Spanish translations of the Rejoinder on Jurisdiction and accompanying documents were submitted on 1 April 2020.

69.   On 26 March 2020, the Tribunal circulated a draft version of Order No. 7 for the Parties' review and comments.

70.   On 1 April 2020, the Parties reverted with regard to the draft Order No. 7 and recorded their agreement that "that the global pandemic justifies on the basis of *force majeure* the suspension of a hearing as originally scheduled and the corresponding procedural adjustments set forth herein, to which the parties do not and will not object."

71.   On 2 April 2020, the Tribunal issued **Order No. 7**, deciding as follows:

   1.   The hearing scheduled to take place on 20-24 April 2020 is **postponed** to take place on **14-18 July 2020.**

   2.   The Tribunal will confer with the Parties on 27 April 2020 with respect to the developing global health situation and the feasibility of conducting the July 2020 hearing in person in London, England.

   3.   In the event that an in person hearing does not appear feasible, the Tribunal will coordinate with the Parties with respect to the organization of the hearing by videoconference.

   4.   The procedural timetabled adopted as Annex 1 to the Tribunal's Order No. 1 is revised according to the timetable set out as Annex 1 to this Order. (emphasis in original)

72.    On the same date, the PCA informed the Parties that it had shifted the logistical arrangements to the July dates.

73.   On 3 April 2020, the Respondent requested the Tribunal to exclude from the record specific sections of the Claimant's Rejoinder on Jurisdiction, the second witness statement of Mr. Urbina, the third report of Deloitte, and an exhibit (the "**Respondent's Application to Strike**").

74.   On 6 April 2020, the Tribunal invited the Claimant to provide any comments on the Respondent's Application to Strike.

75.   Also on 6 April 2020, the Tribunal circulated a Spanish translation of Order No. 7 and an executed version of the Terms of Appointment.

76.   On 13 April 2020, the Claimant provided its comments in relation to the Respondent's Application to Strike.

77.   Also on 13 April and on 14 April 2020, the Parties simultaneously submitted their notifications of witnesses and experts called for cross-examination at the hearing.

78.   On 20 April 2020, the Respondent submitted its reply in respect of Respondent's Application to Strike.

79.     On 24 April 2020, the Claimant submitted its rejoinder on the Respondent's Application to Strike.

80.     On 27 April 2020, the Tribunal held a teleconference with lead counsel concerning developments with the coronavirus pandemic and technical arrangements to possibly conduct the July hearing by videoconference.

81.     On 11 May 2020, the Tribunal issued **Order No. 8**, deciding on the Respondent's Application to Strike as follows:

> 1.   The Respondent's request that the Tribunal strike from the record (a) Section II.A and para. 32 of the Rejoinder on Jurisdiction; (b) the second witness statement of Mr. Urbina; (c) Section II.B and para. 34 of the Rejoinder on Jurisdiction; and (d) Deloitte's third report is **denied**.
>
> 2.   The Respondent's request that the Tribunal strike from the record Annex C-639 is **granted**.
>
> 3.   The Respondent's request that the Tribunal declare inadmissible the Claimant's characterization of its investment as a "claim[] to money, goodwill and other assets and any claim having an economic value" is **denied**. However, the Respondent's may provide any written response in wishes to make to this argument in a brief further submission by no later than **Monday, 1 June 2020**. (emphasis in original)

82.     On 14 May 2020, the Parties submitted a joint draft hearing plan.

83.     On the same date, a procedural videoconference was held to discuss virtual hearing considerations.

84.     On 18 May 2020, the Tribunal circulated a Spanish translation of Order No. 8.

85.     On 1 June 2020, pursuant to Order No. 8, the Respondent submitted a **Complementary Submission on the State's Objections to Jurisdiction** (in Spanish).  On 9 June 2020, the Respondent submitted an English translation of such submission.

F.     THE HEARING AND POST-HEARING SUBMISSIONS

86.     On 3 June 2020, the Tribunal circulated a draft version of Order No. 9 in respect of arrangements for a videoconference hearing for the Parties' comments.

87.     On 15 June 2020, the Parties provided their respective comments on draft Order No. 9.

88.     On 21 June 2020, the Parties submitted joint supplemental procedural comments.

89.     On 24 June 2020, the Tribunal issued **Order No. 9** regarding the Conduct of the Hearing by Videoconference.

90.  On 26 June 2020, the Parties provided a provisional indication of the location from where their participants would join the hearing by videoconference.

91.  On 30 June 2020, the Tribunal circulated a provisional agenda for the pre-hearing videoconference scheduled to take place on 2 July 2020.

92.  On 2 July 2020, the **pre-hearing videoconference** was held.

93.  On the same date, a Spanish translation of Order No. 9 was circulated to the Parties.

94.  From 13 to 18 July 2020, the Tribunal convened a hearing with the Parties by videoconference. Participating in the hearing were the following:

| **Arbitral Tribunal** | |
|---|---|
| Professor Albert Jan van den Berg (President) | |
| Professor Guido S. Tawil | |
| Professor Raúl Emilio Vinuesa | |
| **Claimant** | **Respondent** |
| Jonathan C. Hamilton | Ing. Roberto Malouf |
| Rafael Llano | Licda. Edith Flores de Molina |
| Michelle Grando | Lic. Alexander Cutz |
| Jaime Crowe | Lic. Jorge Luis Godínez |
| John Dalebroux | Licda. Ivannia Ponce |
| Sandra Huerta | Licda. Giselle Rodriguez |
| Paulo Maza | Licda. Karla Liquez |
| Sophia Castillero | *Ministerio de Economía de Guatemala* |
| Antonio Nittoli | |
| Nadia Navarro Martinez | Licenciado Jorge Luis Donado Vivar |
| *White & Case* | Licenciado Mario Antonio de Jesús Morales |
| | Licenciada Ana Luisa Gatica |
| Rob Rosen | Licenciado Mario René Mérida |
| David Kay | Licenciado Julio Eduardo Santiz |
| *Party Representatives* | Licenciada María Gabriela Hernández |
| | Jose Velasquez |
| Yoav Doppelt | Mario Lutín |
| Javier Garcia | *Procuraduría General de la Nación* |
| Daniel Urbina | |
| Horacio Albin | Eduardo Silva Romero |
| *Witnesses* | José Manuel García Represa |
| | Juan Felipe Merizalde |
| Yvette Austin Smith | Catalina Echeverri |
| Darrell Chodorow | Ruxandra Esnau |
| Alexis Maniatis | Federico Arata |
| *Brattle Group* | Ana Durán |
| | Laura Arboleda Gutierrez |
| Saúl Donado | Santiago Soto García |
| Juan Rodolfo Pérez | Anne Driscoll |
| Walter Martinez | Melina Mirambeaux Hernandez |
| *Experts* | Mateo Mezzera |
| | Sofia de Murard |
| | Jean-Philippe Nguyen |
| | *Dechert LLP* |

| Javier Novales<br>María José Alcazar<br>Alexander Morales Reyes<br>*Novales Abogados* | David Muñóz<br>*Witness*<br><br>Marcelo Shoeters<br>Gustavo De Marco<br>Alan Rozenberg<br>*Compass Lexecon*<br><br>Ángel Menéndez<br>Edvin Montoya<br>*Legal Experts*<br><br>Pedro Legris<br>Carla Calá<br>*Team Compass Lexecon* |
|---|---|
| **Registry** | |
| Mr. Garth Schofield, Senior Legal Counsel<br>Mr. José Luis Aragón Cardiel, Legal Counsel<br>Ms. Elena Laura Álvarez Ortega, Assistant Legal Counsel<br>Ms. Vilmante Blink, Case Manager | |
| **Interpreters** | |
| Ms. Silvia Colla<br>Mr. Daniel Giglio | |
| **Court Reporters** | |
| Mr. Trevor McGowan<br>Ms. Georgina Vaughn<br>Mr. Dante Rinaldi | |
| **Law in Order** | |
| Mr. Jason Aoun | |

95.  On 7 August 2020, the Parties each submitted a post-hearing brief.

96.  On 18 August 2020, the Parties each submitted a submission on costs. The Parties submitted updated versions of their submissions on costs on 30 September and 29 September, respectively.

## III.  FACTUAL RECORD

97.  This section sets out the main events relayed by the Parties in their submissions in order to provide an overview of the factual background regarding the dispute at stake in this arbitration.

98.  The Parties advance different interpretations or views concerning certain important events. Their differing views are noted in the following paragraphs where relevant.

99.  This overview, however, does not purport to be exhaustive of all the events and circumstances laid out by the Parties in their submissions nor their diverging views thereon.

A.    MAIN ACTORS

1.    The Claimant and Related Entities

100.   The Claimant is IC Power Asia Development Ltd., a company incorporated in Israel.  IC Power
        was established on 13 January 2010 by Israel Corporation Ltd. ("IC") as a wholly owned
        subsidiary.[3]

101.   In January 2015, IC transferred its shares in IC Power to Kenon Holdings Ltd. ("**Kenon**"), a
        company incorporated in Singapore.[4] In turn, in March 2016, Kenon transferred its interest in IC
        Power to IC Power Pte. Ltd., also incorporated in Singapore.[5]

102.   In 2016, the Claimant acquired an indirect shareholding in two Guatemalan companies:
        (i) Distribuidora de Electricidad de Occidente, S.A., and (ii) Distribuidora de Electricidad de
        Oriente, S.A., both of which are principally dedicated to the distribution of electrical power in
        Guatemala.[6] At the time of the acquisition, the Distributors were controlled by Actis LLP, a UK-
        based investment fund ("**Actis**").[7]

103.   The Distributors are the two largest electricity distribution companies in Guatemala.[8] As of 2015,
        the Distributors operated over 70,000 km of distribution lines in Guatemala (about 84 per cent of
        all lines) and served around 55 per cent of Guatemala's regulated customers.[9]

---

[3]    Claimant's Statement of Claim, para. 16; Certificate of Incorporation of IC Power, dated 13 January 2010,
       p. 6 (**Exhibit C-6**).  Inkia Energy Limited ("**Inkia**"), a subsidiary of IC, had in 2007 purchased the Latin
       American power generation assets of Globeleq Americas Limited ("**Globeleq**").  IC contributed Inkia and
       its subsidiaries to IC Power (Claimant's Statement of Claim, para. 16; Witness Declaration of Javier García-
       Burgos Benfield, dated 16 May 2019, para. 5).

[4]    Claimant's Statement of Claim, para. 16; Spin Off and Distribution Agreement by and between Kenon
       Holdings Ltd. and Israel Corp. Ltd., dated 7 January 2015, pp. 1, 19 (**Exhibit C-126**).

[5]    Claimant's Statement of Claim, para. 16; Share Transfer Agreement between Kenon Holdings Ltd. and
       IC Power Pte. Ltd., dated 17 March 2016, p. 3 (**Exhibit C-168**); IC Power Corporate Structure Chart, dated
       22 November 2016 (**Exhibit C-221**).

[6]    DEOCSA Articles of Incorporation, dated 28 October 1998, p. 11 (**Exhibit R-2**); DEORSA Articles of
       Incorporation, dated 28 October 1998, p. 3 (**Exhibit R-3**).

[7]    Claimant's Statement of Claim para. 3. According to the Respondent, Actis' activity focuses "on carrying
       out a large number of asset procurement transactions to obtain short-term profits and quickly dispose of
       them".  *See* The Respondent's Statement of Defence, para. 13; Actis (web page), "About Actis, Facts and
       Figures", available at: https://www.act.is/about-actis/facts-and-figures/ (last access on 29 August 2019)
       (**Exhibit R-4**).

[8]    Claimant's Statement of Claim paras. 3, 35.

[9]    Claimant's Statement of Claim para. 35.

104. Comercializadora Guatemalteca Mayorista de Electricidad, S.A. ("**Guatemel**") is an electricity trading company whose activities involved 58 unregulated customers, and Redes Eléctricas de Centro América, S.A. ("**Recsa**") is a transmission company which operated 31 kilometres of transmission lines and eight sub-stations.[10] Together with the Distributors, Guatemel and Recsa formed part of a group of companies known collectively as Energuate ("**Energuate**").[11]

105. The Claimant entered into in an insurance contract with AIG Asia Pacific Insurance Ltd. ("**AIG**") in relation to certain representations and warranties included in the agreement whereby it acquired the Distributors.[12]

### 2.    Governmental Bodies

106. The main State organ involved in the events leading to this dispute is the Guatemalan Superintendence of Tax Administration (the "*Superintendencia de Administración Tributaria*", or "**SAT**").

107. The SAT was established by Law of the Superintendence of Tax Administration (the "**SAT Law**") as "a decentralized state entity with competence and jurisdiction in all the national territory for the fulfilment of its objectives, [and] shall have the attributions and functions assigned by the current law. It shall enjoy functional, economic, financial, technical and administrative autonomy, as well as its own legal personality, budget and resources".[13]

108. The SAT is empowered to issue binding opinions under Article 102 of the 1998 Tax Code (the "**Tax Code**"), which reads:

---

[10]   Claimant's Statement of Claim para. 35; IC Power Presentation on the Energuate Acquisition Proposal to the IC Power Board of Directors, dated 11 July 2015, p. 6 (**Exhibit C-148**).

[11]   Claimant's Statement of Claim para. 35; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 7; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 3; SEC Filing Form 6K, Kenon Holdings Ltd., "IC Power Completes Acquisition of Energuate, a Private Electricity Distribution Business in Guatemala," dated 28 January 2016 (**Exhibit C-164**).

[12]   See AIG Buyer-Side Reps and Warranties Insurance Policy – No. 1000148496, 29 December 2015 (**Exhibit C-438**).

[13]   Claimant's Statement of Claim, para. 21; Decree Law 1-98 of the Superintendence of Tax Administration, Superintendence of Tax Administration Organization Law (1998), Article 1 (**Authority CL-14**) (Claimant's translation).

[t]he Tax Administration shall respond to questions formulated by whoever has a personal and direct interest over the concrete tax situation, with respect to the application of this Code and the tax laws…The opinion does not have the character of a resolution, is not susceptible to challenge or any appeal and has a binding effect on the Tax Administration, with respect to the concrete case specifically consulted…[14] (emphasis omitted)

## B.   THE 2011 TRANSACTION

109.   Actis acquired Energuate from Unión Fenosa Internacional, S.A. ("**Fenosa**") in 2011 through a specific form of reverse merger leveraged buyout ("**LBO**") referred to as a 'reverse triangular merger' (the "**2011 Transaction**").[15]

110.   A reverse triangular merger typically involves three entities: the target company, the acquirer, and a wholly owned subsidiary of the acquirer. The wholly owned subsidiary is often an entity created for the specific purpose of the transaction. This vehicle entity merges with the target company, with the latter becoming the surviving entity. In so doing, the target company becomes a wholly owned subsidiary of the acquirer.[16]

111.   Actis retained Ernst & Young ("**EY**") to perform "certain tax structuring services in connection with [its] contemplated acquisition of [DEORSA], [DEOCSA], Generación Limpia Guatemala, S.A., [Guatemel] and [Recsa] ("**Target**")".[17]

112.   The strategy recommended by EY included incorporating five companies in the Netherlands that would be indirectly controlled by Actis (together, the "**Dutch SPVs**").[18] Three of those companies would acquire Generación Limpia Guatemala, S.A., Guatemel and Recsa, respectively.[19] The

---

[14]   Claimant's Statement of Claim, para. 22; Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991), Article 102 (**Authority CL-9**) (Claimant's translation).

[15]   Claimant's Statement of Claim paras. 36-37; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 7; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 8; Agreement for the Sale and Purchase of the Companies whereby Union Fenosa International sells shares to Deocsa BV, Deorsa BV, Recsa BV, Guatemel BV, Ascoed and Asroed, dated 19 May 2011 (**Exhibit C-50**); Agreement for the Sale of Purchase of Deocsa and Deorsa, whereby Deocsa BV and Deorsa BV are the sellers and Ascoed and Asroed are the Buyers, dated 19 May 2011 (**Exhibit C-51**). *See also*, the Respondent's Statement of Defence, paras. 13, 22; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 3.

[16]   Claimant's Statement of Claim para. 39; Brattle Expert Report, dated 16 May 2019, para. 50.

[17]   Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, p. 2 (**Exhibit C-56**).

[18]   Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, pp. 5-6, 8 (**Exhibit C-56**). The term Dutch SPVs refers, collectively, to the following companies: DEOCSA, B.V., DEORSA, B.V., RECSA, B.V., GUATEMEL, B.V. and GENERACION LIMPIA, B.V.

[19]   Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, pp. 5-6, 8 (**Exhibit C-56**). Recsa, Guatemel and Generación Limpia, S.A. are referred to by EY as the "Small Targets".

remaining two Dutch SPVs, DEOCSA, B.V. and DEORSA, B.V, would acquire the Distributors.[20]

113. On 5 April 2011, DEOCSA, B.V. and DEORSA, B.V. incorporated two companies in Guatemala: Ascoed, S.A. ("**ASCOED**") and Asroed, S.A. ("**ASROED**", and, together with ASCOED, the "**Guatemalan SPVs**").[21] ASCOED and ASROED would obtain the financing necessary to acquire the Distributors.[22] According to EY's advice, the "ultimate purpose of BidCos 1 & 2 [ASROED & ASCOED] is to merge into DEORSA and DEOCSA".[23]

114. On 19 May 2011, the envisaged structure was set up and almost simultaneously the acts described as follows took place.

115. On 19 May 2011, two Share Purchase Agreements ("**SPAs**") were signed in New York. Pursuant to the first SPA, Fenosa sold its shares in the Target to the Dutch SPVs.[24] Following the conclusion of the first SPA, DEOCSA, B.V. and DEORSA, B.V. sold their shares in the Distributors to the Guatemalan SPVs under the second SPA.[25]

116. On the same date, the Guatemalan SPVs signed a series of syndicated loans managed by Banco Agromercantil (the "**Syndicated Loans**"),[26] receiving a joint sum of US$ 220 million.[27] On the same date, those assets were transferred to Fenosa.[28]

---

[20]  Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, pp. 5-6, 8 Respondent's Statement of Defence, para. 34.

[21]  Respondent's Statement of Defence, para. 34; Articles of Incorporation of ASROED S.A., dated 5 April 2011 (**Exhibit R-14**); Articles of Incorporation of ASCOED S.A., dated 5 April 2011 (**Exhibit R-15**). *See also*, Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, at pp. 5-6, 8 (**Exhibit C-56**).

[22]  Claimant's Statement of Claim para. 40; Brattle Expert Report, dated 16 May 2019, para. 51. *See also*, Respondent's Statement of Defence, para. 44; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 3.

[23]  Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, p. 8 (**Exhibit C-56**).

[24]  See Agreement for the Sale and Purchase of the Companies whereby Union Fenosa International sells shares to Deocsa BV, Deorsa BV, Recsa BV, Guatemel BV, and Ascoed and Asroed, dated 19 May 2011 (**Exhibit C-50**).

[25]  Agreement for the Sale of Purchase of Deocsa and Deorsa, whereby Deocsa BV and Deorsa BV are the Sellers and Ascoed and Asroed are the Buyers, dated 19 May 2011 (**Exhibit C-51**).

[26]  Credit Agreement among Asroed, S.A. and Distribuidora de Electricidad de Oriente S.A. as the Borrowers, Deorsa B.V. as Holdings, Banco Agromercantil de Guatemala S.A. as Administrative Agent and the Other Lenders Party Hereto, dated 19 May 2011 (**Exhibit C-53**).

[27]  Respondent's Statement of Defence, para. 44.

[28]  Expert Accountant's Certification of ASROED's Payments to Unión Fenosa, dated 5 December 2012 (**Exhibit R-18**); ASCOED Merger Line Items and Narrative of their Commercial Origin, dated 5 December 2012 (**Exhibit R-19**). The Respondent notes that, according to such certifications, the remaining part of

117. On 3 October 2011, ASCOED and ASROED were absorbed respectively by DEOCSA and DEORSA.[29] The Distributors were the surviving companies of the merger.[30] After the merger, the Distributors became liable for the financing obtained by ASCOED and ASROED, including the bank debt.[31]

## C. TAX IMPLICATIONS OF THE 2011 TRANSACTION

### 1. Tax Regulations in Guatemala

118. According to the Claimant, the 2011 Transaction generated two tax deductions: (i) the amortization of the goodwill obtained by the Distributors as a result of the Transaction; and (ii) a deduction for interest expenses on the loans used to acquire the Distributors (the "**Tax Deductions**").[32]

119. The Respondent considers that the Tax Deductions were not allowable under Guatemalan law: the 2011 Transaction did not imply any contribution of money, assets, or experience to the Distributors and was structured with the sole purpose of "fabricating a tax credit in Guatemala".[33]

### (a) *Reverse Triangular Merger*

*The Claimant's Position*

120. According to the Claimant, LBOs have been widely used by private equity firms to invest in the infrastructure sector, and the reverse triangular merger has been referred to as the "most commonly used acquisition technique".[34]

---

the price had already been paid to Fenosa on 17 May 2011, two days before the signature of the contract justifying such payment (see Respondent's Statement of Defence, para. 44).

[29] Respondent's Statement of Defence, para. 46; Certificate of the DEOCSA-ASCOED Mmerger, dated 3 October 2011 (Exhibit R-20); Certificate of the DEORSA-ASROED Mmerger, dated 3 October 2011 (Exhibit R-21). *See also,* Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 3.

[30] Claimant's Statement of Claim, para. 40; Brattle Expert Report, dated 16 May 2019, para. 51. *See also,* Respondent's Statement of Defence, para. 46.

[31] Claimant's Statement of Claim para. 40; Brattle Expert Report, dated 16 May 2019, para. 51.

[32] Claimant's Statement of Claim, paras. 42-43, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 3.

[33] Respondent's Statement of Defence, paras. 4, 13, 22.

[34] Claimant's Statement of Claim, para. 38; Brattle Expert Report, dated 16 May 2019, para. 50.

121. In conducting the 2011 Transaction, the Claimant notes, Actis was advised by "leading tax and legal professionals", including Clifford Chance, EY and Guatemala's Consortium Legal (or RACSA).[35] The Claimant also notes that the banks that were approached to provide the necessary financing "expressed comfort with the transaction".[36]

122. The Claimant rejects the Respondent's contention that the 2011 Transaction was designed to "fabricate" the Tax Deductions, and refers in this regard to (i) the advice provided by Consortium Legal, which notes that a reverse merger was required to maintain the operating license of the Target;[37] (ii) the testimony of Mr. Albín (former CFO of the Distributors), according to whom the 2011 Transaction sought to maintain the conditions imposed to obtain the necessary bank loan, which required the reverse merger so as to transfer the debt to the Distributors;[38] and (iii) the opinion of its expert, the Brattle Group, positing that the survival of the Distributors was necessary due to the significant number of contracts, licenses, permits or real estate deeds that they required to operate.[39]

123. Similarly, the Claimant rejects the notion that EY was retained to advice on how to "fabricate" the Tax Deductions, and notes that EY examined the potential tax implications of the 2011 Transaction in determining that the proposed transaction was legally sound.[40]

---

[35] Claimant's Statement of Claim, para. 47; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 10; Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011 (**Exhibit C-56**). *See also*, the Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 3, 20; Consortium Legal Memorandum to Actis regarding Legal Structure, dated 8 February 2011, p. 6 (**Exhibit C-349**) ("[w]e don't foresee any legal risk in performing the transaction as it is structured", "[t]he proposed transaction is legal, and does not violate any local law or regulation.").

[36] Claimant's Statement of Claim, para. 48; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 10; Credit Agreement among Ascoed, S.A. and Distribuidora de Electricidad de Occidente S.A. as the Borrowers, Deocsa B.V. as Holdings, Banco Agromercantil de Guatemala S.A. as Administrative Agent and the Other Lenders Party Hereto, dated 19 May 2011 (**Exhibit C-52**); Credit Agreement among Asroed, S.A. and Distribuidora de Electricidad de Oriente S.A. as the Borrowers, Deorsa B.V. as Holdings, Banco Agromercantil de Guatemala S.A. as Administrative Agent and the Other Lenders Party Hereto, dated 19 May 2011 (**Exhibit C-53**).

[37] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 20; Consortium Legal Memorandum to Actis regarding Legal Structure, dated 8 February 2011, p. 1 (**Exhibit C-349**) ("[i]n order to maintain the operating license of these Targets, the mergers should be a reverse merger by which each target absorbs its corresponding Bid Co.").

[38] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 24; Second Witness Declaration of Horacio Albín Izuibejeros, dated 23 December 2019, para. 10. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 27-31.

[39] Claimant's Statement of Claim, para. 41. *See also*, Brattle Expert Report, dated 16 May 2019, para. 15; Legal Report of Saúl Augusto Donado Rodríguez, dated 16 May 2019, para. 43, footnote 31.

[40] Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 21, 25; Second Witness Declaration of Horacio Albín Izuibejeros, dated 23 December 2019, para. 10.

*The Respondent's Position*

124. According to the Respondent, the 2011 Transaction was unlawful under Guatemalan law. This alleged unlawfulness does not lie solely in the fact that it was structured through an LBO;[41] rather, its illegality lies in the manner in which Actis structured the Transaction to fabricate "unjustified and exorbitant" tax deductions in favour of the Guatemalan SPVs, and to the detriment of the Guatemalan tax authorities.[42]

125. In particular, the Respondent avers that the sole purpose of the May 2011 SPAs was to allow "the Guatemalan SPVs to record in their accounting books a line item for an intangible asset called 'Goodwill'", which was calculated as the difference between the price of the shares acquired in the 2011 Transaction and the shares' nominal value.[43] Such recording of goodwill would later allow the creation of a purported tax deduction corresponding to its amortization.[44] In turn, the reverse triangular merger would serve to transfer the ownership of the Tax Deductions to the Distributors.[45]

---

[41] Respondent's Statement of Defence, para. 22.

[42] Respondent's Statement of Defence, paras. 4, 22, 31. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 31-34; Second Legal Report of Ángel Menéndez, dated 21 February 2020, para. 7; Opinion of Attorney Edvin Oswaldo Montoya Berganza, dated 21 February 2020, para. 32.

[43] Respondent's Statement of Defence, para. 37; SAT Report INF-SAT-GRC-DG-SI-1155-2012 DR, dated 20 December 2012, p. 5 (**Exhibit C-79**); SAT Report INF-SAT-GRC-DF-SI-1168-2012 DC, dated 28 December 2012, p. 5 (**Exhibit C-81**). *See also*, Compass Lexecon Report, dated 16 September 2019, para. 115.

[44] Respondent's Statement of Defence, para. 38.

[45] Respondent's Statement of Defence, paras. 31, 47, 50. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 32-33; Opinion of Attorney Edvin Oswaldo Montoya Berganza, dated 21 February 2020, para. 24. *See also* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 32; IC Power Due Diligence Team Financial Statement Review and Energuate Business Plan Report, dated 30 November 2015, p. 11 (**Exhibit C-158**) ("In 2011, Deocsa and Deorsa made a reverse triangular merger in which it absorbed two Guatemalan corporations that were the owners of Deocsa and Deorsa for the purposes of reducing its financial debt and goodwill balances generated in the purchase-sale transaction of the companies in order to receive interest and goodwill amortization from the income tax") (Claimant's translation); Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, p. 19 (**Exhibit C-56**) ("Goodwill should derive as a result from the merger").

(b) *Allowable Deductions in Guatemala*

*The Claimant's Position*

126. According to the Claimant, Guatemalan law permitted deductions for interest expenses and the amortization of goodwill in calculating taxable income.[46] Those deductions were applicable to the Distributors' "incurred interest expense" and the goodwill asset obtained as a result of the 2011 Transaction.[47]

127. According to the Claimant, the purpose of the Syndicated Loans "was to invest in stock and generate income for the shareholders, and considering that interest is paid from the cash flow generated by the company in the ordinary course of business, it can be technically and legally concluded that such interest is associated with taxable income in Guatemala."[48]

*The Respondent's Position*

128. According to the Respondent, Actis led the Distributors to record exorbitant Tax Deductions in their books to defraud taxes,[49] while the 2011 Transaction did not generate any of the expenses or costs which may give rise to tax deductions.[50]

129. The Respondent notes that taxpayers registered in the Tax System for Gainful Activities, as is the case of the Distributors, are required to pay income tax calculated on the basis of their taxable income.[51] Guatemalan tax law allows taxpayers to deduct from their gross income duly documented costs and expenses which are "useful, necessary, relevant or indispensable to produce or preserve the source of taxable income" in Guatemala.[52] The Respondent refers to domestic and

---

[46] Claimant's Statement of Claim, para. 43; Legal Report of Saúl Augusto Donado Rodríguez, dated 16 May 2019, paras. 36-39, 47. *See also*, Brattle Expert Report, dated 16 May 2019, paras. 74-85.

[47] Claimant's Statement of Claim, para. 42; Brattle Expert Report, dated 16 May 2019, para. 17. *See also*, Claimant's Rejoinder on Jurisdiction, paras. 15-16; Second Supplement to the Report of Walter Vinicio Martínez Guzmán, dated 20 March 2020, para. 13.

[48] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 23; Report of Walter Vinicio Martínez Guzmán, dated 27 December 2019, para. 15.

[49] Respondent's Statement of Defence, paras. 1, 23.

[50] Respondent's Statement of Defence, paras. 23, 55. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 16-17, 22.

[51] Respondent's Statement of Defence, para. 24; Tax Update Law, dated 1 March 2012, Article 1 **(Exhibit R-1)**.

[52] Respondent's Statement of Defence, paras. 4, 23, 26; Tax Update Law, dated 1 March 2012, Article 21 **(Exhibit R-1)**.

comparative case-law as requiring a causal link between a deductible expense and the production of income.[53]

130. Furthermore, the Respondent notes that taxpayers must maintain full accounting records in accordance with the provisions of the Tax Update Law in order to deduct costs and expenses.[54] Accordingly, taxpayers must provide the documents and means of support required by the Tax Update Law with regard to deductions, which must meet the accounting criteria set out in the Commercial Code.[55]

131. The Respondent acknowledges that Guatemalan law allows deductions of interest payments. However, to be deductible, the loans in question must have been used in transactions that generate taxable income for the taxpayer.[56]

132. The Respondent also acknowledges that Guatemalan law allows the deduction of depreciation and amortization of a taxpayer's intangible assets, which include goodwill actually incurred.[57] It

---

[53] Respondent's Statement of Defence, para. 26; Supreme Court of Justice of Guatemala, Judicial Review, Judgement No. 597-2008, dated 19 June 2009, pp. 8-9 (**Exhibit R-9**); Constitutional Court of Guatemala, Judgment, dated 27 February 2014, p. 13 (**Exhibit R-10**); Council of State of Colombia, Judicial Review Court, Judgment, dated 30 August 2016 (Reg. 21274), p. 15 (**Authority RLA-3**); Council of State of Colombia, Judicial Review Court, Judgment, dated 6 November 2014 (Reg. 19247), p. 18 (**Authority RLA-4**); Council of State of Colombia, Judicial Review Court, Judgment, dated 29 July 2008 (Reg. 15992), p. 18 (**Authority RLA-5**); Tribunal of Cundimararca, Judgement, dated 3 July 2014, p. 44 (**Exhibit R-11**); Supreme Court of Spain, Third Judicial Review Court, Judgement, dated 6 February 2015 (Reg. 290/2013), p. 21 (**Authority RLA-6**); Supreme Court of Spain, Third Judicial Review Court, Judgement, dated 22 May 2015 (Reg. 202/2013), p. 15 (**Authority RLA-7**); Supreme Court of Spain, Third Judicial Review Court, Judgement, dated 2 February 2012 (Reg. 686/2009), p. 13 (**Authority RLA-8**).

[54] Respondent's Statement of Defence, para. 27; Tax Update Law, dated 1 March 2012, Article 22 (**Exhibit R-1**) ( "In order for the costs and expenses detailed in the previous article to be deductible, they must meet the following requirements: [...] for those required to keep full accounting records, they must be duly accounted for.") (Respondent's translation).

[55] Respondent's Statement of Defence, para. 27; Tax Update Law, dated 1 March 2012, Article 22 (**Exhibit R-1**) ("To be deductible [...] they must [...] 4. Have the documents and means of support, with these understood as: [...]") (Respondent's translation); ibid, Article 42. ("Taxpayers must comply with the following: [...] 4. Keep full accounting records in accordance with the Commercial Code, as appropriate, and this book") (Respondent's translation); Commercial Code of the Republic of Guatemala, Article 368 (**Exhibit R-12**) ( "Businesses are required to maintain their accounting in an organized manner, in accordance with the double-entry system and using general accepted accounting principles") (Respondent's translation).

[56] Respondent's Statement of Defence, para. 28; Tax Update Law, dated 1 March 2012, Article 24 (**Exhibit R-1**).

[57] Respondent's Statement of Defence, para. 29; Tax Update Law, dated 1 March 2012, Article 21 (**Exhibit R-1**) ( "The costs and expenses considered deductible provided they are useful, necessary, relevant or indispensable to produce or preserve the productive source of taxable income, are as follows: [...] 19. The depreciation and amortization that comply with the provisions of this title") (Respondent's translation). According to the Respondent, in the context of a merger, goodwill is "a payment made by the acquirer as an advance on future economic benefits from assets that could not be identified individually and recognized

notes, however, that such possibility is also conditioned to their use for the generation of taxable income.[58]

133.  As to the specifics of the 2011 Transaction, the Respondent notes, first, that goodwill corresponds to 96% of the 2011 Transaction's value.[59] The Respondent's expert, Compass Lexecon, considers that such percentage is "clearly exaggerated when compared to the reasonable ratios that can be justified in a similar transaction".[60] Such percentage is even more "scandalous", in the Respondent's view, considering the absence of documentation justifying goodwill, which is a fundamental requirement under Guatemalan tax law for its deductibility.[61] In the Respondent's view, such absence suggests that the difference in value was artificial and its only purpose was to generate a large asset that could be used to record amortization costs reducing income tax.[62]

134.  The Respondent also refers to the Distributors' 2015 correction of their goodwill calculations, which was based on a dividend discount model[63] and resulted in goodwill amounting to 60% of the price paid in the 2011 Transaction.  According to the Respondent, such percentage is still above the ratio expected in similar transactions.[64]

135.  In addition to the goodwill asset being undocumented, the Respondent submits that the Claimant has also failed to establish how "a supposed asset created using a mere arithmetic operation based

---

separately". See Respondent's Statement of Defence, para. 29; International Financial Reporting Standard No. 3 (IFRS3), para. 52 **(Exhibit R-13)** (Respondent's translation).

[58]  Respondent's Statement of Defence, para. 29; Tax Update Law, dated 1 March 2012, Article 25 **(Exhibit R-1)** ("The deduction of depreciation and amortization allowed by this book are those that must be made on intangible and fixed assets owned by the taxpayer and used in the gainful activities that generate taxable income") (Respondent's translation).

[59]  Respondent's Statement of Defence, para. 38. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 23.

[60]  Respondent's Statement of Defence, para. 39; Compass Lexecon Report, dated 16 September 2019, paras. 117-122.

[61]  Respondent's Statement of Defence, para. 40. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 23-24.

[62]  Respondent's Statement of Defence, para. 41. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 23-24.

[63]  Respondent's Statement of Defence, para. 42; Brattle Expert Report, dated 16 May 2019, footnotes 57 and 65.

[64]  Respondent's Statement of Defence, para. 42; Compass Lexecon Report, dated 16 September 2019, para. 120. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 23.

on arbitrarily established premises[] was able to generate taxable income in Guatemala", which, as noted above, is a legal requirement for its deductibility.[65]

136.   In relation to the interest payment deductions, the Respondent affirms that the Syndicated Loans were only used as consideration for Fenosa's shares in the Target.[66] In the Respondent's submission, the Distributors attempted to disguise this fact by indicating to the SAT that "the credit was used to finance a going concern";[67] however, the Guatemalan SPVs never generated any taxable income in Guatemala.[68]

137.   Finally, the Respondent notes that the Claimant has initiated an arbitration against its insurer, AIG, for breach of representations and warranties by Actis. In particular, the Claimant invoked the representations that the Distributors were in compliance with all laws and that all due taxes had been paid.[69]

---

[65]   Respondent's Statement of Defence, para. 43; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 23-28.

[66]   Respondent's Statement of Defence, para. 45; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 29.

[67]   Respondent's Statement of Defence, para. 45; Opinion OPI-2015-08-01-000025 of the Superintendence of Tax Administration, dated 9 February 2015 (Exhibit C-4); Opinion OPI-2015-08-01-000024 of the Superintendence of Tax Administration, dated 9 February 2015 (Exhibit C-5). The Respondent also refers to EY's advise to Actis to the effect that "[a]ll the documentation should be aligned to demonstrate that the merger is part of a larger, integrated transaction that would meet all the requirements of an acquisition of going concern in Guatemala". See Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, p. 29 (Exhibit C-56).

[68]   Respondent's Statement of Defence, para. 45; SAT Report INF-SAT-GRC-DG-SI-1155-2012 DR, dated 20 December 2012, p. 5 (Exhibit C-79) ( "It was verified that the taxpayer, during the period from 01 April to 03 November 2011 (the date on which it was acquired through merger by absorption by Distribuidora de Electricidad de Oriente, Sociedad Anónima), did not receive any income subject to or that generated Value Added Tax and Income Tax") (Respondent's translation); SAT Report INF-SAT-GRC-DF-SI-1168-2012 DC, dated 28 December 2012, p. 12 (Exhibit C-81) ("From the verification of the costs and expenses, it was determined that there is no income subject to Value Added Tax and Income Tax for the taxpayer to which the scope of this audit refers. It was also verified that the costs and expenses declared by the taxpayer originate with or are related to the stock investment activities (acquisition of shares issued by DEOCSA, S.A. with a share certificate issued in the name of Unión Fenosa Internacional, S.A) and the acquisition of a syndicated loan carried out during the period of 1 April 2011 to 3 November 2011") (Respondent's translation). See also, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 29-30; Opinion of Attorney Edvin Oswaldo Montoya Berganza, dated 21 February 2020, para. 14.

[69]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 20; Arbitration: IC Power v. AIG, AAA, Statement of Claim, dated 8 February 2018 (Exhibit R-145).

## 2.   Tax Audit of the Distributors by SAT

138.   The SAT is responsible for inspecting tax collection in accordance with the internal regulations governing the Tax Audit Planning and Execution Procedure, the Tax Code and the Organic Law of the SAT.[70]

139.   In April 2012, the Distributors filed with the SAT their financial statements for 2011, which detailed the accounting treatment of the reverse merger.[71] According to the Claimant, at the time, the Distributors were completely transparent with the SAT in relation to the 2011 Transaction and the Tax Deductions.[72]

140.   On 19 April and 25 May 2012, the Head of Management and Collection Division of SAT (*División de Recaudación*) suggested to the Inspection Supervisor (*Intendente de Fiscalización*) to include the Distributors within the audit schedule to determine whether they had properly performed their tax obligations (the "**Tax Audit**").[73] Such request was based on the significant decrease in collection for the period January to March 2012 in comparison with the previous tax year.[74]

141.   By several official notices issued in October and November 2012, the Head of Taxation Division of Special Taxpayers *(Jefe de División de Fiscalización, Gerencia de Contribuyentes Especiales Grandes)* appointed two teams of auditors to verify whether the Distributors had fulfilled their

---

[70]   Respondent's Statement of Defence, para. 56; Internal Regulations of the SAT, Board Resolution No. 007-2007, dated 27 December 2017, Article 33 (**Exhibit R-28**); SAT, "Procedure: Planning and Conducting Tax Audits, December 2003", dated 22 December 2003 (**Exhibit R-29**); Tax Code of the Republic of Guatemala, dated 25 March 1991, Article 19 (**Exhibit R-5**); Superintendence of Tax Administration Act, Article 3 (**Exhibit R-30**).

[71]   Claimant's Statement of Claim, paras. 50-51; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 11; Distribuidora de Electricidad de Occidente S.A. Financial Statements for the Year Ending on 31 December 2011 and Corresponding Figures of 2010 and Independent Auditor's Report, dated 13 April 2012 (**Exhibit C-63**); Distribuidora de Electricidad de Oriente S.A. Financial Statements for the Year Ending on 31 December 2011 and Corresponding Figures of 2010 and Independent Auditor's Report, dated 13 April 2012 (**Exhibit C-64**).

[72]   Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 4, 22-23, 35-36; Second Witness Declaration of Horacio Albín Izuibejeros, dated 23 December 2019, paras. 7, 9.

[73]   Respondent's Statement of Defence, paras. 57-58; Memorandum No. M-SAT-GCEG-DRG-076-2012 from the Collection Division to the Taxation Bureau, dated 19 April 2012 (**Exhibit R-31**); Memorandum No. M-SAT-GCEG-DRG-106-2012 from the Collection Division to the Taxation Bureau, dated 25 May 2012 (**Exhibit R-32**).

[74]   Respondent's Statement of Defence, paras. 59, 60; Memorandum No. M-SAT-GCEG-DRG-106-2012 from the Collection Division to the Taxation Bureau, dated 25 May 2012, p. 1 (**Exhibit R-32**); Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 27.

tax obligations during the period between 1 January and 31 December 2011 (the **"Auditing Teams"**).[75]

142.  The SAT served several audit information requests to the Distributors in October, November, and December 2012, including requests for information concerning the 2011 Transaction.[76]

143.  On 19 December 2012, Mr. Albín (as legal representative of the Distributors) and the auditors designated by the SAT held a meeting.[77] Mr. Albín recounts that the meeting was held at the Distributors' request with a view to providing the SAT auditors with all relevant details concerning the 2011 Transaction.[78] He asserts that around 20 SAT employees attended the meeting, and that Energuate's management team was joined by EY, which assisted with a presentation regarding the 2011 Transaction.[79]

144.  On 21 December 2012, a meeting took place between a representative of DEORSA and the auditors designated by SAT.[80]

145.  On 8 April 2013, a meeting took place between a representative of DEOCSA and the auditors designated by SAT.[81]

---

[75]  SAT Auditor Appointment 2012-7-895 for Deorsa for Tax Year 2011, dated 2 October 2012 **(Exhibit C-68)**; SAT Auditor Appointment 2012-7-896 for Deocsa for Tax Year 2011, dated 2 October 2012 **(Exhibit C-69)**; SAT Auditor Appointment 2012-7-896-A for Deocsa for Tax Year 2011, dated 5 November 2012 **(Exhibit C-73)**; Appointment of DEOCSA Audit Team No. 2012-7-896-A dated 5 November 2012 **(Exhibit R-33)**; Appointment of DEOCSA Audit Team No. 2012-7-895 dated 2 October 2012 **(Exhibit R-34)**.

[76]  SAT Request for Information 2012-7-895-1 to Deorsa for Tax Year 2011, dated 2 October 2012 **(Exhibit C-70)**; SAT Request for Information 2012-7-896-1 to Deocsa for Tax Year 2011, dated 2 October 2012 **(Exhibit C-71)**; SAT Request for Information 2012-7-896-2 to Deocsa for Tax Year 2011, dated 13 November 2012 **(Exhibit C-74)**; SAT Request for Information 2012-7-896-3 to Deocsa for Tax Years 2011, dated 14 December 2012 **(Exhibit C-75)**; SAT Request for Information 2012-7-896-4 to Deocsa for Tax Years 2011, dated 14 December 2012 **(Exhibit C-76)**. *See also*, Claimant's Statement of Claim, para. 52; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 12.

[77]  Claimant's Statement of Claim, para. 52; SAT Minutes (Act 4953-2012) regarding Meeting with Horacio Albin related to Deocsa Audit for Tax Year 2011, dated 19 December 2012 **(Exhibit C-77)**; SAT Minutes (Act 3509-2012) regarding Meeting with Horacio Albin related to Deorsa Audit for Tax Year 2011, dated 19 December 2012 **(Exhibit C-78)**.

[78]  Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 13.

[79]  Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 13.

[80]  SAT Minutes (Act GCEG-DF-SIA-650-2012) regarding Deorsa Audit Request Period Close for 2011, dated 21 December 2012 **(Exhibit C-80)**.

[81]  SAT Minutes (Act GCEG-DF-SC-191-2013) regarding Deocsa Audit Request Period Close for 2011, dated 8 April 2013 **(Exhibit C-90)**.

146. In March 2013, the Distributors filed their financial statements for the year 2012 with the SAT. Those statements also reflected deductions for interest and goodwill amortization as a result of the 2011 Transaction.[82]

147. On 19 September 2013, the Taxation Bureau considered it relevant to extend the Tax Audit to tax year 2012.[83] The SAT appointed additional auditors and expanded the scope of the Tax Audit to the period between 1 January 2011 and 31 December 2012.[84]

148. In September 2013, the SAT served several information requests to the Distributors in relation to tax years 2011 and 2012.[85]

149. On 11 December 2013, a meeting took place between a representative of DEORSA and the auditors appointed by the SAT.[86] On 10 January 2014, a meeting took place between a representative of DEOCSA and the auditors designated by SAT.[87]

150. On 12 December 2013 and on 17 February 2014, the Auditing Teams issued reports with their findings (the "**Audit Reports**").[88] The teams found several inconsistencies justifying adjustments in the Distributors' income tax returns and in their value added tax and solidarity tax returns.[89] In particular, the Auditing Teams concluded that the Tax Deductions for amortization of goodwill

---

[82] Claimant's Statement of Claim, para. 55; Distribuidora de Electricidad de Occidente S.A. Financial Statements for the Year Ending on 31 December 2012 and Corresponding Figures of 2011 and Independent Auditor's Report, dated 25 March 2013, pp. 8-9 (**Exhibit C-88**); Distribuidora de Electricidad de Oriente S.A. Financial Statements for the Year Ending on 31 December 2012 and Corresponding Figures of 2011 and Independent Auditor's Report, dated 25 March 2013, pp. 8-9 (**Exhibit C-89**).

[83] Memorandum No. MEM-SAT-GEG-DF-061-2013 of the Taxation Division to the Taxation Bureau, dated 19 September 2013 (**Exhibit R-35**).

[84] SAT Auditor Appointment 2012-7-895-A for Deorsa for Tax Years 2011-2012, dated 24 September 2013 (**Exhibit C-91**); SAT Auditor Appointment 2012-7-896-B for Deocsa for Tax Years 2011-2012, dated 24 September 2013 (**Exhibit C-92**); Appointment of DEOCSA Audit Team No. 2012-7-896-B dated 24 September 2013 (**Exhibit R-36**).

[85] SAT Request for Information 2012-7-895-2 to Deorsa for Tax Years 2011-2012, dated 25 September 2013 (**Exhibit C-93**); SAT Request for Information 2012-7-896-5 to Deocsa for Tax Years 2011-2012, dated 25 September 2013 (**Exhibit C-94**); SAT Request for Information 2012-7-896-6 for Deocsa for Tax Years 2011-2012, dated 2 December 2013 (**Exhibit C-97**). *See also*, Claimant's Statement of Claim, para. 55.

[86] Claimant's Statement of Claim, para. 55; SAT Minutes (Act GEG-DF-SIA-674-2013) regarding Deorsa Audit Request Period Close for 2011 and 2012, dated 11 December 2013 (**Exhibit C-99**).

[87] Claimant's Statement of Claim, para. 55; SAT Minutes (Act GEG-DF-SC-03-2014) regarding Deocsa Audit Request Period Close for 2011 and 2012, dated 10 January 2014 (**Exhibit C-102**).

[88] Report No. INF-GEG-DF-SC-01-2014 from the Auditor Team to DEOCSA, dated 17 February 2014 (**Exhibit R-42**); Report No. INF-GEG-DF-SIA-938-2013 from the Auditor Team to DEORSA, dated 12 December 2013 (**Exhibit R-43**).

[89] Respondents s Statement of Defence, para. 65.

and interest payments were inadmissible.[90] In relation to the 2011 Transaction, the Auditor Team considered that "[t]he main objective of the taxpayer was to create the intangible asset [i.e., Goodwill] and the loan, to decrease its Taxable Income".[91]

151.  On 18 February 2014, the SAT reopened the Tax Audit in relation to DEOCSA.[92]

152.  On 27 March 2014, the Taxation Division of SAT (*División de Fiscalización, Gerencia de Contribuyentes Especiales Grandes*) notified the Distributors that, as a result of the Tax Audit, the SAT had formulated certain adjustments that could be challenged within thirty working days from such notification ("**SAT Hearings Notifications**").[93] Said adjustments primarily concerned the Distributors' Tax Deductions for interest and goodwill amortizations.[94]

153.  In relation to the goodwill amortization, the Taxation Division noted that, in response to the Audit Teams' requests, the Distributors' accountant had acknowledged the absence of any feasibility study regarding the acquisition of the ongoing business.[95] In such circumstances, the Audit Teams concluded

> ...that value which the taxpayer indicates it has overpaid for the purchase of the acquired entity's capital cannot be considered as goodwill, [given that] the same taxpayer acknowledges that it does not have a feasibility study regarding the purchase of business, and that it can neither include nor document the purchase price of said business.[96]

---

[90]   Respondent's Statement of Defence, para. 66.

[91]   Report No. INF-GEG-DF-SC-01-2014 from the Auditor Team to DEOCSA, dated 17 February 2014, p. 36 (**Exhibit R-42**) (Respondent's translation).

[92]   Claimant's Statement of Claim, footnote 103; SAT Auditor Appointment 2012-7-896-C for Deocsa for Tax Years 2011-2012, dated 18 February 2014 (**Exhibit C-103**).

[93]   SAT Notification of Hearing A-2014-21-01-000030 regarding Tax and Fine Adjustments for Deocsa for Tax Years 2011-2012, dated 26 March 2014, pp. 9, 12-58 (**Exhibit C-107**); SAT Notification of Hearing A-2014-21-01-000056 regarding Tax and Fine Adjustments for Deorsa for Tax Years 2011-2012, dated 26 March 2014, pp. 9, 12-58 (**Exhibit C-108**). *See also*, Claimant's Statement of Claim, para. 57; Respondent's Statement of Defence, para. 68.

[94]   According to the Claimant, the SAT Hearings Notifications discussed in detail the 2011 Transaction, "relying on extensive information that the Distributors had provided the SAT. This demonstrates the Distributors' transparency at all times with the SAT and other Government agencies" (see Claimant's Statement of Claim, para. 57. According to the Respondent, the Tax Audit concluded that the Tax Deductions were not permitted under Guatemalan tax law (see Respondent's Statement of Defence, paras. 69-77).

[95]   SAT Notification of Hearing A-2014-21-01-000030 regarding Tax and Fine Adjustments for Deocsa for Tax Years 2011-2012, dated 26 Mach. 2014, pp. 18, 40 (**Exhibit C-107**); SAT Notification of Hearing A-2014-21-01-000056 regarding Tax and Fine Adjustments for Deorsa for Tax Years 2011-2012, dated 26 March 2014, p. 18 (**Exhibit C-108**).

[96]   SAT Notification of Hearing A-2014-21-01-000030 regarding Tax and Fine Adjustments for Deocsa for Tax Years 2011-2012, dated 26 Mach. 2014, p. 40 (**Exhibit C-107**) (Respondent's translation). *See also*,

154.  The SAT Hearings Notifications further noted that the purported goodwill did not meet the requirement of Article 38 of the Income Tax Law to the extent that it was not necessary to produce or preserve the source of taxable income.[97] Furthermore, such goodwill had not been "actually incurred" by the Distributors as required by Article 23 of the same law, but by the Dutch SPVs.[98]

155.  With regard to the interest payments, the Taxation Division informed the Distributors that they could not be deduced from income tax given that the loan had not been intended to produce taxable income in Guatemala, as required by Article 38(m) of the Income Tax Law.[99]

156.  On 14 May 2014, the Distributors filed their objections to the adjustments set out in the SAT Hearings Notifications with the SAT.[100]

157.  On 18 June and 1 August 2014, the Resolutions Division requested the Department of Legal Affairs to assess the 2011 Transaction and whether there were elements to typify such transaction as tax fraud.[101]

---

SAT Notification of Hearing A-2014-21-01-000056 regarding Tax and Fine Adjustments for Deorsa for Tax Years 2011-2012, dated 26 March 2014, p. 18 (**Exhibit C-108**).

[97]  SAT Notification of Hearing A-2014-21-01-000030 regarding Tax and Fine Adjustments for Deocsa for Tax Years 2011-2012, dated 26 Mach. 2014, pp. 42-43 (**Exhibit C-107**); Decree Law 59-87 of the Guatemalan Congress, Income Tax Law (repealed by Decree Law 26-92 of the Guatemalan Congress), dated 30 September 1987, Article 38 (**Authority CL-007**). *See also*, SAT Notification of Hearing A-2014-21-01-000056 regarding Tax and Fine Adjustments for Deorsa for Tax Years 2011-2012, dated 26 March 2014, p. 20 (**Exhibit C-108**); Respondent's Statement of Defence, paras. 72-73.

[98]  SAT Notification of Hearing A-2014-21-01-000030 regarding Tax and Fine Adjustments for Deocsa for Tax Years 2011-2012, dated 26 March. 2014, p. 22 (**Exhibit C-107**); SAT Notification of Hearing A-2014-21-01-000056 regarding Tax and Fine Adjustments for Deorsa for Tax Years 2011-2012, dated 26 March 2014, p. 22 (**Exhibit C-108**). *See also*, Respondent's Statement of Defence, para. 74.

[99]  SAT Notification of Hearing A-2014-21-01-000030 regarding Tax and Fine Adjustments for Deocsa for Tax Years 2011-2012, dated 26 March 2014, p. 29 (**Exhibit C-107**); SAT Notification of Hearing A-2014-21-01-000056 regarding Tax and Fine Adjustments for Deorsa for Tax Years 2011-2012 dated 26 March 2014, p. 27 (**Exhibit C-108**).

[100]  Deocsa Submission to the SAT Objecting to Adjustments in Notification of Hearing A-2014-21-01-000030, dated 14 May 2014 (**Exhibit C-109**); SAT Receipt Stamp for Deocsa Submission Objecting to Adjustments in Notification of Hearing A-2014-21-01-000030, dated 14 May 2014 (**Exhibit C-110**); Deorsa Submission to the SAT Objecting to Adjustments in Notification of Hearing A-2014-21-01-000056, dated 14 May 2014 (**Exhibit C-111**); SAT Receipt Stamp for Deorsa Submission Objecting to Adjustments in Notification of Hearing A-2014-21-01-000056, dated 14 May 2014 (**Exhibit C-112**). *See also*, Claimant's Statement of Claim, para. 58; Respondent's Statement of Defence, para. 78; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 37.

[101]  Claimant's Statement of Claim, para. 93; Internal SAT Report INF-GEG-DF-SC-585-2015 regarding Results of Deocsa Audit for 2011 and 2012, dated 21 September 2015, pp. 1-2 (**Exhibit C-151**); Internal SAT Report INF-GEG-DF-SIA-584-2015 regarding Results of Deorsa Audit for 2011 and 2012, dated 21 September 2015, p. 2 (**Exhibit C-152**).

158.  The Claimant underscores that, in the Resolutions Division's report of 18 June 2014, the Division expressed the view that there was a "weak administrative case and would likely lose in Court" when conveying the importance of sending the file to the Department of Legal Affairs.[102]

159.  On the other hand, the Respondent submits that said reports fail to indicate why the administrative proceedings were purportedly "unsustainable" and, in any event, claims that "the merits of the administrative proceedings bear no relationship whatsoever to the merits of the criminal tax proceedings".[103]

160.  On 14 July and 8 August 2014, the Department of Legal Affairs twice declined to recommend the initiation of a criminal prosecution, noting that at such moment in time "it [wa]s not possible to initiate a criminal prosecution, because the report on the merits does not establish a causal link as required under article 10 of the Penal Code". [104]

161.  On 12 November 2014, the Resolutions Division analysed the Distributors' objections and sent a report with its recommendations to the Head of the Taxation Division.[105]   Such report recommended the annulment of the SAT Hearings Notifications, the notification of a new hearing, and the transmission of the file to the Department of Legal Affairs so that the latter may assess whether on the basis of the new elements a criminal prosecution was possible.[106]

162.  On 13 November 2014, the SAT issued resolutions nullifying the SAT Hearings Notifications (the "**Annulment Resolutions**").[107]  The Annulment Resolutions considered, *inter alia*, that "in the present case, it is advised that there exists substantial defect in the adjustments, made known

---

[102]  SAT Report No. INF-GEM-DR-027-2014, 18 June 2014, p. 1 (**Exhibit C-378**) (Claimant's translation); SAT Report No. INF-GEM-DR-028-2014, 18 June 2014, p. 1 (**Exhibit C-379**) (Claimant's translation). *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 4, 7, 32, 37-38.

[103]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 102; Second Witness Statement of David Alejandro Muñoz Ortiz, dated 21 February 2020, para. 17.

[104]  Internal SAT Report INF-GEG-DF-SC-585-2015 regarding Results of Deocsa Audit for 2011 and 2012, dated 21 September 2015, p. 2 (**Exhibit C-151**) (Claimant's translation); Internal SAT Report INF-GEG-DF-SIA-584-2015 regarding Results of Deorsa Audit for 2011 and 2012, dated 21 September 2015, p. 3 (**Exhibit C-152**). *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 38.

[105]  Report No. GEG-DF-SC-0568-2014 of the Auditor Team, dated 12 November 2014 (**Exhibit R-46**).

[106]  Report No. GEG-DF-SC-0568-2014 of the Auditor Team, dated 12 November 2014, p. 4 (**Exhibit R-46**).

[107]  SAT Resolution No. N-2014-21-01-000032 regarding Nullification of Hearing no. A-2014-21-01-000030 for Deocsa, dated 13 November 2014 (**Exhibit C-117**); SAT Resolution No. N-2014-21-01-000031 regarding Nullification of Hearing No. A-2014-21-01-000056 for Deorsa, dated 13 November 2014, (**Exhibit C-118**). *See also*, Claimant's Statement of Claim, para. 58; Respondent's Statement of Defence, para. 90.

to the taxpayer in the aforementioned hearing, which resulted in error in determining the tax obligation of the referenced taxes, which affected the due process and defense rights of the taxpayer"[108]

163. The Annulment Resolutions resolved as follows:

   1.    TO DECLARE THE NULLITY of the Hearing No. [A-2014-21-01-000030 / A-2014-21-01-000056, respectively] of 26 March 2014 and its respective notification, carried out on 27 March 2014 to the contributor [DEOCSA / DEORSA, respectively], leaving without effect all procedural steps taken after the notification of the above-referenced hearing, without affecting the efficacy of the evidence rendered in due time by the contributor.

   2.    To grant a new Hearing according to the legal formalities to the contributor [DEOCSA / DEORSA, respectively].[109]

164. The Parties disagree as to the effects of the Annulment Resolutions. The Claimant avers that the resolutions "nullified the entirety of the adjustments, without making any distinction".[110] According to the Respondent, the Annulment Resolutions only annulled the SAT Hearings Notifications through which the SAT notified the adjustments to the Distributors but did not affect the actions which took place prior to the SAT Hearings Notifications.[111] The Respondent further contends that "the breach of the essential procedural requirements which according to the SAT could entail potential violations of the Distributors' due process and right to defense had no connection whatsoever with…the Tax Deductions…but rather with the Other Adjustments."[112]

165. Also on 13 November 2014, the SAT issued new adjustments that could be challenged within thirty working days from such notification.[113] The Claimant notes that the new adjustments did

---

[108]   Claimant's Statement of Claim, para. 58; SAT Resolution No. N-2014-21-01-000032 regarding Nullification of Hearing no. A-2014-21-01-000030 for Deocsa, dated 13 November 2014, p. 1 (**Exhibit C-117**) (Claimant's translation); SAT Resolution No. N-2014-21-01-000031 regarding Nullification of Hearing No. A-2014-21-01-000056 for Deorsa, dated 13 November 2014, p. 1 (**Exhibit C-118**) (Claimant's translation).

[109]   SAT Resolution No. N-2014-21-01-000032 regarding Nullification of Hearing no. A-2014-21-01-000030 for Deocsa, dated 13 November 2014, p. 2 (**Exhibit C-117**) (Tribunal's translation); SAT Resolution No. N-2014-21-01-000031 regarding Nullification of Hearing No. A-2014-21-01-000056 for Deorsa, dated 13 November 2014, p. 2 (**Exhibit C-118**) (Tribunal's translation).

[110]   Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 42-44; Report No. GEG-DF-SC-0568-2014 of the Auditor Team, dated 12 November 2014, p. 4 (**Exhibit R-46**); Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 21.

[111]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 38-39, 109.

[112]   Respondent's Statement of Defence, para. 95. *See also,* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 16, 35-39.

[113]   SAT Notification of Hearing A-2014-21-01-000343 regarding Tax and Fine Adjustments for Deocsa for Tax Year 2011, dated 13 November 2014 (**Exhibit C-119**); SAT Notification of Hearing A-2014-21-01-

not affirm any deficiency in relation with the Tax Deductions.[114]  The Respondent, however, recalls that the Tax Deductions had raised the suspicion that a tax fraud crime had been committed, and contends that, as a result, the SAT intentionally drew a distinction[115] between adjustments other than income tax adjustments and the Tax Deductions, with regard to which "it was decided to continue evaluating whether it was admissible to file a criminal complaint".[116]

166. On 14 November 2014, the Taxation Division issued a report in relation to DEOCSA and recommended to transfer the file to the Department of Legal Affairs for the latter to assess whether there were indications of alleged tax fraud.[117]  The file was transferred on the same date.[118]

167. On 8 December 2014, the Department of Legal Affairs returned the file to the SAT auditors for the administrative proceedings to continue, considering that at such moment in time "it [wa]s not possible to initiate a criminal prosecution…"[119]

### 3.   Binding Tax Opinions

168. On 5 February 2015, the Distributors submitted requests to the Consulting Department of the SAT seeking binding tax opinions regarding the deductibility of interest payments and goodwill amortization arising from the 2011 Transaction (the "**Tax Opinion Requests**").[120]

---

000341 regarding Tax and Fine Adjustments for Deorsa for Tax Year 2011, dated 13 November 2014 (**Exhibit C-120**).

[114]   Claimant's Statement of Claim, para. 59; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 43.

[115]   Respondent's Statement of Defence, para. 91; SAT, "Procedure: Planning and Conducting Tax Audits, December 2003", dated 22 December 2003, pp. 12-13 (**Exhibit R-29**).

[116]   Respondent's Statement of Defence, paras. 91, 94-95. *See also*, Ruling No. A-2014-21-01-000343 of the Resolution Division, dated 13 November 2014 (**Exhibit R-47**).

[117]   DEOCSA Audit Report No. INF-GEG-DF-SC-586-2014 on Income Tax Adjustments, dated 14 November 2014 (**Exhibit R-48**). *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 44.

[118]   Ruling No. PRO-SAT-GEM-DR-377-2014 of the Resolutions Division, dated 14 November 2014 (**Exhibit R-49**). *See also*, Internal SAT Report INF-GEG-DF-SC-585-2015 regarding Results of Deocsa Audit for 2011 and 2012, dated 21 September 2015, pp. 2-3 (**Exhibit C-151**); Internal SAT Report INF-GEG-DF-SIA-584-2015 regarding Results of Deorsa Audit for 2011 and 2012, dated 21 September 2015, p. 2 (**Exhibit C-152**).

[119]   Internal SAT Report INF-GEG-DF-SC-585-2015 regarding Results of Deocsa Audit for 2011 and 2012, dated 21 September 2015, p. 3 (**Exhibit C-151**) (Claimant's translation); Internal SAT Report INF-GEG-DF-SIA-584-2015 regarding Results of Deorsa Audit for 2011 and 2012, dated 21 September 2015, p. 4 (**Exhibit C-152**) (Claimant's translation). *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 38, 44.

[120]   Deocsa Consultation to the SAT regarding Deductions of Interest and Amortization of Goodwill, dated 5 February 2015 (**Exhibit C-128**); Deorsa Consultation to the SAT regarding Deductions of Interest and

169.   The Tax Opinion Requests put the following consults to the SAT:

> a. Is it valid, is it technically and legally correct and, thus, applicable, to apply the method of "future discounted dividend" to determine the value of the shares acquired by the Buyer which, as was set out, on the basis of the available information and reasonably and objectively applied, results in a value of...? And, as a consequence, would this be the value to be deducted from the Price in order to determine the amount of goodwill amortization under articles 26 of Decree 26-92 of the Congress of the Republic and its amendments and 33 of Decree 10-2012 of the Congress of the Republic, since its entering into force?
>
> b. Is it deductible the amount of interests paid in relation to the Credit, irrespective of the juridical acts described in section "B" above and as a result of which the Credit has become a passive of the Distributor, within the limits of Articles 38 letter "m" of Decree 26-92 of the Congress of the Republic and its amendments and article 21 section 16 and article 24, of Decree 10-2012 of the Congress of the Republic, since its entering into force?[121]

170.   On 9 February 2015, the SAT issued the binding tax opinions (the "**Binding Tax Opinions**").[122]

The Binding Tax Opinions concluded, in relevant part, as follows:

> That, according to the provisions that regulate the Guatemalan tax system, taxpayers shall keep accounting records in accordance with Generally Accepted Accounting Principles so that the discounted future dividend method used by the taxpaying entity, [Deocsa], is not expressly regulated by the tax provisions. However, its use is technically correct within the applicable legal framework as analyzed in the section on Legal Analysis. Consequently, the value of the acquired shares indicated in the query, calculated using the Future Dividend Discount Model, is the value to be deducted from the Price to determine the amount of amortizable goodwill according to articles 26 of Decree 2692 of the Congress of the Republic and amendments (for fiscal years 2011 and 2012), and 33 of Decree 10-2012 of the Congress of the Republic. B) Regarding the interest resulting from credit acquired by the aforementioned entity, pursuant to articles 38, letter m) of Decree number 26-92; and 21, numbers 16 and 24 of Decree number 10-2012, both of the Congress of the Republic, and the limitations established therein, its deduction is appropriate provided that it is supported and documented according to the section on legal analysis.
>
> Pursuant to Article 102 of the Tax Code, the answer to the query made by the interested party cannot be resolved, disputed, or appealed in any way and only has a binding effect for the Tax Administration regarding this specifically consulted case.[123]

---

Amortization of Goodwill, dated 5 February 2015 (**Exhibit C-129**). *See also*, Claimant's Statement of Claim, para. 60; Respondent's Statement of Defence, para. 96.

[121]   Deocsa Consultation to the SAT regarding Deductions of Interest and Amortization of Goodwill, dated 5 February 2015, p. 5 (**Exhibit C-128**) (Tribunal's translation); Deorsa Consultation to the SAT regarding Deductions of Interest and Amortization of Goodwill, dated 5 February 2015, p. 5 (**Exhibit C-129**) (Tribunal's translation).

[122]   Claimant's Statement of Claim, para. 61; Deocsa Binding Tax Opinion, dated 9 February 2015 (**Exhibit C-4**); Deorsa Binding Tax Opinion, dated 9 February 2015 (**Exhibit C-5**).

[123]   Deocsa Binding Tax Opinion, dated 9 February 2015, pp. 13-14 (**Exhibit C-4**) (Claimant's translation). *See also*, in almost identical terms, Deorsa Binding Tax Opinion, dated 9 February 2015 (**Exhibit C-5**).

*The Claimant's Position*

171. According to the Claimant, the Tax Opinion Requests were submitted by the Distributors because they wanted to obtain "certainty and finality regarding the Deductions".[124]

172. In the Claimant's view, the Tax Opinion Requests were another occasion on which the Distributors provided the SAT with information regarding the 2011 Transaction, of which the SAT was already "fully aware", as was the case with regard to the Tax Deductions on the basis of "extensive information that the Distributors had provided the SAT in response to its information requests, but also because the Distributors and the SAT had discussed the possibility of the Distributors seeking tax opinions from the SAT".[125]

173. The Claimant disagrees with the Respondent's contention that the Distributors concealed information.[126] According to the Claimant, had any information been missing, the SAT would have requested it or else it would not have rendered the opinions.[127] In particular, the Claimant is of the view that, at that time, such matters were no longer subject to verification or audits and "the audits were annulled as of November 2014, leaving nothing to disclose".[128] In any event, the Claimant denies that the Distributors would have had a duty to inform the Consulting Department about such proceedings.[129]

174. The Claimant further recalls that the SAT had 10 days to revoke the Binding Tax Opinions, and that, absent such revocation, they became binding for the SAT.[130] Further, the Binding Tax

---

[124] Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 5, 33, 45. *See also*, Claimant's Statement of Claim, para. 60.

[125] Claimant's Statement of Claim, para. 60. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 23, 58-60.

[126] Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 53-55.

[127] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 58; Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 27; SAT's Internal Regulation for the Issuance of Binding Opinions. No. PR-IAJ/DC/UCTA01, issued by the Legal Affairs Bureau, dated 13 November 2014, p. 9 (**Exhibit C-391**) ( "if necessary [the SAT] may obtain additional documentation from the taxpayer… if more documents are required, [the SAT] must issue a document termed *providencia*, through which additional information is requested from the taxpayer to assist with the issuance of the Opinion") (Claimant's translation).

[128] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 55; Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, paras. 33-34.

[129] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 56; Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 34.

[130] Claimant's Statement of Claim, paras. 28, 63; Legal Report of Saúl Augusto Donado Rodríguez, dated 16 May 2019, paras. 34-35, 38-39; Decree Law 6-91 of the Guatemalan Congress, Tax Code, dated 9

Opinions could have been, but were not, revoked through a contentious-administrative procedure initiated within three years of their issuance based on a declaration by the President of Guatemala whereby the act was declared injurious to the national interests.[131] Therefore, the Binding Tax Opinions remain valid and unchallenged to date.[132]

175.  As a result, in the Claimant's submission, the Binding Tax Opinions confirmed that "the Distributors were legally entitled to interest and goodwill amortization deductions arising from Actis's 2011 Transaction".[133] In this respect, the Claimant's expert, Mr. Martínez Guzmán, suggests that the Binding Tax Opinions did not condition the deductibility of the Tax Deductions "to the compliance of the legal requisites for its deduction. In fact, an opinion in such sense would be contrary to the purpose of a binding opinion since it would only redirect the taxpayer to what is already on the law".[134] Similarly, the Claimant's expert, Mr. Donado argues that, under Guatemalan law, the Binding Tax Opinions "can indeed relate to events which already occurred".[135]

176.  Finally, the Claimant notes that the SAT has not brought proceedings against the Distributors alleging tax fraud in relation to the Binding Tax Opinions.[136]

---

January 1991, Article 154 (**Authority CL-9**). *See also,* Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 47-48.

[131]  Claimant's Statement of Claim, para. 28; Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 47-49; Legal Report of Saúl Augusto Donado Rodríguez, dated 16 May 2019, paras. 35, 38-39; Decree Law 119-96 of the Guatemalan Congress, Administrative Litigation Law, dated 21 November 1993, Article 20 (**Authority CL-13**).

[132]  Claimant's Statement of Claim, para. 66; Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 47-48.

[133]  Claimant's Statement of Claim, para. 64; Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 2, 23, 45, 53; Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 7. *See also,* Claimant's Rejoinder on Jurisdiction, para. 13; Second Supplement to the Report of Walter Vinicio Martínez Guzmán, dated 20 March 2020, para. 8.

[134]  Second Supplement to the Report of Walter Vinicio Martínez Guzmán, dated 20 March 2020, para. 11. *See also,* Claimant's Rejoinder on Jurisdiction, paras. 13-14.

[135]  Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 25. *See also,* Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 52.

[136]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 50.

*The Respondent's Position*

177. In the Respondent's view, the submission of the Tax Opinion Requests was an attempt by the Distributors to eliminate the signs of tax fraud detected by the Taxation Division during the Tax Audit.[137]

178. According to the Respondent, the Distributors concealed information in their Tax Opinion Requests and misrepresented the 2011 Transaction.[138] In particular, the Distributors allegedly concealed the fact that the Taxation Division had already determined that the Tax Deductions were not permissible.[139]

179. The Respondent refers in this regard to Article 102 of the Tax Code, pursuant to which the SAT has no obligation to verify the veracity of the taxpayer's statements or to consult with other SAT units regarding the existence of any proceedings against the taxpayer in relation to the particular case.[140] The Respondent further notes that the Auditing Teams were not aware of the Tax Opinion Requests and had to request a copy of the Binding Tax Opinions from the Legal Affairs Department, which were received on 11 August 2015.[141]

180. In any event, the Binding Tax Opinions stated that the deduction of any cost or expense was contingent on it being duly documented and its ability to generate taxable income in Guatemala.[142] Thus, the Respondent disputes the Claimant's allegation that the Binding Tax Opinions authorised or confirmed any entitlement to the Tax Deductions.[143]

---

[137] Respondent's Statement of Defence, paras. 18, 96; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 16.

[138] Respondent's Statement of Defence, paras. 18, 100, 103-117; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 16, 42-45.

[139] Respondent's Statement of Defence, paras. 105, 117. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 43.

[140] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 44; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, para. 14; Second Legal Report of Ángel Menéndez, dated 21 February 2020, paras. 32-34

[141] Respondent's Statement of Defence, para. 98; Memorandum No. MEM-SAT-GEG-DF-039-2015 of the Taxation Division to the Legal Affairs Bureau, dated 29 July 2015 (**Exhibit R-50**).

[142] Respondent's Statement of Defence, paras. 100, 118-123. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 16.

[143] Respondent's Statement of Defence, paras. 17-18, 99, 102, 125. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 6, 16, 21, 40, 45-47.

181. Moreover, the Respondent rejects the Claimant's assertion that the Binding Tax Opinions have the status of a resolution or are "analogous to a court's judgement".[144] In this respect, Article 102 of the Tax Code establishes that the SAT's binding opinions "do not have the quality of a ruling".[145] Therefore, the Respondent argues, Article 154 of the Tax Code, which regulates the reversal of rulings by the administration, is not applicable to binding opinions.[146] Similarly, binding opinions are not susceptible to annulment by judicial review.[147]

### 4.   Rectification Payments

182. On 19 February 2015, shortly after the issuance of the Binding Tax Opinions, the Distributors submitted a series of rectifications payments in relation to their tax declarations for the years 2011 to 2013 (the "**Rectification Payments**").[148]

183. On 27 February 2015, a representative from the Distributors met with SAT officials of the Taxation and Collection Departments to discuss the Rectification Payments.[149] The SAT's Minutes of those meetings reflect certain statements made by the Distributors' representative to

---

[144] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 41; referring to Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, paras. 23, 32. *See also*, Second Legal Report of Ángel Menéndez, dated 21 February 2020, paras. 15, 25; Opinion of Attorney Edvin Oswaldo Montoya Berganza, dated 21 February 2020, para. 16.

[145] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 41; Tax Code of the Republic of Guatemala, dated 25 March 1991, Article 102 (**Exhibit R-5**) (Respondent's translation).

[146] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 41.

[147] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 41.

[148] Receipt of Deocsa Rectification Payment to the SAT for 2011, dated 19 February 2015 (**Exhibit C-130**); SAT Confirmation of Receipt of Deocsa Rectification Payment for 2011, dated 19 February 2015 (**Exhibit C-131**); Receipt of Deorsa Rectification Payment to the SAT for 2011, dated 19 February 2015 (**Exhibit C-132**); SAT Confirmation of Receipt of Deorsa Rectification Payment for 2011, dated 19 February 2015 (**Exhibit C-133**); Receipt of Deocsa Rectification Payment to the SAT for 2012, dated 19 February 2015 (**Exhibit C-134**); SAT Confirmation of Receipt of Deocsa Rectification Payment for 2012, dated 19 February 2015 (**Exhibit C-135**); Receipt of Deorsa Rectification Payment to the SAT for 2012, dated 19 February 2015 (**Exhibit C-136**); SAT Confirmation of Receipt of Deorsa Rectification Payment for 2012, dated 19 February 2015 (**Exhibit C-137**); Receipt of Deocsa Rectification Payment to the SAT for 2013, dated 19 February 2015 (**Exhibit C-138**); Receipt of Deorsa Rectification Payment to the SAT for 2013, dated 19 February 2015 (**Exhibit C-139**). *See also*, Claimant's Statement of Claim, para. 64; Respondent's Statement of Defence, para. 126; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 5.

[149] SAT Minutes (Act GEG-DF-SC-087-2015) regarding Deocsa Rectification Payments for 2011-2013, dated 27 February 2015 (**Exhibit C-140**); SAT Minutes (Act GEG-DF-SC-088-2015) regarding Deorsa Rectification Payments for 2011-2013, dated 27 February 2015 (**Exhibit C-141**). *See also*, Claimant's Statement of Claim, para. 65; Respondent's Statement of Defence, para. 127.

the effect that the Rectification Payments were made taking into account the Binding Tax Opinions (the "**SAT Rectification Payments Minutes**").[150]

184. Certain SAT internal reports to the SAT's Chief of the Audit Division for Special Large Taxpayers dated 21 September 2015 (the "**SAT Internal Reports**") recommended an audit of the Distributors' Rectification Payments in relation to the fiscal years 2011 to 2013.[151]

185. On 9 November 2015, the Distributors' files were sent to the General Archive of the SAT's General Secretary.[152]

*The Claimant's Position*

186. The Claimant notes that the SAT Rectification Payments Minutes do not reflect any disagreement by the SAT officials with the representations made by the Distributors' representative during the 27 February 2015 meeting.[153]

187. The Claimant underscores that SAT officials did not continue the Tax Audit, nor did they open any new administrative procedure against the Distributors.[154]    Similarly, no requests for clarification were issued to the Distributors.[155]

188. The Claimant rejects the Respondent's contention that the meetings recorded in the SAT Rectification Payments Minutes were irregular: according to Mr. Donado, since its creation the SAT had always had "an open door policy with taxpayers; it was very common to have meetings with 3 or 4 heads of relevant departments."[156] Mr. Donado points out that it was not until mid-

---

[150]    SAT Minutes (Act GEG-DF-SC-087-2015) regarding Deocsa Rectification Payments for 2011-2013, dated 27 February 2015 (**Exhibit C-140**); SAT Minutes (Act GEG-DF-SC-088-2015) regarding Deorsa Rectification Payments for 2011-2013, dated 27 February 2015 (**Exhibit C-141**).

[151]    Internal SAT Report INF-GEG-DF-SC-585-2015 regarding Results of Deocsa Audit for 2011 and 2012, dated 21 September 2015, p. 7 (**Exhibit C-151**); Internal SAT Report INF-GEG-DF-SIA-584-2015 regarding Results of Deorsa Audit for 2011 and 2012, dated 21 September 2015, p. 7 (**Exhibit C-152**).

[152]    SAT Administrative Ruling PRO-SAT-GEG-DF-SIA-027-2015, dated 9 November 2015 (**Exhibit C-426**); SAT Administrative Ruling PRO-SAT-GEG-DF-SC-059-2015, dated 9 November 2015 (**Exhibit C-427**). *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 46.

[153]    Claimant's Statement of Claim, para. 65; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 61.

[154]    Claimant's Statement of Claim, para. 65.

[155]    Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 61.

[156]    Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 63-64; Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 40.

2016, after Mr. Solórzano Foppa took office, that meetings of that sort were "virtually forbidden".[157]

*The Respondent's Position*

189. According to the Respondent, the Rectification Payments were calculated arbitrarily by the Distributors and did not follow any established procedure.[158]   Contrary to the Claimant's contention that such meetings were common, Mr. Menéndez and Mr. Muñoz assert that in more than two decades in professional practice they have never come across evidence of a similar meeting.[159]

190. The Respondent notes that none of the SAT officials who attended such meetings were members of the Auditing Teams, and further states that two of those officials were involved in corruption scandals.[160]

191. In the Respondent's submission, this event was regarded as a sign to determine the commission of a tax crime in the Criminal Complaint against the Distributors (see III.F.1 below).[161]

**D.   ACQUISITION OF THE DISTRIBUTORS BY IC POWER**

192. In 2015, IC Power was considering diversifying its business beyond power generation and into distribution "as a new vein for growth within the electric utility activity".[162]

---

[157]   See Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 41.

[158]   Respondent's Statement of Defence, para. 128; Witness Statement of David Alejandro Muñoz Ortiz, 16 September 2019, para. 40.   *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 51-52, 98.

[159]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 55, 100; Second Witness Statement of David Alejandro Muñoz Ortiz, dated 21 February 2020, paras. 36-37; Second Legal Report of Ángel Menéndez, dated 21 February 2020, para. 84.

[160]   Respondent's Statement of Defence, para. 127; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 86-88.

[161]   Respondent's Statement of Defence, para. 129; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 52, 56.   *See also*, Second Witness Statement of David Alejandro Muñoz Ortiz, dated 21 February 2020, para. 37; Witness statement of Mr. Colindres Sandoval, dated 2 November 2016 **(Exhibit R-109)**; Request for Information by the Public Prosecutor's Office, dated 22 January 2018 **(Exhibit R-162)**.

[162]   Project Spring Memorandum to the IC Power Board of Directors regarding Acquisition Opportunity of Actis's Distribution Companies in Guatemala, dated 9 July 2015, p. 11 **(Exhibit C-147)**.

193. Mr. García, who was Chief Executive Officer of IC Power from 2011 until 2017, testifies that he learned about Actis' intention to sell the Distributors in the first half of 2015.[163] Being aware that Energuate held a concession contract until 2048, Mr. García asked Citigroup Global Markets, Inc. ("**Citi**"), which was acting as Actis' financial advisor, to include IC Power in the bidding process.[164] As part of the process, IC Power initiated due diligence and valuation studies.[165]

### 1.    Due Diligence

194. In order to conduct its due diligence, IC Power set up a team composed of 12 internal members, assisted by a team of 4 external executives, including the former CEO of Chilectra and Ampla, and Mr. Horacio Albín, former CFO of Energuate ("**DD Team**").[166]

195. The DD Team was advised in relation to tax and legal due diligence by a Guatemalan law firm (García & Bodán, later known as Asensio, Barrios, Flores, Andradre & Asociados, and currently known as Sfera Legal),[167] and with regard to financial and accounting due diligence by PricewaterhouseCoopers ("**PwC**").[168]

196. In the first version of their due diligence report dated 26 June 2015 (the "**First version of DD Report**"), García & Bodán advised as follows:

---

[163]   Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 9.

[164]   Claimant's Statement of Claim, paras. 68-69; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 9; Project Spring Memorandum to the IC Power Board of Directors regarding Acquisition Opportunity of Actis's Distribution Companies in Guatemala, dated 9 July 2015, p. 10 (**Exhibit C-147**) ("IC Power has been invited by Citibank in the middle of the process because the principal bidder, ENEL, is not sure to submit a bid.  Citibank changed the bid date from early June to the middle of July to allow IC Power to conduct its due diligence"); Letter from Citi to Inkia Energy Ltd. regarding Invitation to Bid, p. 1 (**Exhibit C-144**).

[165]   Claimant's Statement of Claim, para. 71; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 9.

[166]   Project Spring Memorandum to the IC Power Board of Directors regarding Acquisition Opportunity of Actis's Distribution Companies in Guatemala, dated 9 July 2015, pp. 11 and 22 (**Exhibit C-147**); Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 11; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 17.

[167]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 68; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 58; Email from Asensio to IC Power and PQP regarding Due Diligence, 8 May 2015 (**Exhibit C-402**); Emails between Urbina, Grossheim and Asensio regarding Tax Diligence, 11 June 2015 (**Exhibit C-405**); Emails between IC Power regarding Due Diligence Team, 20 May 2015 (**Exhibit C-404**).

[168]   Claimant's Statement of Claim, para. 73; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 11; Project Spring Memorandum to the IC Power Board of Directors regarding Acquisition Opportunity of Actis's Distribution Companies in Guatemala, dated 9 July 2015, p. 11 (**Exhibit C-147**); Project Spring PwC Diligence Observations, dated 21 October 2015 (**Exhibit C-154**).

One of the tax matters that has our important attention are the two "Reverse Mergers" operated [...] Under Guatemala law, all reverse mergers generate a lot of attention within the ranks of SAT. We have information that SAT has acted very drastically in other reverse merger cases, even arguing that the structure was implemented as a mechanism to defraud the Guatemala tax system. In the present case, we were not able to determine if the large tax adjustments referred...above originates as consequence of the reverse merger. The Consultation Procedure referred...above is definitely related to the reverse merger and sets the record straight regarding two aspects of that merger: the deduction of interest for the debt incurred by the parent, and the amortization and calculation of the "goodwill" value of the negotiation. However, many other elements of the merger may also come up in the form of tax adjustments and these will always be against DEORSA and DEOCSA as the surviving entities. We did not identify any specific claims, and can only infer that these two companies are not entirely isolated from future claims derived from the reverse merger.

The Client should request specific information regarding the tax claim and material adverse effects on the situations of those claims...We believe that the tax information available is very poor. An in depth assessment of a tax case can only be done contrasting SAT's arguments with the corresponding defense, including an analysis of the evidence presented at both administrative and court levels.[169]

197.  In their final version of due diligence report dated 22 October 2015 ("**Final version of DD Report**"), García & Bodán advised as follows:

The aspect that relates to the "reverse merger" should also be commented...The effect of this merger also produces a goodwill that must be amortized. Subsequent to the merger a consultation procedure was filed as explained above. SAT responded favourably to both questions leaving no doubt as to the deductibility of the interests, and the amortization of the goodwill. After SAT's response was delivered, we found no further tax adjustments subsequent to SAT's nullification of the original 2014 tax notices. We're almost sure that SAT's responses clarified the issue to the point that no further adjustments were merited.

Regarding some Tax inquiries sent, the Company confirmed that as a result of the Consulta made to the SAT, the Income Tax Declarations for the fiscal years 2011, 2012, 2013 and 2014 were rectified and the corresponding taxes were paid; however, no documents were presented for our review to verify this affirmation.[170]

198.  The Parties diverge as to the extent and thoroughness of the due diligence process.

*The Claimant's Position*

199.  The Claimant submits that its due diligence was extensive and thorough, including in relation to tax issues:[171] it lasted from May 2015 until January 2016,[172] and "at all times" the DD Team engaged García & Bodán and put forward "probing" questions to obtain a full understanding of

---

[169]  García & Bodán Due Diligence Report (26 June 2015), 30 June 2015, pp. 12-13 (**Exhibit C-409**).

[170]  García & Bodán Final Due Diligence Report (22 October 2015), 13 Nov. 2015, p. 21 (**Exhibit C-429**)

[171]  Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 6, 65-66, 74, 78-83, 86; Claimant's Rejoinder on Jurisdiction, paras. 3, 6.

[172]  Claimant's Rejoinder on Jurisdiction, para. 6; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 66.

the Binding Tax Opinions.[173]  In particular, the Claimant denies the Respondent's allegation that
the DD Team sought to have any risks underestimated.[174]

200.  The DD Team conducted its own review with regard to the Binding Tax Opinions and related
documents.[175]  According to the Claimant, the in-house advisors who developed the tax due
diligence were Mr. Daniel Urbina (IC Power's General Counsel), Mr. Marco Cárdenas (former
tax audit manager at EY) and Ms. Angela Grossheim (former lawyer with the Ministry of
Economy and Finance of Peru).[176]

201.  Mr. Albín, former CFO of the Distributors, was one of the Claimant's external advisors during
the due diligence.[177]  According to Mr. Albín, the DD Team took into consideration tax issues
when valuing the Distributors: they concluded that the Binding Tax Opinions allowed the
Distributors to deduct interest payments and to amortize goodwill.[178]

202.  According to the Claimant, the DD Team identified no areas of significant concern.[179]
Specifically, the DD Team "considered the deductions a non-issue because of the Binding Tax
Opinions".[180]  In Mr. Albín's words:

> Had the due diligence and valuation team had any doubts that the deductions were allowable,
> we would have brought it to the attention of the IC Power Board. We did not because we had
> no concerns regarding the deductibility of the interest and goodwill amortization on the loans,
> given the existence of the Binding Tax Opinions.[181]

---

[173]  Claimant's Rejoinder on Jurisdiction, para. 8.

[174]  Claimant's Rejoinder on Jurisdiction, paras. 7-8; Supplementary Witness Declaration of Daniel Urbina,
dated 20 March 2020, para. 5.

[175]  Claimant's Statement of Claim, para. 75; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May
2019, paras. 17-18. See also, Claimant's Rejoinder on Jurisdiction, para. 6.

[176]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 68; Second Witness
Declaration of Javier García-Burgos Benfield, dated 23 December 2019, para. 7; Witness Declaration of
Daniel Urbina, dated 23 December 2019, para. 6.

[177]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 68.

[178]  Claimant's Statement of Claim, para. 76; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May
2019, paras. 18-19. See also, Claimant's Statement of Reply and Response to Jurisdictional Objections,
para. 69; Second Witness Declaration of Horacio Albín Izuibejeros, dated 23 December 2019, paras. 20-
26. See also, Claimant's Rejoinder on Jurisdiction, para. 6.

[179]  Claimant's Statement of Claim, para. 73; IC Power Due Diligence Team Financial Statement Review and
Energuate Business Plan Report, dated 30 November 2015, pp. 10-12 (Exhibit C-158). See also, Witness
Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 13.

[180]  Claimant's Statement of Claim, para. 77; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May
2019, para. 20. See also, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 2.

[181]  Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 20. See also, Witness
Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 13 ("… as we considered the
Distributors' tax treatment of interest and goodwill settled by the Binding Tax Opinions, we did not set the

203. The Claimant further avers that the Binding Tax Opinions and the SAT Audit documents were reviewed by García & Bodán, which prepared a specific memorandum on the matter.[182]  The Claimant acknowledges that García & Bodán's initial advice was unclear in this regard, thus prompting a request for clarification.[183]  In the Final version of DD Report (which was submitted to the Board of IC Power) García & Bodán advised that the Binding Tax Opinions confirmed the deductibility of the Tax Deductions.[184]

204. According to the Claimant, García & Bodán's advice was confirmed by PwC, which was engaged to assist in the analysis (including tax implications) of potential structures for the Claimant's acquisition of the Distributors.[185]

205. The Claimant also submits that Actis confirmed that the Binding Tax Opinions settled the matter and that "[t]he amount on the books today is vetted by SAT."[186]

206. As to AIG, which provided insurance coverage for representations and warranties in the SPAs, the Claimant notes that it conducted its own due diligence as part of the process to enter into the insurance policy.[187]  According to Mr. Urbina, AIG was advised by Simpson Thatcher & Bartlett and by the Guatemalan law firm QIL+4, and had access to the same data room as the Claimant

---

issue on the agenda for discussion with the IC Power Board."). *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 77.

[182] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 70; Asensio Memorandum regarding Binding Tax Opinions, dated 16 June 2015 (**Exhibit C-406**).

[183] Claimant's Statement of Reply and Response to Jurisdictional Objections, footnote 146; García & Bodán Due Diligence Report (26 June 2015), dated 30 June 2015 (**Exhibit C-409**); E-mail with General Comments about the Due Diligence Report, dated 3 July 2015 (**Exhibit C-410**); García & Bodán Final Due Diligence Report (22 October 2015), dated 13 November 2015 (**Exhibit C-429**).

[184] Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 70-71; García & Bodán Final Due Diligence Report (22 October 2015), dated 13 November 2015 (**Exhibit C-429**). *See also*, Claimant's Rejoinder on Jurisdiction, para. 9.

[185] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 72; Project Spring Strawman Acquisition Structuring Presentation, dated 30 October 2015, pp. 22-23, 25 (**Exhibit C-421**). PwC advised them that the same structure that Actis had used could be implemented and recommended filling similar tax consultations with the tax authorities to confirm deductibility. However, according to the Claimant, a different structure was implemented in order not to delay the closing and because "we received advice that there were no precedents in Guatemala of a company generating new goodwill on top of goodwill that was still being amortized". *See also*, Witness Declaration of Daniel Urbina, dated 23 December 2019, para. 12; Actis Presentation "Project Spring: Transaction Structure Considerations", November 2015 (**Exhibit C-422**).

[186] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 73; Actis presentation "Project Spring: Transaction Structure Considerations," November 2015, p. 3 (**Exhibit C-422**).

[187] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 76; Witness Declaration of Daniel Urbina, dated 23 December 2019, para. 21.

and to its due diligence reports.[188] AIG did not convey any doubts concerning the validity of the Tax Deductions.[189]

207. Relatedly, the Claimant notes that Foreign Corruption Practices Act issues ("**FCPA**") were also part of the due diligence.[190] García & Bodán also concluded that neither the Distributors nor their employees were mentioned in connection with several corruption scandals, nor were any actions filed in court against Energuate.[191] In particular, García & Bodán assessed the very short timeframe within which the Binding Tax Opinions were obtained, and suggested that the Distributors and the SAT might have reached an agreement on the answer beforehand.[192] However, they noted that such understanding did not suggest that wrongful payments had been made,[193] noting in particular that Energuate made voluntary revisions of fiscal years 2011-2013 on the basis of such opinions that may have generated additional tax payments, which would suggest absence of wrongdoing.[194] In any event, the Claimant notes, the Respondent has not established any wrongdoing.[195]

---

[188]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 76; Witness Declaration of Daniel Urbina, dated 23 December 2019, para. 21.

[189]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 76; Witness Declaration of Daniel Urbina, dated 23 December 2019, para. 22; Email from Ritterberg to IC Power Regarding Signing without Further Exclusions, 23 December 2015 (**Exhibit C-437**).

[190]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 87; Claimant's Rejoinder on Jurisdiction, para. 9.

[191]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 87; García & Bodán Final FCPA Opinion letter, dated 28 October 2015 (**Exhibit C-420**); Email from García & Bodán to IC Power regarding FCPA, 21 October 2015 (**Exhibit C-416**).

[192]   Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 88-89; Asensio Memorandum regarding Binding Tax Opinions, 16 June 2015 (**Exhibit C-406**); Email from García & Bodán to IC Power regarding FCPA, dated 21 October 2015, p. 1 (**Exhibit C-416**); Email from García & Bodán to IC Power, dated 22 October 2015, p. 3 (**Exhibit C-417**).

[193]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 88; Email from García & Bodán to IC Power regarding FCPA, dated 21 October 2015, p. 1 (**Exhibit C-416**). *See also*, The Claimant's Rejoinder on Jurisdiction, paras. 6, 9.

[194]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 90; García & Bodán Draft FCPA Opinion Letter, dated 22 October 2015 (**Exhibit C-418**).

[195]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 91; Claimant's Rejoinder on Jurisdiction, para. 6.

*The Respondent's Position*

208. According to the Respondent, at the time of acquiring the Distributors, the Claimant knew, or at least had reason to know, that there were irregularities in the Tax Deductions.[196] This was evidenced, in the Respondent's view, by (i) the Audit Report issued by the Taxation Division of SAT, concluding that the Tax Deductions were not allowable;[197] (ii) the Binding Tax Opinions, which stated that the deduction of any cost or expense was contingent upon it being duly documented and being indispensable for generating taxable income in Guatemala;[198] and (iii) the SAT Rectification Payments Minutes and the existence of various corruption scandals within the SAT, which were indications that "raised doubts about the way the Distributors' file had been 'resolved'".[199]

209. Thus, the Respondent is of the view that the Claimant decided to acquire an asset with "an obvious contingency (i.e., signs of the commission of a tax crime) arising from the undue conduct of its former owner".[200]

210. The Respondent further contends that the Claimant did not conduct sufficient due diligence,[201] or was at least negligent in conducting it.[202] In this respect, the Respondent considers that the Financial Statement Review and Energuate Business Plan Report produced by the DD Team cannot be regarded as "a proper due diligence", since (i) the members of such team were executives with experience on electric power distribution and not experts on tax matters;[203] (ii) the analysis of tax aspects was very brief and did not cover all aspects which should have been

---

[196] Respondent's Statement of Defence, paras. 16, 146. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 3, 7, 17, 57-58.

[197] Respondent's Statement of Defence, para. 146; SAT Notification of Hearing A-2014-21-01-000030 regarding Tax and Fine Adjustments for Deocsa for Tax Years 2011-2012, dated 26 March 2014 (**Exhibit C-107**); SAT Notification of Hearing A-2014-21-01-000056 regarding Tax and Fine Adjustments for Deorsa for Tax Years 2011-2012 dated 26 March 2014 (**Exhibit C-108**). *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 57.

[198] Respondent's Statement of Defence, para. 146.

[199] Respondent's Statement of Defence, para. 146; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 57.

[200] Respondent's Statement of Defence, para. 14. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 17.

[201] Respondent's Statement of Defence, paras. 1, 19, 149-151; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 17, 60-76.

[202] Respondent's Statement of Defence, paras. 5, 147, 151-152; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 73-75, 77-80.

[203] Respondent's Statement of Defence, paras. 150-151; Compass Lexecon Report, dated 16 September 2019, para. 88.a.

considered as part of a tax due diligence process;[204] and (iii) the factual description "is plagued by inconsistencies and red flags".[205]

211. Similarly, the Respondent considers that the memorandum prepared by the DD Team for the Board of Directors of IC Power "deliberately omitted the tax risks".[206] In this regard, Mr. García-Burgos and Mr. Albín acknowledge that tax risks was not included for consideration by the Board of Directors because the team "had no concerns regarding the deductibility of the interest and goodwill amortization on the loans, given the existence of the Binding Tax Opinions."[207]

212. With respect to the report prepared by PwC, the Respondent notes that it was prepared "in two days, based on the review of a scant number of documents and without access to company management."[208] In any event, the Respondent notes, PwC recommended performing "tax due diligence to identify and quantify any known or unknown potential tax exposures you may be assuming should you proceed with this transaction."[209]

213. Finally, the Respondent argues that the DD Team ignored the warnings from García & Bodán concerning "red flags" in relation to the extremely short timeframe within which the Binding Tax Opinions were issued and their recommendation to conduct an "enhanced scrutiny".[210]

214. Furthermore, according to the Respondent, every time that García & Bodán attempted to discuss the risks inherent to the Tax Deductions, "the DD Team sought to have said risks underestimated, in the words of one of the DD Team members, so as not 'to generate more concerns than we

---

[204] Respondent's Statement of Defence, paras. 152-153; Compass Lexecon Report, dated 16 September 2019, para. 88.b.

[205] Respondent's Statement of Defence, paras. 154-157.

[206] Respondent's Statement of Defence, paras. 159-160; Project Spring Memorandum to the IC Power Board of Directors regarding Acquisition Opportunity of Actis's Distribution Companies in Guatemala, dated 9 July 2015 (**Exhibit C-147**).

[207] Respondent's Statement of Defence, para. 160; Witness Statement of Horacio Albín Izuibejeros, dated 16 May 2019, para. 20; Witness Statement of Javier García-Burgos Benfield, dated 16 May 2019, para. 13; Compass Lexecon Report, dated 16 September 2019, para. 91.

[208] Respondent's Statement of Defence, para. 162; Compass Lexecon Report, dated 16 September 2019, para. 92.a; Project Spring PwC Diligence Observations, dated 21 October 2015, p. 4 (**Exhibit C-154**).

[209] Respondent's Statement of Defence, para. 163; Compass Lexecon Report, dated 16 September 2019, para. 92.c; Project Spring PwC Diligence Observations, dated 21 October 2015, p. 9 (**Exhibit C-154**).

[210] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 17; García & Bodán FCPA Report, dated 1 July 2015, p. 2, section 5 (**Exhibit R-199**); García & Bodán Final FCPA Opinion letter, dated 28 October 2015, p. 2, section 5 (**Exhibit C-420**).

should.'"[211] In the Respondent's view, the DD Team "attempted to conceal the evidence of the warning in order to rapidly complete the operation".[212]

215. The Respondent notes that, in response to the First version of DD Report, Ms. Roxana Guzmán sent an e-mail to other members of the DD team in which she proposed to examine why the reverse triangular merger would be contingent.[213] Later, she sent another message enclosing a version with comments of the First version of DD Report where she suggested, in relation to the Tax Deductions, to "ask for the information to draw our own tax conclusions: include rep in the SPA".[214] Nevertheless, the Respondent submits, IC Power did not request such information, nor was any representation included in the share purchase agreement which would allow the Claimant to claim against Actis if the Tax Deductions were not allowable.[215]

216. Similarly, the Respondent notes that, in a draft memorandum concerning an FCPA analysis, García & Bodán stressed that the celerity with which the Binding Tax Opinions were issued "may raise red flags".[216] Instead of inquiring into the matter, Ms. Grossheim—who was coordinating the preparation of the FCPA memorandum—suggested that certain statements be included in the memorandum to the effect that no proceedings had been brought against officials or employees in that connection.[217] The following day, García & Bodán provided a revised version, indicating in the cover e-mail: "I think I have interpreted your request, but if you still want to tone down the

---

[211] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 17, 60; Email from García & Bodán to IC Power, dated 22 October 2015, p. 2 (**Exhibit C-417**) (Respondent's translation).

[212] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 60.

[213] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 65; Email with General Comments about the Due Diligence Report, dated 3 July 2015, p. 1 (**Exhibit C-410**) (Respondent's translation).

[214] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 65; Due Diligence Final Report and Analysis (redacted), dated 26 June 2015, p. 13 (**Exhibit R-203**) (Respondent's translation).

[215] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 65, 78.

[216] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 66; García & Bodán FCPA Report, dated 1 July 2015, at p. 2 (**Exhibit R-199**).

[217] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 67; Email from García & Bodán to IC Power regarding FCPA, dated 21 October 2015, p. 1 (**Exhibit C-416**) ("A. That there never have been claims against the officials [misspelled in original] and employees. On this subject. B. That in the case of the line, [someone] never [unintelligible] mentioned any of the entities..." (Respondent's translation).

matter, I'll do it."[218]  García & Bodán, however, continued to stress that complementary information in relation to the tax adjustments was necessary.[219]

217. On the same day, Mr. Urbina put some questions to García & Bodán also concerning FCPA issues.[220]  In response, they did not develop a legal analysis, but instead provided some comments "with a certain logic of an inspector" and suggested to "address the point with the lawyers with whom they ha[d] a good relationship" in order to dispel any doubts.[221]  Mr. Urbina expressed his concern that addressing those points would "generate more concerns than [they] should."[222]

218. The Respondent notes that, in any event, the final version of the FCPA report continued to recommend "to submit the tax 'consultation procedures' filed in February of this year to an enhanced scrutiny".[223]  Hence, the Respondent concludes that it is not true that the Tax Deductions were a "non-issue".[224]

219. Finally, the Respondent asserts that the Claimant has not provided evidence to establish that AIG and its advisors reached that same conclusion.[225]

2.    Closing

220. According to the testimony of Mr. Yoav Doppelt, who was a member of IC Power's Board of Directors at the time, in November 2015, the Board invited the DD Team to give a presentation

[218] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 68; Email on Plantilla GB, dated 22 October 2015, p. 1 (**Exhibit R-204**) (Respondent's translation). *See also*, García & Bodán Draft FCPA Opinion Letter, dated 22 October 2015 (**Exhibit C-418**).

[219] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 68; García & Bodán Draft FCPA Opinion Letter, dated 22 October 2015, p. 2 (**Exhibit C-418**).

[220] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 69; Emails between Urbina, Asensio and Grossheim regarding Updated FCPA Opinion Letter, dated 26 October 2015, p. 4 (**Exhibit C-419**); Email from García & Bodán to IC Power, dated 22 October 2015 (**Exhibit C-417**).

[221] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 70-71; Email from García & Bodán to IC Power, dated 22 October 2015 (**Exhibit C-417**) (Respondent's translation).

[222] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 71; Email from García & Bodán to IC Power, dated 22 October 2015 (**Exhibit C-417**) (Respondent's translation).

[223] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 72; García & Bodán Final FCPA Opinion letter, dated 28 October 2015, p. 2 (**Exhibit C-420**).

[224] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 80.

[225] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 79.

about Energuate.[226] No tax issues of concern were raised.[227] Afterwards, the Board of Directors approved the transaction.[228]

221. On 28 January 2016, the acquisition of Energuate by IC Power closed: IC Power paid US$ 265 million to Actis in order to acquire Energuate (**"Acquisition of Energuate"**).[229] Such consideration consisted in a combination of "cash on hand" and a US$ 120 million loan facility.[230]

222. More specifically, the Acquisition of Energuate was effected through IC Power's acquisition of a 100% shareholding in a holding company which indirectly owned 90.62% of the shares in DEOCSA and 92.68% of the shares in DEORSA, as well as a 100% shareholding of two smaller related businesses (Guatemel and Recsa).[231]

E.   **CHANGE OF LEADERSHIP IN SAT**

1.   **Corruption Cases within SAT**

223. In 2015, a wave of corruption scandals in Guatemala[232] led to the resignation of President Otto Pérez Molina in September 2015.[233] On 14 January 2016, President Jimmy Morales took office.[234]

---

[226]   Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 10.

[227]   Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 10.

[228]   Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 10; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 14.

[229]   Claimant's Statement of Claim, para. 80; SEC Filing Form 6-K, Kenon Holdings Ltd, "IC Power Completes Acquisition of Energuate, a Private Electricity Distribution Business in Guatemala", dated 28 January 2016, p. 4 (**Exhibit C-164**). See also, Respondent's Statement of Defence, para. 13; Stock Purchase Agreement among IC Power Distribution Holdings Pte, Ltd. as Purchaser and Inkia Energy, Ltd. as Purchaser Guarantor and Deorsa-Deocsa Holdings Ltd. as Seller and Estrella Cooperatief BA, dated 29 December 2015 (**Exhibit C-160**).

[230]   SEC Filing Form 6-K, Kenon Holdings Ltd., "IC Power Completes Acquisition of Energuate, a Private Electricity Distribution Business in Guatemala", dated 28 January 2016, p. 4 (**Exhibit C-164**).

[231]   SEC Filing Form 6-K, Kenon Holdings Ltd., "IC Power Completes Acquisition of Energuate, a Private Electricity Distribution Business in Guatemala", dated 28 January 2016, p. 4 (**Exhibit C-164**).

[232]   Respondent's Statement of Defence, paras. 131-134; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 11.

[233]   Press report, BBC News Mundo, "Guatemalan president Otto Pérez Molina resigns," dated 3 September 2015 (**Exhibit R-57**).

[234]   Press report, CNN Español, "Jimmy Morales takes over as new president of Guatemala," dated 14 January 2016 (**Exhibit R-58**).

224. On 12 February 2016, the International Commission Against Impunity in Guatemala ("CICIG")
unveiled a corruption case known as "Aceros de Guatemala".[235] According to the Respondent,
this case is "especially relevant" because three of the officials implicated in such case made
crucial decisions with regard to the Distributors' case.[236] The Claimant insists that the Respondent
has not established the commission of any wrongdoing by those or other officials in relation with
the Distributors' files.[237].

### 2.   Change of Leadership in SAT

225. In March 2016, President Morales appointed Mr. Juan Francisco Solórzano Foppa as the new
head of the SAT.[238] At his swearing-in, President Morales asserted that an "effort to convert the
SAT into an efficient and effective institution capable of increasing taxes in a sustained, honest
and transparent manner" was necessary.[239]

226. Within one month from the designation of the new Superintendent, the SAT opened investigations
in relation to 161 companies mentioned in the so-called Panama Papers.[240]

227. The Claimant characterizes the SAT's actions at the time against companies for alleged tax fraud
as "aggressive", and notes that they were frequently reported by the Guatemalan press.[241] The

---

[235] Respondent's Statement of Defence, para. 136; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 17. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 86.

[236] In this regard, the Respondent refers to the following officials: (i) Mr. Alfonzo Romeo Castillo Castro (Legal Affairs Bureau Chief), who signed the Tax Binding Opinions and was responsible for the legal reports which advised against the filing of a criminal complaint against the Distributors; and (ii) Mr. Elder Hermelindo Fuentes García (Taxation Bureau Chief) and Mr. José Antonio Mangandi Ortiz (Manager of the collection Division), both of whom were amongst the officials who signed the SAT Rectification Payments Minutes (see Respondent's Statement of Defence, paras. 137-139).

[237] See Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 39, 91, 100-101.

[238] Claimant's Statement of Claim, paras. 6, 85; Prensa Libre, "Juan Francisco Solorzano Foppa es el nuevo jefe de la SAT", dated 9 March 2016, p. 1 (**Exhibit C-167**). *See also*, Respondent's Statement of Defence, para. 140; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 89.

[239] Claimant's Statement of Claim, para. 85; Prensa Libre, "Juan Francisco Solorzano Foppa es el nuevo jefe de la SAT", dated 9 March 2016, p. 1 (**Exhibit C-167**) (Claimant's translation).

[240] Soy 502, "SAT investigará 161 empresas mencionadas en los Papeles de Panama", dated 5 April 2016, p. 1 (**Exhibit C-171**).

[241] Claimant's Statement of Claim, para. 86; Contrapoder, "Todos a pagar, Por las buenas o por las malas", dated 29 July 2016 (**Exhibit C-182**); Prensa Libre, "Cacif pide a SAT bajar intensidad a la persecución penal", dated 6 August 2016 (**Exhibit C-188**); Prensa Libre, "Cacif busca contener intervención", dated 7 August 2016 (**Exhibit C-189**); Prensa Libre, "Recaudación inusual suma Q2 mil millones", dated 8 August 2016 (**Exhibit C-190**).

Respondent disagrees with the Claimant's criticisms of Mr. Solórzano Foppa, noting that different press outlets praised his work.[242]

### 3.    Revision of the Distributors' Tax Declarations

228.  On 27 April 2016, Mr. Solórzano Foppa sent a memorandum to SAT employees inviting "the auditors and other professionals connected to oversight processes to indicate those files that were resolved at the time, to the detriment of the Tax Administration".[243]

229.  According to the testimony of Mr. David Muñoz, in June 2016, in response to Mr. Solórzano Foppa's request, Mr. Luis Argelio Villatoro Cifuentes, Head of the Verifications Department and Mr. Muñoz's supervisor, allocated around 483 files for revision to a group of employees.[244] Mr. Muñoz was assigned the revision of files No. 2012-21-01-44-0001276 and 2012-21-01-44-0001277, concerning the Distributors' Tax Audit.[245]

230.  According to Mr. Muñoz, in light of the potential tax underpayment that could be established from the SAT Hearings Notifications, he arranged various meetings with members of the Auditing Teams and with his supervisor.[246] He testifies that during such meetings they "noted various acts that constituted signs of commission of the crime of tax fraud described in Article 358 A of the Guatemalan Criminal Code".[247]

---

[242]  Respondent's Statement of Defence, paras. 141-142; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 92-95; Press report, Prensa Libre, "Enormous Challenge for Replacement at the SAT", dated 19 January 2018 (**Exhibit R-206**); Press report, Nómada, "As Director, Foppa is a Hope", dated 18 January 2018 (**Exhibit R-207**); Press report, Plaza Pública, "Dubious Legality in Firing of Solorzano Foppa", dated 23 January 2018 (**Exhibit R-208**); Insight Crime, "With Firing of Tax Agency Chief, Guatemala's Status Quo Makes Its Move", dated 24 January 2018 (**Exhibit R-209**).

[243]  Superintendent's Memo No. MEM-SAT-DSI-91-2016, dated 27 April 2016, p. 3 (**Exhibit R-64**) (Respondent's translation). *See also*, Respondent's Statement of Defence, para. 169; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 20; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 90.

[244]  Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 21.

[245]  Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 21.

[246]  Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 28-29; Auditor Team's Presentation to the Verifications Unit, dated May 2016 (**Exhibit R-118**).

[247]  Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 30-51; Decree Law 17-73 of the Guatemalan Congress, Criminal Code, dated 27 July 1973, Article 358 A (**Authority CL-5**) ("...the person who, through misrepresentation, cover-up, manipulation, trickery, or any other type of deception, leads the Tax Administration to error in the determination or payment of tax obligations, such that it results in detriment to or underpayment in tax collection, commits the crime of tax fraud") (Respondent's translation).

*The Respondent's Position*

231. The Respondent avers that the *Panama Papers* scandal led authorities worldwide to conduct investigations.[248] In the context of corruption scandals within the SAT, Mr. Solórzano Foppa took measures to coordinate the revision of certain large taxpayers' files who could have been granted illegal benefits by SAT employees.[249]

232. According to the Respondent, the SAT's approach to report the possible commission of tax fraud was "duly grounded in fact and in law".[250] Within such process, the SAT considered that the Distributors' files contained signs of a possible tax fraud.[251]

233. According to Mr. Muñoz, the officials in charge of the review of the Distributors' files considered several indications of tax fraud, including certain irregularities in relation to the Rectification Payments, such as the fact that they were made unbeknownst to the Auditing Teams, or the absence of technical and accounting information to assess their correctness.[252] Similarly, Mr. Muñoz alleges that the SAT Rectification Payments Minutes and the meetings recorded therein "are completely irregular".[253]

234. Mr. Muñoz also testifies that certain decisions from the Criminal Affairs Department (*Departamento de Auntos Penales de la Intendencia de Asuntos Jurídicos*) also raised suspicion, since they indicated that "for the moment, it is impossible to begin criminal prosecution [against the Distributors], since the causal link regulated in Article 10 of the Criminal Code does not follow".[254] In this regard, he states that the Criminal Affairs Department did not have jurisdiction

---

[248] Respondent's Statement of Defence, para. 142; Association of Certified Financial Crime Specialists (web page), "ICIJ: Panama Papers help recover more than US$1.2 billion from all over the world", dated 4 April 2019, p. 2 (**Exhibit R-63**).

[249] Respondent's Statement of Defence, paras. 143, 169.

[250] Respondent's Statement of Defence, para. 6. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 94.

[251] Respondent's Statement of Defence, paras. 165-166, 170. *See also*, Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 30-45.

[252] Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 35-38; Internal SAT Report INF-GEG-DF-SIA-584-2015 regarding Results of Deorsa Audit for 2011 and 2012, dated 21 September 2015 (**Exhibit C-152**). *See also*, Respondent's Statement of Defence, paras. 171-172.

[253] Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 40. Mr. Muñoz also notes that two of the officials who signed said minutes were involved in a publicly known corruption scandal (see ibid, para. 41). *See also*, Respondent's Statement of Defence, paras. 171-172.

[254] Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 44; Internal SAT Report INF-GEG-DF-SC-585-2015 regarding Results of Deocsa Audit for 2011 and 2012, dated 21 September 2015 (**Exhibit C-151**); Ruling PRO-SAT-IAJ-DAP-2336-2014, dated 14 July 2014 (**Exhibit**

to issue such decision: according to Resolution No. 467-2007, the Verifications Department (*Departamento de Verificaciones*) was the competent unit to assess whether there was a legal basis for filing criminal charges insofar as the Distributors' files qualified as "high-impact cases".[255]

235. Moreover, the Respondent argues that the brief analysis set out by the Criminal Affairs Department in its decisions lacked merit: under Guatemalan law, the SAT was only required to assess whether there were sufficient indications to file a criminal complaint, and did not need to establish the existence of a causal link as a constituent element of a criminal charge.[256] Such analysis would correspond to the criminal judge in the context of a criminal proceeding.[257]

236. The Respondent also notes that the decisions were approved by the former Legal Affairs Bureau Chief, who was facing a criminal trial for having influenced the modification of various audit reports in a publicly known corruption scandal.[258]

237. According to the Respondent, it was as a result of the above factors, and in accordance with the Executive's obligations under Guatemalan law, that a criminal complaint against the Distributors and other companies which took part in the 2011 Transaction was submitted.[259]

---

R-59); Ruling PRO-SAT-IAJ- DAP-3273-2014, dated 8 August 2014 (**Exhibit R-60**); Ruling PRO-SAT-IAJ-DAP-5740-2014, dated 8 December 2014 (**Exhibit R-61**).

[255] Witness Statement of David Alejandro Muñoz Ortiz, 16 September 2019, para. 45; Resolution No. 467-2007, Organizational Charts of the SAT's Second and Third Levels, dated 26 June 2007, Article 24 Bis (**Exhibit R-65**); Procedure for Processing Files that Find Crimes against the Tax Regimen, dated 4 February 2016, p. 9 (**Exhibit R-66**) ("7. The legal professionals, advisors and prosecutors of the Verifications Department, at the time of analyzing a file they had been assigned to handle, must determine that the amount is equal to or greater than five million quetzals (Q. 5,000,000.00) in fraud. If it is not, [the file] must be physically returned to the pertinent Administrative Unit immediately ...") (Respondent's translation). *See also*, Respondent's Statement of Defence, para. 175.

[256] Respondent's Statement of Defence, paras. 174, 178; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 46-48; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 75-76. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 116.

[257] Respondent's Statement of Defence, para. 179; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 48.

[258] Respondent's Statement of Defence, para. 176; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 50. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 103.

[259] Respondent's Statement of Defence, paras. 165-166, 181, 188; Tax Code of the Republic of Guatemala, dated 25 March 1991, Articles 70 and 90 (**Exhibit R-5**); Code of Criminal Procedure of the Republic of Guatemala, Article 298 (**Exhibit R-69**).

*The Claimant's Position*

238. According to the Claimant, under its new leadership, the SAT adopted a new approach to tax collection which "disregarded applicable law, precedents and due process".[260]

239. The Claimant contends that the SAT started to disregard the appropriate administrative proceedings in favour of criminal proceedings, "using the latter as a shortcut to achieve its goals".[261]  In the Claimant's submission, such strategy was known in Guatemala as "tax terrorism".[262]

240. Mr. Muñoz's testimony is characterized by the Claimant as a "cursory review" of the Distributors' audit file; and notes that it has produced no official documentation to evidence that proper administrative proceedings were followed leading up to the Criminal Complaint.[263]

241. The Claimant rejects the Respondent's criticisms regarding the determinations made by the Criminal Affairs Department of the Legal Affairs Bureau: (i) such department was competent to analyse the matter according to the regulations applicable at the time;[264] (ii) the Head of the Legal Affairs Bureau, even if allegedly involved in an unrelated corruption scandal, did nothing but approve the reports that had been prepared by another official, and, in any event, the Respondent has not provided evidence of any wrongdoing in relation with the reports at stake in this case;[265] and (iii) the causal link is one of the elements of tax fraud and its analysis was necessary to avoid the criminalization of trivial tax matters.[266]

---

[260]  Claimant's Statement of Claim, para. 6.

[261]  Claimant's Statement of Claim, paras. 87-88.

[262]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 7; El Periódico, "Ni tanto que queme al santo ni poco que no le alumbre," dated 14 May 2017, p. 1 (**Exhibit C-498**) ( "if Solórzano Foppa and his terrorist clan befalls you by the chance of fate, the legal rigor with which you have operated your records and books will mean nothing.") (Claimant's translation).

[263]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 102.

[264]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 39; Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, paras. 50-52. The Claimant contends that there is no evidence that the Distributors' case was designated as "high impact", noting that the guidelines containing a definition in this regard submitted by the Respondent were issued in 2016 (see Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 39). The Claimant notes that despite its document production request, the Respondent has failed to produce the guidelines applicable at the time and requests the Tribunal to infer that the Criminal Affairs Department of SAT operated under different guidance (see Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 99).

[265]  Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 39, 100-101.

[266]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 39.

F.   **CRIMINAL PROCEEDING AND FURTHER TAX AUDIT AGAINST THE DISTRIBUTORS**

1.   **SAT's Criminal Complaint**

242.   On 13 July 2016, the SAT filed a criminal complaint for tax fraud against the Distributors (the **"Criminal Complaint"**), which was admitted on 22 July 2016 by the Fifth Criminal, Narcotics, and Environmental Crimes Trial Court of the Department of Guatemala (the **"Criminal Court"**), resulting in a criminal proceeding currently underway in Guatemala (the **"Criminal Proceeding"**).[267]

243.   The Criminal Complaint accused the Distributors of tax fraud in relation to the Tax Deductions for tax years 2011 and 2012.[268]   The crime of tax fraud is regulated in Article 358 A of the Guatemalan Criminal Code which provides that such crime is committed by:

> the person who, through misrepresentation, cover-up, manipulation, trickery, or any other type of deception, leads the Tax Administration to error in the determination or payment of tax obligations, such that it results in detriment to or underpayment in tax collection, commits the crime of tax fraud"[269]

244.   The Parties are in disagreement as to whether the submission of the Criminal Complaint by the SAT was carried out in accordance with the applicable requirements under Guatemalan law.

*The Claimant's Position*

245.   Before submitting a criminal complaint, the Claimant states, the SAT must exhaust administrative proceedings in order to establish whether there is evidence of a violation of the Tax Code, determine the amount of any liability, and afford due process to the taxpayer.[270]   This obligation

---

[267]   Claimant's Statement of Claim, para. 7; Respondent's Statement of Defence, para. 20; SAT Criminal Complaint against DEOCSA and DEORSA, dated 21 July 2016 **(Exhibit R-6)**.

[268]   SAT's Complaint against Deocsa and Deorsa, dated 21 July 2016 **(Exhibit C-8)**. *See also*, SAT Criminal Complaint against DEOCSA and DEORSA, dated 21 July 2016 **(Exhibit R-6)**.

[269]   Decree Law 17-73 of the Guatemalan Congress, Criminal Code, dated 27 July 1973, Article 358 A **(Authority CL-005)** (Respondent's translation).

[270]   Claimant's Statement of Claim, paras. 31-34; Legal Report of Saúl Augusto Donado Rodríguez, dated 16 May 2019, paras. 13, 44-45; Legal Report of Juan Rodolfo Pérez Trabanino, dated 16 May 2018, section II. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 96-98, 106-108.

stems from Article 103 of the Tax Code[271] and such legal requirement was established, at least partially, to protect the rights of tax payers.[272]

246. Thus, in failing to exhaust administrative proceedings, the Criminal Complaint was, in the Claimant's view, "legally deficient".[273]   This is further underscored by certain SAT Internal Reports noting that the Department of Legal Affairs declined to recommend the initiation of criminal proceedings against the Distributors on several occasions.[274]

*The Respondent's Position*

247. According to the Respondent, the SAT was correct in concluding that there were sufficient indications to warrant the submission of the Criminal Complaint,[275] and notes that the submission of the Criminal Complaint was approved by the Legal Affairs Bureau Chief, who participated as assistant in the complaint, together with the entire Verifications Department.[276]

248. The Respondent avers that a criminal complaint does not need "to prove categorically all the elements of the crime, since this job is within the purview of the Prosecutor's Office and not within that of the SAT".[277]   In any event, the Respondent is of the view that the Criminal Complaint does

---

[271]  Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991), Article 103 (**Authority CL-9**) ("The determination of the tax obligation is an act by which the taxable person or the Tax Administration, as appropriate under the law, or both in coordination, declare the existence of the tax obligation, calculate the taxable base and its amount, or otherwise declare the absence, exemption or unenforceability thereof") (Claimant's translation).   *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 106.

[272]  Claimant's Statement of Claim, para. 34.

[273]  Claimant's Statement of Claim, para. 32; Legal Report of Juan Rodolfo Pérez Trabanino, dated 16 May 2018, para. 8. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 96-98.

[274]  Claimant's Statement of Claim, para. 93; Internal SAT Report INF-GEG-DF-SC-585-2015 regarding Results of Deocsa Audit for 2011 and 2012, dated 21 September 2015 (**Exhibit C-151**); Internal SAT Report INF-GEG-DF-SIA-584-2015 regarding Results of Deorsa Audit for 2011 and 2012, dated 21 September 2015 (**Exhibit C-152**). *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 2, 98.

[275]  Respondent's Statement of Defence, paras. 6, 188; Tax Code of the Republic of Guatemala, dated 25 March 1991, Articles 70 and 90 (**Exhibit R-5**); Code of Criminal Procedure of the Republic of Guatemala, Article 298 (**Exhibit R-69**). *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 4, 18, 81, 83, 101, 105, 112-115, 119.

[276]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 112-115; SAT's Criminal Complaint against Deocsa and Deorsa, pp. 2, 46-47 (**Exhibit C-8**); Second Witness Statement of David Alejandro Muñoz Ortiz, dated 21 February 2020, para. 9.

[277]  Respondent's Statement of Defence, para. 20; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 39, 57; Decision of the Third Chamber of the Court of Appeals of the Criminal,

establish the tax underpayment by the Distributors, which had been analysed in detail by the Auditing Teams.[278]

249. Furthermore, the Criminal Complaint met the requirements set forth under Guatemalan law, which does not require the prior exhaustion of an administrative or legal procedure.[279] On the contrary, the Respondent submits that Guatemalan law requires officials to suspend an administrative procedure and file a criminal complaint whenever they find evidence of a crime's commission.[280] The Respondent refers in this regard to the prohibition of *non bis in idem* contained in Article 90 of the Tax Code,[281] and to jurisprudence from the Constitutional Court of Guatemala which has held that:

> ...this regulation does not require the administrative procedure before the Superintendence of Tax Administration to be exhausted before the criminal complaint is filed. In light of the above, no violation of the rights to defense and due process are found in this case, since, specifically, it is in protection of these rights that the administrative authority abstains from ruling in an administrative context so that, given the alleged commission of criminal acts, the matter is examined before the competent courts of the criminal division, and thus avoiding duplication of sanctions for the same action, in accordance with Article 90 of the Tax Code.[282]

250. Similarly, the Respondent argues that it was not necessary for the SAT to obtain a decision from a civil judge declaring that certain acts in the 2011 Transaction had been a misrepresentation: misrepresentation is merely one of the several acts through which tax fraud may be committed, and the Criminal Complaint was not circumscribed to simulation, as such specific determination would correspond to the judge.[283] In any event, the Constitutional Court of Guatemala has

---

Drug and Crimes Against the Environment, dated 4 August 2017, p. 3 (**Exhibit R-7**). *See also,* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 18, 105, 116-117.

[278]   Respondent's Statement of Defence, para. 189.

[279]   Respondent's Statement of Defence, paras. 166, 184-187; Decree Law 51-92 of the Guatemalan Congress, Criminal Procedure Code, dated 7 December 1992, Article 299, (**Authority CL-011**); Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 10(f), 36, 44. *See also,* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 8, 119.

[280]   Respondent's Statement of Defence, para. 188; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 102, 107-108.

[281]   Respondent's Statement of Defence, para. 188; Tax Code of the Republic of Guatemala, dated 25 March 1991, Article 90 (**Exhibit R-5**). *See also,* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 108.

[282]   Respondent's Statement of Defence, para. 188; Constitutional Court of Guatemala, Judgment, dated 19 January 2010, p. 149 (**Exhibit R-70**) (Respondent's translation). *See also,* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 8.

[283]   Respondent's Statement of Defence, paras. 190-191; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 67; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, para. 64. *See also,* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 118; Second Legal Report of Ángel Menéndez, 21 February 2020, para. 130.

established that criminal complaints based on alleged misrepresentation are not subject to obtaining a final judgment in a civil court.[284]

### 2.   Criminal Proceedings and Second Tax Audit

#### (a)   *Provisional Measures: Preventive Seizure of Bank Accounts*

251. On 29 July 2016, the Criminal Court held an *ex parte* hearing concerning precautionary measures in the Criminal Proceeding.[285] *Inter alia*, the Criminal Court ordered a preventive seizure of bank accounts against the Distributors for the full amounts that were alleged to be owed for taxes corresponding to the fiscal years 2011 and 2012.[286] The Parties disagree as to the legality of the preventive seizures.

*The Claimant's Position*

252. According to Mr. Albín, the Distributors met regularly with the SAT between 27 July 2016 and 10 August 2016 in attempts to bring an end to the Criminal Proceeding.[287] However, the SAT did not act in good faith.[288] In particular, Mr. Albín testifies that, in a meeting held on 28 July 2016, the Distributors' lawyers requested that the SAT refrain from filing a freezing order request against the Distributors' bank accounts; the SAT representatives agreed, and indicated to the Distributors that they did not need to attend the hearing scheduled for the following day.[289]

253. However, the Distributors later learned that, on 29 July 2016, the Criminal Court had issued orders—at the Government's request and without their presence—freezing the Distributors' bank

---

[284] Respondent's Statement of Defence, para. 192; Constitutional Court, Judgment, dated 26 April 2018, p. 175 (**Exhibit R-71**) ("From the foregoing, one notices that the word "simulation" contained in Article 358-A of the Criminal Code does not contradict Article 17 of the Constitution. As for the argument by [sic] which maintains that [the action] must first be brought before a civil judge so that the latter is the one who declares the existence of the simulation, this Court believes that the petitioner purports to confer upon the language in the challenged rule a scope and meaning that it does not possess") (Respondent's translation); Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 52-54.

[285] Criminal Court Summary of Hearing on Preliminary Measures, dated 29 July 2016 (**Exhibit C-180**).

[286] Criminal Court Summary of Hearing on Preliminary Measures, dated 29 July 2016 (**Exhibit C-180**); Communications from the Criminal Court to various banks regarding Deocsa and Deorsa bank account freeze, dated 29 July 2016 (**Exhibit C-181**).

[287] Claimant's Statement of Claim, para. 96; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 25.

[288] Claimant's Statement of Claim, para. 96.

[289] Claimant's Statement of Claim, para. 96; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 28. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 113; Second Witness Declaration of Horacio Albín Izuibejeros, dated 23 December 2019, para. 32.

accounts for the full amounts that the SAT alleged were owed for taxes corresponding to 2011 and 2012.[290]

254. The Claimant alleges that the freezing orders were not in compliance with Guatemalan law. First, the SAT should have proven the existence of a "risk" in order to obtain preliminary measures.[291] Second, the SAT's request for provisional measures did not meet the requirements contained in Article 530 of the Code of Civil and Commercial Procedure, as laid out in the jurisprudence of the Constitutional Court of Guatemala.[292] In particular, the Claimant contends that: (i) the provisional measures were unnecessary because the Distributors had always cooperated with SAT, including by voluntarily making Rectification Payments; (ii) the provisional measures were legally defective because the SAT did not offer any evidence of tax fraud nor any risk to the Distributors' funds; and (iii) the Criminal Complaint concerned conduct from the previous management, while there was no evidence that the current management of the Distributors posed "an imminent and irreparable prejudice to the SAT or the investigation".[293]

255. Thus, in the Claimant's submission, the provisional measures awarded by the Criminal Court (the freezing of bank accounts and later the appointment of a receiver, as set out in Section III.F.2(d) below) were arbitrary and unsupported under the circumstances.[294]

256. Furthermore, the Claimant criticizes that the freezing of bank accounts was "overbroad" because it was not limited to the amounts at issue. Rather, orders were issued on every bank account held by the Distributors ("far exceeding the amounts of the alleged tax deficiencies") and the orders

---

[290]   Claimant's Statement of Claim, para. 97; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 28; Criminal Court Summary of Hearing on Preliminary Measures, dated 29 July 2016 (**Exhibit C-180**); Communications from the Criminal Court to various banks regarding Deocsa and Deorsa bank account freeze, dated 29 July 2016 (**Exhibit C-181**). The Claimant considers that the Respondent's contention that the Criminal Court did not order "freezing orders" but "seizures on the bank accounts for specific amounts" is merely a semantic issue (see Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 112).

[291]   Claimant's Statement of Claim, para. 98; Decree Law 6-91 of the Guatemalan Congress, Tax Code, dated 9 January 1991, Article 170 (**Authority CL-9**).

[292]   Claimant's Statement of Claim, para. 99; Sentence no. 443-99 of the Guatemalan Constitutional Court, dated 7 September 1999, p. 4 (**Authority CL-16**) (Claimant's translation). "judge has duly and rationally appreciated the circumstances of the concrete case to avoid unreasonable measures that deviate from the true oversight that judges should exercise". *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 109-111.

[293]   Claimant's Statement of Claim, para. 100; Legal Report of Juan Rodolfo Pérez Tabanino, dated 16 May 2019, paras. 34-37. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 115.

[294]   Claimant's Statement of Claim, para. 101.

not only blocked withdrawal of funds but also deposits into the accounts, which prevented the Distributors' clients from making any payments and "effectively blocked" any business.[295]

*The Respondent's Position*

257. The Respondent clarifies that, in the Criminal Complaint, it was the SAT that requested that a hearing be held to decide on the adoption of precautionary measures;[296] noting that the Constitutional Court of Guatemala has confirmed the SAT's authority to request precautionary measures in criminal proceedings.[297] However, at the hearing, it was the Public Prosecutor's office (as opposed to the SAT) who—as is standard practice—requested the precautionary seizure of the amounts owed.[298]

258. The Respondent submits that precautionary measures may be requested under Guatemalan law without the initial participation of the respondent, a practice that seeks to avoid attempts to thwart such measures.[299] Once ordered, the affected party may challenge their appropriateness and duration through reconsideration and nullity challenges. If rejected, an appeal may be filed and, in exceptional circumstances, relief may also be sought before the Constitutional Court.[300] Reduction or replacement by sufficient assets or guarantees may be also requested.[301]

---

[295]   Claimant's Statement of Claim, para. 102; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 26. *See also*, the Claimant's Statement of Claim, para. 120; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 47; Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 112, 117; Claimant's Rejoinder on Jurisdiction, footnote 23; Emails from Alvaro Wer Estrada to Energuate regarding Embargo G&T, dated 12 August 2016 (**Exhibit C-639**).

[296]   Respondent's Statement of Defence, para. 194; SAT Criminal Complaint against DEOCSA and DEORSA, dated 22 July 2016, p. 48 (**Exhibit R-6**).

[297]   Respondent's Statement of Defence, para. 195; Constitutional Court of Guatemala, Resolution No. 4159-2017, dated 17 January 2018 (**Exhibit R-72**) (Respondent's translation) "the [Superintendence of Tax Administration] from the time it becomes party to proceedings – in this case, as a third party – can request the imposition of precautionary measures to protect the interests of the tax authority, in the timely receipt of the tax payments, interest and fines owed."

[298]   Respondent's Statement of Defence, para. 167.

[299]   Respondent's Statement of Defence, para. 197; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 73. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 121-122.

[300]   Respondent's Statement of Defence, para. 197; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 105-111; Decree Law 107, Code of Civil and Commercial Procedure, dated 14 September 1963, Articles 598, 613, 615 (**Authority CL-4**); Constitution of the Republic of Guatemala, dated 17 November 1993, Article 265 (**Authority CL-12**); Constitutional Court of Guatemala, Judgment (Case, 2508-2006), dated 30 November 2006, p. 5 (**Exhibit R-75**).

[301]   Respondent's Statement of Defence, para. 197; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, para. 91; Constitutional Court of Guatemala, Judgement, dated 27 November 2018 (**Exhibit R-76**).

259. The Respondent denies the Claimant's allegation that certain SAT officials instructed the Distributors' lawyers not to attend the hearing at which the precautionary measures were discussed and granted.[302] The Respondent notes that, in any event, the question is irrelevant, as it was an *ex parte* hearing.[303]

260. The Respondent further affirms that the Criminal Court did not grant "freezing orders" as suggested by the Claimant, but seizures on bank accounts for specific amounts.[304] In the Respondent's view, this is not merely a "semantic distinction" as argued by the Claimant:[305] the order did not impede the deposit of funds into the Distributors' bank accounts,[306] and the Claimant has failed to produce evidence of any such hurdle.[307] According to the Respondent, any freezing of the bank account for deposits must have been unrelated to the freezing orders, seeing that the terms of the seizure order and notices are clear.[308]

261. The Respondent disagrees with the Claimant's assertions that the preventive seizures violated Article 170 of the Tax Code and Article 530 of the Code of Civil and Commercial Procedure: the Public Prosecutor requested such measures in order to protect the interests of the tax authority and prevent the risk that the Distributors could not comply with a possible conviction.[309]

262. Likewise, according to the Respondent, the seizures were not excessive: they were ordered for the exact amount claimed in the Criminal Complaint.[310] The Respondent notes that, for reasons of bank secrecy, the Criminal Court, the Public Prosecutor and the SAT were not privy to which

---

[302] Respondent's Statement of Defence, para. 198; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 77-78. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 123.

[303] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 123.

[304] Respondent's Statement of Defence, para. 199; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 87. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 124-125.

[305] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 126-127.

[306] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 128.

[307] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 129.

[308] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 130.

[309] Respondent's Statement of Defence, paras. 200-209; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 138.

[310] Respondent's Statement of Defence, para. 210; SAT's Criminal Complaint against Deocsa and Deorsa, at pp. 17, 34 (**Exhibit C-8**); Criminal Court Summary of Hearing on Precautionary Measures, dated 29 July 2016, pp. 1, 2 (**Exhibit C-180**).

banks held the Distributors' bank accounts or the amounts held therein.[311] For this reason, the Respondent avers, it is common practice in Guatemala to send official records to all banks for the total amount claimed, and the defendant may later request the decrease of the seizure to the disputed amount.[312]

263. Nonetheless, the Respondent asserts that the Distributors failed to challenge the precautionary measures or offer a bank guarantee as an alternative;[313] rather, as will be further discussed below, they "voluntarily" paid the amounts claimed by the SAT, "even for the years 2013-2015—the latter without the SAT even having requested it".[314]

### (b)   *Tax Audit by SAT for Years 2014-2015*

264. On 3 August 2016, the SAT submitted requests for information to the Distributors in relation to tax years 2014 and 2015.[315]

### (c)   *Hearing regarding Lifting of Preventive Seizures and Payments under Protest*

265. On 3 August 2016, the Distributors' lawyers requested a hearing to lift the preventive seizures.[316]

266. On the same date, the Criminal Court scheduled a hearing for 28 October 2016.[317]

267. According to Mr. Albín, the Distributors were concerned about their inability to operate with frozen bank accounts for two months and urged the SAT to request the Criminal Court to revoke the provisional measures.[318]   However, SAT officials conditioned any such request on the

---

[311]   Respondent's Statement of Defence, para. 210; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 93-94.

[312]   Respondent's Statement of Defence, para. 210; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 93-94.

[313]   Respondent's Statement of Defence, paras. 167, 199. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 132-133.

[314]   Respondent's Statement of Defence, para. 167.

[315]   SAT Request for Information 2016-8-1604-1 for Deocsa for tax years 2014 and 2015, dated 3 August 2016 (**Exhibit C-185**); SAT Request for Information 2016-8-1603-1 for Deorsa for tax years 2014 and 2015, dated 3 August 2016 (**Exhibit C-186**).

[316]   Claimant's Statement of Claim, para. 105; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 31.

[317]   Criminal Court notice of hearing for lifting of bank freeze, dated 3 August 2016 (**Exhibit C-187**).

[318]   Claimant's Statement of Claim, para. 105; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 31

Distributors' agreement to pay to the SAT the full amounts allegedly owed pursuant to the Criminal Complaint, as well as rectification payments for fiscal years 2013 to 2015.[319]

268. The Respondent denies that the Distributors conveyed an intention to pay the amounts claimed in the Criminal Complaint to the SAT, including interest and fines.[320] In such circumstances and on account of the essential nature of the electricity services provided by the Distributors, the SAT, the Public Prosecutor's Office and the Attorney General's Office jointly requested the Criminal Court to hold an earlier hearing to discuss the lifting of the preventive seizures: as a result, the hearing was rescheduled for 9 August 2016.[321]

269. On 8 August 2016, Energuate's senior management decided to pay the amounts requested by SAT to avoid risking the Distributors' operational viability.[322] According to Mr. Doppelt's testimony, he agreed with Mr. García that, if the SAT were to file a claim with regard to years 2013 to 2015, the claim would include penalties in an amount that the Distributors would not be able to pay.[323]

270. On 9 August 2016 prior to the Hearing, the Distributors' lawyers held a meeting with SAT officials, the Public Prosecution and the Attorney General's Office.[324]

271. According to the Claimant, the Distributors' lawyers informed the public officials that the Distributors would pay the alleged tax deficiencies for tax years 2011 and 2012, as well as alleged tax deficiencies for tax years 2014 and 2015 "given the risk of a new criminal complaint" in relation to the tax year 2015, and would also pay the alleged tax deficiency for year 2013 within 10 days from the Court's decision to lift the preventive seizures.[325] They noted that such payments

---

[319] Claimant's Statement of Claim, para. 105; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 32. See also, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 120; Witness Declaration of Daniel Urbina, dated 23 December 2019, para. 31.

[320] Respondent's Statement of Defence, para. 212; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 89.

[321] Respondent's Statement of Defence, para. 213; Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016, pp. 8, 18 (Exhibit C-194). See also, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 118.

[322] Claimant's Statement of Claim, para. 106; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 33.

[323] Claimant's Statement of Claim, para. 106; Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 14. See also, Claimant's Statement of Claim, para. 121; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, paras. 24-25.

[324] Claimant's Statement of Claim, para. 107; Respondent's Statement of Defence, para. 213.

[325] Claimant's Statement of Claim, para. 107; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 34; Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016, p. 5 (Exhibit C-194).

"would not be voluntary, would be made in protest, would not be an admission of liability, and would be subject to a full reservation of the Distributors' rights."[326] According to the Claimant, the Distributors' payments under protest to the SAT amounted to a total of US$ 75 million (the **"Payments under Protest"**).[327]

272. The Respondent alleges that the 9 August meeting was devoted to discussing the conditions under which the lifting of the precautionary measures would be requested. It asserts that the public officials agreed not to oppose such request if payment of the amounts owed for tax years 2011 and 2012, plus interest and fines, was guaranteed.[328] The Respondent denies that the discussions regarding the lifting of the precautionary measures encompassed payments in relation to tax years 2013 to 2015.[329] According to Mr. Muñoz, it was the Distributors who proposed to make such payments, and the SAT never threatened to file another criminal claim or condition the lifting of the precautionary measures upon such payments.[330]

273. At the hearing, the SAT informed the judge that the Distributors would make payments for tax years 2011 to 2015 with regard to the years covered in the Criminal Complaint, and would also pay the alleged deficiencies, followed by a payment of interest and penalties within 60 days.[331] The Respondent reads the original Spanish transcript of the hearing as evincing that it was the

---

[326] Claimant's Statement of Claim, para. 107; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 34.

[327] Claimant's Statement of Claim, para. 122; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 48; Witness Declaration of Javier Garcia-Burgos Benfield, dated 16 May 2019, para. 40. The Claimant also notes that the Distributors also decided "to forgo the tax deductions going forward, in order to prevent further exposure". Furthermore, the Claimant argues that the Criminal Proceeding undermined the Claimant's ability to invest in the Distributors as planned under the business plan as well as the Distributors' reputation and diverted attention from management (*see* Claimant's Statement of Claim, paras. 119-120, 122-124).

[328] Respondent's Statement of Defence, para. 214; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 90.

[329] Respondent's Statement of Defence, para. 217; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 95. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 135-136; Second Witness Statement of David Alejandro Muñoz Ortiz, dated 21 February 2020, paras. 52-54.

[330] Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 95.

[331] Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016, pp. 4-5 (**Exhibit C-194**).

Distributors' attorney who presented the proposal to pay rectification payments for the years 2013
to 2015.[332]

274. The SAT also noted that if the Distributors failed to abide by the above undertakings, an
intervention in receivership could be requested.[333]

275. The judge agreed to lift the orders on condition that the Distributors (i) paid the alleged tax
deficiencies for years 2011 and 2012 within 24 hours, and (ii) made the rectification payments
and pay the amounts corresponding to fines and interest within 60 days.[334] Moreover, the judge
decided to place a lien on the vehicles owned by the Distributors as an alternative warranty, and
scheduled a further hearing for 3 November 2016. The judge nonetheless rejected the request to
bar the payment of dividends or to impose any lien on the Distributors' shares.[335]

276. On 9 August 2016, the Distributors made payments to the SAT for the alleged deficiencies for
tax years 2011, 2012, 2014 and 2015.[336]

277. On 10 August 2016, the order for the preventive seizure of bank accounts was lifted.[337]

[332] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 137; Unofficial Audio Transcript of Hearing on Partial Lifting of Precautionary Measures, dated 9 August 2016, p. 4 (**Exhibit C-194**).

[333] Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016, at p. 11 (**Exhibit C-194**).

[334] Criminal Court Summary of Hearing on the Lifting of Preliminary Measures, dated 9 August 2016 (**Exhibit C-191**); Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016 (**Exhibit C-194**). See also, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 36.

[335] Criminal Court Summary of Hearing on the Lifting of Preliminary Measures, dated 9 August 2016 (**Exhibit C-191**); Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016 (**Exhibit C-194**). See also, Witness Declaration of Horacio Albin Izuibejeros, dated 16 May 2019, para. 36.

[336] Receipts of Deocsa and Deorsa Rectification payments to SAT for 2011 and 2012, dated 9 August 2016 (**Exhibit C-193**); Receipt of Deocsa rectification payment to the SAT for 2014, dated 9 August 2016 (**Exhibit C-12**); Receipt of Deorsa Rectification payment to the SAT for 2014, dated 9 August 2016 (**Exhibit C-13**); Receipt of Deocsa rectification payment to the SAT for 2015, dated 9 August 2016 (**Exhibit C-14**); Receipt of Deorsa rectification payment to the SAT for 2015, dated 9 August 2016 (**Exhibit C-15**). See also, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 37.

[337] Orders of the Criminal Court to banks regarding lifting of bank freeze, dated 9 August 2016 (**Exhibit C-192**).

278.  On 17 August 2016, the Distributors requested that the SAT recognize that the rectification concerning tax years 2014 and 2015 was made under protest.[338]

279.  On 19 August 2016, the Distributors paid the alleged tax deficiency for tax year 2013.[339]

280.  On 22 August 2016, the Distributors requested that the SAT recognize that the rectification payments for tax year 2013 were made under protest.[340]

281.  On 9 September 2016, the Distributors requested the SAT to take into consideration the Rectification Payments in the calculations of amounts due for alleged interest and penalties in relation to tax years 2011 and 2012.[341]

282.  On 12 October 2016, the Distributors submitted to the Criminal Court requests to "require the SAT to provide a corrected calculation of the interest and penalties for tax years 2011 and 2012."[342]

283.  On the same date, the Criminal Court ordered the SAT to provide the requested calculation.[343]

284.  On 21 October 2016, the SAT submitted its calculation to the Criminal Court.[344] According to Mr. Albín, such calculation failed to consider the Rectification Payments.[345]

---

[338]  Submission from Deocsa to the SAT regarding 2014 and 2015 rectifications made under protest, dated 17 August 2016 (**Exhibit C-199**); Submission from Deorsa to the SAT regarding 2014 and 2015 rectifications made under protest, dated 17 August 2016 (**Exhibit C-200**).

[339]  Receipt of Deocsa rectification payment to the SAT for 2013, dated 19 August 2016 (**Exhibit C-10**); Receipt of Deorsa rectification payment to the SAT for 2013, dated 19 August 2016 (**Exhibit C-11**). *See also*, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 37.

[340]  Submission from Deocsa to the SAT regarding 2013 rectifications made under protest, dated 22 August 2016 (**Exhibit C-202**); Submission from Deorsa to the SAT regarding 2013 rectifications made under protest, dated 22 August 2016 (**Exhibit C-203**).

[341]  Claimant's Statement of Claim, para. 111; Submission from Deocsa to the SAT regarding February 2015 rectifications, payments made under protest, and calculation of fines and interest, dated 9 September 2016 (**Exhibit C-207**); Submission from Deorsa to the SAT regarding February 2015 rectifications, payments made under protest, and calculation of fines and interest, dated 9 September 2016 (**Exhibit C-208**). *See also*, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 39.

[342]  Deorsa and Deocsa Request to Criminal Court for order to SAT to provide calculation of interest and fines for tax years 2011 and 2012, dated 12 October 2016 (**Exhibit C-212**). *See also*, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 40.

[343]  Order of the Criminal Court to SAT for calculation of interest and fines for tax years 2011 and 2012, dated 12 October 2016 (**Exhibit C-213**).

[344]  SAT MFM-SAT-GEM-DRG-187-2016 to the Criminal Court containing calculations of interest and fines for tax years 2011 and 2012, dated 21 October 2016 (**Exhibit C-216**).

[345]  Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 40.

285.  On 27 October 2016, the Distributors' lawyer requested the Criminal Court to schedule a hearing for the discussion and review of the SAT's calculation of interest and fines.  On the same date, the Criminal Court scheduled the hearing for 29 December 2016.[346]

(d)  *Provisional Measures: Designation of Receivers*

286.  On 12 December 2016, there was an *ex parte* hearing attended by the SAT, the Public Prosecutor's Office and the Attorney General Office in which the SAT requested, *inter alia*, the appointment of a receiver for the Distributors.[347]  The judge granted the request to appoint receivers over the Distributors and to issue subpoenas to certain individuals, including Mr. Albín.[348]  The judge, however, denied the request to inspect, register and obtain financial documents from the Distributors' offices.[349]

287.  According to the Respondent, the SAT requested the appointment of receivers due to the Distributors' failure to pay interest and fines as had been agreed in the previous hearing.[350]  Mr. Muñoz testifies that such measure was requested in lieu of preventive seizures due to its lesser impact, as it protects the normal course of business of the companies.[351]

---

[346]  Criminal Court notice of hearing for review and discussion of calculation of interest and fines for tax years 2011 and 2012, dated 27 October 2016 (**Exhibit C-217**).

[347]  Criminal Court summary of *ex parte* hearing regarding the appointment of receivers for Deocsa and Deorsa, dated 12 December 2016 (**Exhibit C-224**).  *See also*, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 42.

[348]  Criminal Court summary of ex parte hearing regarding the appointment of receivers for Deocsa and Deorsa, dated 12 December 2016 (**Exhibit C-224**); Communication by the Criminal Court to the Director of the Criminal Justice Administration ordering the appointment of a receiver for Deocsa and Deorsa, dated 12 December 2016 (**Exhibit C-16**); Communication from the Criminal Court to the Merchant Registry regarding the appointment of receivers for Deocsa, dated 12 December 2016 (**Exhibit C-225**); Communication from the Criminal Court to the Merchant Registry regarding the appointment of receivers for Deorsa, dated 12 December 2016 (**Exhibit C-226**); Communication from the Criminal Court to the National Civil Police, dated 12 December 2012 (**Exhibit C-227**).  *See also*, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 42.

[349]  See Criminal Court summary of ex parte hearing regarding the appointment of receivers for Deocsa and Deorsa, dated 12 December 2016, p. 3 (**Exhibit C-224**).

[350]  Respondent's Statement of Defence, para. 218; Unofficial Audio Transcript of ex parte Hearing on appointment of receivers for Deocsa and Deorsa, dated 12 December 2016 (**Exhibit C-228**).  The Respondent disagrees with the Claimant's criticism regarding the *ex parte* character of the hearing, reiterating that precautionary measures are usually requested *ex parte* to preserve their purpose and that due process is preserved as such measures may be lifted, reduced and replaced (see Respondent's Statement of Defence, para. 220).  *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 134.

[351]  Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 98.

288.    The Claimant considers the request for the appointment of receivers as "further proof that the SAT would punish any attempt to 'challenge' the 'appropriateness' of the preliminary measures".[352]  According to Mr. Albín, the Distributors feared that the appointment of receivers "could destroy the Distributors' operations" and thus "felt compelled" to pay the full amount for interest and penalties for years 2011 and 2012 as calculated by SAT.[353]

289.    On 13 December 2016, the Distributors conveyed to the SAT their intention to pay the full amount for interest and penalties corresponding to years 2011 and 2012 as calculated by SAT in light of the decision to intervene in the Distributors in order to guarantee such payment.[354]  Such payments were made under protest.[355]

290.    On 14 December 2016, the Distributors requested the Criminal Court to vacate the order to appoint a receiver, noting that they had paid the amounts allegedly due as fines and interest for years 2011 and 2012 under protest.[356]

291.    On the same date, the Criminal Court decided to vacate the intervention order as well as to lift the liens imposed over certain vehicles from the Distributors.[357]

---

[352]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 119.

[353]   Claimant's Statement of Claim, para. 112; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 43. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 119; Witness Declaration of Daniel Urbina, dated 23 December 2019, para. 37.

[354]   Submission from Deocsa to SAT regarding payment of interest and fines for tax years 2011-2012, dated 13 December 2016 (**Exhibit C-229**); Submission from Deorsa to SAT regarding payment of interest and fines for tax years 2011-2012, dated 13 December 2016 (**Exhibit C-230**); Receipt of Deorsa payment to the SAT regarding fines and interest for 2011 and 2012, dated 13 December 2016 (**Exhibit C-17**); Receipt of Deocsa payment to the SAT regarding fines and interest for 2011 and 2012, dated 13 December 2016 (**Exhibit C-18**).

[355]   Submission from Deocsa to SAT regarding payment of interest and fines for tax years 2011-2012, dated 13 December 2016 (**Exhibit C-229**); Submission from Deorsa to SAT regarding payment of interest and fines for tax years 2011-2012, dated 13 December 2016 (**Exhibit C-230**).  The Claimant refers to the opinion of its expert, Mr. Donado, who claims that the SAT's calculation of interest and penalties were legally unsupported because they were not determined and quantified in accordance with the requirements of Article 103 of the Tax Code and because the SAT failed to take into consideration the Rectification Payments (*see* Claimant's Statement of Claim, para. 114; Legal Report of Saúl Augusto Donado Rodríguez, dated 16 May 2019, paras. 47-48).

[356]   Deocsa and Deorsa Submission to the Criminal Court regarding revocation of appointment of receivers and vehicle lien, dated 14 December 2016 (**Exhibit C-231**).

[357]   Resolution of the Criminal Court regarding revocation of appointment of receivers and vehicle lien, dated 14 December 2016 (**Exhibit C-232**).

292. On 15 December 2016, the SAT informed the Criminal Court that the Distributors had paid an amount corresponding to interest and fines for tax years 2011 and 2012.[358]

**(e)** *Preliminary Motions*

*(i)   Motion of Prejudiciality*

293. On 20 January 2017, Mr. Álvaro Rodrigo Castellanos Howell, founding partner of the Guatemalan SPVs, filed a motion of prejudiciality ("*cuestión prejudicial*") pursuant to Article 291 of the Code of Criminal Procedure.[359]

294. At a hearing held on 11 July 2017, the Court of First Instance dismissed the motion of prejudiciality.[360]

295. On 12 July 2017, Mr. Castellanos Howell filed an appeal against such decision, which is currently pending.[361]

*(ii)   Motion to Dismiss for Failure to State a Claim*

296. On 3 March 2017, the Distributors filed a motion before the Criminal Court seeking dismissal of the Criminal Complaint for failure to state a claim.[362]

---

[358] SAT submission to the Criminal Court regarding Deocsa and Deorsa payment of interest and fines for tax years 2011-2012, dated 15 December 2016 (**Exhibit C-233**); Resolution of the Criminal Court of SAT submission regarding Deocsa and Deorsa payment of interest and fines for tax years 2011-2012, dated 15 December 2016 (**Exhibit C-234**).

[359] Motion of Prejudiciality filed by Mr. Howell, dated 20 January 2017 (**Exhibit R-98**); Code of Criminal Procedure of the Republic of Guatemala, Article 291 (**Exhibit R-69**) (Respondent's translation)"If the criminal prosecution depends solely on the adjudication of a matter of prejudiciality that, according to the law, must be resolved in an independent proceeding, the latter must be brought and prosecuted by the Prosecutor's Office with summons being served on all the interested parties, so long as this is permitted in the law regulating the matter. When the Prosecutor's Office is not entitled to bring the matter of prejudiciality it shall notify the person having standing of its existence and, in addition, shall require notification of the filing of the procedure and its outcome."

[360] Respondent's Statement of Defence, para. 239; Hearing to Request a Preliminary Ruling (audio), dated 11 July 2017, 02:35:53 - 02:36:33 (**Exhibit R-83**).

[361] Appeal filed by Mr. Castellanos Howell, dated 12 July 2017 (**Exhibit R-99**); Decision of the Court of First Instance in Criminal Law, Drug Trafficking and Crimes against the Environment, dated 14 July 2017 (**Exhibit R-93**).

[362] Motion to Dismiss for Failure to State a Claim filed by DEOCSA and DEORSA, dated 3 March 2017 (**Exhibit R-67**). The Respondent notes that other accused (Mr. Howell, founding partner of the Guatemalan SPVs; Mr. Riedel, representative of the Guatemalan SPVs in the 2011 Transaction; and Ms. Martínez Mont Molina, legal representative of DEOCSA, B.V.) also submitted motions for failure to state a claim, which were dismissed by the Criminal Court, decision which was appealed. *See* Respondent's Statement of Defence, para. 236; Succinct summary of the Criminal Proceeding hearing, dated 22 September 2017

297. On 22 March 2017, a hearing was held in which the parties to the Criminal Proceeding stated their positions on the motion and offered evidence. Such hearing was suspended and a new one was scheduled for 8 June 2017.[363]

298. On 8 June 2017, another hearing took place, at which the Criminal Court rejected the motion to dismiss and ordered the continuation of the Criminal Proceeding.[364]

299. On 12 June 2017, the Distributors filed an appeal against the resolution rejecting the motion to dismiss.[365]

300. On 4 August 2017, the Court of Appeals rejected the Distributors' appeal concerning the motion to dismiss.[366] The Court of Appeal held, *inter alia*, that the determination of the causal link corresponds exclusively to the trial phase of the Criminal Proceeding.[367]

301. On 18 September 2017, the Distributors filed an *amparo* action against the decision of the Court of Appeals before the Supreme Court of Guatemala.[368] The Respondent notes that such action was pending as of the date of submission of the Statement of Defence.[369]

---

(Exhibit R-87); Demurrer filed by Mr. Riedel, dated 30 January 2017 (Exhibit R-88); Succinct summary of the Criminal Proceeding hearing, dated 9 August 2017 (Exhibit R-89); Appeal filed by Mr. Riedel, dated 14 July 2017 (Exhibit R-90); Appeal filed by Mr. Martinez Mont Molina on 2 May 2018 (Exhibit R-91); Appeal filed by Mr. Castellanos Howell, dated 18 October 2018 (Exhibit R-92). The Respondent notes that the appeals by Ms. Mont Molina and Mr. Castellanos were rejected by the Court of Appeal, while the appeal by Mr. Riedel is still pending. *See* Decision of the Criminal Court of Appeals, dated 22 July 2019 (Exhibit R-96); Decision of the Criminal Court of Appeals, dated 16 August 2018 (Exhibit R-97).

[363] Brief record of the Criminal Procedure hearing, dated 22 March 2017 (Exhibit R-80). *See also*, Respondent's Statement of Defence, para. 228.

[364] Brief record of the Criminal Procedure hearing, dated 8 June 2017 (Exhibit R-82). *See also*, Respondent's Statement of Defence, paras. 228-229.

[365] Appeal filed by the Distributors, dated 12 June 2017, p. 7 (Exhibit R-68).

[366] Decision of the Third Chamber of the Court of Appeals of the Criminal, Drug and Crimes Against the Environment, dated 4 August 2018, p. 3 (Exhibit R-7).

[367] Decision of the Third Chamber of the Court of Appeals of the Criminal, Drug and Crimes Against the Environment, dated 4 August 2018, p. 3 (Exhibit R-7) (Respondent's Translation): "we the presiding judges in this court believe that it is not feasible on such occasions to establish either the existence of the causal relationship or the direct participation of any individual in the facts subject to complaint, because such acts are specific to another phase of the criminal proceeding which is the oral and public hearing phase, given that the preliminary phase for establishing the truth only requires an order by the authorized public bodies that an investigation be commenced into the possible existence of a criminal act."

[368] Amparo action filed by the Distributors, dated 18 September 2017 (Exhibit R-86).

[369] Respondent's Statement of Defence, para. 235.

### (iii)   *Objection for Lack of Causal Relation and Elements of the Crime*

302. On 4 November 2019, the Distributors filed another motion before the Criminal Court seeking the dismissal of the Criminal Complaint for lack of causal relation and lack of elements of the crime ("*falta de elementos de tipicidad*").[370]

*The Respondent's Position on the Preliminary Motions*

303. The Respondent contends that the defendants in the Criminal Proceeding have filed many preliminary motions with dilatory purposes.[371]

304. In particular, the Respondent asserts that the motion to dismiss for failure to state a claim and the motion of prejudiciality are similar in content to the Claimant's arguments in this arbitration.[372] Both preliminary motions were dismissed in first instance and are pending resolution before Guatemalan higher courts.[373]

*The Claimant's Position on the Preliminary Motions*

305. The Claimant is critical of the Respondent's characterization of the preliminary motions filed by the Distributors, arguing that the Distributors, in filing such, are availing themselves of their right of defense against the SAT's allegations.[374]

306. Moreover, the Claimant denies that it or the Distributors would have any incentive in delaying the Criminal Proceeding, noting that, while the proceeding is still pending, the Respondent will remain in possession of the full amount in dispute, which was paid under protest.[375]

---

[370] Memorial for the Demurrer, dated 4 November 2019 (**Exhibit R-212**).

[371] Respondent's Statement of Defence, para. 223; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 81, 148-150, 152-154.

[372] Respondent's Statement of Defence, paras. 224, 241.

[373] Respondent's Statement of Defence, para. 224.

[374] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 122.

[375] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 122.

(f)    *Audit in relation to Rectification Payments and Calculation of Amounts Allegedly Due*

307.  On 4 December 2018, the Criminal Court ordered the SAT to develop new audits in relation to the Rectification Payments.[376]

308.  On 29 January 2018, an independent expert appointed by the Criminal Court submitted an opinion on certain matters as requested by the Criminal Court.[377]   The Claimant underscores the independent expert's opinion that the Binding Tax Opinions complied with the legal requirements.[378]   The Respondent replies that the independent expert only assessed whether the requirements to issue a binding opinion were complied with and the necessary formal elements were included.   However, he did not align himself with the Claimant's interpretation of the opinions.[379]

309.  On 27 February 2019, the SAT issued reports in response to the Criminal Court's order, finding that "the tax paid as a result of the rectifications, which were not considered in the submitted criminal complaint, so the taxpayer can request its compensation or devolution to the SAT through the corresponding administrative procedure".[380]

310.  On 29 May 2019, a hearing was held before the Criminal Court to present the results of the new tax audit.   The judge granted the Distributors' request to have the amount of interest and fines determined and ordered the SAT to apply and compensate the amounts received on 19 February 2015, 10 August 2016 and 13 December 2016 through an administrative resolution.[381]

---

[376]   See Liquidation presented by the SAT in the Criminal Procedure, dated 23 October 2019, p. 5 (**Exhibit R-78**).

[377]   Claimant's Statement of Claim, para. 117; José Miguel Paredes Rangel, Independent Expert's Report of the Procedural Subjects Related to the Case, dated 29 January 2018 (**Exhibit C-288**).

[378]   Claimant's Statement of Claim, para. 117; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 51; José Miguel Paredes Rangel, Independent Expert's Report of the Procedural Subjects Related to the Case, dated 29 January 2018, p. 3 (**Exhibit C-288**) (Claimant's translation): "lawfully comply with consideration in articles 102, 122 and 123 of the Tax Code, which determine the requirements and effects to be considered binding consultations."

[379]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 49.

[380]   *See* Liquidation presented by the SAT in the Criminal Procedure, dated 23 October 2019, p. 5 (**Exhibit R-78**) (Tribunal's translation).

[381]   See Unofficial transcript of hearing regarding determination of calculation of alleged amounts due, dated 29 May 2019 (**Exhibit C-586**); Liquidation presented by the SAT in the Criminal Procedure, dated 23 October 2019, pp. 10, 21 (**Exhibit R-78**). *See also*, Respondent's Statement of Defence, para. 221.

311. On 23 August 2019, the SAT submitted to the Criminal Court reports settling the difference between the amounts paid by the Distributors, including the Rectification Payments, and noting that the latter could request from the SAT restitution of the exceeding amounts.[382]

312. On 14 November 2019, the Distributors submitted a request to the Criminal Court to have the order of 29 May 2019 enforced.[383]

313. On 15 November 2019, the Criminal Court ordered the SAT to submit a report within twenty-four hours providing the status of compliance with its order.[384]

314. On 26 December 2019, the SAT issued two resolutions concluding: "(i) an undue payment is acknowledged, and (ii) the offset ordered by the Criminal Court is not possible."[385]  The Resolutions indicated that the taxpayers could claim the amounts unduly paid before the SAT pursuant to Article 153 of the Tax Code.[386]

315. On 9 January 2020, the SAT filed a memorial before the Criminal Court noting that the Distributors had been notified on 27 December 2019 of the existence of excess payments made in the context of the Criminal Proceeding, and that, as a result, the Distributors had the right to have such amounts returned.[387]

316. On 10 January 2020, the Distributors request that the Criminal Court enforce its order of 29 May 2019.[388]

---

[382]  See Liquidation presented by the SAT in the Criminal Procedure, dated 23 October 2019, pp. 5-6, 9 (**Exhibit R-78**). *See also*, Respondent's Statement of Defence, para. 221.

[383]  See Distributors submission to the Criminal Court requesting execution of 29 May 2019 order, dated 14 November 2019 (**Exhibit C-597**).

[384]  See Criminal Court request for SAT report of compliance, dated 15 November 2019 (**Exhibit C-641**).

[385]  *See* SAT Resolution No. GEG-DR-R-2019-21-01-001361, dated 26 December 2019, p. 5 (**Exhibit C-642**); SAT Resolution No. GEG-DR-R-2019-21-01-001360, dated 26 December 2019, p. 5 (**Exhibit C-643**) (Tribunal's translation).

[386]  See SAT Resolution No. GEG-DR-R-2019-21-01-001361, dated 26 December 2019, p. 6 (**Exhibit C-642**); SAT Resolution No. GEG-DR-R-2019-21-01-001360, dated 26 December 2019, p. 6 (**Exhibit C-643**).

[387]  See Memorial filed by the SAT, dated 9 January 2020 (**Exhibit R-211**).

[388]  See Distributors request to resolve the judicial warnings for non-compliance with 29 May 2019 order, dated 10 January 2020 (**C-645**).

317. On 13 January 2020, the Distributors filed an administrative appeal ("*recurso de revocatoria*") before the SAT in relation to the resolutions dated 26 December 2019.[389]

318. On 15 January 2020, the Criminal Court granted the Distributors' request and issued an order requiring the SAT to compensate said amounts and to issue a new resolution recalculating the amounts due within 72 hours.[390]  According to the Claimant, the SAT is yet to comply with this order.[391]

### (g)   *Current Status of the Criminal Proceeding*

319. The Criminal Proceeding is still underway before Guatemalan criminal courts.[392]

320. According to the Respondent, the Criminal Proceeding is still in its investigative phase and so far there has been no formal indictment issued by the Public Prosecutor's Office against the Distributors.[393]

321. The Respondent notes that the Payments under Protest could be restored if the Distributors are acquitted in the Criminal Proceeding.[394]  The Respondent refers in this regard to the Distributors' financial statements for years 2016 and 2017, which note that "Energuate's administration believes that, based on the opinion of its tax and legal experts, there is a greater than 50% probability of recovering these payments as a result of the final resolution of this claim and other appeals that will be filed by Energuate and the Company".[395]

---

[389]   Objection of DEOCSA to SAT Resolution No. GEG-DR-R-2019-21-01-001361, dated 13 January 2020 (**Exhibit C-647**); Objection of DEORSA to SAT Resolution No. GEG-DR-R-2019-21-01-001360, dated 13 January 2020 (**Exhibit C-648**).

[390]   See Criminal Court Order to the SAT for compliance with 29 May 2019 order, dated 15 January 2020, pp. 4-5 (**Exhibit C-649**).

[391]   The Claimant's Rejoinder on Jurisdiction, para. 20; Fourth Legal Report of Saúl Augusto Donado Rodríguez, dated 20 March 2020, para. 12.

[392]   Claimant's Statement of Claim, para. 117; Respondent's Statement of Defence, paras. 1, 8.

[393]   Respondent's Statement of Defence, paras. 1, 8, 21. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 9.

[394]   Respondent's Statement of Defence, para. 222; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 9, 81, 139-142, 145-147.

[395]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 141; Distribuidora de Electricidad de Occidente S.A. Financial Statements for the Year Ending on 31 December 2016 and Corresponding Figures of 2015 and Independent Auditor's Report, dated 31 March 2017, p. 77 (**Exhibit C-253**); Distribuidora de Electricidad de Oriente S.A. Financial Statements for the Year Ending on 31 December 2016 and Corresponding Figures of 2015 and Independent Auditor's Report, dated 31 March 2017, p. 77 (**Exhibit C-254**); Distribuidora de Electricidad de Occidente S.A. Financial Statements for the Year Ending on 31 December 2017 and Corresponding Figures of 2016 and Independent Auditor's Report,

322. The Claimant is critical of the fact that the Criminal Proceeding has been ongoing for four years now "with no end in sight".[396] According to Mr. Donado, as the Criminal Proceeding is still in a preliminary stage, it may still take ten or more years until a final decision is taken.[397] He further considers that there is a real risk that the Payments under Protest may not be refunded.[398]

### G.   DISTRIBUTORS' REQUEST FOR BINDING TAX OPINIONS REGARDING DEBT REFINANCING

323. On 17 October 2016, the Distributors submitted to the SAT a request to obtain a binding opinion pursuant to Article 102 of the Tax Code regarding the entitlement to deduct interest arising from the refinanced debt (the **"Consultation Requests"**).   In the Consultation Requests, the Distributors submitted the following specific questions to the SAT:

> 1. Is it considered to be exempt from the 10% retention in relation to ISR [income tax] the payment or accreditation over account of interests that [DEOCSA / DEORSA, respectively] will make in favour of Santander as a result of the financing structure described above?
>
> 2. Is it considered as a deductible expense in relation to ISR [income tax] the interests paid abroad in accordance with the financing structure described above in the section "Background"?[399]

324. On 21 November 2016, the Distributors submitted a modification submission with regard to their Consultation Requests, now stating that the financing entity would be Credit Suisse (the **"Modified Consultation Requests"**).[400]

325. On 6 December 2016, the SAT issued non-binding opinions in response to the Distributors' Modified Consultation Requests (the **"Non-Binding Tax Opinions"**).[401]

---

dated 21 March 2018, at p. 68 (**Exhibit C-289**); Distribuidora de Electricidad de Oriente S.A. Financial Statements for the Year Ending on 31 December 2017 and Corresponding Figures of 2016 and Independent Auditor's Report, dated 21 March 2018, p. 68 (**Exhibit C-290**).

[396]   Claimant's Rejoinder on Jurisdiction, paras. 17, 21.

[397]   Claimant's Rejoinder on Jurisdiction, para. 21; Fourth Legal Report of Saúl Augusto Donado Rodríguez, dated 20 March 2020, paras. 4-5.

[398]   Claimant's Rejoinder on Jurisdiction, para. 21; Fourth Legal Report of Saúl Augusto Donado Rodríguez, dated 20 March 2020, paras. 5-6.

[399]   Deocsa Binding Consultation regarding Consulta Vinculante on exemption of ISR in payment of interest to non-resident Bank in Guatemala and deduction of interest expense, dated 17 October 2016 p. 7 (**Exhibit C-291**); Deorsa Binding Consultation regarding Consulta Vinculante on exemption of ISR in payment of interest to non-resident Bank in Guatemala and deduction of interest expense, dated 17 October 2016, p. 7 (**Exhibit C-292**) (Tribunal's translation).

[400]   Deocsa Modification to the Submitted Binding Consultation, dated 21 November 2016 (**Exhibit C-293**); Deorsa Modification to the Submitted Binding Consultation, dated 21 November 2016 (**Exhibit C-294**).

[401]   Non-Binding Opinion from the SAT to Deocsa, dated 6 December 2016 (**Exhibit C-295**); Non-Binding Opinion from the SAT to Deorsa, dated 6 December 2016 (**Exhibit C-296**).

326.  The Non-Binding Tax Opinions indicated that the Unit of Tax Consultations (*"Unidad de Consultas Tributarias y Aduaneras del Departamento de Consultas de la Intendencia de Asuntos Jurídicos"*) had sent the (Modified) Consultation Requests to the Unit of Legal Orientation (*"Unidad de Orientación Legal y Derechos del Contribuyente del Departamento de Consultas de la Intendencia de Asuntos Jurídicos"*) after having determined that the former:

> was not competent to entertain the request, given that it was not a specific tax consultation, as from the reading of the request it flows that it is not a binding consultation within the terms referred to in Article 102 of the Tax Code, insofar as the requesting party refers to its interest in acquiring debt to finance its operations with the purpose of continuing its current business in electric energy distribution in Guatemala and for the financing structure [DEOCSA / DEORSA, respectively], has considered Banco Santander, resident abroad, from the above it was decided that it had to be addressed as a request for Legal Orientation, pursuant to Articles 1 and 6 of Resolution No SAT-S-1706-2012, which modified Resolution No. 467-2007, both from the Superintendent of Tax Administration.[402]

327.  The Distributors refinanced their debt in May 2017 and, according to Mr. Albín, did not claim interest deductions as a result of the SAT's refusal to provide binding tax opinions on the matter and its recent treatment of the Distributors.[403]

## H.    CONSULTATIONS BETWEEN THE PARTIES

328.  On 16 August 2016, Javier García Burgos, in his capacity of CEO of the IC Power group, sent a letter to the President of Guatemala, with copies provided to the Ministers of Economy, Public Finance, Energy and Mines and the Superintendent of SAT, concerning the initiation of the Criminal Proceeding.[404]

329.  On 27 September 2016, DEOCSA, B.V., DEORSA, B.V., and Estrella Cooperatief BA (all of which are members of the IC Power group) submitted a Notification of Dispute to the President of Guatemala and the Minister of Foreign Affairs, pursuant to the Agreement between the Republic of Guatemala and the Kingdom of the Netherlands on the Promotion and Reciprocal Protection of Investments (the **"Guatemala-Netherlands BIT"**).[405]

---

[402]  Non-Binding Opinion from the SAT to Deocsa, dated 6 December 2016 at pp. 8-9 **(Exhibit C-295)**; Non-Binding Opinion from the SAT to Deorsa, dated 6 December 2016, p. 9 **(Exhibit C-296)** (Tribunal's translation).

[403]  Claimant's Statement of Claim, para. 125; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 52. According to Brattle, the deductions on the refinanced debt had a value of US$ 18.1 million and its non-application resulted in US$ 16.6 million losses for the Claimant (Brattle Expert Report, dated 16 May 2019, para. 30).

[404]  Letter from IC Power to President of Guatemala, dated 16 August 2016 **(Exhibit C-198)**.

[405]  Letter from Estrella Cooperatief B.A. to President of Guatemala and Minister of Foreign Affairs, dated 27 September 2016 **(Exhibit C-209)**.

330. A meeting was scheduled to take place between Mr. García-Burgos and the Minister of Finance, which was cancelled before it took place.[406]

331. As a follow-up, IC Power submitted letters on 12 and on 21 December 2016 to the Minister of Energy and Mines.[407]

332. On 21 December 2016, a meeting between representatives of IC Power and the Minister of Energy and Mines took place.[408] According to the Claimant, the Minister of Energy and Mines proposed consultations with SAT and the Minister of Public Finance.[409] IC Power sent a follow-up letter to the Minister on 13 March 2017.[410]

333. According to the Claimant, on 5 April 2017, a representative of the IC Power group met with the President. On the same date, the Private Secretary of the Presidency requested by e-mail the "filing of information of opinion about taxes as agreed with the President".[411]

334. By letter dated 11 April 2016, the Chief Operating Officer of Distribution of the IC Power group provided an *aide-memoire* to the Secretary of the Presidency concerning the circumstances affecting their investment in Energuate and copies of the Binding Tax Opinions.[412]

335. On 23 May 2017, IC Power submitted a Notice of Dispute under the Treaty to the Minister of Economy.[413]

---

[406] Claimant's Statement of Claim, para. 127; Emails between Ministry of Public Finance and IC Power, dated 5 October 2016 (**Exhibit C-210**). *See also* Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 29.

[407] Letter from IC Power to Minister of Energy and Mines, dated 12 December 2016 (**Exhibit C-223**); Letter from IC Power to Ministry of Energy and Mines, dated 21 December 2016 (**Exhibit C-235**).

[408] Claimant's Statement of Claim, para. 128; Letter from IC Power to Ministry of Energy and Mines, dated 29 December 2016 (**Exhibit C-236**).

[409] Claimant's Statement of Claim, para. 128.

[410] Letter from IC Power to Ministry of Energy and Mines, dated 13 March 2016 (**Exhibit C-251**).

[411] Email from Presidency requesting Binding Tax Opinions, dated 5 April 2017 (**Exhibit C-256**) (Tribunal's translation)According to the Claimant, by such e-mail the Secretary was requesting a copy of the Binding Tax Opinions (*see* Claimant's Statement of Claim, para. 130).

[412] Letter from IC Power to the Presidency, dated 11 April 2017 (**Exhibit C-257**).

[413] IC Power Notification of Dispute to Guatemala, dated 23 May 2016 (**Exhibit C-7**).

336.    On 7 June 2017, IC Power sent letters to the President of Guatemala and the Minister of Energy and Mines to inform them about the submission of the Notice of Dispute and reiterating their interest in promoting new consultations.[414]

337.    According to the Claimant, on 6 July 2017, a meeting was held between representatives of IC Power and the Minister of Economy.[415] According to Mr. García, during the meeting the Minister expressed his embarrassment "regarding the situation with the Distributors".[416] On 19 July 2017, as a follow-up, the General Manager of Energuate provided the Minister with an *aide memoire* on key aspects of the disputes and with copies of the Binding Tax Opinions.[417]

338.    According to the Claimant, the Minister of Economy requested an informal meeting with the Distributors in September 2017.[418]

I.    SALE OF THE DISTRIBUTORS

339.    At the end of January 2017, IC Power launched an IPO to raise capital.[419] According to Mr. García, the IPO was withdrawn shortly thereafter on account that the existing demand was not meeting IC Power's price expectations.[420]

---

[414]    Letter from IC Power to President of Guatemala, dated 7 June 2017 (**Exhibit C-263**); Letter from IC Power to Ministry of Energy and Mines, dated 7 June 2017 (**Exhibit C-264**).

[415]    Claimant's Statement of Claim, para. 132.

[416]    Claimant's Statement of Claim, para. 132; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 43.

[417]    Email from Energuate to Minister of Economy, dated 19 July 2017 (**Exhibit C-266**).

[418]    Claimant's Statement of Claim, para. 132.

[419]    SEC Filing, Kenon Holdings Ltd., "IC Power Ltd., a Wholly-Owned Subsidiary of Kenon Holdings Ltd., Launches Initial Public Offering," dated 23 January 2017 (**Exhibit C-244**).

[420]    Claimant's Statement of Claim, para. 135; Witness Statement of Javier García-Burgos Benfield dated 16 May 2019, para. 44; SEC Filing, Kenon Holdings Ltd., "IC Power Ltd., a Wholly-Owned Subsidiary of Kenon Holdings Ltd., Withdraws Initial Public Offering Due to Market Conditions," dated 2 February 2017 (**Exhibit C-248**). This is not disputed by the Respondent: See Respondent's Statement of Defence, para. 246; Witness Statement of Javier García-Burgos Benfield, dated 16 May 2019, para. 44; SEC Filing, Kenon Holdings Ltd., "IC Power Ltd., a Wholly-Owned Subsidiary of Kenon Holdings Ltd., Withdraws Initial Public Offering Due to Market Conditions", dated 2 February 2017, p. 2 (**Exhibit C-248**) ("In light of current market conditions, we believe that our proposed IPO is not in the best interests of our company and our shareholder at this time, and accordingly, we have decided to withdraw our IPO"). *See also*, Respondent's Rejoinder on Merits and Reply to the Jurisdictional Objections, para. 157.

340. IC Power's parent company then decided to consider non-binding offers from purchasers interested in acquiring its Latin American assets.[421]

341. IC Power provided due diligence materials to three potential buyers (Colbun, BlackRock, and I Squared Capital, or "**ISQ**").[422] Colbun and BlackRock discontinued the process following the due diligence.[423] The third potential investor, ISQ, submitted an offer to purchase 100% of IC Power's assets in Latin America.[424] Following further negotiations, ISQ revised its offer.[425]

342. By a Stock Purchase Agreement dated 24 November 2017, IC Power Distribution Holdings Pte. Ltd. and Inkia sold IC Power's assets in Latin America to Nautilus Inkia Holdings LLC, Nautilus Distribution Holdings LLC, and Nautilus Isthmus Holdings LLC, subsidiaries of ISQ (the "**Sale**").[426] The Sale closed on 31 December 2017.[427] IC Power sold its assets in Latin America for US$ 1.2 billion.[428]

343. According to the Respondent, the Sale responds to the global strategies of IC Power's parent company and is unrelated to the present dispute.[429]

---

[421] Claimant's Statement of Claim, para. 136; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 44; Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 16.

[422] Claimant's Statement of Claim, para. 137; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 44; Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 16.

[423] Claimant's Statement of Claim, para. 137; Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 45; Witness Declaration of Yoav Doppelt, dated 16 May 2019, paras. 17-18. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 158.

[424] Claimant's Statement of Claim, para. 138; Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 19; Email from I Squared Capital to IC Power regarding the I Squared Offer, dated 2 September 2017 (**Exhibit C-268**).

[425] Claimant's Statement of Claim, para. 138; Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 19; Email from I Squared Capital to Yoav Doppelt regarding Revised Offer, dated 9 October 2017 (**Exhibit C-269**).

[426] Share Purchase Agreement by and among Inkia Energy Ltd., IC Power Distribution Holdings, Pte. Ltd., Nautilus Inkia Holdings LLC, Nautilus Distribution Holdings LLC, and Nautilus Isthmus Holdings LLC, dated 24 November 2017 (**Exhibit C-271**); Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para. 44; Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 20. *See also*, Claimant's Statement of Claim, paras. 11, 139; Respondent's Statement of Defence, paras. 15, 244; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 8; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 156.

[427] Witness Declaration of Javier García-Burgos Benfield, dated 16 May 2019, para.45; Witness Declaration of Yoav Doppelt, dated 16 May 2019, para. 20.

[428] Respondent's Statement of Defence, para. 244; Press Release, Reuters, "Israel's Kenon agrees to sell IC Power's Latam business for $1.2 billion", dated 26 November 2017 (**Exhibit R-100**).

[429] Respondent's Statement of Defence, para. 243, 246-249; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 10, 155.

**J.      THE CLAIM AGREEMENT AND SUPPLEMENTAL AGREEMENT**

344.    Before the Sale was closed, on 28 December 2017, Nautilus Inkia Holdings LLC, DEOCSA,
        DEORSA, IC Power Distribution Holdings, Pte. Ltd. and IC Power entered into an agreement
        whereby IC Power would "continue to retain the right to pursue the Investment Treaty Claims
        against Guatemala and to retain any proceeds thereof" (the "**Claim Agreement**" or "**Letter
        Agreement**").[430] Pursuant to the Letter Agreement:

> Buyer, DEOCSA and DEORSA agree not to, and Buyer agrees to cause no Acquired
> Company or Subsidiary or any of their Affiliates to, pursue any investment treaty claim in
> connection with the SAT Criminal Complaint or the Guatemalan Tax Payment or any matter
> directly related to the SAT Criminal Complaint or the Guatemalan Tax Payment.[431]

345.    On 19 December 2019, IC Power and ISQ entered into a supplemental agreement whereby they
        clarified their original intention in entering the Claim Agreement (the "**Supplemental
        Agreement**").[432] The Supplemental Agreement provides, in relevant part, as follows:

> 1. <u>Allocation of Economic Benefits</u>. The Parties hereby confirm and document their original
> intention that ICPAD shall retain the economic benefit of any refund or repayment of the
> Guatemalan Tax Payment (as such definition is amended herein) and receive a payment with
> respect to any deductions for interest expense and amortization of goodwill for the years 2018
> through the end of 2027 to which DEOCSA and DEORSA might be entitled to in connection
> with the SAT Criminal Complaint.
>
> 2. <u>Pursuit of Economic Benefits</u>. The Parties further confirm and document their original
> intention that, in furtherance of the foregoing, Buyer 1, DEORSA and DEOCSA shall not
> and Buyer 1 agrees to cause each Acquired Company, Subsidiary and any of their Affiliates
> not to, initiate, file, institute, or proceed upon any Action to pursue, or otherwise claim, any
> SAT Tax Recovery to the extent that such amounts are being pursued or have been received
> by Seller 2 or any of its Affiliates, including ICPAD, pursuant to the Investment Treaty
> Claims.[433]

346.    According to the Respondent, there is a risk that Guatemala will have to face several claims
        regarding the same facts as a consequence of the Sale of the Distributors, and there is also a risk

---

[430]   Letter Agreement Regarding SAT Criminal Proceedings and Potential Investment Treaty Claims, dated
        28 December 2017, at p. 2 (**Exhibit C-273**). *See also*, Claimant's Statement of Claim, para. 139; Witness
        Declaration of Yoav Doppelt, dated 16 May 2019, para. 20; Witness Declaration of Javier García-Burgos
        Benfield, dated 16 May 2019, para. 45; Claimant's Statement of Reply and Response to Jurisdictional
        Objections, paras. 8, 124-125; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional
        Objections, para. 162.

[431]   Letter Agreement Regarding SAT Criminal Proceedings and Potential Investment Treaty Claims, dated
        28 December 2017, p. 4 (**Exhibit C-273**).

[432]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 8. *See also*, Respondent's
        Statement of Defence, paras. 252-252; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional
        Objections, para. 162.

[433]   Supplemental Agreement Regarding Economic Benefits and SAT Criminal Proceedings, dated
        19 December 2019, p. 1 (**Exhibit C-582**).

of double recovery.[434]  In the Respondent's view, such risk is not eliminated by the Supplemental Agreement.[435]

347.   In the Claimant's view, there is no risk of double recovery: the Supplemental Agreement clarifies that the definition of Guatemalan Tax payment includes tax years 2016 and 2017 and that IC Power is entitled to "payment with respect to any deductions for interest expense and amortization of goodwill for the years 2018 through the end of 2027."[436]

## IV.   RELIEF REQUESTED

*The Claimant's Request*

348.   In its Statement of Claim, the Claimant requests as relief that the Tribunal issue an award:

   (a)   Ruling that Guatemala violated the Treaty.

   (b)   Ordering Guatemala to pay Claimant damages in the amount of US$117,000,000.00, incurred by Claimant as a consequence of Guatemala's breaches of the Treaty, with compound interest until payment;

   (c)   Ordering Guatemala to pay all costs incurred by Claimant in connection with this proceeding;

   (d)   Ordering such further or other relief as may be appropriate. [437]

349.   In its Reply and Response to Jurisdictional Objections, the Claimant requests as relief that the Tribunal issue an award:

   (a)   Ruling that Respondent violated the Treaty;

   (b)   Ordering Respondent to pay Claimant damages in the amount of US$113,130,000, incurred by Claimant as a consequence of Respondent's breaches of the Treaty, with compound interest until payment;

   (c)   Ordering Respondent to pay all costs incurred by Claimant in connection with this proceeding;

   (d)   Ordering such further or other relief as may be appropriate.

---

[434]   Respondent's Statement of Defence, paras. 251-256; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 161-162.

[435]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 164-165.

[436]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 128; Supplemental Agreement Regarding Economic Benefits and SAT Criminal Proceedings, dated 19 December 2019, p. 1 (**Exhibit C-582**). *See also*, The Claimant's Rejoinder on Jurisdiction, para. 21.

[437]   Claimant's Statement of Claim, para. 239.

*The Respondent's Request*

350. In its Statement of Defence, the Respondent requests the following relief:

    (a)    "to declare that it [the Tribunal] lacks jurisdiction to rule on IC Power's claims or, otherwise, that said claims are inadmissible";[438]

    (b)    If the Tribunal finds it does have jurisdiction, or that the Claimant's claims are admissible, to "declare that the State has acted in accordance with the Treaty and international law in all matters that concern the Criminal Procedure against the Distributors";[439]

    (c)    If the Tribunal finds that the State's conduct violated the Treaty, "to declare that IC Power has no right to receive compensation for the damages it claims";[440]

    (d)    To "[o]rder IC Power to fully reimburse Guatemala for the costs incurred in the defense of its interests in this arbitration, jointly with interest calculated at a reasonable rate at the discretion of the Tribunal from the moment the State incurred in said costs up to the date of effective payment";[441]

    (e)    To "[o]rder any other measure of satisfaction to the State that the Tribunal deems appropriate."[442]

351. The Respondent reiterates this request for relief in its Rejoinder and Reply to Jurisdictional Objections.[443]

## V.    THE TRIBUNAL'S JURISDICTION AND THE ADMISSIBILITY OF CLAIMS

352. The Respondent raises a series of objections to the Tribunal's jurisdiction to consider the merits of the dispute. First, the Respondent argues that the "the Tribunal lacks jurisdiction *rationae*

---

[438]    Respondent's Statement of Defence, para. 516.

[439]    Respondent's Statement of Defence, para. 517.

[440]    Respondent's Statement of Defence, para. 518.

[441]    Respondent's Statement of Defence, para. 519.

[442]    Respondent's Statement of Defence, para. 519.

[443]    Respondent's Rejoinder and Reply to Jurisdictional Objections, paras. 455-458.

*materiae*"[444] and that the Claimant "in any event, lacks standing."[445]  The Respondent objects to the Tribunal's jurisdiction on the grounds that:

(a)     The Claimant "did not have an investment protected by the Treaty on the date it filed its Notice of Arbitration";[446]

(b)     The Claimant does not have standing "to claim the damages suffered directly by the Distributors";[447]

(c)     The Statement of Claim "is nothing but an abuse of the investment arbitration that must be sanctioned by the Tribunal";[448]

(d)     Claims made by the Claimant "are a dispute of domestic law that is outside its jurisdiction";[449]

(e)     The Claimant has not shown that "Guatemala's conduct constitutes *prime facie* a violation of the treaty";[450] and

(f)     The Respondent is not liable for decisions made by its courts "in the absence of a denial of justice or procedural error."[451]

353.   The Respondent further contends that the Claimant's claims are inadmissible by virtue of being "premature."[452]

354.   The Claimant rejects all of these objections and submits that the Tribunal has jurisdiction to render a decision on the claim.

---

[444]    Respondent's Statement of Defence, para. 257.
[445]    Respondent's Statement of Defence, para. 257.
[446]    Respondent's Statement of Defence, para. 257.
[447]    Respondent's Statement of Defence, para. 257.
[448]    Respondent's Statement of Defence, para. 257.
[449]    Respondent's Statement of Defence, para. 258.
[450]    Respondent's Statement of Defence, para. 258.
[451]    Respondent's Statement of Defence, para. 258.
[452]    Respondent's Statement of Defence, para. 258.

**A.    THE TRIBUNAL'S JURISDICTION**

    **1.    The Date on which the Investment Must be Held**

        **(a)    *The Parties' Arguments***

*The Respondent's Position*

355.  The Respondent submits that, as the Claimant did not have an existing investment in Guatemala when it filed its Notice of Arbitration on 20 February 2018, the Tribunal lacks jurisdiction to decide this matter.  In the Respondent's view, the Claimant's investment only existed until December 2017, "when it transferred its ownership in the Distributors to a third party."[453]  The Respondent cites the *Lockerbie* case for the proposition that the Tribunal's jurisdiction is determined from "the time that the act instituting proceedings was filed."[454]  Recalling *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, the Respondent contends that "the determination whether a party has standing in an international judicial forum . . . is made by reference to the date on which such proceedings are deemed to have been instituted."[455]  The Respondent notes that Article 8 of the Treaty—which relates to settlement of disputes arising pursuant to the Treaty—is to resolve "any dispute related to an investment"[456] between parties.[457]  The Respondent argues that as the Claimant did not have the necessary "investment" at the relevant time, the Tribunal has no jurisdiction under the Treaty.

356.  For the Respondent, the Claimant's earlier ownership of the Distributors is "irrelevant".  The Respondent cites *David R. Aven, et al. v. Republic of Costa Rica* for the principle that "an investor who disposes of ownership of the investment in question before arbitral proceedings should not be eligible to seek the Treaty's protection, unless special circumstances are present."[458]  The Respondent argues that none of the special circumstances foreseen in *David R. Aven, et al. v.*

---

[453]  Respondent's Statement of Defence, para. 260; Claimant's Notice of Arbitration, para. 11.

[454]  *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom)*, Preliminary Objections, Judgment, I.C.J. Reports 1998, paras. 37-38 (**Authority RLA-12**).

[455]  *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Ruling on Jurisdiction, 24 May 1999, para. 31 (**Authority RLA-21**).

[456]  Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 8.1 (**Exhibit C-1**).

[457]  Respondent's Statement of Defence, para. 264.

[458]  *David R. Aven, et al. v. Republic of Costa Rica*, ICSID Case No. UNCT/15/3, Award, (18 Sept. 2018), para. 301 (**Authority RLA-18**); Respondent's Statement of Defence, para. 265.

*Republic of Costa Rica*—such as the loss of the investment due to third-party action—are present here.[459] According to the Respondent, "the sale of the Distributors' shares to I Squared was a business decision ... unrelated to the Distributors' transaction and even less to the criminal investigation resulting from the SAT's complaint."[460] In this respect, the Respondent notes that the sale of the Claimant's share in the Distributors in 2017 was part of a much larger sale, and is hence unrelated to Guatemala's conduct.[461] The Respondent further submits that the Claimant decided to sell "for market reasons" and that, as it notified the Government of the dispute only after commencing negotiations for its shares, there can be no suggestion "it had been forced to sell its assets as a result of the SAT's conduct."[462] As such, the Respondent contends that the relevant date for the Claimant to have held these investments remains that on which the Notice of Arbitration was filed.[463]

357.  In the Respondent's view, the Claimant's express retention of claims under the Treaty in its sale of the Distributors is irrelevant to the question of jurisdiction. The Respondent submits that "[t]his is a unilateral declaration by Claimant; it is not binding on the state, and it cannot be understood as a change in the jurisdictional requirements under the treaty between Israel and Guatemala."[464]

358.  The Respondent disagrees with the Claimant's view that the "relevant date to determine the Tribunal's jurisdiction is that on which the alleged violation of the Treaty occurred."[465]

    (a)  First, the Respondent does not agree that this is necessary to permit claims of expropriation, because "the general rule acknowledges expropriation as an exception to its application."[466]

    (b)  Second, the Respondent disputes the Claimant's argument that cases decided under the ICSID Convention should be disregarded as they are not relevant to the present proceedings under the UNCITRAL Rules.[467] The Respondent contends that "ICSID jurisprudence" is

---

[459]  Respondent's Statement of Defence, para. 265.

[460]  Respondent's Statement of Defence, para. 266.

[461]  Respondent's Statement of Defence, para. 267.

[462]  Respondent's Statement of Defence, para. 269.

[463]  Respondent's Statement of Defence, para. 270.

[464]  Hearing Tr. (Day 1) 116:2-6.

[465]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 174.

[466]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 176.

[467]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 177.

relevant to the UNCITRAL Rules, and submits that cases such as *Vivendi v. Argentina II*,[468] as well as general jurisprudence and academic writing, confirm that "the rule cited by the State concerning the relevant date to determine the tribunal's jurisdiction is a general principle of the mechanisms for international dispute resolution (and not of ICSID arbitrations)."[469]

359. The Respondent likewise disagrees with the Claimant's argument that "the Tribunal would still have jurisdiction to rule on its claims because IC Power gave its consent to the arbitration"[470] in the Notification of Dispute.  The Respondent submits that the UNCITRAL Rules tie the commencement of arbitration to the date when "the notice of the arbitration is received by the respondent."[471]  Furthermore, the Respondent submits that "the Claimant did not consent to UNCITRAL arbitration when it submitted its Notification of Dispute."[472]

360. Finally, the Respondent disagrees with the Claimant's alternative argument that a claim under the Treaty is itself a protected investment, falling within the definition of "investment" as including "claims to money, goodwill and other assets and any claim having an economic value".[473] According to the Respondent, this would effectively eliminate the jurisdictional requirement of an investment: "purported investors should only allege that they have a claim under the treaty to meet the requirement of having an investment."[474]  The Respondent invokes *ACP Axos Capital GmbH v. Republic of Kosovo*[475] as an instance of a tribunal rejecting this very argument.[476]

---

[468]   *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Republic of Argentina*, ICSID Case No. ARB/97/3, Decision on Jurisdiction (14 Nov. 2005), para. 61 (**Authority RLA-145**).

[469]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 180.

[470]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 174.

[471]   Arbitration Rules of the United Nations Commission on International Trade Law (2013), article 3(2) (**Authority RLA-22**).

[472]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 184.

[473]   Hearing Tr. (Day 1) 116:9-25.

[474]   Hearing Tr. (Day 1) 116:19-21.

[475]   *ACP Axos Capital GmbH v. Republic of Kosovo*, ICSID Case No. ARB/15/22, Award (3 May 2018), paras. 246-256 (**Authority RLA-177**).

[476]   Hearing Tr. (Day 1) 116:22-25; Respondent's Post-Hearing Brief, para. 119.

*The Claimant's Position*

361. The Claimant disputes the Respondent's position that the Tribunal lacks jurisdiction as a result of the Claimant having sold its shares in the Distributors.[477]

362. According to the Claimant, "the relevant date to assess whether Claimant held qualifying investments under the Treaty is the date on which the disputed measures were adopted, i.e., at the time of the alleged breach."[478] The Claimant notes that there is no dispute that it held an investment at the time of the alleged breaches.[479]

363. In any event, however, the Claimant submits that it continued to hold the "right to pursue the Investment Treaty Claims against Guatemala", which was expressly reserved in its sale of the Distributors. Whether viewed as "rights derived from stock, shares . . . and other kinds of interest interests in legal entities," stemming from its previous shareholding, or as "claims to money, goodwill and other assets and any claim having an economic value," the Claimant submits that this suffices to demonstrate an investment.[480]

364. According to the Claimant, "[t]he Treaty does not require that a claimant continue to hold certain assets in order to bring a claim. The term 'investment dispute' does not require continuous holding of any assets, much less all assets."[481] The Claimant submits that this accords with the view in *El Paso v. Argentina* that "[t]here is no rule of continuous ownership of the investment"[482] and that the right to demand compensation for the injury under ICSID or a BIT mechanism continues to exist unless it was "sold with the investment."[483] In the Claimant's view, any requirement of continuous ownership "would imply that an illegal expropriation, which by definition deprives the investor of the ownership of its investment prior to the treaty arbitration, would automatically deprive any tribunal under that treaty of jurisdiction."[484]

---

[477]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 213.

[478]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 213.

[479]   Claimant's Post-Hearing Brief, para. 33.

[480]   Claimant's Post-Hearing Brief, paras. 32-33.

[481]   Claimant's Post-Hearing Brief, para. 35.

[482]   *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Decision on Jurisdiction (27 Apr. 2006), para. 135 **(Authority CL-138)**.

[483]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 214.

[484]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 214.

365.  In the Claimant's view, the decisions of the International Court of Justice in *Lockerbie*[485] and *Arrest Warrant*[486] are inapposite to the circumstances of the present case. Both cases "concerned objections that events that postdated the filing of the application to the Court deprived it of jurisdiction."[487] In any case, the Claimant maintains that it still held an investment at the time of its Notice of Arbitration.[488]

366.  The Claimant submits that investment arbitration precedents support its view. The Claimant relies in particular on *GEA Group Aktiengesellschaft v. Ukraine*,[489] which it considers "analogous to the present case."[490] In that case, the Claimant argues, the tribunal declined to introduce a continuous ownership requirement that it considered to have no foundation in the Treaty, the ICSID Convention, or the ICSID Rules.[491] The Claimant also relies on *Daimler v. Argentina* and its holding that "should accord standing to any qualifying investor under the relevant treaty texts who suffered damages as a result of the allegedly offending governmental measures at the time that those measures were taken—provided that the investor did not otherwise relinquish its right to bring an ICSID claim."[492]

367.  The Claimant distinguishes the Respondent's reliance on *David R. Aven, et al. v. Republic of Costa Rica*, and the argument that it must show "special circumstances"[493] to establish the Tribunal's jurisdiction while having disposed of its investment. According to the Claimant, this was "an ICSID case with little relevance to the present dispute."[494] The Claimant further notes that the claimant in *David R. Aven* did not expressly retain its rights to the investment claim and

---

[485]  *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom)*, Preliminary Objections, Judgment, I.C.J. Reports 1998, paras. 37-38 (**Authority RLA-12**).

[486]  *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, I.C.J. Reports 2002, paras. 23-24, 26 (**Authority RLA-23**).

[487]  Claimant's Post-Hearing Brief, para. 35.

[488]  Claimant's Post-Hearing Brief, para. 35.

[489]  *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award (31 Mar. 2011), paras. 107-125 (**Authority RLA-85**).

[490]  Claimant's Post-Hearing Brief, para. 35.

[491]  Claimant's Post-Hearing Brief, para. 36.

[492]  Claimant's Post-Hearing Brief, para. 37, *quoting Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award (22 Aug. 2012), para. 145 (**Authority CL-164**).

[493]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 216; *David R. Aven, et al. v. Republic of Costa Rica*, ICSID Case No. UNCT/15/3, Award (18 Sept. 2018), para. 296 (**Authority RLA-18**).

[494]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 216.

that the definition of investment under the there-applicable DR-CAFTA implies a requirement of continuous ownership.[495]

368.  The Claimant submits that "Respondent conflates two unrelated issues: (i) the date on which jurisdiction must be established by a tribunal under international law, and (ii) whether disposal of an investment before proceedings commence deprives a tribunal of jurisdiction."[496] The general rule, according to the Claimant, implies only that a Tribunal with jurisdiction as of the notice of arbitration will not lose it due to subsequent developments; it does not imply a rule of continuous ownership for investments, "particularly when the investor retains that component of the assets and the right to bring a claim".[497]

369.  The Claimant concludes that the only requirement relevant to situations where an investment was transferred before arbitration is that "the investor did not otherwise relinquish its right to bring"[498] the treaty claim.[499] The Claimant submits that it has met this requirement. According to the Claimant:

> IC Power has demonstrated that it held a qualifying investment under the Treaty at all relevant times. IC Power specifically negotiated for, and ultimately retained the right to bring this Treaty claim in its sale of the Distributors to ISQ. The Treaty specifically defines "investment" to include "claims to money, goodwill and other assets and any claim having an economic value."[500]

### (b)  *The Tribunal's Considerations*

370.  Reduced to its essence, the Respondent's objection is that IC Power was required to hold an investment in Guatemala at the moment it initiated these arbitral proceedings. The Claimant having voluntarily sold its interest in the Distributors, the Respondent posits that it no longer holds an investment and the Tribunal must deny jurisdiction. The Claimant both denies that any such requirement exists, in particular where it has expressly retained from the sale of the Distributors the right to bring these claims, and submits that it did in fact retain an investment at the time these proceedings were commenced.

---

[495]  Claimant's Rejoinder on Jurisdiction, para. 28.

[496]  Claimant's Rejoinder on Jurisdiction, para. 24.

[497]  Claimant's Rejoinder on Jurisdiction, paras. 25-26.

[498]  *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award (22 Aug. 2012), para. 145 **(Authority CL-164)**.

[499]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 218.

[500]  Claimant's Rejoinder on Jurisdiction, para. 22.

371. Although contrary to the order in which these issues were argued by the Parties, the Tribunal considers it opportune to begin its analysis with the Claimant's alternative argument, namely that the Claimant did in fact maintain an investment at the time it began this arbitration. The more complicated legal analysis of the rights of an investor under the Treaty in respect of an investment it no longer retains may well be avoided if the Claimant maintained a qualifying investment even after its sale of the Distributors.

372. As the Tribunal understands the Claimant's argument, it invokes two distinct elements of the definition of investment within Article 1 of the Treaty. The Claimant has expressly retained "the right to pursue the Investment Treaty Claims against Guatemala and to retain any proceeds thereof" from its sale of the Distributors.[501] The Claimant considers that this retained right qualifies as an investment either as a "claims to money, goodwill and other assets and any claim having an economic value" pursuant to Article 1(1)(a)(3) of the Treaty or as a "right[] derived from stocks, shares, . . . and other kinds of interests in legal entities" under Article 1(1)(a)(2), with the shares in question being the Claimant's former share interest in the Distributors.

373. In the Tribunal's view, the difficulty with this argument stems from the chapeau of the definition of investment within the Treaty and also from the question of where a public international law claim under the Treaty can be said to be located. The chapeau of Article 1(1) of the Treaty limits an investment to assets "implemented in accordance with the legislation of the Contracting Party in whose territory the investment is made."[502] For the Tribunal, this formulation implies that a qualifying investment must be physically located within the territory of Guatemala or arise as a matter of Guatemalan law. While the Tribunal could accept that the retention of a Guatemalan law claim from the sale of the remainder of the Claimant's investment would constitute an investment in its own right (as a "claim for money" "implemented in accordance with" Guatemalan law), this does not hold true for a Treaty claim. Even if directly related to the Claimant's investment in the Distributors in Guatemala, a public international law claim under the Treaty cannot fairly be said to constitute an asset located in Guatemala. And it certainly is not something implemented in accordance with Guatemalan law. Effectively, the Claimant's retention of Treaty claims in its sale of its investment is no different than if it had retained an

---

[501]  Letter Agreement Regarding SAT Criminal Proceedings and Potential Investment Treaty Claims, dated 28 December 2017 (**Exhibit C-273**); Share Purchase Agreement by and among Inkia Energy Ltd., IC Power Distribution Holdings Pte. Ltd., Nautilus Inkia Holdings LLC, Nautilus Distribution Holdings LLC, and Nautilus Isthmus Holdings LLC, dated 24 November 2017 (**Exhibit C-271**).

[502]  Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 1(1) (**Exhibit C-1**).

interest in a foreign (non-Guatemalan) asset owned by the Distributors: the Claimant has retained a portion of the property rights comprising its investment, but not one located in Guatemala.

374.   The Tribunal also agrees with the reasoning of the Tribunal in *Axos Capital v. Kosovo* that a contrary interpretation would produce paradoxical results: any investor would create a qualifying investment through the mere fact of advancing a claim under the treaty.[503]   The Tribunal accordingly concludes that the Claimant's Treaty claims do not themselves constitute qualifying investments under Treaty.

375.   Having disposed of the Claimant's alternative argument, the Tribunal now turns to the question of whether an investor may bring claims under the Treaty in respect of an investment it has since sold, in particular where it has expressly retained the right to do so.

376.   The first point of contention between the Parties with respect to this question is whether the existence of a qualifying investment should be evaluated as at the commencement of proceedings, or at some other point in time.   To determine the scope of the Parties' consent in the present matter, the Tribunal must look first to the terms of the Treaty itself.

377.   The Tribunal notes that Article 8 of the Treaty limits recourse to arbitration to "[a]ny investment dispute between a Contracting Party and an investor of the other Contracting Party."[504]   The same provision refers in Spanish to "[c]ualquier controversia concerniente a una inversión entre un inversionista de una Parte Contratante y la otra Parte Contratante."[505]   The Treaty provides that its English, Spanish, and Hebrew texts shall be equally authentic, but that the English text shall prevail in the event of any differences with respect to interpretation.   Here, however, the Tribunal sees no difference between the English and Spanish formulations.

378.   "Investor" is a defined term and in the case of a legal person includes "a legal entity, including a corporation, a firm, an association or a partnership: (i) that was incorporated, constituted or otherwise duly organized under the legislation of the Home Contracting Party."[506]   While the

---

[503]   *ACP Axos Capital GmbH v. Republic of Kosovo*, ICSID Case No. ARB/15/22, Award (3 May 2018), paras. 246-256 (**Authority RLA-177**).

[504]   Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 8(1) (**Exhibit C-1**).

[505]   Acuerdo entre la República de Guatemala y el Estado de Israel para la promoción y protección de las inversiones, dated 7 November 2006, Article 8(1) (**Authority RLA-95**).

[506]   Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 1(1)(d) (**Exhibit C-1**).

definition of investor does not itself explicitly require a company to make an investment, the "Home Contracting Party" is defined as the Contracting Party other than that "in whose territory the investment is made."[507] Effectively, therefore, an investment must have been made for a legal entity to qualify as an investor under the Treaty. It is a peculiarity of the Treaty that no such restriction appears to apply to natural persons, however, and it would appear that, on the face of the Treaty, any citizen of Guatemala or Israel, save for dual nationals, is an "investor".

379. The ordinary meaning of an "investment dispute" is a dispute with an "Investor" relating to an "Investment" as defined in the Treaty.

380. No clear time elements are contained in the notion of an "investment dispute", or in the definition of an investor within the Treaty text. An "investment dispute" is equally capable of referring to a dispute regarding a past investment as to a dispute in respect of an investment presently existing. The identification of the "Host Contracting Party" and "Home Contracting Party" by reference to where "the investment is made" (in the present tense) could imply a requirement that a corporate entity presently hold an investment to qualify as an investor, but could also be intended as time-neutral formulation, to apply more broadly. The Tribunal notes that certain elements of the Treaty (such as the encouragement and admission of "investments by investors"[508]) would necessarily apply before an investment is made within the territory of the Host Contracting Party. Moreover, reading a time element into the definition of investor for legal persons would only introduce a distinction between legal persons and natural persons for which no rational basis is apparent. Accordingly, the Tribunal is unwilling to find a specific time restriction for the determination of its jurisdiction within this definition.

381. Taken as a whole, the Tribunal finds that the text of the Treaty is ambiguous as to whether a dispute may be submitted to arbitration in respect of a former investment that has been sold prior to the commencement of arbitral proceedings. As no *travaux preparatoires* has been filed on the record, the Tribunal must conclude that the Treaty does not provide an answer to this question. As such, the Tribunal must resort to general international law and the practice of international courts and tribunals.

---

[507] Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 1(1)(b) **(Exhibit C-1)**.

[508] Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 2(1) **(Exhibit C-1)**.

382. In this respect, the Tribunal considers it broadly accepted that the jurisdiction of a public international law tribunal is assessed as at the date on which the proceedings were commenced.[509] The Tribunal also considers it generally recognized that this rule is subject to derogation. For example, it was well established by the tribunal in *Mondev International, Ltd. v. United States*[510] that a claimant who is deprived of a qualifying investment (or status as a qualifying investor) as a result of the very measures complained of (for instance, in the case of expropriation), will not be prevented from having recourse to dispute resolution by virtue of its lack of an investment at the time the proceedings are commenced. This rule is axiomatic for the provision of any meaningful protection, in particular in respect of expropriation.

383. In considering whether the general rule that international tribunals must assess their jurisdiction as at the date of commencement of proceedings is absolute, the tribunal in *David R. Aven, et al. v. Republic of Costa Rica* concluded as follows:

> To summarize, the Tribunal finds that the relevant case law instructs that in general terms, an investment sold after the date of Notice of Arbitration meets the criteria for an "investment" in the terms of DR-CAFTA. On the other hand, an investor who disposes of ownership of the investment in question before arbitral proceedings should not be eligible to seek the Treaty's protection, <u>unless special circumstances are present</u>. Such circumstances include, *inter alia*, the loss of the investment by the actions of a third party or the retroactive application of a treaty, neither of which are applicable to the matter at hand. (Emphasis added)

384. The Tribunal aligns with the view of the tribunal in *Aven* and considers that special circumstances may justify extending treaty protections to a claimant who voluntarily disposes of an investment prior to initiating proceedings. Such "special" circumstances need not be "exceptional"—the Tribunal understands the term "special" to mean that a valid reason must exist for a claimant to prolong a claim that it would otherwise be unable to bring.

385. Accordingly, the question before the Tribunal is whether the explicit retention by the Claimant of its Treaty claims in the Letter Agreement and the Supplemental Agreement prior to its transfer of ownership in the Distributors constitutes a valid reason to prolong those claims (see ¶¶ 344 and 345 above). The Tribunal considers that such is the case. There is no reason to prohibit the retention of Treaty claims in the absence of clear Treaty language to that effect. As noted by the tribunal in *GEA Group Aktiengesellschaft v. Ukraine*, reading a requirement of continuous

---

[509] *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Jurisdiction (24 May 1999), para. 31 (**Authority RLA-21**); *National Grid PLC v. Argentine Republic*, Decision on Jurisdiction (20 June 2006), para. 118 (**Authority RLA-13**); *David R. Aven, et al. v. Republic of Costa Rica*, ICSID Case No. UNCT/15/3, Award (18 Sept. 2018), paras. 294-296 (**Authority RLA-18**).

[510] *Mondev International, Ltd. v. United States*, ICSID Case No. ARB(AF)/99/2, Award (11 Oct. 2002), para. 91 (**Authority RLA-60**).

ownership into the Treaty "would exclude a significant range of cases where claims are made in respect of the divestment or expropriation of an investment."[511] Insofar as the alleged Treaty breaches were committed in respect of an investment held by the Claimant at the time, the Tribunal considers that the later transfer of ownership in the investment cannot extinguish the Claimant's right to bring a Treaty claim in respect of those breaches.

386.  Additionally, the Tribunal finds that, as a matter of principle, the ability of investors to mitigate the damage arising from a treaty breach would be significantly curtailed if investors were precluded from disposing of distressed assets before seeking redress before an investment tribunal.[512]

387.  However, the retention of treaty claims by investors prior to the disposal of an investment should not be unqualified. First, any retention of treaty claims must be absolute, such that any new owner of the investment would be precluded from bringing the same treaty claim in respect of the same facts. In the instant case, the Respondent has not questioned the validity of the Letter Agreement or the Supplemental Agreement, or else argued that their terms would leave scope for a duplication of claims—and the Tribunal is satisfied that they do not.

388.  Second, a claimant must have fulfilled the treaty's requirements for a qualifying investor and qualifying investment at some point prior to the commencement of the dispute resolution proceedings.[513] In this regard, it is common ground between the Parties that the Claimant owned an investment in Guatemala, at least, until December 2017[514]—that is, two months before the Claimant served on the Respondent its Notice of Arbitration, which, under Article 3(2) of the UNCITRAL Rules, constitutes the date of commencement of proceedings.

389.  Accordingly, the Tribunal finds that the Claimant is eligible to seek Treaty protection by virtue of its retention of its Treaty claims through the Letter Agreement and the Supplemental Agreement (see ¶¶ 344 and 345 above).

---

[511]   *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award (31 Mar. 2011), para. 124 (**Authority RLA-85**).

[512]   *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award (22 Aug. 2012), para. 144 (**Authority CL-164**) ("...As the large and thriving global market for distressed debt attests, most jurisdictions allow for legal claims to be either sold along with or reserved separately from the underlying assets from which they are derived. The reason is that such severability greatly facilitates and speeds the productive re-employment of assets in other ventures.")

[513]   *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award (31 Mar. 2011), paras. 122-124 (**Authority RLA-85**).

[514]   Respondent's Statement of Defence, para. 260; Claimant's Notice of Arbitration, para. 11.

390. For the foregoing reasons, the Tribunal rejects the Respondent's objection that it lacks jurisdiction as a result of the Claimant having sold its shares in the Distributors.

### 2.    The Claimant's Standing

#### (a)    *The Parties' Arguments*

*The Respondent's Position*

391. The Respondent submits that the Claimant has no standing to make a claim for damages suffered directly by the Distributors,[515] and any claim "should be limited to its rights as shareholders."[516] The Respondent relies on cases including *Enkev Beheer B.V. v. Republic of Poland*[517] and *El Paso Energy International Company v. Republic of Argentina*[518] for the proposition that rights arising from shares do not entitle shareholders to claim damages suffered by the company. According to the Respondent, a specific provision in the Treaty would be required for the Claimant to be able to claim damages suffered by the Distributors.[519]

392. For the Respondent, the damages claimed by the Claimant prior to and including 2017 are those "suffered directly by the Distributors", and do not relate to the Claimant's role as shareholder. In the Respondent's view, the Claimant therefore has no standing to make a claim for the "alleged damages suffered."[520]

*The Claimant's Position*

393. The Claimant contends that it can bring its claim as shareholder in the Distributors.[521] The Claimant notes the Respondent's argument that it has standing only for claims for damages "it

---

[515]    Respondent's Statement of Defence, para. 271.

[516]    Respondent's Statement of Defence, para. 272.

[517]    *Enkev Beheer B.V. v. Republic of Poland*, PCA Case No. 2013-01, First Partial Award (29 Apr. 2014), para. 310 (**Authority RLA-24**); Respondent's Statement of Defence, para. 272.

[518]    *El Paso Energy International Company v. Republic of Argentina*, ICSID Case No. ARB/03/15, Award (31 Oct. 2011), para. 206 (**Authority RLA-26**); Respondent's Statement of Defence, para. 272.

[519]    *BG Group Plc. v. Republic of Argentina*, UNCITRAL, Award (24 Dec. 2007), para. 190 (**Authority RLA-123**); Respondent's Statement of Defence, para. 451.

[520]    Respondent's Statement of Defence, para. 274.

[521]    Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 219.

personally suffered",[522] and states that "[t]his is precisely the object of IC Power's claim."[523] The Claimant submits that Article 1(a) of the Treaty, defining "investment", includes "rights derived from stocks, shares, bonds, debentures and other kinds of interests in legal entities."[524] As such, a claimant with "shares in a relevant legal entity"[525] has an investment and can "bring a claim for damage that it has suffered as a result of a breach of the Treaty."[526] According to the Claimant, "the right of shareholders to seek protection for direct damages suffered as a result of measures taken against the company in which they hold shares is firmly established in international investment law",[527] and "scores of tribunals have recognized the right of a parent corporation to bring a treaty claim against the host state for damages sustained by its local subsidiary."[528]

394. The Claimant criticizes the Respondent's reliance on *BG Group Plc v. Republic of Argentina* and argues that the *BG Group* tribunal was aware that that the claimant's claims were derived from measures taken against the claimant's local subsidiaries.[529] The Claimant submits that *BG* tribunal nonetheless held that it had jurisdiction related to the Claimant's "indirect shareholding."[530] The Claimant likewise disagrees with the Respondent's characterisation of *Enkev Beheer v. Poland* and *El Paso v. Argentina*, arguing that both allowed the relevant claimant to claim for the diminution in value of the shares it held.[531]

### (b)   *The Tribunal's Considerations*

395. The Tribunal takes note of the Respondent's objection, but does not consider that it raises a question that properly goes to the Tribunal's jurisdiction.

---

[522]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 220.

[523]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 220.

[524]   Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 1(a) (**Exhibit C-1**).

[525]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 221.

[526]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 221.

[527]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 224.

[528]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 222.

[529]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 220.

[530]   *BG Group Plc. v. Republic of Argentina*, UNCITRAL, Award (24 Dec. 2007), para. 190 (**Authority RLA-123**); Claimant's Statement of Reply and Response to Jurisdictional Objections, para 220.

[531]   *Enkev Beheer B.V. v. Republic of Poland*, PCA Case No. 2013-01, First Partial Award (29 Apr. 2014), para. 313 (**Authority RLA-24**); *El Paso Energy International Company v. Republic of Argentina*, ICSID Case No. ARB/03/15, Award (31 Oct. 2011), para. 175, 204 (**Authority RLA-26**).

396.  The Claimant was, at least during the period in which it was the owner of the Distributors, an "investor" within the meaning of Article 1(1)(d) of the Treaty, being a legal entity organized under the law of Israel, being the Home Contracting Party in respect of an investment in the shares of the Distributors.  As such, but for the question of the timing of the Claimant's investment discussed above, the Claimant was entitled to initiate the dispute resolution provisions of Article 8 in respect of measure affecting its investment.

397.  In the Tribunal's view, the point raised by the Respondent properly goes to the question of quantum, insofar as the effects of the Government's measures on the Distributors may not directly equate to their effect on the Claimant.  In this respect, the Claimant would only potentially be entitled to claim for the value of damages incurred by the Claimant itself, to the extent that these differ from those incurred by the Distributors.

398.  Accordingly, the Tribunal rejects the Respondent's objection that it lacks jurisdiction as a result of the Claimant's lack of standing.

3.  **Due Diligence and Abuse of Investment Arbitration**

(a)  *The Parties' Arguments*

*The Respondent's Position*

399.  The Respondent contends that the Claimant's actions "constitute an abuse of investment arbitration and must therefore be dismissed by the Tribunal."[532] According to the Respondent:

> IC Power acquired a shareholding in the distributors knowing -- or should have known – that they had with it more than $100 million of tax contingency. This is clearly stated in the due diligence by IC Power. The contingency materialised, and IC Power decided to start this arbitration against the state with the single purpose of curing its negligence when acquiring Energuate and the distributors.[533]

400.  Relying on *Orascom TMT Investments v. People's Democratic Republic of Algeria*, the Respondent defines abuse as "the use of procedural instruments or rights by one or more parties for purposes that are alien to those for which the procedural rights were established."[534] According to the Respondent, a finding of abuse of process will depend "on the objective

---

[532]   Respondent's Statement of Defence, para. 275.

[533]   Hearing Tr. (Day 1) 117:10-18.

[534]   *Orascom TMT Investments S.à r.l. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Award (31 May 2017), para. 541 (**Authority RLA-27**); Respondent's Statement of Defence, para. 277.

circumstances of each case and not on the intention of the parties."[535] The Respondent contests the Claimant's emphasis on "good faith", quoting *Phillip Morris* for the proposition that "the notion of abuse does not imply a showing of bad faith . . . [but] is subject to an objective test."[536]

401. Recalling *Emilio Agustín Maffezini v. Kingdom of Spain*, and further cases including *CMS Gas Transmission Company v. Republic of Argentina* and *Société Générale In respect of DR Energy Holdings Limited & Empresa Distribuidora de Electricidad del Este v. Dominican Republic*, the Respondent argues that "bilateral investment agreements are not insurance policies against bad business decisions."[537] According to the Respondent, a key obligation on foreign investors is "to conduct an appropriate due diligence proceeding when they make their investment."[538] The Respondent submits that had the Claimant "conducted a true due diligence process,"[539] it would have taken "preventive measures"[540] against the tax issues at hand. The Respondent considers that the Claimant, after having failed to conduct the due diligence process and being unable otherwise to recover capital invested in the Distributors, "intends to use the Treaty as an insurance policy against its own bad business decisions."[541] This, according to the Respondent, amounts to an abuse of the proceedings.[542]

402. With respect to the Claimant's lack of due diligence, the Respondent elaborates as follows:

---

[535] Respondent's Statement of Defence, para. 277.

[536] *Philip Morris Asia Limited v. Commonwealth of Australia*, PCA Case No. 2012-12, Award on Jurisdiction and Admissibility (17 Dec. 2015), para. 539 (**Authority RLA-32**); *see* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 193.

[537] *Emilio Agustín Maffezini v. Kingdom of Spain*, ICSID Case No. ARB/97/7, Award (9 Nov. 2000), para. 64 (**Authority RLA-1**); *CMS Gas Transmission Company v. Republic of Argentina*, ICSID Case No. ARB/01/8, Ruling on Jurisdiction (17 Jul. 2003), para. 29 (**Authority RLA-33**); *Société Générale In respect of DR Energy Holdings Limited & Empresa Distribuidora de Electricidad del Este, S.A. v. Dominican Republic*, UNCITRAL, ICAI Case No. UN 7927, Ruling on Jurisdiction (19 Sept. 2018) (**Authority RLA-34**).

[538] Respondent's Statement of Defence, para. 279; *Álvarez & Marín Corporación S.A. et al. v. Republic of Panama*, ICSID Case No. ARB/15/14, Award (12 Sept. 2018), para. 337 (**Authority RLA-38**).

[539] Respondent's Statement of Defence, para. 280.

[540] Respondent's Statement of Defence, para. 280.

[541] Respondent's Statement of Defence, para. 280.

[542] Respondent's Statement of Defence, para. 281.

(a)     First, Respondent submits that the Claimant cannot provide "serious documents"[543] establishing that it carried out a "tax diligence" process, as was recommended by its financial and accounting advisers.[544]

(b)     Second, the Respondent contends that the documents provided to the Claimant for its due diligence process "were full of red flags about a possible tax fraud in the creation and claim of the Tax Deductions."[545]

(c)     Third, the Respondent submits that the Claimant's conduct is effectively "nothing but a way to remedy its own negligence in the purchase of the Distributors' shares."[546] In particular, the Respondent relies on the fact that the Claimant had an "insurance policy for non-compliance of the representations and warranties in the shares sale contract with Actis,"[547] from which, the Respondent alleges, the Claimant will be unlikely to reclaim money. The Respondent claims that as a result, the Claimant is wrongly using the proceedings "as a second insurance policy."[548]

403.    The Respondent disagrees with the Claimant's view that due diligence goes to the merits, rather than jurisdiction. Relying on *Inceysa Vallisoletana S.L. v. Republic of El Salvado*,[549] the Respondent argues that the Tribunal, when considering its jurisdiction, may consider whatever issues are relevant to it; examining merits issues in connection with jurisdiction is "only inappropriate in cases where the proceedings is bifurcated."[550] The Respondent notes that international tribunals frequently examine due diligence while deciding on jurisdiction. The Respondent also disputes the Claimant's argument that the facts of the present case differ from other instances where abuse of process has been found; in the Respondent's view, "there is no comprehensive list of all the circumstances in which an abuse can be found."[551] Finally, the

---

[543]    Respondent's Statement of Defence, para. 282.

[544]    Respondent's Statement of Defence, para. 282.

[545]    Respondent's Statement of Defence, para. 283.

[546]    Respondent's Statement of Defence, para. 284.

[547]    Respondent's Statement of Defence, para. 285.

[548]    Respondent's Statement of Defence, para. 286.

[549]    *Inceysa Vallisoletana S.L. v. Republic of El Salvador*, ICSID Case No. ARB 03 26, Award (2 Aug. 2006) (**Authority RLA-149**).

[550]    *Inceysa Vallisoletana S.L. v. Republic of El Salvador*, ICSID Case No. ARB 03 26, Award (2 Aug 2006), para. 155 (**Authority RLA-149**); *see* Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 191.

[551]    Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 194.

Respondent considers IC Power's alleged inability to take legal action against Actis as evidence of its negligence in acquiring the shares.[552] The Respondent also submits that IC Power has made assertions in its proceedings against AIG that contradict those in the present arbitration.[553]

*The Claimant's Position*

404.   The Claimant disputes the Respondent's claim of abuse of investment proceedings being present here. In the Claimant's view, both the Respondent's allegations of treating the Treaty as an "insurance policy"[554] and of lack of due diligence on the Claimant's part are unsupported, and in any case would "not meet the legal threshold to establish an abuse of process in any form."[555] The Claimant submits that the Respondent "bears the burden of proving the existence of an abuse of process."[556] Quoting *Chevron Corporation and Texaco Petroleum Corporation v. Republic of Ecuador I*, the Claimant contends that a tribunal will find abuse of process only "in very exceptional circumstances."[557] The Claimant's view is that "the threshold for finding an abuse of process [is] high"[558] and "abuse of process would require a serious departure from the principle of good faith."[559]

405.   According to the Claimant, the question of adequate due diligence goes directly to the merits of the case and "has no bearing upon the jurisdiction [of] the tribunal or the admissibility of IC Power's claims."[560] The Claimant argues that the assessment of whether due diligence was sufficient "would require making a factual determination contrary to the claimant's stated case, which would be inappropriate as part of a jurisdictional determination."[561] The Claimant further submits that it did nonetheless "conduct a proper due diligence"[562] process. The Claimant also contests the relevance of potential claims against Actis, arguing "Guatemala points to no

---

[552]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 196.

[553]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 197.

[554]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 225.

[555]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 225.

[556]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 226.

[557]   *Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v. Republic of Ecuador I*, PCA Case No. 2007-02, Interim Award (1 Dec. 2008), para. 143 (**Authority CL-150**).

[558]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 226.

[559]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 226.

[560]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 227.

[561]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 227.

[562]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 227.

provision of the SPA that Actis allegedly breached, including any fraud in connection with its representations to IC Power."[563]

406.   The Claimant submits that the authorities cited by the Respondent "cannot be compared with the circumstances of the present case."[564]  In particular, *Philip Morris Asia v. Australia* is "a case of corporate restructuring after the investment dispute was foreseeable . . . which is not an issue in the present case"[565] and *Maffezini v. Spain* "did not deal with an issue of abuse of process, and made the point that a BIT is not an insurance policy only in the context of whether Mr. Maffezini's claim had merit."[566]  The Claimant likewise distinguishes *Iberdrola v. Republic of Guatemala* and *Incesya v. El Salvador*.[567]  As such, the Claimant does not believe there is any support for the "Respondent's objection that IC Power's claims are inadmissible due to a supposed abuse of the arbitral process."[568]

        **(b)**     ***The Tribunal's Considerations***

407.   The Tribunal takes note of the Respondent's objection, but does not consider that it raises an issue that properly goes to the Tribunal's jurisdiction.

408.   As the Tribunal understands the Respondent's objection, it is that the Claimant failed to engage in due diligence to such an extent that it could not possibly prevail on the merits, rendering recourse to investment arbitration abusive.  The Claimant contests this assertion as a matter of fact, and the Tribunal considers this a matter more appropriately addressed as part of the merits. Moreover, the extent to which due diligence is indeed a required element of the Claimant's claims would also be an issue going to the merits.

409.   The Tribunal recognizes that courts and tribunals may be called upon to make factual determinations in the course of considering an objection to jurisdiction, in particular when such an objection is presented in bifurcated proceedings as a preliminary matter.  In such circumstances, however, a court or tribunal may also determine that a jurisdictional objection does not have an exclusively preliminary character and defer it for further consideration in

---

[563]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 228.

[564]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 229.

[565]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 229.

[566]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 229.

[567]   Claimant's Rejoinder on Jurisdiction, paras. 35-36.

[568]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 230.

conjunction with the merits. In contrast to other instances when investment tribunals have been called on to consider issues of abuse of process, the Respondent's objection does not concern discrete factual circumstances, such as a corporate restructuring, but is predicated on the Claimant's claims being substantively without merit. This is not a determination that can be made on a preliminary basis as a question of jurisdiction.

410.   Accordingly, the Tribunal rejects the Respondent's objection that it lacks jurisdiction as a result of the Claimant's abuse of process.

### 4.   Domestic or International Law

#### (a)   *The Parties' Arguments*

*The Respondent's Position*

411.   The Respondent objects to the Tribunal's jurisdiction on the grounds that the Parties' dispute relates solely to "violations of domestic law".[569] Effectively, the Respondent argues, the Tribunal is being asked to act as a domestic or appellate court on matters of Guatemalan Law. The Respondent states that "an international investment tribunal has jurisdiction only over claims of international law,"[570] and contends that "IC Power's claim is no more than a desperate attempt to 'manufacture an international dispute out of a purely domestic dispute.'"[571]

412.   Relying on *EDF International S.A., SAUR International S.A.* and *León Participaciones Argentinas S.A. v. Republic of Argentina*,[572] the Respondent argues that investment tribunals are not empowered "to rule on disputes of exclusively domestic law."[573] The Respondent cites *Payment of Various Serbian Loans Issued in France (France v. Kingdom of Slovakia, Croatia and Serbia)* and *Payment in Gold of the Brazilian Loans Issued in France (France v. Brazil)* for the proposition that "[f]or the Court itself to undertake its own construction of municipal law . . .

---

[569]   Respondent's Statement of Defence, para. 288.

[570]   Respondent's Statement of Defence, para. 290.

[571]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 199, *quoting Cementownia "Nowa Huta" S.A. v. Republic of Turkey*, ICSID Case No. ARB(AF)/06/2, Award of 17 September 2009, para. 117(**Authority RLA-151**).

[572]   *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Republic of Argentina*, ICSID Case No. ARB/03/23, Award of 11 June 2012, para. 904 (**Authority RLA-46**).

[573]   Respondent's Statement of Defence, para. 291.

would not be in conformity with the task for which the Court has been established."[574]  In the Respondent's opinion, "an international tribunal cannot act either as a court of first instance or as an appellate court on matters of domestic law."[575]

413.  The Respondent looks to *ADF Group Inc. v. United States of America*,[576] *Generation Ukraine, Inc. v. Ukraine*,[577] *Iberdrola v. Republic of Guatemala*[578] and *International Thunderbird Gaming Corporation v. The Government of the United Mexican States*[579] for the proposition that an international tribunal is "not a court of first instance that can discuss the legality of the State's actions under domestic law".[580]  Nor, the Respondent submits, recalling *Mamidoil Jatoil Greek Petroleum Products Sociedad S.A. v. Republic of Albania*,[581] can an international tribunal act as an appellate court on matters of domestic law.[582]  Finally, the Respondent references *Loewen v. United States of America*[583] for the proposition that "the separation between the domestic and international spheres seeks to preserve the integrity of both systems."[584]

414.  The Respondent's position is that "IC Power intends the Tribunal to review the decisions of the Guatemalan courts as if it were an appellate court, which is contrary to fundamental principles of international law."[585]  The Respondent submits that the Claimant's arguments are based on violations of domestic Guatemalan law, first related to "the Criminal Complaint against the

---

[574]  *Payment of Various Serbian Loans Issued in France (France v. Kingdom of Slovakia, Croatia and Serbia)*, P.C.I.J. Series A. – Nos. 20/21, Judgment, 12 July 1929, pp. 46-47 (**Authority RLA-49**); *Payment in Gold of the Brazilian Loans Issued in France (France v. Brazil)*, P.C.I.J. Series A. – Nos. 20/21, Judgment, 12 July 1929, pp. 124-125(**Authority RLA-50**); Respondent's Statement of Defence, para. 292.

[575]  Respondent's Statement of Defence, para. 293.

[576]  *ADF Group Inc. v. United States of America*, ICSID Case No. ARB (AF)/00/1, Award (9 Jan. 2003), para. 190 (**Authority RLA-52**).

[577]  *Generation Ukraine, Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award (16 Sept. 2003), paras. 20.14-20.15, 20.32-20.33 (**Authority RLA-53**).

[578]  *Iberdrola v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Award (17 Aug. 2012) (**Authority RLA-54**).

[579]  *International Thunderbird Gaming Corporation v. The Government of the United Mexican States*, NAFTA-CDNUDMI, Award (26 Jan. 2006), para. 160 (**Authority RLA-55**).

[580]  Respondent's Statement of Defence, para. 294.

[581]  *Mamidoil Jatoil Greek Petroleum Products Sociedad S.A. v. Republic of Albania*, ICSID Case No. ARB/11/2, Award (30 Mar. 2015), para. 764 (**Authority RLA-56**).

[582]  Respondent's Statement of Defence, para. 295.

[583]  *The Loewen Group, Inc. & Raymond L. Loewen v. United States of America*, ICSID Case No. ARB (AF)/98/3, Award (26 Jun. 2003), para. 242 (**Authority RLA-61**).

[584]  Respondent's Statement of Defence, para. 296.

[585]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 205.

Distributors"[586] and second "when the precautionary measures were decreed."[587] The Respondent analogises the case to *Iberdrola v. Republic of Guatemala*, wherein "the disputes the Claimant asks the Tribunal to decide on, refer to Guatemalan law"[588] and contends that "the essential basis of the Claimant's claims relate exclusively to a dispute under Guatemalan law that should be adjudicated by . . . State courts."[589]

415.  The Respondent submits that each of the Claimant's claims relates to "a violation of the Tax Code"[590] and is founded on "an incorrect interpretation of the Binding Opinions"[591]—that is to say, its submissions are "geared to demonstrating an alleged violation of Guatemalan law."[592] The Respondent argues that the Claimant's arguments regarding the Criminal Complaint are an attempt "to have the Tribunal rule *de novo* on matters that have already been decided"[593] by domestic courts.

416.  The Respondent also disagrees with the Claimant's position that administrative proceedings must "be exhausted"[594] before criminal proceedings can be commenced, and hence that the commencement of the Criminal Proceedings provide a ground on which the Tribunal can make a ruling.  According to the Respondent "by confirming the existence of items of evidence of tax fraud, the SAT has the obligation to suspend the administrative proceedings and immediately file a complaint with the competent authority."[595]

417.  The Respondent further states that "the Claimant's claim regarding the precautionary measures"—the injunctions and other measures—should have been challenged in the Guatemalan courts and it is "not up to the Tribunal to decide as if it were a court of appeals."[596]  The Respondent also disagrees with the Claimant's argument that the Tribunal would not act as an

---

[586]  Respondent's Statement of Defence, para. 298.

[587]  Respondent's Statement of Defence, para. 298.

[588]  Respondent's Statement of Defence, para. 299, *Iberdrola v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Award (17 Aug. 2012), para. 372 **(Authority RLA-54)**.

[589]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 200.

[590]  Respondent's Statement of Defence, para. 300.

[591]  Respondent's Statement of Defence, para. 301.

[592]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 206.

[593]  Respondent's Statement of Defence, para. 303.

[594]  Constitutional Court of Guatemala, Judgment, dated 19 January 2010, p. 149 **(Exhibit R-70)**.

[595]  Respondent's Statement of Defence, para. 304.

[596]  Respondent's Statement of Defence, para. 307.

appellate court given the proceedings have not yet ended, drawing attention to the fact that while the proceedings are still in train, "the Guatemalan courts have already issued decisions"[597] on the Claimant's case.

418. The Respondent's view is that it is not sufficient that the Parties disagree on the application of the Treaty, and asserts that every matter at issue is a specific question of Guatemalan law:

> (i) whether the SAT violated Guatemalan law when it presented the Criminal Complaint, allegedly against the provisions of the Binding Opinions; (ii) whether the SAT violated Guatemalan law by not having exhausted an administrative procedure before filing the Criminal Complaint in order to establish the tax underpayment with certainty, and/or not having exhausted a civil proceeding, to establish the existence of misrepresentation; and (iii) whether the precautionary measures were illegal under Guatemalan law.[598]

According to the Respondent, the Claimant's analysis focuses entirely on Guatemala's domestic law, with little argument on "its rights under the Treaty."[599] Instead, the Respondent submits, the Claimant "limits itself to repeating over and over again its arguments on the supposed violations of Guatemalan law."[600]

*The Claimant's Position*

419. The Claimant submits that this is a dispute of international law. In this respect, the Claimant distinguishes the present matter from *Iberdrola v. Republic of Guatemala*,[601] arguing that "the claimant in that case was held to have failed to make any attempt to explain how Guatemala's alleged regulatory mistakes amounted to a breach of the relevant treaty."[602] The Claimant contends that it has here "extensively shown"[603] how the Respondent's behaviour "violated multiple treaty standards."[604]

---

[597] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 208.

[598] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 204.

[599] Respondent's Statement of Defence, para. 309.

[600] Respondent's Statement of Defence, para. 311.

[601] *Iberdrola v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Award (17 Aug. 2012) **(Authority RLA-54)**.

[602] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 233.

[603] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 233.

[604] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 233.

420. First, the Claimant submits that "[i]t is well established that a State may not rely on its own internal law to avoid international obligations."[605] Accordingly:

> The mere fact that the State invokes its own authority under domestic law to take certain actions vis-à-vis a protected investment does not divest the tribunal of jurisdiction to determine whether the State acted in breach of its international obligation to accord fair and equitable treatment to covered foreign investments.[606]

The Claimant submits that "the Parties clearly disagree on points of law and fact concerning the application of the Treaty, as Respondent denies that its actions . . . constitute violations of its international obligations." Recalling the definition of a "dispute" in *Mavrommatis Palestine Concessions (Greece v. U.K.)*, the Claimant concludes than an international law dispute exists.[607] The Claimant submits that tribunals can look at State compliance with domestic laws without "render[ing] the claims themselves domestic" and asserts that its references to domestic law breaches are only "in the context of substantiating Claimant's assertions that Respondent has breached various Treaty standards."[608]

421. The Claimant argues that the Respondent has mischaracterised the cases *Iberdrola v. Republic of Guatemala* and *Generation Ukraine, Inc. v. Ukraine.*[609] In terms of *Iberdrola v. Republic of Guatemala*, the Claimant considers that the tribunal dismissed the claimant's claims as it had argued only that "Guatemala's actions violated Guatemalan law"[610] and not explained "how those actions violated Respondent's treaty obligations under the Spain-Guatemala BIT."[611] With *Generation v. Ukraine*, too, the Claimant considers that the facts are distinct from the circumstances here, "which clearly constitute violations of the Treaty and international law."[612] The Claimant instead analogises with *TECO v. Guatemala*[613] where, despite the dispute involving treatment under domestic law, the tribunal found that this was "an international dispute" and did

---

[605]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 234.

[606]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 234.

[607]   *Mavrommatis Palestine Concessions (Greece v. U.K.)*, P.C.I.J. Series A No. 2, Objection to the Jurisdiction of the Court, Judgment (30 Aug. 1924), para. 13 (**Authority CL-102**).

[608]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 235.

[609]   *Iberdrola v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Award (17 Aug. 2012), para. 372 (**Authority RLA-54**); *Generation Ukraine, Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award (16 Sept. 2003), paras. 20.14-20.15, 20.32-20.33 (**Authority RLA-53**); Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 236.

[610]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 236.

[611]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 236.

[612]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 238.

[613]   *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Award (19 Dec. 2013), para. 464 (**Authority CL-72**).

not accept "Guatemala's argument that the tribunal did not have jurisdiction to hear TECO's claims given the domestic law issues involved."[614]

422.  Finally, the Claimant submits that the Respondent is "mistaken" in suggesting that the Tribunal cannot "rule *de novo* on matters that have already been decided."[615] The Claimant first states that "the matter has not been ruled upon by Guatemala courts"[616] and "there has not even been an indictment, let alone a ruling by a domestic court."[617] Second, the Claimant affirms that "a breach of the Treaty standards occurs irrespective of the lawfulness or unlawfulness of the measures under domestic law, and without the Tribunal having to act as an appellate court."[618] Third, the Claimant contends that the "Respondent's position appears to be that whenever a treaty claim involves domestic law issues, those issues should be resolved by the local courts."[619] The Claimant argues the Respondent was incorrect in referencing *International Thunderbird Gaming Corporation v. The Government of the United Mexican States*, as "the tribunal in *Thunderbird* did not determine whether Mexico's actions were in conformity with local law",[620] and was able to assess international obligations under NAFTA. The Claimant's position is that it is not "asking this Tribunal to act as a domestic court, but rather to assess the arbitrary nature of Respondent's actions under international law."[621] According to the Claimant, this Tribunal therefore "has jurisdiction to consider issues of Guatemalan law in determining whether Guatemala's actions breached the relevant international law standards under the Treaty."[622]

### (b)  *The Tribunal's Considerations*

423.  In its submissions before the Tribunal, the Claimant has identified measures that it considers to constitute breaches of the Treaty as a matter of public international law. The Respondent does not contest this, and indeed its submissions deal extensively with the application of international investment law. As the Tribunal understands the Respondent's objection, it is not that the Claimant has not invoked a public international law claim. That the Claimant has done so is self-

---

[614]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 237.
[615]  Respondent's Statement of Defence, para. 303.
[616]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 240.
[617]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 240.
[618]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 241.
[619]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 242.
[620]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 242.
[621]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 242.
[622]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 245.

evident.  Rather, the Tribunal understands the Respondent's objection to be that the dispute between the Parties is, at its core, a matter of Guatemalan law, such that the international law claims advanced by the Claimant are ancillary to the true nature of the dispute and that their success or failure will depend entirely upon the resolution of questions of Guatemalan law that remain pending before the Guatemalan Courts.

424.  The Tribunal considers it well established in public international law that it is for the Tribunal "itself 'while giving particular attention to the formulation of the dispute chosen by the Applicant, to determine on an objective basis the dispute dividing the parties, by examining the position of both parties' and in the process 'to isolate the real issue in the case and to identify the object of the claim'."[623]  Viewed on an objective basis, the Tribunal considers that there is, without doubt, a dispute between the Parties concerning matters of Guatemalan law, a dispute that remains pending between the Government and the Distributors in the courts of Guatemala.  However, the Tribunal also considers that the Claimant has presented a dispute concerning the application of the Treaty and the consequences, if any, that follow from it as a matter of public international law.  The Tribunal considers it commonplace that the Parties may be in dispute both with respect to municipal and international law.  Whether this is seen as separate disputes or as two aspects of a single dispute is ultimately of little import.  It is equally well established, however, that a Tribunal need not "decline to take cognizance of one aspect of a dispute merely because that dispute has other aspects, however important."[624]

425.  The Tribunal is cognizant that the Claimant's Treaty claims are predicated in part on matters of Guatemalan law, plead as a matter of fact in these proceedings.  The fact that such matters remain pending in the Courts of Guatemala may well limit the determinations that the Tribunal is presently able to make with respect to the substance of the Claimant's Treaty claims.  It does not, however, suffice to deprive the Tribunal of jurisdiction over a dispute concerning the application of the Treaty as a matter of public international law.

426.  Accordingly, the Tribunal rejects the Respondent's objection that it lacks jurisdiction as a result of the Claimant having commenced arbitration in respect of a dispute concerning Guatemalan law.

---

[623]  *Chagos Marine Protected Area Arbitration (Mauritius v. United Kingdom)*, Award  1(8 Mar. 2015) para. 208, *quoting Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, I.C.J. Reports 1998, para. 30 and *Nuclear Tests (New Zealand v. France)*, Judgment, I.C.J. Reports 1974, para. 30.

[624]  *United States Diplomatic and Consular Staff in Tehran (United States v. Iran)*, Judgment, I.C.J. Reports 1980, para. 36.

5.    **Claimant's Prima Facie Case for a Violation of the Treaty**

(a)    *The Parties' Arguments*

*The Respondent's Position*

427.  In the Respondent's view the Claimant must show "*prima facie*, a violation of the Treaty that, in turn, can provide a legal basis for the Tribunal's jurisdiction."[625] According to the Respondent, "a simple violation of Guatemalan law . . . does not constitute *per se* a breach of an international investment treaty or, in general, of international law."[626] The Respondent relies upon *Elettronica Sicula S.p.A.* for the principle that "the fact that an act of a public authority may have been unlawful in municipal law does not necessarily mean that act was unlawful in international law."[627] According to the Respondent, the Claimant relies solely on "alleged violations of Guatemalan law as the basis of its claims under the Treaty"[628] and does not make an appropriate *prima facie* case on which to ground jurisdiction.

428.  The Respondent contends that the "claimant's mere classification of its claims . . . is irrelevant for the analysis of the jurisdiction of the Tribunal."[629] Further, according to the Respondent, "IC Power ignores that the *prima facie* test necessarily implies an analysis of the legal standard applicable to the facts set forth by the claimant in order to establish whether those facts could violate the invoked legal norm." The Respondent quotes Judge Rosalyn Higgins in *Oil Platforms (Islamic Republic of Iran v. United States of America)*[630] as authority for the requirement of a "detailed analysis" of relevant issues when deciding whether the requisite *prima facie* basis is present.[631] The Respondent asserts that the Claimant does not sufficiently demonstrate "a violation of the treaty standards" in either of its submissions, suggesting that the Claimant merely repeats "that its claims are a matter of international law without explaining in what way the simple

---

[625]   Respondent's Statement of Defence, para. 314; *Oil Platforms (Islamic Republic of Iran v. United States of America)*, Preliminary Objection, Separate Opinion of Judge Higgins, I.C.J. Reports 1996, para. 29-30 (**Authority.RLA-63**).

[626]   Respondent's Statement of Defence, para. 317.

[627]   Respondent's Statement of Defence, para. 319, *Elettronica Sicula S.P.A. (ELSI)*, Judgment, I.C.J. Reports 1989, para. 124 (**Authority RLA-68**).

[628]   Respondent's Statement of Defence, para. 322.

[629]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 214.

[630]   *Oil Platforms (Islamic Republic of Iran v. United States of America)*, Preliminary Objection, Separate Opinion of Judge Higgins, I.C.J. Reports 1996, **Authority RLA-63**).

[631]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 215.

violation of Guatemalan law ... could constitute a violation of the treaty."[632]   As such, the
Respondent maintains that a *prima facie* case is not made out.

*The Claimant's Position*

429. The Claimant argues that when determining the *prima facie* standard, the "relevant question is
the claimant's own characterization of the facts."[633]   Relying on *Chevron Corp and Texaco
Petroleum Corp. v. Ecuador*, the Claimant submits that for the *prima facie* test "it should be
presumed that the Claimant's factual allegations are true."[634]   The Claimant states that the test is
"two-pronged": first, that tribunals "base their jurisdictional decision on the facts as pleaded by
the claimant";[635] and second, that tribunals decide whether these facts "fairly raise questions of
breach or may constitute possible breaches of one or more substantive treaty provision."[636]   The
Claimant submits that by putting forward arguments on the Respondent's "arbitrary,
unreasonable, and disproportionate"[637] measures it has demonstrated violation of the treaty and
"made a sufficient *prima facie* showing for jurisdictional purpose."[638]   The Claimant argues that
further considerations—such as whether the acts "give rise to liability under the Treaty"[639]—are
matters to be decided "with the merits of the case,"[640] and not with respect to jurisdiction.

   **(b)   *The Tribunal's Considerations***

430. The Tribunal takes note of the Parties' discussion of the need for a claimant to make out a *prima
facie* case on the merits of its claims, but does not see that it is relevant in the present
circumstances, where issues of jurisdiction are being considered together with the merits, rather
than in a separate preliminary phase.

431. As the Tribunal understands the requirement, where an objection is made that a claimant's claims
do not arise under the treaty or other relevant instrument, a claimant in bifurcated proceedings

---

[632]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 219.

[633]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 247.

[634]   *Chevron Corp and Texaco Petroleum Corp. v. Ecuador*, UNCITRAL, Interim Award (1 Dec. 2008),
para. 105 (**Authority CL-150**).

[635]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 248.

[636]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 248.

[637]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 249.

[638]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 249.

[639]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 249.

[640]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 249.

should set out the elements of its claims in sufficient detail for a tribunal to conclude *prima facie* that—taking the facts alleged by the claimant as true—relief in favour of the claimant could possibly be granted. Absent such a *prima facie* showing, a tribunal may reasonably dismiss a claim as a preliminary matter without further submissions on the merits.

432. In the present case, no bifurcation was requested and the Claimant has made a full presentation of its claims. Were the Tribunal to determine that the Claimant has failed to state a claim for which relief can be granted, this would be a rejection of the Claimant's claims on the merits, not a jurisdictional determination.

433. In any event, the Tribunal understands the Respondent objection to be that the Claimant's claims are based on the actions of the Guatemalan judiciary applying Guatemalan law. Because, in the Respondent's view, judicial actions cannot constitute a breach of the Treaty except through denial of justice (which the Claimant has not alleged), the Respondent considers that no possible claim has been stated. As set out in greater detail in the following section, the Tribunal notes that the Claimant has stated a claim with respect to the actions of the SAT, which is not a judicial organ, and that the extent to which the judicial organs of a State may incur international responsibility other than through denial of justice, is an open question of law. As such, the Tribunal considers that the Claimant has made out a prima facie claim, were that analysis relevant in the present procedural posture of the proceedings.

434. In any event, the Tribunal rejects the Respondent's objection that it lacks jurisdiction as a result of the Claimant having failed to articulate a *prima facie* claim.

6.   **Denial of Justice or Procedural Error**

   (a)   *Requirement for Denial of Justice*

*The Respondent's Position*

435. The Respondent submits that a State is only liable "for the decisions of its domestic courts—and for the conduct of other bodies supported by its domestic courts—if the Claimant is able to prove a denial of justice or a procedural error of equal gravity."[641] The Respondent relies on *Robert Azinian, et al. v. United States of Mexico* for the argument that to demonstrate a violation of international law, "the Claimant must show either a denial of justice, or a pretense of form to

---

[641]   Respondent's Statement of Defence, para. 324.

achieve an intentionally unlawful end."[642] Moreover, the Respondent argues, international courts apply "unequal treatment and deference"[643] to any analysis of the decisions of domestic courts, and that domestic courts' decisions are held to a higher standard than "the other branches of the State"[644] in determining a denial of justice. The Respondent argues this principle is confirmed by multiple cases and current doctrine, specifically referencing work by Professor Jan Paulsson.[645] Recalling the finding in *Swisslion DOO Skopje v. Former Republic of Macedonia*, the Respondent contends that otherwise "any judgment adverse to an investor's interests could constitute a [treaty] violation."[646]

436. The Respondent disagrees with the Claimant's efforts to limit and distinguish the authorities it cites. According to the Respondent, *Robert Azinian, et al. v. United States of Mexico* was not limited to disputes before a contractually specified forum, but "applies to any judicial decision on matters of domestic law of the competent courts of the State."[647] Similarly, the Respondent submits that *Glencore International A.G. and C.I. Prodeco S.A. v. Republic of Colombia*[648] and *OI European Group B. V. v. Bolivarian Republic of Venezuela*[649] do not simply treat denial of justice as "one of many FET violations, but rather make it clear that "the international standard to assess whether a legal decision is in accordance with the FET guarantee is the denial of justice."[650] The Respondent also considers these authorities to establish that the denial of justice requirement applies generally to violations of the treaty, not just the FET standard.[651]

---

[642] *Robert Azinian, et al. v. United States of Mexico*, ICSID Case No. ARB (AF)/972, Award (1 Nov. 1999), para. 99 (**Authority RLA-74**).

[643] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 228

[644] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 226.

[645] J. Paulsson, *Denial of Justice in International Law*, Cambridge University Press (1 Jan. 2005), p. 73 (**Authority RLA-51**).

[646] *Swisslion DOO Skopje v. Former Republic of Macedonia*, ICSID Case No. ARB/09/16, Award (6 Jul. 2012), para. 314 (**Authority RLA-80**); Respondent's Statement of Defence, para. 329.

[647] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 230.

[648] *Glencore International A.G. and C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award (27 Aug. 2019) (**Authority RLA-82**).

[649] *OI European Group B. V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB.11,25 Award (10 Mar. 2015) (**Authority RLA-79**).

[650] *OI European Group B. V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB.11,25 Award (10 Mar. 2015), para 522 (**Authority RLA-79**); Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 232.

[651] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 233.

437. Conversely, the Respondent submits that the Claimant mischaracterizes the authorities it advances. In the Respondent's view, each of the Claimant's cases actually demonstrates that international law claims against domestic judicial decisions "can only succeed when there are serious irregularities surrounding the judicial process or the decision itself which, for all practical purposes, are equal to a denial of justice."[652] Examining *Saipem v. Bangladesh*,[653] *Sistem Mühendislik v. Kyrgyz Republic*,[654] and *Eli Lilly v. Canada*,[655] the Respondent argues that:

> [E]ach of these cases confirms that the claims against domestic judicial decisions are valid only when there are grave irregularities that surrounded the judicial proceeding or the decision itself that for all practical purposes amount to a denial of justice that caused the decision to be illegal under international law. [656]

438. According to the Respondent, the requirement for a denial of justice is not limited to questions of judicial action. The Respondent further submits that "a State cannot be liable for acting in accordance with the decisions of its domestic courts unless a denial of justice is demonstrated."[657] Thus, the Respondent contends that the SAT cannot be liable in the absence of any denial of justice by the courts. Relying again on *Robert Azinian, et al. v. United States of Mexico*,[658] as well as *Liman Caspian Oil BV & NCL Dutch Investment BV v. Republic of Kazakhstan*[659] and *Iberdrola v. Republic of Guatemala*,[660] the Respondent states that if a judicial decision "that interprets domestic law does not constitute a violation of international law, the entities or officials whose conduct was supported by that decision cannot violate it either."[661]

439. The Respondent contests the Claimant's assertion that the SAT was not acting pursuant to a decision of the Guatemalan courts. The Respondent recalls *Robert Azinian, et al. v. United States*

---

[652] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 238.

[653] *Saipem S.p.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Award (30 Jun. 2009), para. 181 **(Authority CL-51)**.

[654] *Sistem Mühendislik Insaat Sanayi ve Ticaret AS v. Republic of the Kyrgyz Republic*, ICSID Case No. ARB (AF)/06/1, Award (9 Sept. 2009) **(Authority RLA-87)**.

[655] *Eli Lilly and Co. v. Government of Canada*, ICSID Case No. UNCT/14/2, Award of 16 Mar 2017, para. 223 **(Authority CL-91)**.

[656] Respondent's Statement of Defence, para. 331.

[657] Respondent's Statement of Defence, para. 337.

[658] *Robert Azinian, et al. v. United States of Mexico*, ICSID Case No. ARB (AF)/972, Award (1 Nov. 1999), para. 99 **(Authority RLA-74)**.

[659] *Liman Caspian Oil BV & NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award (22 Jun. 2010), para. 433 **(Authority RLA-78)**.

[660] *Iberdrola v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Award (17 Aug. 2012) **(Authority RLA-54)**.

[661] Respondent's Statement of Defence, para. 338.

*of Mexico* for the view that it is sufficient that "the actions for which the Claimant condemns the SAT were subsequently upheld by the Guatemalan courts."[662] According to the Respondent, an international tribunal is not paralyzed by domestic courts' approval of government action, but must then show "that the court decision itself constitutes a violation of the treaty."[663] Finally, the Respondent distinguishes *Eiser Infrastructure Limited and Energía Solar Luxembourg S. à r.l. v. Kingdom of Spain*[664] and *9REN v. Kingdom of Spain*,[665] as these "did not rest on alleged violations of domestic law . . . but on an abrupt and complete change of the regulatory framework applicable to the investment."[666]

*The Claimant's Position*

440. The Claimant first submits that the Respondent's argument on the requirement for a denial of justice "goes to the merits of the case, rather than jurisdiction, as it calls for the substantive assessment of the Treaty standards and their application to the facts of the case."[667] The Claimant then contends that the Respondent's view "that a denial of justice is required for a judicial measure to result in a breach of a BIT is incorrect."[668] According to the Claimant, "the legal scholars that Respondent cites . . . do not support the argument that a denial of justice is the only means by which a judicial measure can lead to a breach of international law."[669] Properly construed, the Claimant considers Professor Paulsson's position to be that "courts may violate an international obligation when they failed to comply with a treaty obligation,"[670] even in the absence of a denial of justice. The Claimant also criticises the Respondent's authorities, including *Robert Azinian, et*

---

[662] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 246.

[663] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 246, *quoting Robert Azinian, et al. v. United States of Mexico*, ICSID Case No. ARB (AF)/972, Award (1 Nov. 1999), para. 99 (**Authority RLA-74**).

[664] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award (4 May 2017) (**Authority CL-177**).

[665] *9REN Holding S.à.r.l v. The Kingdom of Spain*, ICSID Case No. ARB/15/15, Award (31 May 2019) (**Authority CL-191**).

[666] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 250.

[667] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 251.

[668] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 252.

[669] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 253.

[670] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 253.

*al. v. United States of Mexico.*[671]  The Claimant submits that this case is "of limited relevance"[672] as it "involved allegations of breach of contract, which by themselves do not ordinarily result in [the] finding of an international wrongful act."[673]

441.  The Claimant relies on *Saipem S.p.A. v. The People's Republic of Bangladesh,*[674] *Sistem Mühendislik v. Kyrgyz Republic,*[675] and *Eli Lilly and Co. v. Government of Canada,*[676] "as examples of cases where judicial acts could result in a breach of an investment treaty."[677]  In terms of both *Saipem S.p.A. v. The People's Republic of Bangladesh* and *Sistem Mühendislik v. Kyrgyz Republic,* the Claimant states that expropriations had taken place "without a finding of denial of justice."  In particular, in *Saipem S.p.A. v. The People's Republic of Bangladesh,* the tribunal noted that while "expropriation by the courts presupposes that the courts' intervention was illegal, this does not mean that expropriation by a court necessarily presupposes a denial of justice."[678]  In *Eli Lilly and Co. v. Government of Canada,* the Claimant argues, the tribunal recognised that courts can engage in conduct implicating a party's obligations under a treaty, even if "not cast in denial of justice terms."[679]  The Claimant therefore concludes that in terms of "court measures",[680] the "absence of a finding or claim of denial of justice"[681] does not mean that denial of justice is a "prerequisite to international liability."[682]

442.  The Claimant then disputes the Respondent's argument that the requirement for a denial of justice also extends to the SAT's actions.  According to the Claimant:

---

[671]  *Robert Azinian, et al. v. United States of Mexico,* ICSID Case No. ARB (AF)/972, Award (1 Nov. 1999) **(Authority RLA-74)**.

[672]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 255.

[673]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 255.

[674]  *Saipem S.p.A. v. The People's Republic of Bangladesh,* ICSID Case No. ARB/05/07, Award (30 Jun. 2009), para. 181 **(Authority CL-51)**.

[675]  *Sistem Mühendislik Insaat Sanayi ve Ticaret AS v. Republic of the Kyrgyz Republic,* ICSID Case No. ARB (AF)/06/1, Award (9 Sept. 2009) **(Authority RLA-87)**.

[676]  *Eli Lilly and Co. v. Government of Canada,* ICSID Case No. UNCT/14/2, Award of 16 Mar 2017, para. 223 **(Authority CL-91)**.

[677]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 257.

[678]  *Saipem S.p.A. v. The People's Republic of Bangladesh,* ICSID Case No. ARB/05/07, Award (30 Jun. 2009), para. 181 **(Authority CL-51)**.

[679]  *Eli Lilly and Co. v. Government of Canada,* ICSID Case No. UNCT/14/2, Award (16 Mar. 2017), para. 223 **(Authority CL-91)**.

[680]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 261.

[681]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 261.

[682]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 261.

> Investment treaty jurisprudence is replete with cases finding treaty violations on account of a State's legislative or regulatory actions where there has been no finding of a denial of justice by the State's courts, irrespective of whether the judiciary was implicated.[683]

443. The Claimant further distinguishes *Robert Azinian, et al. v. United States of Mexico*[684] and *Liman Caspian Oil BV & NCL Dutch Investment BV v. Republic of Kazakhstan*.[685] The Claimant's position is that "these decisions are inapposite"[686] as "[t]he SAT was not acting pursuant to a decision taken by the local courts; instead, the SAT disregarded the Binding Tax Opinions"[687] and committed further "treaty breaches."[688] The Claimant submits that these cases have also been misinterpreted by the Respondent: for instance, the Claimant recalls that *Robert Azinian, et al. v. United States of Mexico* held that an international tribunal "is not paralyzed by the fact that the national courts have approved the relevant conduct of public officials."[689]

### (b)   *Existence of Denial of Justice*

*The Respondent's Position*

444. The Respondent submits that the Guatemalan courts did not deny justice to IC Power and that have therefore committed no violation of international law.

445. The Respondent contends that denial of justice requires that (i) "serious procedural errors"[690] have occurred and (ii) these errors are "'egregious' and fundamentally unfair."[691] Moreover, according to the Respondent "substantive errors are not enough for a claim against a judicial decision to prosper; only procedural errors can result in a denial of justice."[692] The Respondent cites *Liman*

---

[683]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 262.

[684]   *Robert Azinian, et al. v. United States of Mexico*, ICSID Case No. ARB (AF)/972, Award (1 Nov. 1999), para. 99 **(Authority RLA-74).**

[685]   *Liman Caspian Oil BV & NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award (22 Jun. 2010), para. 433 **(Authority RLA-78).**

[686]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 263

[687]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 263.

[688]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 263.

[689]   *Robert Azinian, et al. v. United States of Mexico*, ICSID Case No. ARB (AF)/972, Award (1 Nov.1999), para. 99 **(Authority RLA-74).**

[690]   Respondent's Statement of Defence, para. 342.

[691]   Respondent's Statement of Defence, para. 342.

[692]   Respondent's Statement of Defence, para. 342.

*Caspian Oil BV & NCL Dutch Investment BV v. Republic of Kazakhstan*[693] to argue that denial of justice further requires "a fundamental failure of the judicial system [to be] present in its entirety."[694] In other words, a single failure at the first instance is insufficient if the appellate mechanisms have not had the opportunity to address the error.

446. The Respondent submits that such failure is not present here, and that there is therefore no denial of justice. In support of this position, the Respondent first submits that the "supposed substantive errors of the Criminal Court and the Court of Appeals"[695] raised by the Claimant are not procedural, and hence do not satisfy the criterion for denial of justice. The Respondent then argues that the Distributors' decision not to challenge "the precautionary measures" precludes denial of justice as the Claimant opted not to "utilize the appeals provided for in Guatemalan law",[696] such as "nullity appeal or an *amparo* action."[697] According to the Respondent, this ensured that "Guatemalan courts did not even have the opportunity to amend it."[698] Third, the Respondent contends, due process was at all times respected in the Criminal Court. Finally, the Respondent submits, as "[criminal] proceedings are still in the investigation stage"[699] and are in no way complete, there cannot yet be a denial of justice.

447. Similarly, the Respondent then submits that the SAT did not deny justice to the Claimant. The Respondent submits that if the Criminal Court and Court of Appeals committed no denial of justice, the SAT is similarly not liable under international law.[700]

*The Claimant's Position*

448. The Claimant does not specifically address whether a denial of justice could indeed be established, limiting its arguments to disputing the fact that this requirement exists at all. However, the

---

[693] *Liman Caspian Oil BV & NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award (22 Jun. 2010), para. 433 (**Authority RLA-78**).

[694] Respondent's Statement of Defence, para. 343.

[695] Respondent's Statement of Defence, para. 345.

[696] Respondent's Statement of Defence, para. 346.

[697] Respondent's Statement of Defence, para. 346.

[698] Respondent's Statement of Defence, para. 347.

[699] Respondent's Statement of Defence, para. 349.

[700] Respondent's Statement of Defence, para. 339.

Claimant does make it clear it disagrees with the Respondent's assessment of the facts, including in the extent to which the SAT's behaviour violated the treaty.[701]

### (c)   *The Tribunal's Considerations*

449.   The Tribunal takes note of the Respondent's objection, but does not consider that it raises an issue that properly goes to the Tribunal's jurisdiction.

450.   As the Tribunal understands the Respondent's objection, it is that the State measures identified by the Claimant as constituting Treaty breaches cannot give rise to a violation of international law unless they are characterized as a denial of justice. This is so, the Respondent avers, because the state measures in question are either actions of the Guatemalan judiciary or measures taken by the SAT and sanctioned by the judiciary.

451.   As advanced above, the Tribunal recalls that the extent to which the actions of judicial organs of a state may constitute violations of international law other than through denial of justice is an open question of law.[702] Without needing to resolve that question for present purposes, it suffices to note that the Claimant's claims concerning judicial action cannot be dismissed as a matter of principle for failure to state a denial of justice claim. The Tribunal is required to assess whether such judicial action may engage the liability of the State under the Treaty standards that were actually relied upon by the Claimant—a quintessential merits question.

452.   In any event, the Tribunal observes that the Claimant's claims are principally concerned, not with the actions of the Guatemalan judiciary, but the SAT—an administrative organ which, according to the Claimant, committed Treaty breaches that were unrelated to any decisions taken by the local courts.[703] This raises the question of whether the denial of justice standard should be extended to administrative conduct sanctioned by the judiciary and, if so, whether the actions of the SAT were effectively sanctioned by the Guatemalan judiciary in the instant case. These are not determinations that can be made on a preliminary basis as a question of jurisdiction.

453.   As a result, the Tribunal rejects the Respondent's objection that it lacks jurisdiction over the Claimant's claims for failure to state a denial of justice claim.

---

[701]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 257.

[702]   *See* paras. 582-587 below.

[703]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 263.

## B.   ADMISSIBILITY OF CLAIMS

### 1.   The Parties' Arguments

*The Respondent's Position*

454.   The Respondent submits that the Claimant's claims are inadmissible by reason of being premature.  The Respondent recalls *Achmea B.V. v. Slovak Republic II*,[704] for the position that "investment tribunals lack competence to rule on hypothetical or premature claims."[705]  The Respondent also quotes the International Court of Justice in *Northern Cameroons (Cameroon v. United Kingdom)* to contend that a tribunal's decision "must have some practical consequences in the sense that it can affect existing legal rights or obligations of the parties."[706]  The Respondent submits that "without any damage, the alleged dispute would not have a practical consequence and therefore there would not be a dispute under international law."[707]

455.   In the present case, the Respondent submits that the "payment of the taxes, fines and interest pertaining to fiscal years 2011 to 2015"[708] are—according to the Guatemalan Tax Code[709]—of a "provisional nature."[710]  The Respondent further notes that "the criminal investigation still continues" and hence that "the competence to determine the existence of a tax underpayment" rests with the Prosecutor's Office and then the Criminal Court.[711]  The Respondent submits that "the Criminal Court accepted the arguments of the Distributors with respect to the defects in the settlement of the defrauded taxes that served as the basis for the precautionary measures."  In the Respondent's view, at this point the Distributors simply had to make a request of the SAT that "the wrongly paid amount be refunded."[712]  The Respondent also draws attention to the

---

[704]   *Achmea B.V. v. Slovak Republic II*, PCA Case No. 2013-12, Award on Jurisdiction and Admissibility (20 May 2014), para. 251 (**Authority RLA-92**).

[705]   Respondent's Statement of Defence, para. 352.

[706]   *The Northern Cameroons (Cameroon v. United Kingdom), Preliminary Objections*, Judgment, I.C.J. Reports 1963, paras. 33-34 (**Authority RLA-93**).

[707]   Respondent's Statement of Defence, para. 354.

[708]   Respondent's Statement of Defence, para. 356.

[709]   Tax Code of the Republic of Guatemala, dated 25 March 1991, Article 38 (**Exhibit R-5**).

[710]   Respondent's Statement of Defence, para. 356.

[711]   Respondent's Statement of Defence, para. 357.

[712]   Respondent's Statement of Defence, para. 358.

Claimant's sale of its share in the Distributors prior to the conclusion of criminal investigations as further evidence that the claims are premature.[713]

456. The Respondent considers the Claimant's answer on this point to confirm that the claims are premature:

(a) First, insofar as the Claimant invokes the length of the criminal investigation without resolution, the Respondent considers this to confirm that the present "claims are purely preventive and, consequently, premature."[714]

(b) Second, the Respondent submits that "the Criminal Court already ordered the SAT to compensate the payments received in February 2015 as a consequence of the Rectifications made by the Distributors."[715] Whether or not this involves the principal amounts in dispute, its shows the premature nature of the claims.[716]

(c) Third, the Respondent argues that the SAT did not characterize payments as final and that "the Criminal Proceeding is still ongoing and that the SAT must comply with any decision by the Criminal Court,"[717]

(d) Finally, the Respondent considers the assertion that the damage has been "fully crystallized" with the Claimant's sale of the Distributors is incorrect.[718] This was a business decision, while the Criminal Proceeding remained ongoing.[719]

*The Claimant's Position*

457. The Claimant submits that its claims are admissible and not premature. The Claimant first objects to the Respondent's argument on the need for the dispute to involve "practical consequences" involving "damage"[720] to the Claimant. According to the Claimant, "whether Claimant suffered

---

[713]   Respondent's Statement of Defence, para. 357.

[714]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 255.

[715]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 256.

[716]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 256.

[717]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 257.

[718]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 258.

[719]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 258.

[720]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 267.

damages has no bearing upon the jurisdiction of the Tribunal"[721]—rather, it is enough that it "suffered an injury."[722]  The Claimant then argues that the dispute does have practical consequences: "[t]he Distributors made tens of millions of dollars in payments to Respondent, as a result of which Claimant's investment in Guatemala has been severely prejudiced."[723]

458.  The Claimant submits its claims are not premature for the following reasons:

    (a)   The SAT's position "that payments under protest are final,"[724] is erroneous;

    (b)   The proceedings are "still in the investigation stage . . . with no end in sight;"[725]

    (c)   The Criminal Court's finding "has nothing to do with the principal amounts at issue;"[726]

    (d)   "The fact that IC Power sold its interest in the Distributors does not mean that it did not suffer any damage as a result of Guatemala's measures."[727]  Rather, "it means that the damage is fully crystallized."[728]

459.  The Claimant contests the Respondent's reliance on *Achmea B.V. v. Slovak Republic II*[729] and *Northern Cameroons (Cameroon v. United Kingdom)*.[730]  In regard to the former, the Claimant suggests that the tribunal in that case held it could not look "into the future to examine a State conduct that had not yet materialized" while, by contrast, the current case involves "very specific measures that have already had a substantial impact on Claimant."  In relation to the latter case, the Claimant cites the International Court of Justice's view that it may adjudicate on "an actual controversy involving a conflict of legal interest between the parties" and that its judgment "must

---

[721]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 268.
[722]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 268.
[723]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 269.
[724]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 270.
[725]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 270.
[726]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 270.
[727]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 270.
[728]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 270.
[729]  *Achmea B.V. v. Slovak Republic II*, PCA Case No. 2013-12, Award on Jurisdiction and Admissibility (20 May 2014), para. 251 (**Authority RLA-92**).
[730]  *The Northern Cameroons (Cameroon v. United Kingdom)*, Preliminary Objections, Judgment, I.C.J. Reports 1963, p. 15 (**Authority RLA-93**).

have some practical consequence."[731]    The Claimant is clear in its belief that the type of controversy foreshadowed in *Northern Cameroons (Cameroon v. United Kingdom)* exists here.

### 2.    The Tribunal's Considerations

460.    As noted above with respect to the Respondent's objection concerning Guatemalan law claims, the Tribunal is fully cognizant that the Claimant's Treaty claims are predicated in part on matters of Guatemalan law, plead as a matter of fact in these proceedings.  The Tribunal is further aware that certain such matters remain pending in the Courts of Guatemala.  The Tribunal does not see, however, that this gives rise to a general objection to the Claimant's claims as premature.

461.    In the Tribunal's view, consideration of the implication of the pending proceedings in the Courts of Guatemala requires the specific examination of the extent to which the measures complained of by the Claimant are linked to the ongoing proceedings or distinct, and the extent to which the exhaustion of local remedies is or is not a required element of the Claimant's claims.  The Tribunal considers it preferable to consider the limits on the determinations that it may make in the course of considering the Claimant's individual claims, rather than as an overall matter of admissibility.

462.    Accordingly, the Tribunal rejects the Respondent's objection that the Claimant's claims are generally inadmissible in light of the ongoing judicial proceedings in Guatemala.

### C.    THE TRIBUNAL'S CONCLUSION IN RESPECT OF JURISDICTION AND ADMISSIBILITY

463.    Having considered the Respondent's objections to its jurisdiction and the admissibility of the Claimant's claims, the Tribunal finds that it has jurisdiction to entertain the Claimant's claims and that the Claimant's claims are admissible.

## VI.    THE MERITS OF THE CLAIMANT'S CASE

464.    The Claimant submits that the Respondent has breached multiple aspects of the fair and equitable treatment ("**FET**") standard in Article 2(2) of the Treaty.  The Claimant contends that the Respondent has also breached Article 2(2) by imposing unreasonable measures.  The Claimant further relies on the most-favoured nation ("**MFN**") provisions of Article 3 of the Treaty.  The Respondent denies having breached any provision of the Treaty.

---

[731]    *The Northern Cameroons (Cameroon v. United Kingdom)*, Preliminary Objections, Judgment, I.C.J. Reports 1963, p. 15 (**Authority RLA-93**).

## A.    ARTICLE 2 OF THE TREATY AND FAIR AND EQUITABLE TREATMENT

465.    Article 2(2) of the Treaty provides in relevant part as follows:

> Investments made by investors of each Contracting Party shall be accorded fair and equitable treatment...[732]

466.    The Claimant submits the Respondent has breached the standard of fair and equitable treatment (FET) through breach of the Claimant's legitimate expectations, arbitrary conduct, breach of procedural fairness and due process, and lack of transparency.  The Respondent contends it has not breached the FET standard.

### 1.    The Parties' Arguments on FET

### (a)    *Breach of the Claimant's Legitimate Expectations*

*The Claimant's Position*

467.    The Claimant alleges that the Respondent frustrated its legitimate expectations.  Citing *Saluka Investments B.V. v. Czech Republic*,[733] the Claimant characterises the protection of legitimate expectations as "the central tenet of the FET standard."[734]  The Claimant notes that the analysis of legitimate expectations "focuses on the actions of the State upon which an investor may have reasonably relied."[735]  The Claimant argues that it had a reasonable expectation "that the legal and business environment would remain predictable and stable" and that "Guatemala would honor its own laws and regulations regarding the Binding Tax Opinions."[736]  Specifically, the Claimant submits that the Binding Tax Opinions "gave rise to IC Power's legitimate expectations that the Distributors were allowed to deduct the interest on the loan"[737] that ASCOED and ASROED "obtained to acquire them."[738]  Quoting *Suez and Vivendi v. Argentina*,[739] the Claimant states that

---

[732]    Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 2(2) (**Exhibit C-1**).

[733]    *Saluka Investments B. V. v. Czech Republic*, Partial Award (17 Mar. 2006) (**Authority CL-36**).

[734]    Claimant's Statement of Claim, para. 171.

[735]    Claimant's Statement of Claim, para. 171.

[736]    Claimant's Statement of Claim, para. 174.

[737]    Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 133.

[738]    Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 133.

[739]    *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Liability (30 July 2010) (**Authority CL-58**).

expectations coming from "laws, regulations, declared policies, and statements"[740] that "influence initial investment decisions" can be legitimate expectations for these purposes, and that the FET standard is breached where a State "frustrates"[741] such expectations.

468.   The Claimant lists numerous ways in which its legitimate expectations were allegedly breached:

(a)    First, the Claimant submits that the SAT disregarded the Binding Tax Opinions, "retroactively changing the binding position it had adopted."[742]

(b)    Second, the Claimant argues the SAT commenced criminal proceedings without "the administrative procedure that Guatemalan law requires."[743]

(c)    Third, the Claimant suggests that the Respondent's application for "unsubstantiated"[744] freezing orders during these criminal proceedings similarly constituted a frustration of its legitimate expectations.

469.   The Claimant disagrees with each of the Respondent's points against the existence of legitimate expectations. The Claimant first argues that "it is hard to conceive a more specific commitment than the Binding Tax Opinions."[745] According to the Claimant, the SAT itself has expressed the view that the Binding Tax Opinions "[g]rant legal certainty and tax justice to the taxpayer specifically with respect to the answer to the concrete case presented and the Tax Administration cannot deviate in its actions from the criteria set out in the binding opinion."[746] The Claimant disputes the "suggestion that the Binding Tax Opinions were not valid under its [the Respondent's] own laws"[747] and states that this view is inconsistent with the Respondent's

---

[740]   *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Liability (30 July 2010), para. 222 (**Authority CL-58**).

[741]   *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Liability (30 July 2010), para. 223 (**Authority CL-58**).

[742]   Claimant's Statement of Claim, para. 179.

[743]   Claimant's Statement of Claim, para. 179.

[744]   Claimant's Statement of Claim, para. 179.

[745]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 134.

[746]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 138, *quoting* SAT Oficio No. CAR-SAT-D-016-2016 from the Superintendent of the SAT to the Legal Representative of the Guatemalan Institute for Public Accountants and Auditors (IGCPA) regarding SAT DIC-SAT-IAJ-81-2016 (31 Mar. 2016), p. 3 (**Authority CL-78**).

[747]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 139.

behaviour, including the SAT's decision not to "revoke [the Opinions] within the prescribed period."[748]

470. According to the Claimant, "Respondent's argument that IC Power should have taken into account Guatemala's overall regulatory and legal framework, including its discretionary powers . . . is misplaced."[749] The Claimant contends that the disallowance of the Binding Tax Opinions and the commencement of Criminal Proceedings are "not a legitimate exercise of the State police powers."[750] The Claimant endorses the tribunals' views in *Técnicas Medioambientales Tecmed, S.A. v. The United Mexican States*[751] and *Methanex Corporation v. United States of America*,[752] arguing that to be within international legal requirements, "State measures adopted in the exercise of police powers must be (i) proportional; and (ii) not in violation of a specific commitment with the investor or its investments."[753] The Claimant specifically identifies the "disallowance of the Opinions and subsequent imposition of penalties, as well as the initiation of criminal proceedings and procurement of freezing orders"[754] as "disproportionate".[755] The Claimant also rejects the Respondent's reliance on *Spyridon Roussalis v. Romania*,[756] arguing that the facts differ significantly from the present case and that the *Spyridon* tribunal "noted that the claimant had failed to demonstrate any adverse impact,"[757] something the Claimant distinguishes from the Distributors' payments to the SAT. Citing Article 3 of the ILC Articles, the Claimant further submits that "Guatemala cannot avoid the legal effect of the representations made under the Binding Tax Opinions by arguing that the Deductions contemplated therein were somehow not in conformity with Guatemalan law".[758]

---

[748] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 139.

[749] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 142.

[750] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 142.

[751] *Técnicas Medioambientales Tecmed, S.A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award (29 May 2003) (**Authority CL-25**).

[752] *Methanex Corporation v. United States of America*, UNCITRAL, Final Award of the Tribunal on Jurisdiction and Merits (3 Aug. 2005) (**Authority CL-135**).

[753] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 143.

[754] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 144.

[755] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 144.

[756] *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award (7 Dec. 2011), para. 506 (**Authority RLA-105**).

[757] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 146.

[758] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 148.

471. The Claimant submits that the Respondent's arguments on the requirement for due diligence as part of establishing a legitimate expectation are "entirely without merit."[759] The Claimant first contends that where "a regulatory regime upon which an investor decides to invest is clear on its face, the investor does not need to demonstrate whether it undertook a sophisticated due diligence when relying on the continued application of such a regime."[760] The Claimant states that it has met this requirement. The Claimant further disputes that "red flags" were raised: in particular, it contends that the Respondent's argument specifically focuses on "the SAT Audit that pre-existed the issuance of the Binding Tax Opinions"[761] and that has "no bearing on the validity of the Tax Opinions."[762] According to the Claimant, "the objective of a binding tax opinion issued by a sovereign taxing authority is precisely to 'address and dispel' any concerns."[763]

472. Finally, the Claimant rejects the Respondent's view that "the application of the Binding Tax Opinion was not an important factor in IC Power's decision to invest in the Distributors"[764] The Claimant submits that this is incorrect, and the Binding Tax Opinions were a key factor: the Distributors' "sustainable financial performance" was a major component of the "strategic rationale" to invest in the Distributors as raised in the presentation to the IC Power Board in November 2015.[765]

*The Respondent's Position*

473. The Respondent disagrees that the Claimant's legitimate expectations were violated. Rather, the Respondent's view is that the Binding Tax Opinions "could not have provided ground for any legitimate expectation that the SAT would have authorized the Tax Deductions or that these were in accordance with the law."[766]

474. The Respondent takes issue with the Claimant's arguments regarding the extent to which the Binding Tax Opinions create legitimate expectations. The Respondent argues the Claimant

---

[759] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 152.

[760] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 153.

[761] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 154 (emphasis in original).

[762] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 154.

[763] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 158; *quoting* Second Expert Report prepared by Brattle, dated 23 December 2019, para. 25.

[764] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 163.

[765] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 163; *quoting* Second Witness Declaration of Horacio Albín Izuibejeros, dated 23 December 2019, para. 25.

[766] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 265.

"cannot have had a reasonable expectation under which the Consulting Department would have authorized the Tax Deductions:"[767] an investor can only reasonably base their expectations on representations "attributable to a competent organ or representative of the state,"[768] which, the Respondent suggests, is not the case here.

475. Citing *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, the Respondent asserts that only expectations arising from specific commitments are protected. The commitment or guarantee "must be sufficiently specific, i.e., it must be precise as to its content and clear as to its form."[769] The Respondent's view is that the Binding Tax Opinions are not specific enough to meet this standard: they were "at most, ambiguous" on the availability of the Tax Deductions.[770]

476. The Respondent then states that "the investor's expectations must be legitimate and reasonable in light of the circumstances,"[771] and cannot be subjective.[772] The Respondent argues that this principle requires that "any expectation by the investor must take into account the entire legal and regulatory framework applicable to the investment, including the oversight mechanisms of the State."[773]

477. As such, the Respondent contends that "it was perfectly foreseeable that the SAT would verify the lawfulness of the Tax Deductions even after the Binding Tax Opinions had been issued."[774] The Respondent analogises the case to the decision by the tribunal in *Spyridon Roussalis v. Romania*, noting that the Claimant could not have expected authorities to "refrain from resolving reasonable concerns they might have concerning Claimant's fulfillment of its tax obligations."[775] The Respondent particularly emphasises that the Binding Tax Opinions "are not binding in

---

[767] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 268.

[768] *Ioan Micula et al v. Romania*, ICSID Case No. ARB/05/20, Award (11 Dec. 2013), para. 669 (**Authority RLA-135**); Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 268.

[769] *Crystallex International Corp v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award (4 Apr. 2016), para. 547 (**Authority RLA-99**).

[770] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 277.

[771] Respondent's Statement of Defence, para. 370.

[772] Respondent's Statement of Defence, para. 370.

[773] Respondent's Statement of Defence, para. 371.

[774] Respondent's Statement of Defence, para. 372.

[775] *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award (7 Dec. 2011), para. 506 (**Authority RLA-105**).

dispute resolution"[776] and do not affect the competency of the Guatemalan courts.[777] It contends that "[i]nternational law does not prevent the State from exercising criminal oversight, regardless of the investor's interpretation as to whether a regulation in domestic law is reasonable."[778] Further, "[r]egardless of whether the Claimant may have made a reasonable interpretation of the tax law,"[779] the SAT is obliged "to suspend the administrative procedure and file a criminal complaint."[780]

478.  The Respondent submits that a further requirement of fair and equitable treatment is that "investors' expectations are only legitimate when the investors performed an adequate due diligence process at the time they made their investment."[781] The Respondent contends that "the documents of the alleged due diligence were full of red flags as to the illegitimacy of the Tax Deductions"[782] and the Claimant "decided to ignore these many red flags."[783] The Respondent argues that the Claimant "attempts to restrict the scope of the obligation of due diligence under international law by appealing to a distorted reading of international case law,"[784] and particularly notes that it is erroneous to state "that the standard of due diligence applicable to experienced businessmen, one recognized by numerous ICC awards, has no relevance to investment arbitration."[785]

479.  Finally, the Respondent asserts that "international law only protects those legitimate expectations that the investor took into account in making its investment,"[786] and that the Claimant does not demonstrate that the existence of the Binding Tax Opinions was a key attraction of the purchase. Rather, the Respondent alleges the "approval of the board of directors"[787] for the purchase was

---

[776]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 278; *quoting* Supreme Court of Justice, Judgment (Case No. 23-2015), dated 18 August 2015, p. 4 (**Exhibit R-170**).

[777]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 278.

[778]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 280.

[779]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 281.

[780]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 281.

[781]   Respondent's Statement of Defence, para. 373; *see also Álvarez & Marín Corporación S.A. et al. v. Republic of Panama*, ICSID Case No. ARB/15/14, Arbitration Award (12 Sept. 2018), para. 337 (**Authority RLA-38**).

[782]   Respondent's Statement of Defence, para. 374.

[783]   Respondent's Statement of Defence, para. 374.

[784]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 282.

[785]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 283.

[786]   Respondent's Statement of Defence, para. 375.

[787]   Respondent's Statement of Defence, para. 376.

made on the basis of other "features that made it a highly attractive deal."[788] The Respondent characterises the Claimant's argument as being that "international law does not require legitimate expectations to have been a decisive factor in the investment for these to be protected."[789] According to the Respondent, the case law does not support this. Recalling *Técnicas Medioambientales Tecmed, S.A. v. The United Mexican States*,[790] the Respondent asserts that the rule is "that FET only protects those legitimate expectations the investor took into consideration in making its investment."[791]

### (b) *Arbitrary Treatment*

480. The Claimant submits that the Respondent engaged in arbitrary conduct by "disregard[ing] the Binding Tax Opinions by commencing criminal proceedings"[792] and by obtaining "injunctions which effectively forced the Distributors to make tens of millions of dollars in payments to the State."[793]

#### (i) *Standard for Arbitrary Treatment*

*The Claimant's Position*

481. The Claimant states that a country which "engages in arbitrary conduct against the investor"[794] is in breach of the FET standard in Article 2(2) of the Treaty. Recalling *Ronald S. Lauder v. Czech Republic*,[795] the Claimant notes that arbitrary conduct is that which is "founded on prejudice or preference rather than on reason or fact."[796] The Claimant also recalls the Tecmed tribunal's association of arbitrariness with inconsistent behaviour and its requirement that the State act consistently.[797]

---

[788] Respondent's Statement of Defence, para. 376.

[789] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 289.

[790] *Técnicas Medioambientales Tecmed, S.A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award (29 May 2003), para. 154 **(Authority CL-25)**.

[791] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 290.

[792] Claimant's Statement of Claim, para. 154.

[793] Claimant's Statement of Claim, para. 154.

[794] Claimant's Statement of Claim, para. 151.

[795] *Ronald S. Lauder v. Czech Republic*, UNCITRAL, Final Award (3 Sept. 2001) **(Authority CL-22)**.

[796] Claimant's Statement of Claim, para. 152, *quoting Ronald S. Lauder v. Czech Republic*, UNCITRAL, Final Award (3 Sept. 2001), para. 221 **(Authority CL-22)**.

[797] Claimant's Statement of Claim, para. 153.

482. The Claimant suggests the Respondent uses the *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*[798] to set too high a threshold for arbitrariness, explaining that "the concept of arbitrariness has evolved substantially in investment treaty arbitration since the ICJ judgment in the *ELSI* case."[799] The Claimant states that the Respondent has mischaracterised one part of the Claimant's argument as being that "Guatemala simply misapplied its own laws."[800] Instead, the Claimant clarifies its position that this case relates to its "undermined"[801] expectations based on the Binding Tax Opinions. The Claimant further distinguishes a series of authorities invoked by the Respondent as follows:

(a) First, the Claimant distinguishes the Respondent's reliance on *Cervin Investissements S.A. & Rhone Investissements S.A. v. Republic of Costa Rica*[802] and the view that "a violation of municipal law does not *per se* give rise to a violation of international law."[803] According to the Claimant, the *Cervin* tribunal nevertheless recognized that the "unreasonable or capricious"[804] application of domestic law can still be arbitrary.

(b) Second, the Claimant opposes the Respondent's reliance on *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia*[805] to argue that arbitrariness is more difficult to satisfy when examining "the mechanisms of State oversight."[806] According to the Claimant, the tribunal was not unanimous on this, and "there are many other cases in which the mechanisms of State oversight were found to be arbitrary and in breach of the FET

---

[798]   *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, I.C.J. Reports 1989, p. 15, Judgment (20 July 1989), para. 128 **(Authority RLA-68)**.

[799]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 169.

[800]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 172.

[801]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 172.

[802]   *Cervin Investissements S.A. & Rhone Investissements S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/13/2, Award (7 Mar. 2017) **(Authority RLA-113)**.

[803]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 173 (emphasis in original).

[804]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 173.

[805]   *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award (27 Aug. 2019) **(Authority RLA-82)**.

[806]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 176; *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award (27 Aug. 2019), para. 1458 **(Authority RLA-82)**.

standard."[807] The Claimant also argues that *Glencore* is misused in arguing that a refusal of justice is required for proceedings to be arbitrary.[808]

(c)   Similarly, the Claimant disagrees with the Respondent's position, based on *EDF (Services) Limited v. Romania*,[809] that court proceedings cannot be arbitrary if they have a "legitimate purpose". According to the Claimant, that case centred on whether the relevant government had "authority" to start proceedings and not on the actual arbitrariness of these proceedings.[810]

*The Respondent's Position*

483.  The Respondent submits that the Claimant does not acknowledge "the fact that international law sets a high threshold for claims on arbitrary conduct."[811]  The Respondent cites the *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)* to state that arbitrariness requires "a wilful disregard of due process of law."[812] The Respondent disagrees with the Claimant's efforts to narrow the *ELSI* holding and considers it applicable in "all types of situations."[813] The Respondent also denies that international law has evolved significantly since *ELSI*. The Respondent asserts that "a simple breach of Guatemalan law"[814] is insufficient to establish arbitrary conduct – rather, "[t]he error of law must be of such a nature as to give rise to justified concerns as to the judicial propriety of the outcome."[815] Moreover, the Respondent relies on Glencore for the proposition that "[s]atisfying this standard is even more difficult when the mechanisms of State oversight are analysed and, particularly the conduct of the domestic courts of the State receiving the investment."[816]

---

[807]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 176.

[808]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 178.

[809]   *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award (8 Oct. 2009), para. 303 (**Authority CL-55**); Claimant's Statement of Claim, para. 152.

[810]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 180.

[811]   Respondent's Statement of Defence, para. 380.

[812]   Respondent's Statement of Defence, para. 380, *quoting Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, I.C.J. Reports 1989, p. 15, Judgment (20 July 1989), para. 128 (**Authority RLA-68**).

[813]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 296.

[814]   *Cervin Investissements S.A. & Rhone Investissements S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/13/2, Award (7 Mar. 2017), para. 527 (**Authority RLA-113**).

[815]   *Georg Gavrilovic & Gavrilovic D.O.O. v. Republic of Croatia*, ICSID Case No. ARB/12/39, Award (26 July 2018), para. 878 (**Authority RLA-98**).

[816]   Respondent's Statement of Defence, para. 381.

       *(ii)   Arbitrary Behaviour by the SAT*

*The Claimant's Position*

484.  The Claimant submits that the SAT acted arbitrarily in pursuing criminal charges against the Claimant. The Claimant contends that this is "an abuse of public authority"[817] which constitutes arbitrary conduct. Recalling *TECO Guatemala Holdings, LLC v. Republic of Guatemala*,[818] the Claimant contends that the Respondent has arbitrarily "overlooked its own rules and regulations without any basis."[819] The Claimant argues that the Respondent's commencement of criminal proceedings against the Distributors represents an arbitrary abuse of power, as the SAT "initiated criminal court proceedings without having previously determined whether the Distributors had committed tax fraud or any other criminal offence,"[820] in breach of its own rules. The Claimant considers that the arbitrariness is compounded by the fact that "SAT officials twice recommended *not* to pursue such proceedings, precisely given the existence of the Binding Tax Opinions,"[821] and the fact that the "complaint of July 2016 was legally deficient."[822]

485.  The Claimant takes issue with the Respondent's argument that the Claimant "submitted no evidence to demonstrate that the alleged conduct was to increase tax collection"[823] and counters by arguing that "President Morales sent a clear message that the SAT needed to increase its tax collections."[824]

*The Respondent's Position*

486.  The Respondent submits that the SAT did not act arbitrarily in commencing, or during the course of, the Criminal Proceeding. The Respondent starts by analogising with *The Rompetrol Group N.V. v. Romania*[825] to argue that "international tribunals do not have competency to verify whether

---

[817] Claimant's Statement of Claim, para. 155.

[818] *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/17, Award (19 Dec. 2013), paras. 106-110, 489, 711 **(Authority CL-72)**.

[819] Claimant's Statement of Claim, para. 156.

[820] Claimant's Statement of Claim, para. 157.

[821] Claimant's Statement of Claim, para. 155 (emphasis by the Claimant).

[822] Claimant's Statement of Claim, para. 158.

[823] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 179.

[824] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 179.

[825] *The Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award (6 May 2013), para. 237 **(Authority RLA-47)**.

a State had sufficient reasons to file a criminal proceeding."[826] As such, the Respondent contends that it is not "the duty of the Tribunal to establish whether a crime of tax fraud exists . . . since that task rests solely with the criminal judge."[827] Beyond this, the Respondent rejects the Claimant's claims regarding the Criminal Proceedings on four further grounds.

487. First, the Respondent argues that by choosing to bring an investigation on "the crime of tax fraud"[828] before "the competent judicial authority in criminal matters",[829] it has demonstrated clear respect for "the Rule of Law"[830] and hence there is no arbitrary conduct. The Respondent relies on *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia* to contend that "the fact of filing a legal proceeding does not constitute a violation of FET in the absence of a refusal of justice."[831] According to the Respondent, the Claimant "has submitted no evidence whatsoever to demonstrate that the conduct of the State was the result of a concerted effort by the administration of President Morales to unjustifiably and maliciously increase tax collection from the Distributors."[832] The Criminal Proceedings were instituted for an "apparent legitimate purpose"[833] and so cannot be "classified as arbitrary."[834]

488. Second, the Respondent submits that it had "sufficient indications to file a Criminal Complaint,"[835] and that Guatemalan law does not require the SAT "to exhaust the administrative procedure prior to filing the Criminal Complaint."[836] The Respondent contests the Claimant's argument that the SAT's conduct was an abuse of power: "the SAT has the obligation of suspending the administrative process and immediately filing a complaint for alleged commission of tax fraud . . . when the existence of indications of tax fraud is verified."[837] According to the

---

[826] Respondent's Statement of Defence, para. 385.

[827] Respondent's Statement of Defence, para. 386.

[828] Respondent's Statement of Defence, para. 388.

[829] Respondent's Statement of Defence, para. 388.

[830] Respondent's Statement of Defence, para. 388.

[831] Respondent's Statement of Defence, para. 388; *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award (27 Aug. 2019), para. 1557 (**Authority RLA-82**).

[832] Respondent's Statement of Defence, para. 390.

[833] Respondent's Statement of Defence, para. 392; Claimant's Statement of Claim, para. 152; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award (8 Oct. 2009) (**Authority CL-055**).

[834] Respondent's Statement of Defence, para. 392.

[835] Respondent's Statement of Defence, para. 169.

[836] Respondent's Statement of Defence, para. 187.

[837] Respondent's Statement of Defence, para. 394.

Respondent, for arbitrary conduct to be satisfied, the Claimant would need to prove "that the SAT deliberately ignored the content of [the Binding Tax Opinions]"[838] or that it acted out of "discretion, prejudice or personal preference."[839]

489.   Third, the Respondent disagrees with the Claimant that the Criminal Complaint is "legally deficient as it did not clearly set out ... the criminal offence of which it accuses the Distributors."[840]   The Respondent next objects to the arguments that SAT officials recommended not to pursue the Criminal Complaint, as well as the point that the Distributors' rectification payments were accepted by the SAT. The Respondent submits that the advice was received prior to the Binding Tax Opinions,[841] and in terms of the payments, the Respondent rejects the implication that accepting these payments implies the SAT "consented to the Tax Deductions."[842] Lastly, the Respondent disputes the claim that it misled the Distributors during the Criminal Proceeding in any way.[843]

### (iii)   Arbitrary Behaviour by the Criminal Courts

*The Claimant's Position*

490.   The Claimant submits that the Criminal Court similarly acted arbitrarily in "disregard[ing] the Binding Tax Opinions,"[844] noting that "judicial conduct can result in a violation of a BIT."[845] The Claimant identifies the alleged "arbitrary nature and disproportionate impact of the freezing orders on the Distributors" as a means by which the Criminal Court's behaviour breached the FET standard.[846] Specifically, the Claimant considers the Court's measures to be arbitrary "because they were (a) not justified under the circumstances, given the lack of any imminent and irreparable

---

[838]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 311 (emphasis omitted).

[839]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 310; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award (8 October 2009), para. 303 (**Authority CL-55**).

[840]   Claimant's Statement of Claim, para. 158.

[841]   Respondent's Statement of Defence, para. 400.

[842]   Respondent's Statement of Defence, para. 401.

[843]   Respondent's Statement of Defence, para. 402.

[844]   Claimant's Statement of Claim, para. 160.

[845]   Claimant's Statement of Claim, para. 160.

[846]   Claimant's Statement of Claim, para. 162.

prejudice; and (b) not tailored to allow for the proper continuity of the companies while securing only the amounts at issue"[847]

491.  The Claimant distinguishes the Respondent's reliance on *Eli Lilly and Company v. Government of Canada*, arguing that the case "did not involve anything like the Binding Tax Opinions, which gave the investor the assurance of a specific interpretation of Guatemala's tax laws"[848] and further found that courts can engage in forms of "arbitrary conduct."[849]

*The Respondent's Position*

492.  The Respondent denies that the Criminal Court acted arbitrarily by imposing precautionary measures. The Respondent reiterates its jurisdictional point that "the Tribunal cannot review the decisions of the Criminal Court as if it were a court of appeals."[850] The Respondent also argues the Claimant has mischaracterised *Eli Lilly and Company v. Government of Canada*; for the Respondent, *Eli Lilly* holds that a tribunal can only assess a court's conduct where "there is clear evidence of egregious and shocking conduct."[851]

493.  The Respondent submits that no such conduct was present here: applying for precautionary measures in a criminal investigation is "by no means unusual in Guatemala"[852] and the measures "complied with the requirements set forth in the Civil and Commercial Procedural Code and the Tax Code."[853] According to the Respondent, "the disregarding of the Binding Opinions by the Criminal Court cannot *per se* constitute arbitrary conduct,"[854] because the Opinions were "not binding for the Criminal Court."[855] Nor, in the Respondent's view, were the measures "disproportionate".[856] In any event, the Distributors' choice not to challenge the decision

---

[847]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 183.

[848]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 183.

[849]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 183.

[850]  Respondent's Statement of Defence, para. 407.

[851]  Respondent's Statement of Defence, para. 407, *quoting Eli Lilly and Company v. Government of Canada*, ICSID Case No. UNCT/14/2 (16 Mar. 2017), para. 224 **(Authority RLA-112)** (emphasis omitted).

[852]  Respondent's Statement of Defence, para. 410.

[853]  Respondent's Statement of Defence, para. 411.

[854]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 319 (emphasis in original).

[855]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 320.

[856]  Respondent's Statement of Defence, para. 412.

"justifies the rejection of the Claimant's claims" [857] of arbitrary conduct. Without the Distributors having done so, the Respondent argues, the Tribunal cannot conclude "that the State acted in an arbitrary manner in violation of its international obligations." [858]

(c)   *Denial of Due Process and Procedural Fairness*

*The Claimant's Position*

494.  The Claimant alleges that it was denied procedural fairness by the Respondent in breach of the FET standard. Drawing on *Metalclad Corporation v. The United Mexican States*,[859] the Claimant argues that the FET standard requires the Government to abide by "basic principles of procedural fairness." [860]  The Claimant's view is that "the FET standard provides a "basic and general standard" with respect to the required procedural fairness." [861]  The Claimant contends procedural fairness was breached by both the actions of the SAT and of the Criminal Court.

495.  The Claimant alleges that the SAT "adopted measures against the Distributors that did not respect basic principles of procedural fairness." [862]  Citing *Crystallex International Corporation v. Bolivarian Republic of Venezuela*,[863] the Claimant argues the applicable standard is whether parties are "treated non-transparently or inconsistently throughout the process and thereafter." [864]  In terms of the SAT's treatment, the Claimant specifically states that "[t]he SAT's use of criminal proceedings to put pressure on the Distributors was unlawful and departs from the standard of procedural fair[ness] that Guatemala is bound to respect under the FET Standard." [865]  In particular,

[857]  Respondent's Statement of Defence, para. 414.

[858]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 325.

[859]  *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award (30 Aug. 2000), paras. 91, 100-101 (**Authority CL-18**).

[860]  Claimant's Statement of Claim, para. 163.

[861]  Claimant's Statement of Claim, para. 164; quoting *Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia*, ICSID Case No. ARB/99/2, Award (25 June 2001) para. 367 (**Authority CL-20**).

[862]  Claimant's Statement of Claim, para. 163.

[863]  *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award (4 Apr. 2016) (**Authority CL-79**).

[864]  *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award (4 Apr. 2016), para. 585 (**Authority CL-79**).

[865]  Claimant's Statement of Claim, para. 169.

the Claimant submits that "[t]he SAT filed the Criminal Complaint against the Distributors without any evidence of fraud by the Distributors or its employees, as legally required."[866]

496. The Claimant also seeks to categorise the behaviour of the Criminal Court as a breach of the requisite standard of procedural fairness and a breach of due process. Recalling decisions in *Antoine Abou Lahoud & Leila Bounafeh-Abou Lahoud v. Democratic Republic of the Congo*[867] and *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*[868] the Claimant argues that the freeze and intervention orders issued by the court were "not justified under the circumstances, given the lack of any imminent and irreparable prejudice; and . . . not tailored to allow for the proper continuity of the companies."[869] The Claimant alleges this was done with no consideration of "the disproportionately adverse effects"[870] that the measures would have on the Distributors. As such, the Claimant concludes that the court's actions "were not only inconsistent with Guatemalan law, but they also did not respect the procedural fairness that the FET standard requires."[871] The Claimant particularly emphasizes that the Court "denied the Distributors access to the case file, held *ex parte* hearings to grant provisional measures" and only convened a hearing regarding the interim measures "almost three months after issuing the Freezing Order."[872]

497. The Claimant disagrees with the Respondent's position that due process is limited to the party's right to present its case, and to the authority to issue a decision. According to the Claimant, the Respondent inaccurately takes issue with Claimant's reliance on *Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia* for a "basic and general standard" of procedural fairness.[873] The Claimant also argues that the Distributors' failure to challenge the Provisional measures "does not render those orders in conformity with international law" as the Distributors would have faced "dire consequences"[874] if they had not paid.

---

[866] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 185.

[867] *Antoine Abou Lahoud & Leila Bounafeh-Abou Lahoud v. Democratic Republic of the Congo*, ICSID Case No. ARB/10/4. Award (7 Feb. 2014), para. 468-475 **(Authority CL-73)**.

[868] *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award (31 Oct. 2012), para. 474 **(Authority CL-68)**.

[869] Claimant's Statement of Claim, para. 167.

[870] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 186.

[871] Claimant's Statement of Claim, para. 168.

[872] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 187.

[873] *Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia*, ICSID Case No. ARB/99/2, Award (25 June 2001), para. 367 **(Authority CL-20)**.

[874] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 190.

*The Respondent's Position*

498.  The Respondent disagrees that the Claimant was denied due process or procedural fairness. With reference to *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia*,[875] the Respondent characterises the right to due process as being "that each party has the opportunity to present its case and that the decision of the corresponding judge or administrative entity shall be reasoned and impartial."[876]  The Respondent's position is that to prove a breach of due process the Claimant must show "manifest and gross failure to comply with the elementary principles of justice."[877]  The Respondent contends the Claimant's claims must be limited to the Criminal Proceedings, and argues that no denial of due process took place.[878]

499.  The Respondent first submits that the precautionary measures ordered by the Criminal Court followed "the procedure established for that purpose in Guatemalan legislation."[879]  The Respondent specifically relies upon the fact that these orders are "customary" in Guatemala.[880]

500.  Second, the Respondent notes that the Distributors did not "exercise their right to a defense" or "request a reduction or substitution of the precautionary measures."[881]  The Respondent submits it is "inconceivable" that the Claimant file for breach of due process without having "ma[de] use of the tools specifically provided by the State to guarantee the investors [sic] right to due process."[882]  The Respondent disagrees with the Claimant's assertion that "SAT officials indicated that they would not consent to their lifting unless the Distributors paid the full amounts claimed",[883] arguing that this does not explain the decision not to file an appeal, and further that it would be "unreasonable" to expect the SAT to "request the revocation of a precautionary measure on its own initiative."[884]

---

[875]  *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award (27 Aug. 2019), para. 1318 (**Authority RLA-82**).

[876]  Respondent's Statement of Defence, para. 418.

[877]  *Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18 (26 July 2007), Dissenting Opinion of Daniel M, Price, para. 20 (**Authority RLA-118**).

[878]  Respondent's Statement of Defence, para. 419.

[879]  Respondent's Statement of Defence, para. 421.

[880]  Respondent's Statement of Defence, para. 421.

[881]  Respondent's Statement of Defence, para. 422.

[882]  Respondent's Statement of Defence, para. 422.

[883]  Claimant's Statement of Claim, para. 169 (emphasis omitted).

[884]  Respondent's Statement of Defence, para. 424.

501.  Third, contrasting the case with *Lahoud & Lahoud v. DRC*[885] and *Deutsche Bank v. Sri Lanka*,[886] the Respondent submits that the Distributors have had full opportunities to defend themselves throughout the Criminal Proceeding and hence have not been denied due process.[887]

502.  The Respondent disputes the Claimant's arguments regarding due process. The Respondent first submits that "infringement of due process"[888] requires "serious error,"[889] which is not established. The Respondent next contends that "none of the facts asserted by the Claimant in its Reply constitute a violation of due process"[890] under the strict standards required. In particular, the Claimant has not shown "procedural infringements in filing the Criminal Complaint"[891] by the SAT. Additionally, the arguments against the ordering of the precautionary measures are not sufficient as under Guatemalan law "it is usual to order precautionary measures on an *ex parte* basis."[892] Finally, the fact that the Distributors "fully exercised their right to a defense in the course of the Criminal Proceeding"[893] helps to establish that the due process requirements were met.

       (d)  *Failure to Act Transparently*

*The Claimant's Position*

503.  The Claimant argues the Respondent breached the FET standard through a failure to act transparently. Referencing *Técnicas Medioambientales Tecmed S.A. v. The United Mexican States*,[894] the Claimant notes the expectation that the State will "act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor."[895] The

---

[885]  *Antoine Abou Lahoud & Leila Bounafeh-Abou Lahoud v. Democratic Republic of the Congo*, ICSID Case No. ARB/10/4, Award (7 Feb. 2014), para. 468-475 **(Authority CL-73)**.

[886]  *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award (31 Oct. 2012), para. 474 **(Authority CL-68)**.

[887]  Respondent's Statement of Defence, para. 426.

[888]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 333.

[889]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 333.

[890]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 337.

[891]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 338.

[892]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 344.

[893]  Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 349.

[894]  *Técnicas Medioambientales Tecmed S.A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award (29 May 2003) **(Authority CL-25)**.

[895]  *Técnicas Medioambientales Tecmed S.A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award (29 May 2003), para. 154 **(Authority CL-25)**.

Claimant also relies on *Metalclad Corporation v. United Mexican States* [896] and *Waste Management Inc. v. United Mexican States* [897] to note that "a violation of the FET standard may arise"[898] as a result of "a complete lack of transparency and candour in an administrative process."[899]

504. The Claimant considers that the Respondent's actions "fell significantly short of the transparency standard that the FET imposes."[900] In particular, the Claimant identifies two ways in which the Respondent fell short of the transparency requirements.[901] The Claimant first alleges the Respondent was not transparent in the SAT's commencement of criminal proceedings, its applications for "crushing"[902] injunctions and the "excessive measures"[903] granted by the Criminal Court. The Claimant next submits that "high-level SAT officials misled the Distributors to the effect that the SAT would not initiate a tax audit for 2013-2015"[904] and then, on the same day, notified the Distributors that this audit was to be conducted.

505. The Claimant disputes the Respondent's argument that objections on the basis of transparency cannot be made unless regulatory change is involved. According to the Claimant, the Respondent mischaracterises *ECE Projektmanagement v. Czech Republic*,[905] in which the tribunal only notes that many cases involving transparency have concerned situations in which a law has been changed.[906] The Claimant also submits the Respondent has not established that it acted transparently: in particular, the Claimant contends that the reasons for "abandoning the Binding

---

[896]    *Metalclad Corporation v. United Mexican States,* ICSID Case No. ARB(AF)/97/1, Award (30 Aug. 2000) **(Authority CL-18).**

[897]    *Waste Management Inc. v. United Mexican States,* ICSID Case No. ARB(AF)00/3, Award (30 Apr. 2004) **(Authority CL-28).**

[898]    Claimant's Statement of Claim, para. 184.

[899]    *Waste Management Inc. v. United Mexican States,* ICSID Case No. ARB(AF)00/3, Award (30 Apr. 2004, para. 98 **(Authority CL-28).**

[900]    Claimant's Statement of Claim, para. 185.

[901]    Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 195.

[902]    Claimant's Statement of Claim, para. 185.

[903]    Claimant's Statement of Claim, para. 185.

[904]    Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 195.

[905]    *ECE Projektmanagement International GmbH and Kommanditgesellschaft Panta Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic,* PCA Case No. 2010-5, Award (19 Sept. 2013) **(Authority RLA-70).**

[906]    Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 198.

Tax Opinions"[907] and for "seeking the Provisional Measures"[908] are opaque, and that the Criminal Proceedings, "which currently have no end in sight,"[909] similarly lack transparency.

*The Respondent's Position*

506. The Respondent denies there was any lack of transparency in its conduct. The Respondent disagrees that the requirement for a "transparent and foreseeable"[910] legal system applies here. Recalling *ECE Projektmanagement v. Czech Republic*, the Respondent argues that this requirement applies only where "the law has been changed to the detriment of the investor following the making of its investment."[911] The Respondent submits no such change took place here.[912]

507. The Respondent further contends that its conduct was nonetheless "completely transparent."[913] The Respondent argues the Binding Tax Opinions provided sufficient "warnings"[914] as to the rules governing deduction of expenditure and the powers of the Tax Administration.[915] According to the Respondent, the SAT also provided "detailed information"[916] to the Distributors on its arguments "with respect to the unlawfulness of the Tax Deductions,"[917] and additionally "described the reasons why it believed a tax fraud could exist in the Criminal Complaint."[918] The Respondent therefore submits that the "claim of lack of transparency must be rejected."[919]

508. The Respondent disputes the Claimant's arguments on transparency. The Respondent first suggests the legal authorities used by the Claimant confirm the Respondent's position: for

---

[907] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 199.
[908] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 199.
[909] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 199.
[910] Respondent's Statement of Defence para. 430.
[911] *ECE Projektmanagement International GmbH and Kommanditgesellschaft Panta Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-5, Award (19 Sept. 2013), para. 4.808 **(Authority RLA-70)**.
[912] Respondent's Statement of Defence, para. 431.
[913] Respondent's Statement of Defence, para. 432.
[914] Respondent's Statement of Defence, para. 433.
[915] Respondent's Statement of Defence, para. 433.
[916] Respondent's Statement of Defence, para. 434.
[917] Respondent's Statement of Defence, para. 434.
[918] Respondent's Statement of Defence, para. 435.
[919] Respondent's Statement of Defence, para. 436.

instance, "the tribunals in *Tecmed* and *Electrabel* only underscored the obligation of the State to publish the regulations governing the investment and future changes to these in such a way that the investor can act accordingly."[920]  The Respondent argues it has consistently "been clear with respect to the regulations applicable to tax and criminal oversight."[921]  The Respondent then re-asserts that "the Claimant has not in any case demonstrated that the conduct of the State has not been transparent."[922]

### 2.   The Tribunal's Considerations on FET

509.   At their core, the Claimant's claims arise from the decision of the SAT to bring criminal proceedings and submit seizure applications against the Distributors in alleged disallowance of the Binding Tax Opinions **(a)**, and without exhausting administrative proceedings in accordance with Guatemalan law **(b)**.  A breach of FET is also claimed in connection with the decision of the Criminal Court to grant the SAT's seizure applications **(c)**.  The Tribunal addresses these maters *seriatim*.  Lastly, the Tribunal will assess whether the Respondent's actions amount to a breach of the FET standard in the Treaty **(d)**.

### (a)   *The Binding Tax Opinions*

510.   An analysis of the scope and effects of the Binding Tax Opinions is first in order.  The Claimant contends that the Binding Tax Opinions "expressly confirmed that the Distributors were legally entitled to interest and goodwill amortization deductions arising from Actis's 2011 Transaction," while their binding nature meant that the Respondent "would honor the commitments set out therein."[923]  Thus, it claims that the Respondent disallowed the Binding Tax Opinions by commencing "the Criminal Proceeding against the Distributors to force them to pay the very taxes that the Binding Tax Opinions allowed the Distributors to deduct."[924]

511.   In response, the Respondent submits that the Binding Tax Opinions "did not address the specific case of the Tax Deductions, but rather an incomplete version of the facts provided by the

---

[920]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 352.
[921]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 353.
[922]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 355.
[923]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 134.
[924]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 164.

Distributors,"[925] and, in any event, the Binding Tax Opinions "made the deduction of any cost or expense contingent upon being duly documented and generating taxable income."[926]

512.   The Tribunal has carefully considered the events leading to the issuance of the Binding Tax Opinions and the Parties' arguments concerning their scope and effects. For the purposes of its FET analysis, the Tribunal considers it appropriate to first address whether, as a matter of Guatemalan law, the Binding Tax Opinions precluded the SAT from filing a criminal complaint against the Distributors in respect of the events underlying the 2011 Transaction. In the Tribunal's view, the Claimant has failed to establish that such is the case.

513.   The Binding Tax Opinions provide, in almost identical terms, and in relevant part, as follows:

> That, according to the provisions that regulate the Guatemalan tax system, taxpayers shall keep accounting records in accordance with Generally Accepted Accounting Principles so that the discounted future dividend method used by the taxpaying entity, [Deocsa], is not expressly regulated by the tax provisions. However, its use is technically correct within the applicable legal framework as analyzed in the section on Legal Analysis. Consequently, the value of the acquired shares indicated in the query, calculated using the Future Dividend Discount Model, is the value to be deducted from the Price to determine the amount of amortizable goodwill according to articles 26 of Decree 2692 of the Congress of the Republic and amendments (for fiscal years 2011 and 2012), and 33 of Decree 10-2012 of the Congress of the Republic. B) Regarding the interest resulting from credit acquired by the aforementioned entity, pursuant to articles 38, letter m) of Decree number 26-92; and 21, numbers 16 and 24 of Decree number 10-2012, both of the Congress of the Republic, and the limitations established therein, its deduction is appropriate provided that it is supported and documented according to the section on legal analysis.
>
> Pursuant to Article 102 of the Tax Code, the answer to the query made by the interested party cannot be resolved, disputed, or appealed in any way and only has a binding effect for the Tax Administration regarding this specifically consulted case. (Emphasis added)[927]

514.   The Tribunal finds no basis to construe the Binding Tax Opinions as a blanket endorsement of the legality of the Tax Deductions, as proffered by the Claimant.[928]   Their terms are much narrower. In the Tribunal's view, this is particularly evident from the opinion drawn in connection with the validity of the deduction for interest payments, which is made dependent on those payments being "duly supported and documented." Other conditions for the legality of the Tax

---

[925]   Respondent's Statement of Defence, Section 2.3.1.

[926]   Respondent's Statement of Defence, Section 2.3.2.

[927]   Opinion OPI-2015-08-01-000025 of the Superintendencia de Administración Tributaria, Intendencia de Asuntos Jurídicos, Departamento de Consultas, Unidad de Consultas Tributarias y Aduaneras , dated 9 February 2015 (Exhibit C-4); Opinion OPI-2015-08-01-000024 of the Superintendencia de Administración Tributaria, Intendencia de Asuntos Jurídicos, Departamento de Consultas, Unidad de Consultas Tributarias y Aduaneras, dated 9 February 2015 (Exhibit C-5) (Claimant's Translation).

[928]   Claimant's Statement of Claim, para. 64; Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 23, 45, 53.

Deductions set out in the opinion, such as the requirement to rely on "Accounting Principles" in applying the discounted cash flow method,[929] or the requirement that any deductible income or expense be used to generate taxable income,[930] lead to the same conclusion. It follows that, in preparing the Binding Tax Opinions, the SAT did not conduct a full enquiry in respect of the 2011 Transaction and the Tax Deductions, but rather circumscribed its legal assessment to the limited factual representations made by the Distributors in the Tax Opinion Requests.

515. Thus, the better view is that the Binding Tax Opinions did not confirm the legality of an actual situation of fact, but rather drew legal conclusions from the factual scenario represented by the Distributors to the SAT in the Tax Opinion Requests. This conclusion is consistent with Article 102, paragraph 2 of the Tax Code, pursuant to which it was incumbent upon the Distributors to "formulate in clear and precise terms all of the underlying elements of the case,"[931] meaning that the SAT did not bear the burden of establishing the truthfulness of the representations made by the Distributors in the Tax Opinion Requests as if it were conducting a tax audit.[932]

516. Accordingly, while the views expressed in the Binding Tax Opinions clearly have "a binding effect on the Tax Administration with respect to the concrete case specifically consulted,"[933] the Tribunal concludes that the Binding Tax Opinions did not preclude the SAT from initiating criminal proceedings against the Distributors in respect of the events surrounding the 2011 Transaction after it became apparent that the scenario that was represented to the SAT in the Tax Opinion Requests was more complex in reality—and, in particular, after the SAT detected indicia of a crime in the tax situation under scrutiny.

517. Indeed, the Tribunal has found no support in Guatemalan law for the proposition that a binding tax opinion could preclude the SAT from bringing criminal charges against a taxpayer. Article 102 of the Tax Code limits the scope and effects of binding tax opinions to questions formulated

---

[929] Opinion OPI-2015-08-01-000025 of theSuperintendencia de Administración Tributaria, Intendencia de Asuntos Jurídicos, Departamento de Consultas, Unidad de Consultas Tributarias y Aduaneras , dated 9 February 2015, pp. 10-11 (**Exhibit C-4**).

[930] Opinion OPI-2015-08-01-000024 of the Superintendencia de Administración Tributaria, Intendencia de Asuntos Jurídicos, Departamento de Consultas, Unidad de Consultas Tributarias y Aduaneras, dated 9 February 2015, p. 12 (**Exhibit C-5**).

[931] Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991), Article 102 (2) (**Authority CL-9**) (Tribunal's translation).

[932] Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, para. 14; Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, paras 28, 30; Hearing Transcript (English), D3:P135:L3-8.

[933] Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991), Article 102 (4) (**Authority CL-9**) (Tribunal's translation).

"with respect to the application of [the Tax] Code and the tax laws."[934] As such, the SAT cannot make binding determinations on matters of criminal law in a binding tax opinion—or, more precisely, it cannot establish that a taxpayer has not committed the crime of tax fraud. Such a determination is clearly beyond the realm of tax opinions and within the purview of the judiciary.[935]

518.   Accordingly, the Tribunal finds that the Claimant has failed to establish that the Binding Tax Opinions precluded the SAT from pursuing criminal action against the Distributors in respect of the events underlying the 2011 Transaction.

**(b)   *Requirement to Exhaust Administrative Proceedings***

519.   The Tribunal now turns to the Claimant's argument that the SAT commenced criminal proceedings without "the administrative procedure that Guatemalan law requires."[936] In particular, the Claimant asserts that the SAT must exhaust administrative proceedings before submitting a criminal complaint in order to establish whether there is evidence of a violation of the Tax Code, determine the amount of any liability and afford due process to the taxpayer.[937]

520.   For its part, the Respondent denies that Guatemalan law requires the prior exhaustion of an administrative or legal procedure for the SAT to file a criminal complaint against a taxpayer.[938] Rather, it posits that Guatemalan law requires officials to suspend an administrative procedure and file a criminal complaint whenever they find evidence of a crime.[939]

521.   The Parties agree that the requirements under which the SAT may bring a criminal complaint against a taxpayer are set out, first, in Article 70 of the Tax Code, pursuant to which: (i) tax-related crimes lie within the exclusive competence of criminal courts; and (ii) the SAT has an

---

[934]   Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991), Article 102 (4) **(Authority CL-9)** (Tribunal's translation).

[935]   Supreme Court of Justice, Judgment (Case No. 23-2015), dated 18 August 2015, p. 4 **(Exhibit R-170)**.

[936]   Claimant's Statement of Claim, para. 179.

[937]   Claimant's Statement of Claim, paras. 31-34; Legal Report of Saúl Augusto Donado Rodríguez, dated 16 May 2019, paras. 13, 42, 46; Legal Report of Juan Rodolfo Pérez Tabanino, dated 16 May 2019, section II. *See also*, Claimant's Statement of Reply and Response to Jurisdictional Objections, paras. 96-98, 106-108.

[938]   Respondent's Statement of Defence, paras. 166, 184-187; Decree Law 51-92 of the Guatemalan Congress, Criminal Procedure Code, dated 7 December 1992, Article 299, **(Authority CL-11)**; Legal Report of Ángel Estuardo Menéndez Ochoa, dated 15 September 2019, paras. 10(f), 36, 44. *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 8, 119.

[939]   Respondent's Statement of Defence, para. 188; Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 102, 107-108.

obligation "immediately" (*inmediatamente*) to bring a claim before criminal courts if it "presumes" (*si presume*) that a tax-related crime has been committed.[940]

522. The Parties also refer extensively to Article 90 of the Tax Code, pursuant to which the SAT (i) is precluded from sanctioning a taxpayer if it detects "indicia" (*indicios*) that the taxpayer in question has committed a tax-related crime; (ii) must bring the matter to the attention of the "competent authority"; and (iii) is precluded from sanctioning a tax payer twice for a single action.[941]

523. The Claimant's legal experts, Dr. Donado and Mr. Pérez, are of the view that Articles 70 and 90 of the Tax Code require the SAT to issue a formal tax assessment before initiating criminal proceedings.  According to Mr. Pérez, this is because a "detriment or impairment in tax collection" is a key element of the definition of the crime of tax fraud set out in Article 358 A of the Guatemalan Criminal Code, and, as such, the extent of the detriment must be determined before initiating criminal proceedings.[942]  In turn, Dr. Donado refers to Article 103 of the Tax Code, which sets out the definition of a "tax determination,"[943] and suggests that a joint reading of Articles 103, 70 and 90 of the Tax Code leads to the conclusion that the Tax Code requires a formal resolution from the SAT "establish[ing] the alleged tax underpayment" and identifying "the existence of acts tantamount to the crime of tax fraud" as a precondition for the initiation of criminal proceedings by the SAT.[944]

524. For its part, the Respondent relies, *inter alia,* on a decision of the Guatemalan Constitutional Court of 19 January 2010, which, in its view, confirms that Articles 70 and 90 of the Tax Code do not require that administrative proceedings before the SAT be exhausted, or that the taxpayer be informed or heard, before bringing a criminal complaint against a taxpayer.  In that case, the SAT conducted an internal assessment of a taxpayer's fulfilment of its obligations, but did not communicate the results of its assessment to the taxpayer before bringing criminal charges against it.  The Constitutional Court confirmed that the SAT's course of conduct did not breach the taxpayer's due process rights, noting that the requirement that the SAT yield the investigation of

[940]  Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991) Article 70 (**Authority CL-9**).
[941]  Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991) Article 90 (**Authority CL-9**).
[942]  Supplemental Report of Juan Rodolfo Pérez Trabanino, dated 27 December 2019, paras. 11-16.
[943]  Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991) Article 103 (**Authority CL-9**).
[944]  Supplemental Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, paras. 45-47.

a potential tax crime to the criminal courts seeks to prevent that a taxpayer be sanctioned twice for the same crime, as required by the *non bis in idem* principle. [945]

525.   In the Tribunal's view, a joint reading of Articles 70 and 90 of the Tax Code shows that the SAT has an obligation immediately to initiate criminal proceedings ("*deberá denunciar inmediatamente*") against a taxpayer if, in the course of an investigation concerning that taxpayer ("*si de la investigación que se realice*"), the SAT detects "indicia" ("*indicios*") or "presumes the existence" ("*presuma la existencia*") of a crime.  As such, the plain terms of Articles 70 and 90 set out no explicit preconditions for the SAT to bring a criminal complaint other than the existence of "indicia" of a crime.  The Tribunal reads the requirement that criminal proceedings be initiated "immediately" after the "indicia" of a crime are detected as an indication that no further preconditions are required.

526.   Accordingly, it appears to the Tribunal that the conclusions of Dr. Donado and Mr. Pérez are inconsistent with the plain terms of Articles 70 and 90 of the Tax Code, which require the SAT to bring a criminal complaint *immediately* after it detects "indicia" of a crime, and thus set a much lower threshold than that suggested by these experts.  The opinions of Mr. Pérez and Dr. Donado would also appear to be inconsistent with the Constitutional Court's interpretation of Articles 70 and 90 of the Tax Code, which confirms that a failure to present a tax assessment to the taxpayer before initiating criminal action does not breach due process. [946]

527.   Overall, the Tribunal concludes, as a matter of fact, that the Claimant has failed to establish that the determination of a tax impairment by way of a formal resolution is a precondition for the SAT to be able to bring criminal proceedings against a taxpayer under Guatemalan law.

528.   The Claimant raises an additional argument in connection with the element of "simulation" in Article 358 A of the Criminal Code, pursuant to which the crime of tax fraud is committed by:

> …the person who, through misrepresentation, cover-up, manipulation, trickery, or any other type of deception, leads the Tax Administration to error in the determination or payment of tax obligations, such that it results in detriment to or underpayment in tax collection, commits the crime of tax fraud[947] (Respondent's translation)

---

[945]   Respondent's Statement of Defence, para. 188; Constitutional Court of Guatemala, Judgment, dated 19 January 2010, p. 149 (**Exhibit R-70**). *See also*, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 8.

[946]   Constitutional Court of Guatemala, Judgment, dated 19 January 2010, at p. 149 (**Exhibit R-70**).

[947]   Decree Law 17-73 of the Guatemalan Congress, Criminal Code, dated 27 July 1973, Article 358 A (**Authority CL-005**) (Tribunal's translation).

529.  As stated above, the Claimant's criminal law expert, Mr. Pérez Trabanino, is of the view that:

> Therefore, the elements necessary to allege and prove Tax Fraud according to article 358 A of the Criminal Code are: (a) <u>simulation</u>, concealment, maneuver, trickery, or any other form of deception that misleads the Tax Administration, and (b) <u>detriment or impairment in tax collection. If there is no precision with respect to these elements of the alleged crime, the criminal complaint is insufficient. If, on the contrary, the complaint alleges with precision the constituent elements of the alleged crime, the Public Prosecutor's Office ("MP") may bring a criminal action.</u>[948]

530.  In connection with the element of "simulation" in Article 358 A of the Criminal Code, Mr. Pérez further notes:

> If the SAT believed that the acquisition of the shares and the subsequent mergers of the companies constituted a simulation in violation of the law, the SAT was obligated to begin an ordinary proceeding so that a non-criminal court could determine whether the acquisitions and mergers constituted a simulation.[949]

531.  The Respondent's legal expert, Mr. Ángel Menéndez, posits that the Claimant is conflating the term "simulation" in Article 358 A of the Criminal Code with the "simulation action" of Article 1284 of the Civil Code,[950] and refers to another Constitutional Court Judgment, dated 26 April 2018, drawing that same distinction.[951]

532.  The Tribunal agrees with the Respondent. Having reviewed the Constitutional Court judgment of 26 April 2018 relied upon by Mr. Menéndez, the Tribunal finds that a clear distinction is drawn between the element of "simulation" in Article 358 A of the Criminal Code and the notion of "simulation" in Article 1284 of the Civil Code. The judgment also states that there is no need for a civil judge to establish the existence of a "simulation" for the purposes of Article 358 A of the Criminal Code,[952] meaning that determining that a "simulation" has taken place is not a precondition for the initiation of criminal proceedings for tax fraud.

533.  Further, the Constitutional Court judgment of 11 July 2013, relied upon by Mr. Pérez, would seem to be inapposite, as it draws its conclusions not in respect of Article 358 A of the Criminal Code,

---

[948]  Legal Report of Juan Rodolfo Pérez Trabanino, dated 16 May 2019, para. 11 (emphasis added).

[949]  Legal Report of Juan Rodolfo Pérez Trabanino, dated 16 May 2019, para. 19.

[950]  Decree Law 106, Civil Code, dated 14 September 1963 (**Authority CL-3**) ("The simulation takes place: 1. When the declared legal nature of the business is concealed, giving the appearance of another of a different nature; 2. When the parties state or confess falsely something that actually has not happened or that has been agreed between them; and 3. When rights are made or transmitted to straw parties to keep the actual actors unknown") (Respondent's translation).

[951]  Constitutional Court, Judgment dated 26 April 2018, p. 175 (**Exhibit R-71**).

[952]  Constitutional Court, Judgment dated 26 April 2018, p. 175 (**Exhibit R-71**)

but in respect of *former* Article 16 A of the Guatemalan Tax Code, entitled "Tax simulation", which reads:

> **Tax simulation.** The Tax Administration will implement the corresponding adjustments, whenever it is established that the taxpayers, in detriment of the tax collection: a) Conceal the juridical nature of the declared transaction, giving it the appearance of one of a different nature; b) Declare or confess falsely what actually did not happen or was convened between them; or c) Create or transfer rights to intermediate persons, in order to maintain unknown the real parties in interest. – In such cases, the Tax Administration will carry out the appropriate adjustments and will notify the taxpayer or responsible persons, without prejudice of starting criminal actions, whenever applicable.[953] (Emphasis added)

534. The above provision was declared unconstitutional by the Court on the basis that it allowed the SAT *within the framework of an administrative procedure,* unilaterally to establish the existence of a tax simulation and order tax adjustments, without granting an opportunity for the taxpayer to be heard. In particular, the Constitutional Court deemed that:

> …since the person who determines the simulation is also the person who later implements the tax adjustment, the only explanation found is that the effect of the simulation determined by the administration, is to turn illusory the taxpayer's right of defence with regard to the implemented adjustment. It appears that before the indication of having incurred in a simulated conduct, in accordance with the legal principle of the natural and pre-established judge, the accused taxpayer must have the possibility to go before an independent and impartial third party (such as a judge) to refute, with the pertinent evidence, such accusation.[954]

535. As such, the Constitutional Court's judgement of 11 July 2013 provides no guidance as to the requirements that must be fulfilled for the SAT to initiate criminal proceedings. In fact, the text of former Article 16 A of the Tax Code makes it clear that the tax simulation procedure is independent of any criminal proceedings that the SAT might initiate –*"sin perjuicio de iniciar las acciones penales, cuando corresponda."*

536. In conclusion, the Tribunal finds that the Claimant has failed to establish that the determination by a civil judge of the existence of a simulation is a precondition for the SAT to bring criminal proceedings against a taxpayer under Guatemalan law.

### (c)   *The Criminal Court*

537. The Tribunal now turns to the Claimant's allegations concerning the actions of the Criminal Court. These events, which appear fully summarized in Section III.F above, concern the initiation of criminal proceedings by the SAT against the Distributors for alleged tax fraud in connection

---

[953]   Constitutional Court Judgment, dated 11 July 2013, p. 2/84 (**Authority CL-70**) (Tribunal's translation).

[954]   Constitutional Court Judgment, dated 11 July 2013, p. 46/84 (**Authority CL-70**) (Tribunal's translation).

with the events underlying the 2011 Transaction—and, in particular, with the Tax Deductions. In this section, the Tribunal draws preliminary conclusions in respect of certain key aspects of the conduct of the Criminal Court that the Tribunal considers to be important for the Claimant's FET claim. These conclusions will be taken into account in the subsequent sections of the Tribunal's reasoning in order to make the Tribunal's final determinations.

538.   In examining the Claimant's allegations, the Tribunal first examines the granting of seizure orders on the Distributors' bank accounts during a hearing held on 29 July 2016. It is uncontroverted that this hearing was held at the request of the Public Ministry, with the SAT's support[955] and without the presence of the Distributors,[956] who were aware that the hearing would take place, but did not attend[957] (allegedly, at the suggestion of the officials of the SAT during a meeting held on 28 July[958], which the Respondent denies).[959] It is equally uncontroverted that *ex parte* hearings on precautionary seizures are allowed under the Guatemalan Code of Civil and Commercial Procedure,[960] and that precautionary seizures are subject to appeal.[961] The Parties, however, disagree as to the precise remedy that is available in these circumstances.[962]

539.   The Claimant contends that the seizure orders were not in compliance with Article 170 of the Tax Code and Article 530 of the Code of Civil and Commercial Procedure, which require, *inter alia*, that preliminary injunctive relief be ordered only if a "risk" is proven, upon a justified fear of "imminent and irreparable prejudice" and not be "arbitrary."[963] The Claimant also asserts that the

---

[955]   SAT Criminal Complaint against DEOCSA and DEORSA, dated 21 July 2016, p. 48 (**Exhibit R-6**).

[956]   Respondent's Statement of Defence, para. 196.

[957]   Claimant's Statement of Claim, para. 96; Statement of Defence, para. 198; Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 28.

[958]   Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 28.

[959]   Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 123; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 77-79.

[960]   Decree Law 107, Code of Civil and Commercial Procedure, 14 September 1963, Article 534 (**Authority CL-4**), Inter-Institutional Master Agreement for the effective implementation of the Reforms of the Code of Criminal Procedure, dated 31 August 2009 (**Exhibit R-74**).

[961]   Hearing Transcript (English), D4, 32-33 (Pérez); D4, 57 (Menéndez), Respondent's Post-Hearing Brief, paras. 104-105.

[962]   According to the Respondent, the Distributors could have submitted a *recurso de reposición* against the seizure orders under Article 402 of the Code of Criminal Procedure, which it claims would have been resolved in three working days (Respondent's Post-Hearing Brief, para. 104, , Code of Criminal Procedure of the Republic of Guatemala (**Exhibit R-69**)). Mr. Pérez denies this possibility, but acknowledges that the seizure orders would have been subject, at least, to an *amparo* action (Hearing Transcript (English), D4:P57:L16-P: 58:L:1).

[963]   Claimant's Statement of Claim, paras. 98, 99.

attachment measures were "overbroad", as they effectively targeted every bank account held by the Distributors.[964] The Respondent disputes these assertions.[965]

540.  As to the scope of the seizure orders, the Tribunal notes that the court ordered a seizure in the amount of Q 81,977,584.68 for DEOCSA, and Q 48,520,610.00 for DEORSA,[966] those being the exact amounts allegedly defrauded by each company in respect of fiscal years 2011 and 2012 as set forth in the Criminal Complaint.[967]  In furtherance of the seizure order, the court issued communications to multiple banks, instructing each of them to withhold the full amount allegedly defrauded by each of the Distributors.[968]

541.  While the Distributors did not appeal the Court's decision granting the precautionary seizures,[969] they did request a hearing to lift the orders on 3 August 2016.  As may be gleaned from the transcript of the 3 August hearing, counsel for the Distributors stressed the need for a prompt ("*lo antes posible*") lifting of the attachments, failing which the Distributors would cease to operate.[970] Counsel also noted that the Distributors declined to request the lifting of the seizures in respect of their bank account in *Banco Agromercantil de Guatemala*, which could cover the full amount of the seizure orders.[971]

542.  At the Distributors' request, the Criminal Court scheduled a hearing for 28 October 2016—that is, approximately three months later.[972]  In scheduling the hearing for 28 October 2016, the Claimant suggests that the judge ignored the Distributors' plea for an early resolution of their

---

[964]  Claimant's Statement of Claim, para. 102.

[965]  Respondent's Statement of Defence, paras. 201-210.

[966]  Criminal Court Summary of Hearing on Preliminary Measures, dated 29 July 2016, p. 2 (**Exhibit C-180**).

[967]  SAT's Criminal Complaint against Deocsa and Deorsa, p. 17 (for DEOCSA), p. 34 (for DEORSA) (**Exhibit C-8**).

[968]  Communications from the Criminal Court to various banks regarding Deocsa and Deorsa bank account freeze, dated 29 July 2016 (**Exhibit C-181**).

[969]  Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 190.

[970]  Unofficial Transcript for Distributors' request for hearing to lift bank freeze, dated 3 August 2016, p. 3 (**Exhibit C-459**).

[971]  Unofficial Transcript for Distributors' request for hearing to lift bank freeze, dated 3 August 2016, pp. 3, 4 (**Exhibit C-459**).

[972]  Criminal Court notice of hearing for lifting of bank freeze, dated 3 August 2016 (**Exhibit C-187**), Unofficial Transcript for Distributors' request for hearing to lift bank freeze, dated 3 August 2016, pp. 3, 4 (**Exhibit C-459**).

request,[973] but the evidence on record suggests that the choice of date was dictated principally by the agenda of the Court.[974]

543. According to the Claimant, keeping the seizure orders in place during the three-month delay until the 28 October hearing would have rendered the Distributors unable to operate.[975] As a result, immediately following the 3 August hearing, the Distributors and the SAT reached an in-principle agreement that the SAT would request the lifting of the seizure orders on condition that the Distributors would pay the full amounts alleged in the Criminal Complaint, plus interest and fines.[976] On that same day, the SAT, together with the Public Ministry and the *Procuraduría General del Estado*, conveyed the understanding reached between the Distributors and the SAT to the Criminal Court and jointly requested that the 28 October hearing be rescheduled to an earlier date.[977] The court then rescheduled the 28 October hearing for 9 August 2016. The Claimant interprets the Court's decision to reschedule the hearing as evidence of preferential treatment to the Guatemalan administration,[978] but the judge herself noted that an earlier slot could be found for the mundane reason that the parties had reached an agreement on the lifting of the order and, as such, the hearing would be shorter than initially expected.[979]

544. During a meeting held in the morning of 9 August 2016 between representatives of the Distributors and the SAT, the Distributors offered to pay, in protest, the alleged tax deficiencies for the years 2011 and 2012 (those being the fiscal years covered by the Criminal Complaint),

---

[973] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 117.

[974] Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016, p. 18 (**Exhibit C-194**).

[975] Claimant's Statement of Claim, para. 105, Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 31.

[976] Claimant's Statement of Claim, para. 105; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 89.

[977] *SAT, PGN y Ministerio Público solicitan audiencia privilegiada para la revisión de las medidas cautelares* (audio) (**Exhibit R-125**).

[978] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 118.

[979] Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, p. 18 (**Exhibit C-194**): *"En la agenda de este Juzgado vamos pues ya hasta en el mes de octubre, entonces se señaló la audiencia para el día 28 de octubre de 2016. Sin embargo se presentaron el representante de la Superintendencia de Administración Tributaria, una Auxiliar Fiscal del Ministerio Público y el representante del Estado de Guatemala, así como el mandatario de las entidades denunciadas, ellos solicitaron que ya se habían puesto de acuerdo, y que se señalara una audiencia, eso fue el 3 de agosto, entonces hicieron la solicitud, y la Juzgadora ordenó que buscaran una fecha ya que estaban de acuerdo que ya no iban a interponer recursos ni nos íbamos a tardar horas en una audiencia porque por lo general se señala una audiencia de media hora y llevamos a veces dos ó tres horas, entonces estaban todos de acuerdo, los sujetos procesales todos de acuerdo, fue como se señaló para el día de hoy la audiencia que estamos realizando."*

plus the alleged tax deficiencies for 2013, 2014 and 2015.[980] The SAT undertook not to oppose the lifting of the seizure orders on condition that the Distributors paid the alleged tax deficiencies for years 2011 and 2012, plus interests and fines, but made no requests in respect of tax years 2013-2015.[981]

545. At the 9 August 2016 hearing, the judge agreed to lift the seizure orders, but gave the Distributors 24 hours to pay the alleged deficiencies for tax years 2011-2012, followed 60 days later by the Distributors' payment of interest and fines for those periods. The judge also placed a lien on the vehicles owned by the Distributors as an alternative warranty and scheduled a further hearing for 3 November 2016, while also rejecting requests to bar the payment of dividends or impose any lien on the Distributors' shares. During the hearing, the SAT noted that if the Distributors failed to abide by the undertakings made, an intervention in receivership could be requested.[982]

546. On 10 August 2016, the attachment orders were lifted.[983]  Over the following ten days, the Distributors made the Payments under Protest in respect of fiscal years 2011-2015. The Payments under Protest were limited to the alleged tax deficiencies for those years, and did not cover interest or penalties.[984]

547. On 9 September 2016, the Distributors requested that the SAT rectify its determinations of the amount of interest and penalties due for tax years 2011 and 2012 on the grounds that such determinations had failed to take into account the 2015 Rectification Payments.[985] On 12 October 2016, the Distributors moved the Court to "require the SAT to provide a corrected calculation of

[980]   Claimant's Statement of Claim, para. 107.

[981]   Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 34; Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 90.

[982]   Claimant's Statement of Claim, para. 109; Unofficial Audio Transcript of Hearing on Partial Lifting of Preliminary Measures, dated 9 August 2016, p. 11 (**Exhibit C-194**).

[983]   Orders of the Criminal Court to banks regarding lifting of bank freeze, dated 9 August 2016 (**Exhibit C-192**).

[984]   Receipts of Deocsa and Deorsa Rectification payments to SAT for 2011 and 2012, dated 9 August 2016 (**Exhibit C-193**); Receipt of Deocsa rectification payment to the SAT for 2014, dated 9 August 2016 (**Exhibit C-12**); Receipt of Deorsa Rectification payment to the SAT for 2014, dated 9 August 2016 (**Exhibit C-13**); Receipt of Deocsa rectification payment to the SAT for 2015, dated 9 August 2016 (**Exhibit C-14**); Receipt of Deorsa rectification payment to the SAT for 2015, dated 9 August 2016 (**Exhibit C-15**).

[985]   Submission from Deocsa to the SAT regarding February 2015 rectifications, payments made under protest and calculation of fines and interest, dated 9 September 2016 (**Exhibit C-207**), Submission from Deorsa to the SAT regarding February 2015 rectifications, payments made under protest and calculation of fines and interest, 9 September 2016 (**Exhibit C-208**).

the interest and penalties for tax years 2011 and 2012,"[986] after which the Court set a hearing for 29 December 2016.[987]

548.  According to the Respondent, the Distributors failed to pay interest and fines in respect of fiscal years 2011 and 2012 as ordered by the Criminal Court on 9 August 2016.[988]  On this basis, on 12 December 2016, the SAT, together with the Public Ministry and the *Procuraduría*, held an *ex parte* hearing before the Criminal Court, seeking that the Court appoint receivers to take over the Distributors.  The Court granted the SAT's request.[989]

549.  Mr. Albín testifies that "[g]iven the potential damage that an intervention would cause, the Distributors felt compelled to pay the full amount alleged by the SAT for interest and penalties for tax years 2011 and 2012."[990]  On 13 December 2016, the Distributors informed the SAT that they intended to make payment of the outstanding interest and fine payments, following which the SAT moved to vacate the Court's order appointing receivers for the Distributors.[991]  The following day, the Court vacated its order.[992]

550.  Finally, the Tribunal notes that, as to the date of this Award, the Criminal Proceeding is still ongoing.  The amounts transferred by the Distributors to the SAT remain with the Guatemalan administration.

551.  The Parties disagree as to the recoverability of those amounts.  According to the Claimant, even if the Distributors were to be found not guilty of tax fraud, they would still need to embark on lengthy administrative proceedings to recover the amounts paid—with an uncertain outcome, as the payments were deemed voluntary by the SAT or put in escrow.[993]  For its part, the Respondent

---

[986]   Deorsa and Deocsa Request to Criminal Court for order to SAT to provide calculation of interest and fines for tax years 2011 and 2012, dated 12 October 2016 (**Exhibit C-212**).

[987]   Criminal Court notice of hearing for review and discussion of calculation of interest and fines for tax years 2011 and 2012, dated 27 October 2016 (**Exhibit C-217**).

[988]   Respondent's Statement of Defence, para. 217.

[989]   Criminal Court summary of ex parte hearing regarding the appointment of receivers for Deocsa and Deorsa, dated 12 December 2016 (**Exhibit C-224**), Unofficial Audio Transcript of ex parte Hearing on appointment of receivers for Deocsa and Deorsa, dated 12 December 2016 (**Exhibit C-228**).

[990]   Witness Declaration of Horacio Albín Izuibejeros, dated 16 May 2019, para. 43.

[991]   SAT submission to the Criminal Court regarding Deocsa and Deorsa payment of interest and fines for tax years 2011-2012, dated 15 December 2016 (**Exhibit C-233**).

[992]   Resolution of the Criminal Court regarding revocation of appointment of receivers and vehicle lien, dated 14 December 2016 (**Exhibit C-232**).

[993]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 283, Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, paras. 65-66.

asserts that the funds could be reimbursed at the order of the Criminal Court if the Distributors were to be absolved, regardless of the characterization given to those payments by the Criminal Court.[994]

552. Having reviewed the evidence before it in connection with the actions of the Criminal Court, the Tribunal shares the observations that follow.

553. First, as further explained below, the Tribunal considers it unnecessary to re-examine the grounds on which the Criminal Court issued the 29 July 2016 seizure orders. *Inter alia*, the Court's decision hinged principally on a test of reasonableness in the circumstances, that being a determination that must not be second-guessed by an investment tribunal absent exceptional circumstances—especially when the decision is made on an expedited basis. The Tribunal merely observes that that the orders were issued following a procedure existing in Guatemalan law and were subject to appeal.

554. Second, based on the evidence before it, the Tribunal sees no evidence of concerted action as between the Criminal Court and the SAT with a view to extracting payments from the Distributors. The Tribunal further observes that no such allegation has been raised by the Claimant.

555. Lastly, the Criminal Proceedings are still ongoing. The validity of the Tax Deductions under Guatemalan law and the impact of the Binding Tax Opinions in this determination is still a question under scrutiny. Relatedly, both sides agree that there is a possibility that the funds transferred by the Distributors to the SAT will be returned if the Distributors are absolved by the Criminal Court—although the Parties disagree, in significant respects, on the time that would be required to recover the funds and the chances of recoverability.

### (d) *Did the Respondent Breach the FET Standard in the Treaty?*

556. Having made the above determinations on the facts, the Tribunal must determine whether the Respondent's actions amount to a breach of FET under the Treaty.

557. As summarized above, the Claimant submits that the Respondent has breached several aspects of the FET standard in Article 2(2) of the Treaty, including the Claimant's legitimate expectations,

---

[994] Respondent's Statement of Defence, para. 222, Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, paras. 145-147, Distribuidora de Electricidad de Occidente S.A. Financial Statements for the Year Ending on 31 December 2016 and Corresponding Figures of 2015 and Independent Auditor's Report ("Deocsa 2016 Financial Statements"), dated 31 March 2017, p. 81 **(Exhibit C-253)**.

arbitrary conduct, breach of procedural fairness and due process, and lack of transparency. The Parties agree that the FET standard encompasses all of these aspects, but hold diverging views as to their scope and application in the instant case.

558. The Tribunal observes that some of the alleged breaches of FET share the same factual predicate, such that one of the Respondent's actions is said to breach several aspects of the FET standard. In turn, different facets of the FET standard overlap in respect of a particular type of conduct. Bearing in mind these considerations, for the purposes of its FET analysis, the Tribunal considers it appropriate to examine first the Claimant's more encompassing allegations of arbitrary conduct, followed by the Claimant's assertions of legitimate expectations, breach of procedural fairness and lack of transparency.

### (i)   Arbitrary Conduct

559. The Parties disagree as to the applicable standard for arbitrariness under Article 2(2) of the Treaty. According to the Respondent, the relevant test is that set out in the *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, under which arbitrariness is defined as "a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety."[995] The Claimant considers that this standard "sets too high a threshold" and asserts, relying *inter alia* on *Ronald S. Lauder v. Czech Republic*, that arbitrary conduct is that which is "founded on prejudice or preference rather than on reason or fact."[996]

560. The Tribunal sees no benefit in addressing the divergences between the Parties in respect of the definition of arbitrariness, which are of little assistance when considered in the abstract in the present case. While the Tribunal would tend to agree with the Respondent that the definition of arbitrariness in *ELSI* captures the current understanding of arbitrary conduct in international law,[997] it is clear to the Tribunal that conduct "founded on prejudice or preference rather than on reason or fact" may well overlap with the standard of arbitrariness articulated in *ELSI*. In any event, the Tribunal does not consider this distinction to be outcome determinative in this case.

---

[995]   *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, I.C.J. Reports 1989 p. 15, Judgment (20 July 1989), para. 128 (**Authority RLA-68**).

[996]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 169; *Ronald S. Lauder v. Czech Republic*, UNCITRAL, Final Award (3 Sept. 2001), para. 221 (**Authority CL-22**)

[997]   *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award (11 Oct. 2002), para. 127 (**Authority RLA-60**).

561. There are, however, other aspects of the notion of arbitrariness that the Tribunal considers particularly pertinent when addressing the limits of a State's discretion to pursue criminal action. First, the Parties agree—and the Tribunal concurs—that a misapplication by the organs of a State of its own laws does not *per se* constitute arbitrariness. This was clearly established in *ELSI*[998] and has been confirmed by investment tribunals.[999] It is equally well established that investment tribunals owe a high degree of deference to the determinations made by State organs in applying domestic law[1000] and to the decision-making processes of States.[1001] The Tribunal remains mindful, however, that "the pursuit of crime – or even its mere invocation – cannot serve on its own as a justification for conduct that breaches the rights of foreign investors under applicable treaties."[1002]

562. Bearing in mind these considerations, the Tribunal turns first to analysing the allegedly arbitrary behaviour of the SAT, which is centred on the filing of the Criminal Complaint in disallowance of the Binding Tax Opinions (i), without following the procedures established in Guatemalan law (ii) and following an allegedly flawed decision-making process (iii). The Claimant also asserts that the SAT improperly exercised pressure on the Distributors within the context of the Criminal Proceedings to extract payments from them (iv).

563. *First*, as the Tribunal understands it, the main factual predicate underlying the Claimant's arbitrariness claim is that the Binding Tax Opinions confirmed the validity of the Tax Deductions, such that any later behaviour by the SAT that was inconsistent with this determination constitutes an instance of arbitrariness. Other actions of the SAT, including the closing of the Tax Audit through the Annulment Resolutions and the acceptance of the Rectification Payments and of the Distributors' financial statements for the year 2015, are part of the larger context of the Binding

---

[998] *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, C.I.J., Judgment (20 July 1989), para. 124 (**Authority RLA-68**).

[999] *Cervin Investissements S.A. & Rhone Investissements S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/13/2, Award (7 Mar. 2017), para. 469 (**Authority RLA-113**); *Georg Gavrilovic & Gavrilovic D.O.O. v. Republic of Croatia*, ICSID Case No. ARB/12/39, Award (26 July 2018), para. 878 (**Authority RLA-98**).

[1000] *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award (4 Apr. 2016), para. 583 (**Authority RLA-99**).

[1001] *ECE Projektmanagement International GmbH and Kommanditgesellschaft Panta Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-5, Award (19 Sept. 2013), para. 4.764 (**Authority RLA-70**).

[1002] *The Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award (6 May 2013), para. 152 (**Authority RLA-47**).

Tax Opinions and constitute, in the Claimant's view, representations that are also in contradiction with the filing of the Criminal Complaint.[1003]

564. The Tribunal observes that the Respondent's alleged contradictory behaviour arises foremost as a matter of Guatemalan law, in that the Binding Tax Opinions were "binding" on the SAT and were later disallowed. As a general notion, the Tribunal agrees with the Claimant that the conclusions reached in the Binding Tax Opinions are "binding" on the SAT as per Article 102 of the Tax Code. The Tribunal nonetheless recalls its above determination that the Claimant has failed to establish, as a matter of Guatemalan law, that the Binding Tax Opinions precluded the initiation of *criminal* action against the Distributors in respect of the 2011 Transaction. Thus, the submission by the SAT of the Criminal Complaint could not, in and of itself, be characterized as contradictory with the Binding Tax Opinions.

565. Having reached this determination, the Tribunal must also conclude that the SAT's alleged disallowance of the Annulment Resolutions[1004] and the acceptance of the Rectification Payments[1005] do not constitute arbitrary conduct. In particular, the Tribunal observes that the Annulment Resolutions nullified certain adjustments concerning the Tax Deductions following the Tax Audit, but did not confirm their validity. In turn, the Rectification Payments were made by the Distributors "taking into account" ("*tomando en consideración*") the Binding Tax Opinions.[1006] As such, the Tribunal sees these actions as contextual in respect of the Binding Tax Opinions and thus of limited significance for the Claimant's assertions of arbitrariness if considered on a stand-alone basis. Even if these actions could be said to constitute representations in contradiction with the initiation of the Criminal Proceedings, such representations, unlike the Binding Tax Opinions, are not "binding" on the SAT and cannot form the basis of a claim for "wilful disregard of due process of law" in this case.

566. *Second*, the Claimant considers that the failure by the SAT to determine the existence of a tax impairment and a tax simulation prior to initiating criminal proceedings constitutes an instance of arbitrariness. As noted above, the Tribunal has concluded that the factual predicate that would be

---

[1003]   Claimant's Statement of Claim, paras. 92, 155.

[1004]   *See* para. 164 above.

[1005]   *See* Section III.C.4 above.

[1006]   SAT Minutes (Act GEG-DF-SC-087-2015) regarding Deocsa Rectification Payments for 2011-2013, dated 27 February 2015 (**Exhibit C-140**); SAT Minutes (Act GEG-DF-SC-088-2015) regarding Deorsa Rectification Payments for 2011-2013, dated 27 February 2015 (**Exhibit C-141**).

necessary to sustain this claim under Guatemalan law has not been established, and thus dismisses this argument.

567.   Accordingly, the Tribunal considers as moot the Respondent's argument that the SAT cannot be liable for acting in accordance with the decisions of Guatemalan domestic courts, which was raised in connection with these arguments.[1007]

568.   *Third,* the Claimant takes issue with the internal decision-making processes within the SAT leading to the submission of the Criminal Complaint before the Criminal Court, as summarized in Section III.E.3 above.  In particular, the Claimant alleges that the Criminal Complaint was an "effort to maximize collections at the expense of the rule of law," as part of what it alleges was a larger policy of the SAT.[1008]  With this alleged intent, the Claimant claims, the SAT "arbitrarily disregarded multiple SAT acts"[1009] when preparing the Criminal Complaint, including the Binding Tax Opinions, the Rectification Payments and internal reports from various SAT departments advising against the initiation of criminal proceedings against the Distributors.[1010]

569.   In light of the Tribunal's above determinations concerning the Binding Tax Opinions and the SAT's failure to exhaust administrative proceedings, the residual question that must be addressed by the Tribunal in connection with the actions of the SAT is whether the submission of the Criminal Complaint before the Criminal Court following an allegedly flawed decision-making process constitutes arbitrary conduct.

570.   In the Tribunal's view, this question must be answered in the negative.  Having carefully considered the evidence before it, the Tribunal finds that the disagreements that arose within the SAT when analysing the potential criminal nature of the Tax Deductions are better explained as part of a deliberative process within the institution than as evidence of arbitrariness.  The decision to file the Criminal Complaint must be understood against the background of the 2011 Transaction, a reverse triangular merger requiring detailed tax structuring[1011] and including key aspects with no clear precedent in Guatemalan law.[1012]  These features of the Transaction, paired

---

[1007]   Respondent's Statement of Defence, paras. 338-339.

[1008]   Claimant's Statement of Claim, para. 155.

[1009]   Claimant's Post-Hearing Brief, para. 26.

[1010]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 185; Claimant's Post-Hearing Brief, para. 26.

[1011]   Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, p. 2 (**Exhibit C-56**).

[1012]   Ernst & Young Potential Tax Implications Presentation, dated 25 May 2011, p. 29 (**Exhibit C-56**): "In Guatemala, there is no clear guidance with regards the method to determine goodwill for Tax purposes."

with other circumstances surrounding the preparation of the Binding Tax Opinions (such as the issuance of the opinions within four days from the filing of the Tax Opinion Requests or the involvement of several of the authors of the opinions in a corruption scandal)[1013] lead to the conclusion that the filing of the Criminal Complaint admits explanations other than maximizing tax collection.

571. In sum, the Tribunal concludes that the SAT's decision to file the Criminal Complaint did not constitute arbitrary behaviour under Article 2(2) of the Treaty.

572. *Fourth*, within the context of the Criminal Proceedings themselves, the Claimant claims that the SAT exerted undue pressure on the Distributors to force them to pay in full the amounts claimed in the Criminal Complaint for the years 2011 and 2012, as well as amounts allegedly owed with respect to the tax years 2013-2015.[1014] The full context of this argument is summarized in Section III.F above.

573. Having determined that the decision to file the Criminal Complaint did not constitute arbitrary conduct, the Tribunal considers that the same conclusion should also apply, in principle, to any action taken by the SAT within the context of the Criminal Proceedings. There is nothing improper in the pursuit of interim measures by a State agency following procedures existing in domestic law. However, as the Tribunal understands the Claimant's argument, it is principally centred on exchanges taking place *in parallel* to the Criminal Proceedings and intended to lead the Distributors to adopt a position that would undermine their criminal defence, as well as to extract payments from them. In particular, the Claimant offers this recount of events in respect of the meeting held between representatives of the SAT and the Distributors on 27 July 2016:

> Moreover, the SAT repeatedly misled the Distributors about its prosecution of the criminal case, e.g., by telling them that it would not pursue injunctions, that the Distributors' representatives needed not attend court hearings, and that the SAT would not seek to expand the criminal case onto further tax years. All of these statements turned out to be false, sometimes disproven by a matter of hours. By acting in this manner, the SAT induced the Distributors to adopt a position that would [undermine] their criminal defense. This behavior was arbitrary and in bad faith, in violation of the FET standard.[1015]

574. The Claimant describes a similar meeting occurring on 3 August 2016 as follows:

---

[1013] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 52. See *also* Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 91.

[1014] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 169.

[1015] Claimant's Statement of Claim, para. 159.

> With these improper injunctions in place, the SAT officials indicated that they would not consent to their lifting unless the Distributors paid the full amounts claimed in the complaint (including interests and penalties), as well as amounts allegedly owed with respect to the tax years 2013-2015, in respect of which the SAT had only recently commenced administrative proceedings. The SAT's use of criminal proceedings to put pressure on the Distributors was unlawful and departs from the standard of procedural [fairness] that Guatemala is bound to respect under the FET Standard. (emphasis omitted)[1016]

575. The Respondent denies that the SAT made any of the assertions that the Claimant alleges were made during the 27 July 2016 meeting.[1017] It also qualifies the description of the 3 August 2016 meeting, noting that the SAT only requested payment of the amounts claimed in the Criminal Complaint (i.e., in respect of tax years 2011 and 2012, plus interest and penalties) as a condition to agree to the lifting of the seizure orders.[1018]

576. In respect of the 27 July 2016 meeting, also in light of the differing accounts of the Parties, the Tribunal determines that the Claimant has failed to establish an intent to mislead on the part of the SAT. As to the conversations held on 3 August 2016, the Tribunal cannot accept that the proposals made by the SAT within the context of a negotiation and accepted freely by the Distributors could somehow constitute arbitrary conduct, unless those proposals were said to be part of a larger plan executed by the SAT in connivance with the Criminal Court—which is not alleged at all in this case.

577. Accordingly, the Tribunal concludes that the SAT did not engage in arbitrary conduct in breach of Article 2(2) of the Treaty.

578. *Lastly*, aside from the SAT, the Claimant raises allegations of arbitrariness in respect of the actions of the Criminal Court. While raised in connection with judicial conduct, the Claimant has clarified that its FET claims do not encompass denial of justice.[1019] The Tribunal has been assisted by arguments on both sides regarding the question of whether the actions of a court are generally capable of constituting a breach of FET outside the paradigm of denial of justice. For the reasons that follow, the Tribunal considers that the actions of the judiciary under scrutiny in this case cannot give rise to a breach of the Treaty unless characterized as denial of justice, meaning that the Tribunal does not need to address this question in general terms.

---

[1016]   Claimant's Statement of Claim, para. 169.

[1017]   Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, paras. 76-79.

[1018]   Witness Statement of David Alejandro Muñoz Ortiz, dated 16 September 2019, para. 90.

[1019]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 261.

579.   First, the Tribunal recalls that international law accords a high level of deference to the decisions
of domestic courts and does not purport to have investment tribunals act as courts of appeal. This
was established by the tribunal in *Robert Azinian et al. v. United Mexican States*:

> The possibility of holding a State internationally liable for judicial decisions does not,
> however, entitle a claimant to seek international review of the national court decisions as
> though the international jurisdiction seised has plenary appellate jurisdiction. This is not true
> generally, and it is not true for NAFTA.[1020]

580.   Accordingly, international law sets a particularly high threshold for the conduct of the judiciary
to constitute an international delict, which is sometimes said to overlap with the standard of
arbitrariness set in *ELSI* ("a wilful disregard of due process of law, an act which shocks, or at
least surprises, a sense of juridical propriety.")[1021]  In defining this threshold, *Azinian* helpfully
distinguished different instances of denial of justice, noting that it "could be pleaded if the relevant
courts refuse to entertain a suit, if they subject it to undue delay, or if they administer justice in a
seriously inadequate way…There is a fourth type of denial of justice, namely, the clear and
malicious misapplication of the law."[1022]

581.   Aside from the requirement of egregious conduct, the exhaustion of local remedies is also a well-
established predicate of the notion of denial of justice.  The *raison d'être* of this requirement, as
articulated by the tribunal in *Jan de Nul N.V. et al. v. Egypt*, is that "the respondent State must be
put in a position to redress the wrongdoings of its judiciary.  In other words, it cannot be held
liable unless 'the system as a whole has been tested and the initial delict remained uncorrected'.
An exception to this rule may be made when there is no effective remedy or 'no reasonable
prospect of success…'"[1023]

582.   As to the question of whether the actions of the judiciary may constitute a breach of international
law other than through denial of justice, the Tribunal in *Eli Lilly v. Canada* observed the
following:

---

[1020]   *Robert Azinian, et al. v. The United States of Mexico*, ICSID Case No. ARB (AF)/97/2, Award (1 Nov.
1999), para. 99 (**Authority RLA-74**).

[1021]   *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award (11 Oct.
2002), para. 127 (**Authority RLA-60**); *Robert Azinian, et al. v. The United States of Mexico*, ICSID Case
No. ARB (AF)/97/2, Award (1 Nov. 1999), para. 103 (**Authority RLA-74**); *Spyridon Roussalis v.
Romania*, ICSID Case No. ARB/06/1, Award (7 Dec. 2011), para. 315 (**Authority RLA-105**).

[1022]   *Robert Azinian, et al. v. The United States of Mexico*, ICSID Case No. ARB (AF)/97/2, Award (1 Nov.
1999), para. 102-103 (**Authority RLA-74**).

[1023]   *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13,
Award (6 Nov. 2008), para. 258 (**Authority RLA-91**) (emphasis omitted).

> ...it is evident that there are distinctions to be made between conduct that may amount to a denial (or gross denial) of justice and other conduct that may also be sufficiently egregious and shocking, such as manifest arbitrariness or blatant unfairness. It is also apparent, in the Tribunal's view, that concepts of manifest arbitrariness and blatant unfairness are capable, as a matter of hypothesis, of attaching to the conduct or decisions of courts. It follows, in the Tribunal's view, that a claimed breach of the customary international law minimum standard of treatment requirement of NAFTA Article 1105(1) may be properly a basis for a claim under NAFTA Article 1105 notwithstanding that it is not cast in denial of justice terms. As noted above, the conduct of the judiciary will in principle be attributable to the State by reference to uncontroversial principles of State responsibility. As a matter of principle, therefore, having regard to the content of the customary international law minimum standard of treatment, the Tribunal is unwilling to shut the door to the possibility that judicial conduct characterized other than as a denial of justice may engage a respondent's obligations under NAFTA Article 1105, within the standard articulated in the award in Glamis. The Tribunal considers that this assessment is consistent with the approach, inter alia, of the NAFTA Chapter Eleven tribunal in *Mondev*, with which it is content to agree.[1024]

583.    The Tribunal reads the *Eli Lilly* obiter as contemplating that, under customary international law, certain judicial conduct might still breach the minimum standard of treatment, even if it does not fall within the realm of denial of justice. Such conclusion cannot be extended to the FET standard in the Treaty, which is agreed sets a lower threshold for a violation than the customary minimum. In any event, the Tribunal notes that the *Eli Lilly* tribunal itself was unable to identify any concrete circumstances that would serve as an example of judicial conduct violating international law outside the paradigm of denial of justice, thus suggesting that it is a rare occurrence. This Tribunal agrees with that assessment.

584.    Bearing these considerations in mind, the Tribunal is faced with three instances of judicial conduct that are claimed to constitute a breach of FET even in the absence of denial of justice: (i) the decision of the Criminal Court to grant *ex parte* the seizure orders requested by the SAT on 29 July 2016; (ii) the *ex parte* appointment of receivers to take over the Distributors on 12 December 2016; and (iii) the decision of the Criminal Court to schedule a hearing to address the Distributors' request for a lifting of the seizure orders roughly three months thereafter.[1025]

585.    In respect of the interim measures issued by the Criminal Court (items (i) and (ii) above), the Claimant asserts that the Court "improperly disregarded the Binding Tax Opinions and issued arbitrary and disproportionate Provisional Measures against the Distributors."[1026]   It further claims that the Court's measures fell short of the requirements set out in Article 170 of the Tax

---

[1024]   *Eli Lilly and Company v. Government of Canada*, ICSID Case No. UNCT/14/2, Final Award (16 Mar. 2017), para. 223 (**Authority RLA-112**) (emphasis in original).

[1025]   Claimant's Post-hearing Brief, paras. 47-48.

[1026]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 174.

Code and Article 530 of the Guatemalan Code of Civil and Commercial Procedure.[1027]  Pleaded on these terms, the Tribunal sees the Claimant's characterization of the Court's interim measures as alleging a "clear and malicious misapplication of the law" by the judiciary under the standard of denial of justice articulated in *Azinian*.

586.  Similarly, with respect to item (iii) above, the Claimant's assertions of arbitrary conduct in connection with the Criminal Court's decision on 3 August 2016 to fix a hearing on the request to lift the seizure orders for 28 October 2016 fall squarely within the paradigm of denial of justice in *Azinian*, whether under the heading of administering justice "in a seriously inadequate way" or the heading of "undue delay".

587.  As a result, the Tribunal concludes that the decisions of the Criminal Court can only generate international responsibility under the standard of denial of justice.  There is nothing in the allegations made about the Respondent's conduct that would fall into the highly exceptional and likely theoretical category of judicial conduct outside the scope of denial of justice.  A different determination would vest this Tribunal with the authority of an appellate court over decisions that should be subject to revision by local courts alone.  Since the Claimant has opted not to raise a denial of justice claim in connection with those decisions, the Tribunal cannot entertain the Claimant's assertions of arbitrariness in respect of the conduct of the Criminal Court.

588.  While this brings the Tribunal's analysis of the actions of the Criminal Court to an end, the Tribunal would recall, in passing, that many of the questions lying at the centre of this dispute (i.e., the validity of the Tax Deductions, the existence of tax fraud or the recoverability of the funds that were disbursed by the Distributors) are matters currently under examination by the Criminal Court for which no final determination has been reached.  Absent exceptionally egregious circumstances, the Tribunal would have been most reluctant to interfere with the Criminal Proceedings in any way.

589.  Based on the above determinations, the Tribunal rejects the Claimant's claim that the Respondent engaged in arbitrary conduct in breach of Article 2(2) of the Treaty.

### (ii)   Legitimate Expectations

590.  The Claimant asserts that its legitimate expectations when making the investment in 2016 were breached by the Respondent through the actions of the SAT also in 2016, which, in the Claimant's

---

[1027]   Claimant's Statement of Claim, paras. 98-100.

view, were inconsistent with the Binding Tax Opinions issued in 2015. In particular, the Claimant's expectations were allegedly breached by the SAT when it (i) requested "allegedly unpaid taxes, arbitrarily and retroactively changing the binding position that it had adopted on the application of the tax deductions"; (ii) commenced "criminal proceedings against the Distributors to force them to make the payments (without even conducting the administrative procedure that Guatemalan law requires)"; and (iii) filed "unsubstantiated freezing order applications, which were then improperly granted by the Criminal Court."[1028]

591. The core of the Claimant's argument, as the Tribunal understands it, is that the Binding Tax Opinions constitute the factual predicate for its asserted legitimate expectations, and that, as a matter of Guatemalan law, the Opinions confirmed the validity of the Tax Deductions, such that any later action of the SAT or the Guatemalan judiciary putting into question the validity of the Tax Deductions constitutes a breach of the Claimant's legitimate expectations.

592. The Tribunal notes that the Claimant's assertion is largely based on the premise that the Binding Tax Opinions precluded the SAT from bringing criminal proceedings against the Distributors in respect of the events underlying the 2011 Transaction. To the extent that such is the case, the Claimant's argument on legitimate expectations must be dismissed on the basis of the Tribunal's above finding that the Binding Tax Opinions did not bar criminal action against the Distributors.[1029] Whether taken by themselves or in conjunction with other representations made by the SAT—i.e., the Annulment Resolutions[1030] and the acceptance of the Rectification Payments[1031]—the Binding Tax Opinions did not constitute a sufficiently specific commitment to refrain from initiating criminal proceedings. The Binding Tax Opinions therefore do not give rise to a legitimate expectation that such criminal proceedings would not be initiated.

593. Other factors supporting the Claimant's alleged expectation that the Tax Deductions were valid under Guatemalan law include Actis' due diligence in advance of the 2011 Transaction and the Claimant's own due diligence prior to its acquisition of shares in the Distributors in 2016.[1032] However, the subjective perception of Actis, the Claimant or the auditing companies charged with

---

[1028] Claimant's Statement of Claim, para. 179.

[1029] *See* para. 518 above.

[1030] SAT Resolution No. N-2014-21-01-000032 regarding Nullification of Hearing no. A-2014-21-01-000030 for Deocsa, dated 13 November 2014, at p. 3 (**Exhibit C-117**); SAT Resolution No. N-2014-21-01-000031 regarding Nullification of Hearing No. A-2014-21-01-000056 for Deorsa, dated 13 November 2014, at p. 3 (**Exhibit C-118**).

[1031] *See* Section III.C.4 above.

[1032] Claimant's Statement of Claim, paras. 176-178.

examining the tax implications of the 2011 Transaction cannot amount to a legitimate expectation worthy of protection under the Treaty.[1033]

594. Finally, the Claimant refers to the Criminal Court's decision to grant the seizure orders against the Distributors as a breach of its legitimate expectations. For the reasons set out above, the Tribunal considers that the actions of the Criminal Court under scrutiny in the instant case could only amount to a Treaty breach under the paradigm of denial of justice, and, as such the Claimant's claims in respect of those actions must fail. In any event, the Tribunal observes that Article 102 of the Tax Code limits the binding effect of the Binding Tax Opinions to the SAT,[1034] meaning that such effect is not extended to the Criminal Court. As such, the Claimant could harbour no reasonable expectation that the Binding Tax Opinions could, in and of themselves, preclude the Court from instating criminal proceedings against the Distributors or ordering interim measures.

595. Accordingly, the Tribunal rejects the Claimant's claim that the Respondent breached its legitimate expectations under Article 2(2) of the Treaty.

(iii)   *Due Process*

596. The Claimant's claim for breach of due process and procedural fairness is centred on three different aspects of the factual matrix of the case. Each is addressed in turn.

597. *First*, the Claimant's claim for breach of due process concerns principally the actions of the Criminal Court, including the seizure orders, the appointment of receivers and the scheduling of a hearing on the Distributors' request to lift the seizure orders three months thereafter.[1035] For the reasons stated above, the Tribunal must decline to examine this conduct other than under the standard of denial of justice, which has not been pleaded in the instant case. As a result, the Tribunal dismisses this argument.

598. *Second*, now in reference to the conduct of the SAT, the Claimant refers to a series of procedural irregularities that it contends were present in the initiation of criminal proceedings against the

---

[1033]   *Saluka Investments B. V. v. Czech Republic*, Partial Award (17 Mar. 2006), para. 304 **(Authority CL-36)**

[1034]   Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991), Article 102 **(Authority CL-9)**.

[1035]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 187.

Distributors, including the non-exhaustion of administrative proceedings or the disagreements occurring within the SAT when analysing the potential criminal nature of the Tax Deductions.[1036]

599. The tribunal in *Glencore International A.G. v. Colombia* articulated the standard of due process required in administrative proceedings under the FET paradigm as follows:

> …the adjudicator, be it a judge, tribunal member, or administrative authority, must give each party a fair opportunity to present its case and to marshal appropriate evidence, and then must assess the submissions and the evidence in a reasoned, even-handed and unbiased decision…[1037] (Emphasis added)

600. When defined on these terms, it becomes apparent that some of the "procedural irregularities" alleged by the Claimant are beyond the scope of the standard of due process. Notably, the SAT did not act as adjudicator during its internal assessment of the potential criminal nature of the Tax Deductions or at the time of submitting the Criminal Complaint—indeed, it then became a *party* in proceedings before a different adjudicator, i.e., the Criminal Court. In such capacity, the SAT was subject to other aspects of the FET standard (such as the prohibition on arbitrariness, as discussed above), but it was not in a position to afford or deny due process to the Distributors as if it was an adjudicator.

601. As to the allegations in respect of the non-exhaustion of administrative proceedings, the Tribunal has already concluded that it has not been established that Guatemalan law institutes any such requirement. As such, the factual predicate that would be required to sustain this claim has not been established, and thus the claim is dismissed by the Tribunal.

602. *Third*, the Claimant asserts that the SAT requested the Criminal Court to have the Distributors' bank accounts frozen, without any justification in doing so and without complying with basic requirements of procedural fairness.[1038] As also noted by the Tribunal in its analysis on arbitrariness, there is nothing *per se* improper in the pursuit of interim measures by a State agency following procedures existing in domestic law. The standard of due process and procedural fairness is not expansive enough to dictate the strategy of States litigating in local courts against foreign investors. In any event, as a matter of hypothesis, the sole submission of a request to a court, even if spurious, would generally have no significance or effect capable of raising to the

---

[1036] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 185.

[1037] *Glencore International A.G. & C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award (27 Aug. 2019), para. 1318 (**Authority RLA-82**).

[1038] Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 186.

level of a Treaty breach unless it was upheld by a local court, in which case it would fall under the paradigm of denial of justice as discussed above.

603. As a result, the Tribunal rejects the Claimant's claim that the Respondent denied due process and procedural fairness in breach of Article 2(2) of the Treaty.

       *(iv)    Lack of Transparency*

604. In its Statement of Reply and Response to Jurisdictional Objections, the Claimant describes its claim for lack of transparency as follows:

> Guatemala's failure to adhere to...the transparency requirement is twofold. Guatemala initiated the baseless Criminal Proceeding against the Distributors, departing from its previous position under Binding Tax Opinions and without explaining to the Distributors the reasons for disallowing the Deductions that were contemplated under the Binding Tax Opinions. When the SAT commenced the Criminal Proceeding, it misled the Distributors about the pursuit of a Freezing Order. Similarly, high-level SAT officials misled the Distributors to the effect that the SAT would not initiate a tax audit for 2013-2015. Hours later on the same day, the Distributors received a notification of the initiation of an audit for those fiscal years. Such conduct was below the transparency standard that the Treaty requires and, like in *Waste Management II*, represents a complete "lack of transparency and candour" from the Guatemalan authorities towards the Distributors.[1039]

605. The Claimant's assertions on lack of transparency are based on the standard formulated by the tribunal in *Tecmed v. United Mexican States*, pursuant to which:

> The foreign investor expects the host State to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor, so that it may know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the relevant policies and administrative practices or directives, to be able to plan its investment and comply with such regulations.[1040]

606. Citing *ECE Projectmanagement v. Czech Republic*, the Respondent contends that the standard of transparency in FET is limited to situations where "the law has been changed to the detriment of the investor following the making of its Investment."[1041]

---

[1039]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 195.

[1040]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 197, *citing Técnicas Medioambientales Tecmed S.A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award (29 May 2003), para. 154 (**Authority CL-25**).

[1041]   Respondent's Statement of Defence, para. 430, citing *ECE Projektmanagement International GmbH and Kommanditgesellschaft Panta Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-5, Award (19 Sept. 2013), para. 4.808 (**Authority RLA-70**).

607.   The Tribunal agrees with the Respondent.  The standard of transparency is not expansive enough to encompass a disagreement over the scope of a binding tax opinion or representations made within the context of negotiations occurring in parallel to criminal proceedings.

608.   Therefore, the Tribunal rejects the Claimant's claim that the Respondent failed to act transparently in breach of Article 2(2) of the Treaty.

### 3.   The Tribunal's Determination on FET

609.   For the reasons stated above, the Tribunal rejects the Claimant's claim that the Respondent failed to provide fair and equitable treatment in accordance with Article 2(2) of the Treaty.

## B.   ARTICLE 2 OF THE TREATY AND OBLIGATION NOT TO IMPAIR BY UNREASONABLE MEASURES

610.   Article 2(2) of the Treaty provides that:

> Neither Contracting Party shall in any way impair by unreasonable measures the management, maintenance, use, enjoyment or disposal of investments in its territory of investors of the other contracting party.[1042]

### (a)   *The Claimant's Position*

611.   The Claimant argues that the Government breached this standard by acting arbitrarily by denying the Claimant due process and through the SAT's use of criminal proceedings against the Claimant. Citing *National Grid Plc v. Argentine Republic*,[1043] the Claimant states that a "measure will be unreasonable if it is arbitrary."[1044]  The Claimant contends that the Government's conduct was unreasonable in that it caused the Claimant to suffer "a breach of due process and a lack of procedural fairness."[1045]  The Claimant further characterises as unreasonable the Government's "complete departure from the SAT's position in the Binding Tax Opinions."[1046]  The Claimant then states that the Government breached this article both through "unlawfully"[1047] commencing

---

[1042]   Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 2(2) **(Exhibit C-1)**.

[1043]   *National Grid Plc v. Argentine Republic*, UNCITRAL, Award (3 Nov. 2008) **(Authority CL-47)**.

[1044]   Claimant's Statement of Claim, para. 188.

[1045]   Claimant's Statement of Claim, para. 189.

[1046]   Claimant's Statement of Claim, para. 189.

[1047]   Claimant's Statement of Claim, para. 190.

criminal proceedings – which it characterises as an "unreasonable abuse of power"[1048] – as well as by the way in which it acted during these proceedings. Specifically, the Claimant contends that the SAT conducted itself "unreasonably" by "making promises or inducing them to adopt a position that would undermine their defense before the Criminal Court."[1049]

612. The Claimant submits that, contrary to the Respondent's argument, it is not necessary to show that these actions are discriminatory. Article 2(2) of the Treaty does not require this. Further, the Claimant contends that there is no issue in its arguments on impairment and on arbitrariness under the FET standard overlapping, as "there is an undisputed overlap . . . even if both protections are enshrined in separate treaty provisions."[1050] The Claimant affirms its previous argument that the measures were, indeed, arbitrary.[1051]

### (b) *The Respondent's Position*

613. The Respondent argues that the Claimant's arguments on unreasonable measures "are the same as those used to support their claims with respect to the alleged arbitrariness of the conduct of the State."[1052] The Respondent contends that to make an argument under Article 2(2) of the Treaty the Claimant needs to show "discriminatory conduct by the State."[1053] Beyond this, the Respondent submits they have sufficiently addressed this issue in their argument against any arbitrariness on the Respondent's part.[1054]

### (c) *The Tribunal's Analysis and Determination on Non-Impairment*

614. The Tribunal observes that the Claimant's non-impairment claim is based on the same factual predicates as its allegations of arbitrariness under the FET standard. It also overlaps with its claim for arbitrariness as a matter of law, and is premised on that claim succeeding in the first place. Indeed, the Claimant acknowledges as much in its submissions, noting that "a finding of a breach

---

[1048]   Claimant's Statement of Claim, para. 190.

[1049]   Claimant's Statement of Claim, para. 191.

[1050]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 202.

[1051]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 203.

[1052]   Respondent's Statement of Defence, para. 364.

[1053]   Respondent's Statement of Defence, para. 364.

[1054]   Respondent's Statement of Defence, para. 364.

of FET due to arbitrariness will also generally give rise to a breach of the non-impairment provision."[1055]

615. The Claimant has also failed to assert that the facts underlying the dispute could give rise to a breach of the non-impairment obligation even if they did not rise to the level of arbitrariness. In the circumstances, the Tribunal must dismiss the Claimant's non-impairment claim for the same reasons underlying its decision to dismiss the Claimant's claim for arbitrariness under the FET standard, as set out above.[1056]

616. Accordingly, the Tribunal rejects the Claimant's claim that the Respondent impaired by unreasonable measures the management, maintenance, use, enjoyment or disposal of the Claimant's investments in Guatemala in breach of Article 2(2) of the Treaty.

## C.   ARTICLE 3 AND THE MFN CLAUSE AND UMBRELLA CLAUSE PROTECTIONS

617. The Claimant alleges that the Respondent breached umbrella clause protections imported into the Treaty through the application of the Most Favoured Nation (MFN) clause in Article 3.

618. Article 3 provides that:

> 1.   Neither Contracting Party shall, in its territory, subject investments or returns of investments of investors of the other Contracting Party, to treatment less favourable than that which it accords to investments or returns of investments of an investor of any third state or, subject to its legislation, to treatment less favourable than that which it accords to investments or returns of investments of its own investors.
>
> 2.   Neither Contracting Party shall, in its territory, subject investors of the other Contracting Party, as regards their management, maintenance, use, enjoyment or disposal of their investments, to treatment less favourable than that which it accords to investors of any third state or, subject to its legislation, than that which it accords its own investors.[1057]

---

[1055]   Claimant's Statement of Claim, para. 188; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 202.

[1056]   *See* Section VI.A.2(d)(i) above.

[1057]   Agreement between the Government of the State of Israel and the Government of the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments, dated 7 November 2006, Article 3 (**Exhibit C-1**).

(a)    *Applicability of Umbrella Clause Protections*

*The Claimant's Position*

619.  The Claimant submits that MFN clauses "afford investors all substantive protection provided in other treaties." The Claimant recalls *Vladimir Berschader and Moïse Berschader v. The Russian Federation*,[1058] arguing that "[m]ost tribunals"[1059] have agreed the importation of substantive treaty obligations to be uncontroversial.[1060]   Relying on *EDF International S.A., SAUR International S.A. and Léon Participaciones Argentinas S.A. v. Argentine Republic*,[1061] the Claimant contends that in that case claimants were able to use the relevant MFN clause "to rely on the umbrella clauses in two other Argentine BITs,"[1062] and that the *EDF* tribunal found that to do otherwise would effectively be "read[ing] the MFN language out of the treaty."[1063]   The Claimant also references *Mr. Franck Charles Arif v. Republic of Moldova*[1064] and submits that Article 3 of the Treaty is "sufficiently ample to allow the invocation of umbrella clauses in other treaties."[1065]

620.  The Claimant seeks to rely on the umbrella clauses in the following Guatemalan investment treaties, submitting that each requires that "the State observe commitments entered into with qualifying investors or their investments, relate[d] to the maintenance and enjoyment of investments"[1066] and therefore falls within the scope of the Treaty's MFN clause:

---

[1058]   *Vladimir Berschader and Moïse Berschader v. The Russian Federation*, SCC Case No. 080/2004, Award (21 April 2006) (**Authority CL-37**).

[1059]   Claimant's Statement of Claim, para. 193.

[1060]   Claimant's Statement of Claim, para. 193; *citing Vladimir Berschader and Moïse Berschader v. The Russian Federation*, SCC Case No. 080/2004, Award (21 Apr. 2006), para. 179 (**Authority CL-37**).

[1061]   *EDF International S.A., SAUR International S.A. and Léon Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Award (11 June 2012) (**Authority CL-65**).

[1062]   Claimant's Statement of Claim, para. 193; see, for example, *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award (8 Apr. 2013), para. 396 (**Authority CL-69**).

[1063]   Claimant's Statement of Claim, para. 193, *quoting EDF International S.A., SAUR International S.A. and Léon Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Award (11 June 2012), para. 933 (**Authority CL-65**).

[1064]   *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award (8 Apr. 2013), para. 396 (**Authority CL-69**).

[1065]   Claimant's Statement of Claim, para. 196.

[1066]   Claimant's Statement of Claim, para. 198.

    a)    BLEU-Guatemala BIT, Article 9:

> Article 9.1: Investments made pursuant to a specific agreement concluded between one Contracting Party and investors of the other Party shall be covered by the provisions of this Agreement and by those of the specific agreement.[1067]
>
> Article 9.2: Each Contracting Party undertakes to ensure at all times that the commitments it has entered into vis-à-vis investors of the other Contracting Party shall be observed.[1068]

    b)    Argentina-Guatemala BIT, Article 8.2: Each Contracting Party shall observe any other obligations it may have entered into with regard to investments in its territory by nationals or companies of the Contracting Party.[1069]

    c)    Korea-Guatemala BIT, Article 10: Either Contracting Party shall observe any other obligation it may have entered into with regard to investments in its territory by investors of the other Contracting Party.[1070]

621.    The Claimant objects to the Respondent's position that – relying on *Hochtief AG v. Argentine Republic*[1071] – the MFN clause cannot import new standards not included in the Treaty.[1072] In contrast, the Claimant recalls *Asian Agricultural Products Ltd. (AAPL) v. Republic of Sri Lanka*[1073] in which the tribunal concluded the MFN clause "may be invoked to increase the host State's liability in case a higher standard of international protection becomes granted to investments pertaining to nationals of a Third State."[1074] The Claimant contends that the umbrella clauses in the treaties cited above involve "the same subject-matter as the Israel-Guatemala BIT"[1075] and so should be allowed.

---

[1067]   Agreement between the Belgo-Luxemburg Economic Union and the Government of the Republic of Guatemala on the Reciprocal Promotion and Protection of Investments (in force as of 1 Sept. 2007), 14 April 2005, Article 9 (**Exhibit C-36**).

[1068]   Agreement between the Belgo-Luxemburg Economic Union and the Government of the Republic of Guatemala on the Reciprocal Promotion and Protection of Investments (in force as of 1 Sept. 2007), 14 April 2005, Article 9 (**Exhibit C-36**).

[1069]   Agreement between the Republic of Argentina and the Republic of Guatemala for the Reciprocal Promotion and Protection of Investments (in force as of 7 Dec. 2002), 21 April 1998, Article. VIII.2 (**Exhibit C-25**) (Claimant's translation).

[1070]   Agreement between the Government of the Republic of Korea and the Government of the Republic of Guatemala for the Promotion and Protection of Investments (in force as of 17 Aug. 2002), 1 August 2002, Article 10(3) (**Exhibit C-32**).

[1071]   *Hochtief AG v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction (24 Oct. 2011), para. 81 (**Authority RLA-119**).

[1072]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 204.

[1073]   *Asian Agricultural Products Ltd. (AAPL) v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award (27 June 1990) (**Authority CL-8**).

[1074]   *Asian Agricultural Products Ltd. (AAPL) v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award (27 june 1990), para. 43 (**Authority CL-8**).

[1075]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 210.

*The Respondent's Position*

622. The Respondent submits that no umbrella clause applies.  The Respondent's view is that "umbrella clauses contained in the BITs with Third-Party Countries cannot be applied to the Israeli investors or their investments under the Treaty."[1076]  The Respondent relies on *Hochtief AG v. Argentine Republic*[1077] to argue that the MFN clause is "applicable to the exercise of rights and duties that are actually secured by the BIT in which the MFN is found."[1078]  The Respondent's view is that the MFN clause cannot be used to include any standards "not originally included in the treaty, as in the present case."[1079]  The Respondent characterises the Claimant's position as being that "new protections can be created that were not originally provided for in the Treaty."[1080]  The Respondent argues that only more beneficial clauses "of the same kind" as those already contained in the Treaty can be introduced from other bilateral investment treaties.[1081]

### (b) *Whether the Respondent Breached the Umbrella Clause Protections*

*The Claimant's Position*

623. The Claimant contends that the Respondent's commitments from the relevant umbrella clauses to observe "any other obligations"[1082] will also "apply to obligations entered into by Guatemala under its laws with regard to Claimant's investments."[1083]  The Claimant's position is that "arbitral tribunals and commentators interpreting similar treaty wording have affirmed that such broadly worded umbrella clauses apply in respect of obligations under the general legislation but also regulatory or administrative acts of a State."[1084]  The Claimant cites *SGS Société Générale de*

---

[1076] Respondent's Statement of Defence, para. 439.

[1077] *Hochtief AG v. The Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction (24 Oct. 2011), para. 81 (**Authority RLA-119**).

[1078] *Hochtief AG v. The Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction (24 Oct. 2011), para. 81 (**Authority RLA-119**).

[1079] Respondent's Statement of Defence, para. 439.

[1080] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 360 (emphasis omitted).

[1081] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 360 (emphasis omitted).

[1082] Claimant's Statement of Claim, para. 200.

[1083] Claimant's Statement of Claim, para. 200.

[1084] Claimant's Statement of Claim, para. 200; *see also* Maria Cristina Gritón Salinas, *Do Umbrella Clauses Apply to Unilateral Undertakings?* In Christina Binder, Ursula Kriebaum et al, International Investment Law for the 21ˢᵗ Century 490, 495 (1ˢᵗ ed. Oxford 2009) (**Authority CL-89**).

*Surveillance S.A. v. Republic of the Philippines* [1085] for the position that umbrella clauses provide assurance to investors "with regard to the performance of obligations assumed by the host State under its own law with regard to specific investments." [1086]

624.   The Claimant submits that the Respondent breached the applicable umbrella clauses, and therefore its obligations under Article 3 of the Treaty, when it "entered into and violated obligations relating to Claimant's investments" [1087] by "disregard[ing] the Binding Tax Opinions issued to the Distributors." [1088] The Claimant quotes Article 102 of Guatemala's Tax Code, noting that it explicitly provides that tax opinions issued under the article have "a binding effect for the Tax Administration" [1089] and therefore "subject the SAT to the obligation to observe or fulfil what is expressed in the opinion." [1090] The Claimant argues that the Binding Tax Opinions are founded on "the Guatemalan constitutional principle of legal security," [1091] which "guarantees that people have the right to know what to expect with regard to legal norms, their interpretation and application by jurisdictional bodies and other public entities, such as the SAT." [1092] The Claimant states that the "binding nature" [1093] of the opinions is intended to demonstrate the Government's "specific commitments to respect the opinion and not object or qualify its opinion in the future." [1094] The Claimant further contends that "the conduct of the Guatemalan state rendered the Binding Tax Opinions not only non-binding, but effectively worthless." [1095]

625.   The Claimant submits that the obligation was first breached when "the SAT filed a complaint against the Distributors alleging tax fraud because the Distributors had been taking the goodwill and interest deductions contemplated in the Binding Opinions." [1096]   The Claimant argues

---

[1085]   *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction (29 Jan. 2004) **(Authority CL-27)**.

[1086]   *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction (29 Jan. 2004), para. 126 **(Authority CL-27)**.

[1087]   Claimant's Statement of Claim, para. 201.

[1088]   Claimant's Statement of Claim, para. 201.

[1089]   Decree Law 6-91 of the Guatemalan Congress, Tax Code (1991), Article 102 **(Authority CL-9)**.

[1090]   Claimant's Statement of Claim, para. 202.

[1091]   Claimant's Statement of Claim, para. 201.

[1092]   Claimant's Statement of Claim, para. 201.

[1093]   Claimant's Statement of Claim, para. 201.

[1094]   Claimant's Statement of Claim, para. 201.

[1095]   Claimant's Statement of Claim, para. 205.

[1096]   Claimant's Statement of Claim, para. 204.

Guatemalan law requires that the Government "respect and maintain"[1097] these obligations, and is prevented by the Binding Tax Opinions from "formulating adjustments or modifications on the specific case consulted."[1098] Second, the Claimant contends that the Government breached its obligations through "forc[ing] payment of the amounts deducted in conformity with those Opinions, under the pressure of a series of injunctions."[1099] The Claimant's view is that the Respondent disobeyed its own laws by opting not to act in accordance with the Binding Tax Opinions, and hence that through application of the relevant umbrella clauses the Respondent is in breach of its obligation to the Claimant.

626. The Claimant disagrees with the Respondent's position that the Binding Tax Opinions would not meet the criteria for protection under the relevant umbrella clauses. The Claimant contends that the Binding Tax Opinions are not a "mere guide" but instead provide that the SAT "can no longer interpret the rule in any way contrary to the one contained in the decision."[1100] The Claimant endorses the view that the opinions are "precisely the type of commitment that the umbrella clauses in the referenced treaties seek to protect."[1101]

*The Respondent's Position*

627. The Respondent contends that even if the MFN clause allows the umbrella clauses to apply, the facts do not establish a breach on the Respondent's part. The Respondent recalls its argument that "it is not possible to derive a legitimate expectation from the Binding Tax Opinions"[1102] and submits that "much less may these [Opinions] constitute a specific commitment by the State in favour of the Distributors."[1103] The Respondent further argues that the Binding Tax Opinions are intended to "guide taxpayers with respect to a future situation"[1104] and not to "exempt the inquiring party from timely compliance of [sic] its respective tax obligations."[1105] The Respondent then submits that the Binding Tax Opinions are in fact not the type of commitment

---

[1097]   Claimant's Statement of Claim, para. 204.

[1098]   Claimant's Statement of Claim, para. 204.

[1099]   Claimant's Statement of Claim, para. 204.

[1100]   Supplemental Legal Report of Saúl Augusto Donado Rodríguez, dated 27 December 2019, para. 2.e; Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 211.

[1101]   Claimant's Statement of Reply and Response to Jurisdictional Objections, para. 211.

[1102]   Respondent's Statement of Defence, para. 441.

[1103]   Respondent's Statement of Defence, para. 441.

[1104]   Respondent's Statement of Defence, para. 441.

[1105]   Respondent's Statement of Defence, para. 441.

protected by the umbrella clauses: in part, they are only "an "opinion" on the interpretation of a tax regulation."[1106]

### (c) The Tribunal's Analysis and Determination on Article 3 and the MFN Clause and Umbrella Clause Protections

628. The Tribunal observes that the Claimant's allegations under this heading are based on the factual premise that the Binding Tax Opinions constituted a commitment on the part of the SAT not to initiate criminal proceedings against the Distributors in respect of the events underlying the 2011 Transaction. As set out above, the Tribunal has determined that this factual predicate has not been established.[1107] Accordingly, the Claimant's claim under this heading must fail.

629. In reaching this conclusion, the Tribunal observes that it does not need to decide the question of whether Article 3 of the Treaty allows the importation of umbrella clauses in other investment treaties signed by Guatemala, or whether those umbrella clauses may be relied upon by the Claimant. For reasons of procedural economy, the Tribunal declines to address these matters.

630. In conclusion, the Tribunal rejects the Claimant's claim that the Respondent breached Article 3 of the Treaty.

### D. THE TRIBUNAL'S CONCLUSION ON THE MERITS

631. For the reasons set out above, the Tribunal dismisses the entirety of the Claimant's claims.

## VII. COSTS

### A. THE PARTIES' COSTS

632. As agreed at the close of the hearing, the Parties provided the Tribunal with skeleton submissions quantifying their costs, but have not made submissions specifically on the allocation of such costs or on their reasonableness. Each Party has sought its full costs within the relief claimed.

---

[1106] Respondent's Rejoinder on the Merits and Reply to the Jurisdictional Objections, para. 362.
[1107] See Section VI.A.2(a) above.

### 1.    The Claimant's Costs

633.    The Claimant quantifies its costs as follows:

| CONCEPT | AMOUNT (US$) |
|---|---|
| **Expert** | |
| ▪ Legal and Tax Experts | $142,150 |
| ▪ Quantum and Acquisitions Experts | $1,069,748 |
| **Attorneys** | |
| ▪ Notice of Arbitration and Preliminary Procedural Phase | $1,674,716 |
| ▪ Written Phase and Document Request | $5,384,512 |
| ▪ Hearing and Post-Hearing Phase | $2,659,904 |
| **Costs** | |
| ▪ General | $405,776 |
| ▪ Arbitration and Arbitrator Costs | $390,000[1108] |
| **Total** | **$11,726,806** |

### 2.    The Respondent's Costs

634.    As at 29 September 2020, the Respondent quantified its costs as follows:

| Description | Costs (in U.S. dollars) |
|---|---|
| **Fees and Expenses of Attorneys and Experts** | |
| **Attorney Fees and Costs** | |
| Dechert (Paris) LLP | **$1,294,117.66** |
| Fees | $1,202,041.98 |
| Costs | $92,075.68 |
| **Expert Fees and Costs** | |
| Total Expert Fees | **$1,054,705.88** |
| Compass Lexecon | $864,705.88 |
| Ángel Menéndez | $140,000.00 |
| Edivn Montoya | $40,000.00 |
| **Total** | **$2,348,823.54** |
| **Description** | **Costs (in U.S. dollars)** |
| **Administrative Costs** | |
| Deposits requested by the PCA | |
| First request (12/20/2019) | $125,000.00 |
| Second request (04/17/2020) | $125,000.00 |
| Third request (09/28/2020) | $140,000.00 |
| **Total Administrative Costs** | **$390,000.00** |
| **Description** | **Costs (in U.S. dollars)** |
| **Total (attorney fees + payments to PCA + administrative costs)** | **$2,728,823.54** |

---

[1108]    As at 30 September 2020. For the final tribunal costs, see the quantification of Arbitration Costs below at Section VII.B.4 below.

**B.  THE TRIBUNAL'S ANALYSIS**

**1.  Relevant Legal Provisions**

635.  The Treaty contains no provisions on the allocation of the costs of arbitration arising out of a
difference or dispute between an investor and a contracting party.  The provisions regarding the
Tribunal's decision in the matter of costs are therefore to be found in Articles 40 to 42 of the
UNCITRAL Rules, as well as Sections 59 through 65 of the UK 1996 Arbitration Act.

636.  Article 40 of the UNCITRAL Rules defines the "costs of arbitration" as follows:

　　1.　　The arbitral tribunal shall fix the costs of arbitration in the final award and, if it deems
appropriate, in another decision.

　　2.　　The term "costs" includes only:

　　　　(a)　　The fees of the arbitral tribunal to be stated separately as to each arbitrator and
to be fixed by the tribunal itself in accordance with article 41;

　　　　(b)　　The reasonable travel and other expenses incurred by the arbitrators;

　　　　(c)　　The reasonable costs of expert advice and of other assistance required by the
arbitral tribunal;

　　　　(d)　　The reasonable travel and other expenses of witnesses to the extent such
expenses are approved by the arbitral tribunal;

　　　　(e)　　The legal and other costs incurred by the parties in relation to the arbitration to
the extent that the arbitral tribunal determines that the amount of such costs is
reasonable;

　　　　(f)　　Any fees and expenses of the appointing authority as well as the fees and
expenses of the Secretary-General of the PCA.

　　3.　　In relation to interpretation, correction or completion of any award under articles 37
to 39, the arbitral tribunal may charge the costs referred to in paragraphs 2 (b) to (f),
but no additional fees.

637.  The principle governing the allocation of the costs of arbitration, according to Article 42 of the
UNCITRAL Rules, is that:

　　1.　　The costs of the arbitration shall in principle be borne by the unsuccessful party or
parties. However, the arbitral tribunal may apportion each of such costs between the
parties if it determines that apportionment is reasonable, taking into account the
circumstances of the case.

　　2.　　The arbitral tribunal shall in the final award or, if it deems appropriate, in any other
award, determine any amount that a party may have to pay to another party as a result
of the decision on allocation of costs.

638.  Sections 59 through 65 of the UK 1996 Arbitration Act provide as follows:

**Section 59 - Costs of the arbitration.**

　　(1)　　References in this Part to the costs of the arbitration are to—

　　　　(a)　　the arbitrators' fees and expenses,

　　　　(b)　　the fees and expenses of any arbitral institution concerned, and

(c)    the legal or other costs of the parties.

(2)    Any such reference includes the costs of or incidental to any proceedings to determine the amount of the recoverable costs of the arbitration (see section 63).

**Section 60 - Agreement to pay costs in any event.**

An agreement which has the effect that a party is to pay the whole or part of the costs of the arbitration in any event is only valid if made after the dispute in question has arisen.

**Section 61 – Award of costs.**

(1)    The tribunal may make an award allocating the costs of the arbitration as between the parties, subject to any agreement of the parties.

(2)    Unless the parties otherwise agree, the tribunal shall award costs on the general principle that costs should follow the event except where it appears to the tribunal that in the circumstances this is not appropriate in relation to the whole or part of the costs.

**Section 62 –Effect of agreement or award about costs.**

Unless the parties otherwise agree, any obligation under an agreement between them as to how the costs of the arbitration are to be borne, or under an award allocating the costs of the arbitration, extends only to such costs as are recoverable.

**Section 63 –The recoverable costs of the arbitration.**

(1)    The parties are free to agree what costs of the arbitration are recoverable.

(2)    If or to the extent there is no such agreement, the following provisions apply.

(3)    The tribunal may determine by award the recoverable costs of the arbitration on such basis as it thinks fit.

If it does so, it shall specify—

(a)    the basis on which it has acted, and

(b)    the items of recoverable costs and the amount referable to each.

(4)    If the tribunal does not determine the recoverable costs of the arbitration, any party to the arbitral proceedings may apply to the court (upon notice to the other parties) which may—

(a)    determine the recoverable costs of the arbitration on such basis as it thinks fit, or

(b)    order that they shall be determined by such means and upon such terms as it may specify.

(5)    Unless the tribunal or the court determines otherwise—

(a)    the recoverable costs of the arbitration shall be determined on the basis that there shall be allowed a reasonable amount in respect of all costs reasonably incurred, and

(b)    any doubt as to whether costs were reasonably incurred or were reasonable in amount shall be resolved in favour of the paying party.

(6)    The above provisions have effect subject to section 64 (recoverable fees and expenses of arbitrators).

(7)     Nothing in this section affects any right of the arbitrators, any expert, legal adviser or assessor appointed by the tribunal, or any arbitral institution, to payment of their fees and expenses.

**Section 64 – Recoverable fees and expenses of the arbitrators.**

(1)     Unless otherwise agreed by the parties, the recoverable costs of the arbitration shall include in respect of the fees and expenses of the arbitrators only such reasonable fees and expenses as are appropriate in the circumstances.

(2)     If there is any question as to what reasonable fees and expenses are appropriate in the circumstances, and the matter is not already before the court on an application under section 63(4), the court may on the application of any party (upon notice to the other parties)—

    (a)     determine the matter, or

    (b)     order that it be determined by such means and upon such terms as the court may specify.

(3)     Subsection (1) has effect subject to any order of the court under section 24(4) or 25(3)(b) (order as to entitlement to fees or expenses in case of removal or resignation of arbitrator).

(4)     Nothing in this section affects any right of the arbitrator to payment of his fees and expenses.

**Section 65 – Power to limit recoverable costs.**

(1)     Unless otherwise agreed by the parties, the tribunal may direct that the recoverable costs of the arbitration, or of any part of the arbitral proceedings, shall be limited to a specified amount.

(2)     Any direction may be made or varied at any stage, but this must be done sufficiently in advance of the incurring of costs to which it relates, or the taking of any steps in the proceedings which may be affected by it, for the limit to be taken into account.

639.   Article 42 of the UNCITRAL Rules no longer makes any distinction in the allocation of the legal and other costs referred to in Article 40(2)(d)-(e) (hereinafter referred to as "**Legal Costs**") and the other costs of the arbitration referred in Article 40(2)(a)-(c) and (f) (the "**Arbitration Costs**"). Nevertheless, insofar as the Parties' Legal Costs are set out in their submissions on costs and the final Arbitration Costs are determined by the Tribunal and paid from the deposit established by the Parties, the Tribunal considers it convenient to quantify them separately. This is also consistent with the division in the UK 1996 Arbitration Act between Section 59(1)(a) and (b) (Arbitration Costs) and Section 59(1)(c) (Legal Costs). The Legal Costs and the Arbitration Costs are collectively hereafter referred to as the "**Costs of Arbitration**".

### 2.    Allocation of the Costs of Arbitration

640.   Article 42(1) of the UNCITRAL Rules prescribes the principle of "costs follow the event" in relation to the Costs of Arbitration generally.  The Rules anticipate that costs will be borne by the unsuccessful Party, but that "the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case." Section 61(2) of the 1996 UK Arbitration Act is, in substance, identical to Article 42(1) of the UNCITRAL Rules.

641.   The Tribunal notes that each Party has requested its full costs in the event that it prevails in these proceedings and that neither Party has requested, or provided justification for, another apportionment of costs.  For its part, the Tribunal considers that the circumstances of the case justify a departure from the general principle that the costs follow the event.  In particular, the Tribunal observes that the Respondent, while ultimately successful in defeating the Claimant's claims, raised six jurisdictional objections, which had to be litigated by the Parties and were ultimately dismissed by the Tribunal.  Bearing in mind this consideration, the Tribunal determines that it would not be appropriate for the Claimant to bear the entirety of the Respondent's Arbitration and Legal Costs.

642.   The Tribunal, therefore, determines that the Claimant should bear its own share of the Arbitration Costs and its own Legal Costs.  The Claimant should further bear two thirds of the Respondent's share of the Arbitration Costs incurred in these proceedings, as well as two thirds of the Respondent's Legal Costs.  The Respondent should bear the remainder of its share of the Arbitration Costs and the remainder of its Legal Costs that are not reimbursed by the Claimant.

### 3.    Reasonableness of Costs

643.   Pursuant to Article 40(2)(e) of the UNCITRAL Rules, the award of the Legal Costs is contingent upon the Tribunal first finding that such costs were reasonable.

644.   The Respondent seeks US$ 2,338,823.54 towards its legal fees and expenses.  The Tribunal has reviewed the amounts incurred by the Respondent and considers them to be reasonable in the circumstances.

### 4.   Quantification of Costs

#### (a)   *Arbitration Costs*

645. The Parties deposited with the PCA a total of US$ 780,000 (US$ 390,000 by the Claimant; US$ 390,000 by the Respondent) to cover the Arbitration Costs.

646. The fees and expenses in this arbitration of Professor Guido S. Tawil, the arbitrator appointed by the Claimant, amount respectively to US$ 180,247.50 and US$ 0.

647. The fees and expenses in this arbitration of Professor Raúl Emilio Vinuesa, the arbitrator appointed by the Respondent, amount respectively to US$ 131,812.50 and US$ 201.13.

648. The fees and expenses in this arbitration of Professor Albert Jan van den Berg, the Presiding Arbitrator, amount respectively to US$ 178,562.50 and US$ 242.87.

649. Pursuant to the agreement of the Parties, the International Bureau of the PCA was designated to act as Registry in this arbitration. The PCA's fees for registry services in this arbitration amount to US$ 125,231.06.

650. Other Tribunal costs in this arbitration, including bank charges, the translation of this Award and all other expenses relating to the arbitration proceedings, amount to US$ 115,183.20.

651. Based on the above figures, the Arbitration Costs, comprising the items covered in Articles 40(2) (a) to (c) of the UNCITRAL Rules, total US$ 731,480.76.

652. The Parties' respective portions of these Arbitration Costs, amounting to US$ 365,740.38 for each Party, shall be deducted from the deposit. The unexpended balance shall be returned to the Parties in equal shares.

653. Following the Tribunal's finding in paragraph 642 above, the Tribunal decides that the Claimant shall pay to the Respondent the amount of US$ 243,826.92 (corresponding to two thirds of the Respondent's portion of the tribunal fees and costs) as reimbursement for the Arbitration Costs.

#### (b)   *Legal Costs*

654. In view of the Tribunal's findings in paragraph 642 above, the Tribunal decides that the Claimant shall pay to the Respondent the amount of US$ 1,559,215.69 towards its Legal Costs in these proceedings.

## VIII. THE TRIBUNAL'S DECISION

655. For the reasons set out above, the Tribunal finds, declares and awards as follows:

    (a)   The Respondent's objections to the Tribunal's jurisdiction and the admissibility of the Claimant's claims are rejected;

    (b)   The Claimant's claim that the Respondent breached the Treaty is rejected;

    (c)   The Claimant shall bear its share of the Arbitration Costs and shall pay to the Respondent the amount of US$ 243,826.92 as reimbursement for the Arbitration Costs;

    (d)   The Claimant shall bear its own Legal Costs and shall pay to the Respondent the amount of US$ 1,559,215.69 towards its Legal Costs in these proceedings; and

    (e)   All other claims and requests are dismissed.

Done in London, United Kingdom, the place of arbitration on ___*7 October*_____ 2020.

_____

**Professor Guido Santiago Tawil**          **Professor Raúl Emilio Vinuesa**

**Professor Albert Jan van den Berg**
**Presiding Arbitrator**

Done in London, United Kingdom, the place of arbitration on ___*7 October*_____ 2020.

_____

**Professor Guido Santiago Tawil**
*(Subject to Dissent)*

_____

**Professor Raúl Emilio Vinuesa**

_____

**Professor Albert Jan van den Berg**
**Presiding Arbitrator**

PCA Case Nº 2019-43
Award
Page 195 of 195

Done in London, United Kingdom, the place of arbitration on _____*7 October*_____ 2020.

_____
**Professor Guido Santiago Tawil**

_____
**Professor Raúl Emilio Vinuesa**

_____
**Professor Albert Jan van den Berg**
**Presiding Arbitrator**

